**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) ) ) |  |
| **Plaintiff,** | ) ) | **Case No. 17-cv-1978 (CKK/GMH)** |
| **v.** | ) ) |  |
| **THE GEORGE WASHINGTON UNIVERSITY,** | ) ) ) |  |
| **Defendant.** | ) ) |  |

## MEMORANDUM OPINION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") filed this action on behalf of Sara Williams against The George Washington University ("Defendant" or "GW") pursuant to the Equal Pay Act, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  EEOC alleges that Ms. Williams, who was employed as Executive Assistant to GW's Director of Athletics, Patrick Nero, was treated less favorably—by being paid less for equal work and being denied employment opportunities and advancement—than a male comparator, Michael Aresco, who was hired as Special Assistant to Mr. Nero.  The dispute here concerns four requests for production of documents served by EEOC that Defendant claims are overbroad and unduly burdensome, arguing primarily that compliance with the requests as written would impose costs that are not proportional to the needs of the case.[1]  Because Defendant is largely correct, EEOC's requests for production shall be narrowed as discussed below.

---

[1] Many of the documents relevant to this dispute are filed under seal because they include confidential information. The undersigned reviewed the following documents in connection with this motion: (1) the Complaint (ECF No. 1);

## I.   BACKGROUND

Ms. Williams earned a salary of between $38,500 and $40,000 per year working as Executive Assistant to Mr. Nero from September 2014 through December 2016, at which point she was promoted to a different position in a different GW department. ECF No. 1, ¶ 17; ECF No. 47-4 at 2; Mar. 12 Tr. at 6.  According to the Complaint, in September 2015, Mr. Aresco, who was then employed as an Assistant Athletic Director at GW, began to perform the duties of what would become the position of Special Assistant to Mr. Nero.  ECF No. 1, ¶ 18.  The Special Assistant position was created in January 2016 and Mr. Aresco was officially hired for that position in February 2016, receiving a salary of approximately $77,500 per year until March 2017, when he left GW's Athletics Department.  *Id.*, ¶ 29; ECF No. 47-2 at 2–3; Mar. 12 Tr. at 5, 12.  EEOC alleges that, during her tenure at the Athletics Department, Ms. Williams, as Executive Assistant, performed substantially the same work as did Mr. Aresco when he began performing the duties of Special Assistant.  ECF No. 1, ¶¶ 24, 32.  Nevertheless, she claims that from February 2016 (when Mr. Aresco became Special Assistant) until December 2016 (when Ms. Williams left the Athletics Department), GW paid her approximately $40,000 less per year than it paid him.  *Id.*, ¶¶ 17, 29.  The agency also asserts that GW intentionally and "with malice or reckless indifference" denied Ms. Williams employment opportunities and advancement because of her sex.  *Id.*, ¶¶ 38, 41–42.  EEOC seeks a total of $480,000 in damages (plus prejudgment interest) on Ms. Williams behalf: specifically, pursuant to the Equal Pay Act, EEOC seeks back pay in the amount of approximately

---

(2) EEOC's letter brief to Judge Kollar-Kotelly dated Jan. 29, 2020 ("EEOC Letter Brief") (on file with the Chambers of the undersigned); (3) Defendant's letter brief to Judge Kollar-Kotelly dated Jan. 31, 2020, and exhibits ("GW Letter Brief") (ECF No. 47-5 at 2–28 (filed under seal)); (4) Defendant's "Notice of Cost Discovery Estimates" (ECF No. 43 (filed under seal)); (5) EEOC's response to Defendant's Notice of Cost Discovery Estimates (ECF No. 42 (filed under seal)); (6) Sealed transcript of March 12, 2020 proceedings before the undersigned ("Mar. 12 Tr.") (on file with the Chambers of the undersigned); (7) Defendant's supplemental brief (ECF No. 47 (filed under seal)); and (8) EEOC's corrected brief in response to GW's supplemental brief (ECF No. 50 (filed under seal)).

$90,000 and $90,000 in liquidated damages;[2] pursuant to Title VII, EEOC seeks the statutory maximum of $300,000 in compensatory and punitive damages.  ECF No. 47 at 9; ECF No. 47-3 at 4; Mar. 12 Tr. at 22–24.

During discovery, EEOC served GW with 25 requests for production ("RFPs").  ECF No. 47 at 10.  As noted, four of those are at issue here.  Three seek the work emails of the individuals involved—Mr. Aresco, Ms. Williams, and Mr. Nero—and one seeks information related to workplace complaints about Mr. Nero.  Specifically, RFP No. 10 seeks "all emails sent from or received by any email account maintained by Defendant for [Mr.] Aresco's use between September 1, 2015 [when he began performing the functions of the Special Assistant] and the end of [his] employment with Defendant" in March 2017.  ECF No. 47-5 at 8.  RFP No. 11 seeks "all emails sent from or received by any email account maintained by Defendant for [Ms. Williams'] use between September 15, 2014 [when she began her employment as Executive Assistant] and December 11, 2016," when she left the Athletics Department.  *Id.* at 9.  According to EEOC, those requests were designed to discover information "describing or demonstrating what [Mr. Aresco's and Ms. Williams'] job duties were."  *Id.* at 8–9.  RFP No. 24 seeks "[a]ny and all emails sent from or received by any email account maintained by Defendant for [Mr.] Nero's use during his employment with Defendant"—that is, from April 2011 until June 2018—in order, EEOC contends, (1) to help it assess "whether, or to what extent, [Mr. Nero] involved [Mr.] Aresco or [Ms.] Williams in accomplishing [his] priorities and goals, [thus] shedding light on whether the two performed substantially equal work"; and (2) to uncover evidence of Mr. Nero's "bias in favor of male employees, including his efforts to groom [Mr.] Aresco for advancement to [Ms.] Williams

---

[2] The $90,000 figure appears to be calculated by multiplying the approximately $40,000 difference between Ms. Williams' and Mr. Aresco's yearly salary by the approximately 2.25 years that Ms. Williams was employed as Executive Assistant in the Athletics Department: $40,000 x 2.25=$90,000.

detriment." ECF No. 47 at 10; EEOC Letter Brief at 2 & Exh. F; Mar. 12 Tr. at 7–8. RFP No. 20 seeks documents "relating to any report or complaint . . . that [Mr.] Nero subjected any employee or student to any discrimination, harassment, retaliation, abuse, mistreatment, or inappropriate conduct." ECF No. 47-5 at 10. GW objected to each of those RFPs to the extent that they sought privileged material, as well as on grounds of overbreadth, burden, proportionality, and relevance. ECF No. 47-5 at 6, 9–10; EEOC Letter Brief, Exh. F. In addition, GW objected to RFP No. 24 to the extent that it sought information protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which generally safeguards the privacy of student educational records. EEOC Letter Brief, Exh. F. With regard to RFP Nos. 10, 11, and 24, GW offered to meet and confer regarding providing a sampling of the emails of Mr. Aresco, Ms. Williams, and Mr. Nero in an effort to narrow the requests. ECF No. 47-5 at 9; EEOC Letter Brief, Exh. F.

    To that end, GW offered a number of compromises while conferring with EEOC, including (1) producing a random sampling of the emails of Mr. Aresco, Ms. Williams, and Mr. Nero; (2) producing emails from those three custodians that hit certain search terms; and (3) producing emails between each of those three custodians and certain senders or recipients to be identified by EEOC using reports, produced by GW, of all the individuals with whom the custodians had emailed during the time frames specified in the RFPs and the total number of emails associated with each sender and recipient. ECF No. 47 at 11–12. EEOC rejected each of those suggestions. *Id.* GW then offered to review and produce all non-privileged emails between Mr. Nero and Mr. Aresco and between Mr. Nero and Ms. Williams, as well as non-privileged emails between Mr. Nero and third-parties that mention Mr. Aresco or Ms. Williams. *Id.* at 12. Rejecting that approach as well, EEOC continues to press for all the emails and documents encompassed in its original requests, with one concession: it has agreed to limit Defendant's response to RFP No. 24 (seeking

4

all of Mr. Nero's emails) to all emails from the timeframe of September 1, 2014, when Ms. Williams began her employment in the Athletics Department, through March 31, 2017, when Mr. Aresco left the Athletics Department, "and to employ search terms to obtain responsive emails from the rest of the timeframe" in which Mr. Nero worked at GW—that is, from April 2011 until September 2014 and from April 2017 until June 2018.  ECF No. 50 at 15.

As to its response to RFP No. 20, which relates to complaints against Mr. Nero, GW argues that it should be required to produce, at most, "complaints of other gender-pay discrimination claims" against Mr. Nero, rather than all documents relating to "'any discrimination, harassment, retaliation, abuse, mistreatment, or inappropriate conduct' on the basis of any characteristic, and without any temporal limitation."  ECF No. 47 at 27–29 (quoting RFP No. 20).  EEOC, for its part, rejects any such narrowing of RFP No. 20 and maintains its demand for any reports or complaints that Mr. Nero "subjected any employee or student to any discrimination or other inappropriate conduct."  ECF No. 50 at 42.

The parties originally brought their dispute to the attention of Judge Kollar-Kotelly, filing letter briefs with her chambers in January 2020.  GW asserted that the requests for the emails of Mr. Aresco, Ms. Williams, and Mr. Nero were overbroad insofar as those accounts would include significant amounts of irrelevant information and also because review and production of those emails would be expensive and disproportionate to the needs of the case.  GW Letter Brief at 1–2. Judge Kollar-Kotelly held a conference on February 19, 2020, and thereafter ordered GW to (1) provide a cost estimate for the search and production of documents which it found reasonable in response to RFP Nos. 10–11; (2) provide a cost estimate for the search and production of all of the documents that the EEOC requests in RFP Nos. 10–11; (3) produce the documents it had agreed to produce in response to RFP No. 24; and (4) provide a cost estimate for the additional search and

production of all of remaining emails from Mr. Nero's email account.  Minute Order dated Feb. 19, 2020.

In declarations filed, as directed, with the Court in March 2020, GW estimated that reviewing all the emails EEOC has requested in connection with RFP No. 10—between 45,000 and 50,000 emails—and RFP No. 11—between 21,000 and 25,000 emails—would cost between $181,000 and $225,100.  ECF No. 43 at 3–4.  Responding to RFP No. 24 as written would require reviewing between 158,000 and 181,000 emails and cost between $432,900 and $529,700.  *Id.* at 7.  The totals reflected "*additional* costs of approximately $580,200–$707,500 over and above the $45,450–$59,350 in costs that already [had] been incurred and/or [would] be incurred by . . . [GW] in responding to [those] RFPs in accordance with . . . its proposals" and with Judge Kollar-Kotelly's Order.  *Id.* at 9.  Those estimates were based on costs associated with a first-level review of documents by contract attorneys at an e-discovery vendor to find and redact information protected by the attorney-client privilege, the work product doctrine, and FERPA, and to code the documents for relevance; and a second-level review by attorneys at Gibson, Dunn & Crutcher ("Gibson Dunn") (counsel of record for GW in this matter) of all documents marked relevant by the contract attorneys, all documents with redacted information, and an additional random sample of 10 percent of the documents reviewed at the first level for quality control.  *Id.* at 7–8.  EEOC objected to those estimates as overblown, arguing that "[a]n attorney-performed document-by-document review of all documents to identify privileged or other protected information, followed by a second attorney review of all the identified protected materials" was "eminently unreasonable."  ECF No. 42-1 at 3.  Instead, EEOC proposed that the e-discovery vendor should "perform filtering and targeted searches to identify" potentially privileged or protected materials and then those documents should be reviewed once by either the e-discovery vendor or by Gibson

Dunn attorneys to "confirm that they contain protected material," rather than engaging in document-by-document review of all documents before production to EEOC.  *Id.* at 3–4, 5–8. EEOC further found the hourly rate used by Gibson Dunn in its estimates to be unreasonably high and suggested using the so-called *Laffey* rate instead.  *Id.* at 4–5.

After Judge Kollar-Kotelly referred this dispute to the undersigned,  a hearing was held on March 12, 2020, to address the disputes raised in the parties' submissions.  At the end of that hearing, the undersigned ordered supplemental briefing to address, among other things, the hourly rate that GW actually pays for Gibson Dunn attorneys to perform work on its behalf and a cost estimate for GW to review and produce Mr. Nero's emails only for the period between September 1, 2014, and March 31, 2017, in response to RFP No. 24.  Mar. 12 Tr. at 121–22.  The undersigned also sought briefing on certain legal issues, including whether it is appropriate for a court to dictate to a party the manner in which it should conduct its review for privileged material and, even if it is not, whether for the purposes of its proportionality review, the Court should consider not the higher cost of pre-production document-by-document review, but rather the lower cost that would be incurred by the use of targeted searches and filtering to identify protected material in conjunction with a protective order allowing a party to claw back any privileged material produced to the other party.[3]  *Id.* at 123.  Following the hearing, GW filed a declaration from a Gibson Dunn attorney attesting that in this matter GW has actually paid 100 percent of the legal expenses that Gibson Dunn charged through December 2019.  ECF No. 47-7 at 3.  Because that work was charged at rates slightly higher than those used for the prior cost estimates, those estimates have

---

[3] The undersigned also encouraged the parties to continue to confer in an effort to resolve their differences prior to the Court issuing a written opinion.  *Id.* at 126.  That last suggestion was, alas, in vain.  To be sure, after the hearing, GW offered to meet and confer with EEOC to discuss a compromise as to RFP Nos. 10, 11, and 24, while noting that if EEOC continued to maintain "that there is no compromise that it would be willing to accept short of all emails belonging to [Mr.] Aresco, [Ms.] Williams, and [Mr.] Nero from the requested timeframes," such a conference would not be productive.  ECF No. 47-6 at 2.  EEOC did not respond.  ECF No. 47 at 15.

been adjusted upward. *Id.* at 2–3. Moreover, Gibson Dunn solicited estimates from two different e-discovery vendors and thus provided the Court with costs based on the differing appraisals it received from them. Mar. 12 Tr. at 40–41. For RFP No. 10, seeking Mr. Aresco's emails from September 15, 2015, until March 31, 2017, the total estimated cost of review of those approximately 50,000 emails at the rates charged is now $130,600 (based on the estimate provided by the cheaper vendor) to $153,600 (based on the estimate provided by the more expensive vendor); for RFP No. 11, seeking Ms. Williams' approximately 25,000 emails for the same period, the total estimate is now $60,900 to $83,500. ECF No. 47-7 at 4. That is, responding to those two RFPs as written would incur legal fees anywhere from $191,500 to $237,100. GW estimates that reviewing the approximately 180,000 emails in Mr. Nero's account called for by RFP 24 (as written) would cost anywhere from $458,100 to $558,600. *Id.* at 5. However, EEOC has backed off its demand for all of Mr. Nero's emails for the entire seven-year period he was employed by GW. If the applicable time period were limited to the two-and-a-half year period between September 1, 2014, and March 31, 2017, which EEOC has now proposed, GW estimates that the cost would be somewhere between $243,700 and $296,300 to review between 84,000 and 96,000 emails.[4] *Id.* at 6. In total, that amounts to between $435,200 and $533,400 for production of documents responsive to these three RFPs using the shortened time period for RFP No. 24. The average of those two estimates (which, for the sake of simplicity, the Court will use as the total cost of compliance with the RFPs as written) is $484,200. *Id.* at 3, 6. In contrast, GW's proposed compromise, by which it would review and produce all non-privileged emails between Mr. Nero and Mr. Aresco and between Mr. Nero and Ms. Williams (together, approximately 12,000 emails),

---

[4] There is no estimate for the cost of responding to RFP No. 24 in accordance with EEOC's concession, by which it seeks all responsive emails for the period of September 1, 2014, to March 31, 2017, and, additionally, a sampling of documents for the periods from April 2011 until September 2014 and from April 2017 until June 2018. Obviously, however, that cost estimate would exceed the range of $243,700 and $296,300.

as well as all non-privileged emails between Mr. Nero and third-parties that mention Mr. Aresco or Ms. Williams (approximately 5,000 emails), would cost between $47,000 and $61,100 (or an average of $54,000), using the same review procedures described above.[5]  ECF No. 47 at 12; ECF No. 47-4 at 4–5.

## II.    LEGAL STANDARD

Rule 26(b)(1) of the Federal Rules of Civil Procedure allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL–CIO–CLC*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) ("Generally speaking, 'relevance' for discovery purposes is broadly construed.").

However, "the relevance standard of Rule 26 is not without bite," and will not allow parties to "explore matter which does not presently appear germane on the theory that it might conceivably become so."  *Food Lion*, 103 F.3d at 1012 (quoting *In re Fontaine*, 402 F. Supp. 1219, 1221 (E.D.N.Y. 1975)).  Moreover, the rule was amended in 2015 to emphasize the need for proportionality in discovery and to "encourage judges to be more aggressive in identifying and discouraging discovery overuse."  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment.  Thus, under Rule 26, "discovery must be relevant *and* 'proportional to the needs of the case.'"  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 6 (D.D.C. 2017) (quoting Fed. R. Civ. P. 26(b)(1)).  Indeed, "all discovery is subject to the balancing test . . . that

---

[5] As noted, Judge Kollar-Kotelly ordered GW to produce those emails prior to her referral of the remaining disputes—such as whether GW should be ordered to produce some or all of the remaining emails—to the undersigned.

requires a court to limit the discovery 'otherwise allowed by these rules' if the burden outweighs its likely benefit." *Intervet, Inc. v. Merial Ltd.*, 252 F.R.D. 47, 49 (D.D.C. 2008) (quoting Fed. R. Civ. P. 26(b)(2)(C)).  To determine whether the likely benefit outweighs the burden or expense of the requested discovery, courts consider a number of factors: the importance of the issues at stake in the action; the amount in controversy; the parties' relative access to relevant information; the parties' resources; the importance of the discovery in resolving the issues; and the actual burden or expense of the requested discovery.  *See Oxbow Carbon*, 322 F.R.D. at 6.   "'[N]o single factor is designed to outweigh the other factors in determining whether the discovery sought is proportional,'  and  all proportionality determinations  must  be  made  on  a  case-by-case basis."  *Oxbow Carbon*, 322 F.R.D. at 6 (alteration in original) (quoting *Williams v. BASF Catalysts, LLC*, No. 11-cv-1754, 2017 WL 3317295, at *4 (D.N.J. Aug. 3, 2017))).

While the initial responsibility of establishing relevance lies with the party seeking the information, "the burden is on the refusing party to show that the movant's request is burdensome, overly broad, vague or outside the scope of discovery."  *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 33 (D.D.C. 2012): *see also Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15 Civ. 0293, 2016 WL 3906712, at *3 (S.D.N.Y. July 14, 2016) ("In general, when disputes are brought before the court, the parties' responsibilities remain the same as they were under the previous iteration of the rules, so that the party resisting discovery has the burden of showing undue burden or expense.").

## III.    DISCUSSION

### A.    RFP Nos. 10, 11, and 24[6]

As noted, the dispute over these RFPs focuses on whether the requested production is proportional to the needs of the case, balancing the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery, and the expense of the proposed discovery to determine whether the burden or expense outweighs the benefit of the discovery.  Some of these factors are more hotly contested than others; indeed, the parties appear to agree as to two of them.  For that reason, the Court takes the six factors out of order and addresses the less complex ones first.

#### 1.    The Importance of the Issues at Stake

This first factor "calls for the Court to 'examine[ ] the significance of the substantive issues [at stake in the litigation], as measured in philosophic, social, or institutional terms.'"  *Oxbow Carbon*, 322 F.R.D. at 7 (some internal quotation marks omitted) (alterations in original) (quoting *Arrow Enter. Computing Sols., Inc. v. BlueAlly, LLC*, No. 5:15-CV-37, 2017 WL 876266, at *4 (E.D.N.C. Mar. 3, 2017)).  The advisory committee's notes to Rule 26 recognize that "many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved."  Fed. R. Civ. P. 26, advisory committee's note to 2015 amendments (quoting Fed. R. Civ. P. 26, advisory committee's note to 1983

---

[6] The Court deals with these three RFPs together for a number of reasons.  First, they each request production of emails and will be subject to the same procedures for review and production.  Second, GW's proposal links the three RFPs insofar as its suggestion to produce emails in response to RFP Nos. 10 and 11—between Mr. Aresco or Ms. Williams, on the one hand, and Mr. Nero, on the other—allows it to limit review and production in response to RFP No. 24 to emails between Mr. Nero and third-parties mentioning Mr. Aresco or Ms. Williams because emails between either of those two individuals and Mr. Nero will already have been captured in its response to RFP Nos. 10 and 11.  Third, the three RFPs complement each other, at least insofar as they are designed to discover evidence of the actual job duties of Mr. Aresco and Ms. Williams.

amendments).  Here, GW acknowledges that there are important issues at stake in this case under the Equal Pay Act and Title VII.  Mar. 12 Tr. at 21.

### 2.    The Parties' Resources

This factor generally focuses on the ability of the responding party to bear the burden or expense of producing the requested discovery.  *See, e.g.*, *Oxbow Carbon*, 322 F.R.D. at 8. Nonetheless, "consideration of the parties' resources does not foreclose discovery requests addressed to an impecunious party, nor justify unlimited discovery requests addressed to a wealthy party."  Fed. R. Civ. P. 26, advisory committee's note to 2015 amendments.  Here, however, GW has not resisted responding to these discovery requests based on an inability to pay.  Mar. 12 Tr. at 33; *see also Oxbow Carbon*, 322 F.R.D. at 8 (finding that this factor weighed in favor of granting the discovery request where the responding party did not object based on an inability to pay).

### 3.    Access to Relevant Material

"In considering this factor, courts look for 'information asymmetry'—a circumstance in which one party has very little discoverable information while the other party has vast amounts of discoverable information."  *Oxbow Carbon*, 322 F.R.D. at 8.  In such a case, the burden will usually, and properly, "lie[ ] heavier on the party who has more information."  *Id.* (quoting Fed. R. Civ. P. 26, advisory committee's note to 2015 amendments).

EEOC argues that it "has virtually no access to the relevant information contained in the emails at issue" and that "without production of the entire accounts (for the requested timeframes), Defendant will be able to keep EEOC at a severe disadvantage in its ability to compare [Ms.] Williams' and [Mr.] Aresco's work communications."  ECF No. 50 at 20.  EEOC exaggerates.  It has access to Ms. Williams, who clearly has significant relevant knowledge, having worked for Mr. Nero both before and during the period that Mr. Aresco began performing the duties of Special

Assistant.   Moreover, EEOC previously had access to Ms. Williams' email account and Ms. Williams provided relevant materials from that account to it both during and subsequent to the EEOC investigation.   Mar. 12 Tr. at 114–15; *see also* Minute Order dated Mar. 13, 2020.   EEOC plans depose Mr. Aresco and Mr. Nero.   Mar. 12 Tr. at 36.   Perhaps most importantly, GW has agreed to produce documents from these email accounts.   It has offered and, indeed, has been ordered, to produce such emails.   *See* Minute Order dated Feb. 19, 2020 (ordering Defendant to "produce all documents sent from or received by any email account maintained by Defendant for Patrick Nero which were sent from or received by Sara Williams or Michael Aresco or were sent from or received by a third-party mentioning Sara Williams or Michael Aresco.").   Thus, while there may be some information asymmetry here, this factor does not weigh heavily in favor of either party's position.

4.   The Amount in Controversy

This factor is rarely interpreted in depth.   Many courts (including this one) appear to base the amount in controversy on some estimate of the defendant's worst-case scenario—that is, on the defendant's exposure if everything were to be decided against it.   *See, e.g.*, *Oxbow Carbon*, 322 F.R.D. at 7–8 (calculating the amount in controversy as the amount that the plaintiff sought to recover in allegedly illegal fuel surcharges, trebled pursuant to statute); *see also Schultz v. Sentinel Ins. Co.*, No. 4:15-cv-4160, 2016 WL 3149686, at *7 (D.S.D. June 3, 2016) (rejecting the defendant's estimation of the value of the case as the amount in compensatory damages the plaintiff could recover if she prevailed because the plaintiff also sought punitive damages based on a claim that the insurer had a "company-wide policy of knowingly denying valid claims," which "had the potential to affect [the insurer's] alleged business practices and to remedy the situation for many insureds").   At least one court has indicated that the amount in controversy for the

purposes of the proportionality analysis should take into account both the worst-case scenario for the plaintiff (a recovery of zero) and the worst-case scenario for the defendant in order to identify "a foreseeable range of damages." *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 364 (D. Md. 2008).

Here, perhaps unsurprisingly, Defendant focusses on the figure of $90,000—the amount of back pay Plaintiff seeks—in making its comparison (although it does not, of course, concede that Plaintiff is entitled to such a sum). ECF No. 47 at 9 n.2, 13, 18. It argues that "EEOC's $480,000 estimate of [Ms.] Williams' alleged damages is artificially inflated" because (1) liquidated damages (which would double the amount of back pay due) are discretionary and not appropriate here, where GW allegedly acted in good faith, and (2) Plaintiff's claim for the $300,000 statutory maximum under Title VII is either duplicative of her claim for back pay or would have to be premised on "alleged emotional distress, which has not been adequately pled." *Id.* at 9 n.3. EEOC counters that GW's arguments as to the merits of Plaintiff's claims are inappropriate because "[t]he amount in controversy is not based on what a party actually obtains after trial of the issues, but what a party could obtain." ECF No. 50 at 22.

On this record, where the parties have not seriously briefed the issue, EEOC has the better argument. As noted, this Court has in prior cases measured the amount in controversy for the purposes of proportionality review by taking in to account the upper range of the defendant's potential exposure. Moreover, in other situations—for example, in determining whether the amount-in-controversy requirement for diversity jurisdiction has been satisfied—"the sum claimed by the plaintiff controls if the claim is apparently made in good faith," as long as it does not "appear[ ] certain that the claim asserted in the complaint will be for less than the jurisdictional amount." *Modis, Inc. v. Infotran Sys., Inc.*, 674 F. Supp. 2d 160, 162 (D.D.C. 2005) (quoting *St.*

*Paul Mercury Indem, Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)).  While there may be some situations in which using a foreseeable range of damages may be useful—especially if the parties have conferred and agreed on such a range, *see Mancia*, 253 F.R.D. at 364 (noting that the court required the parties to confer to come up with a range of damages to be used "to quantify a workable 'discovery budget' that is proportional to what is at issue in the case"), here, the possible range would cover amounts from $90,000 (or, perhaps, $0) to $480,000, which seems too wide a domain to be helpful.  The undersigned will therefore use $480,000 as the amount in controversy.

5.    The Importance of the Discovery in Resolving the Issues

This factor asks "whether '[t]he issues at stake are at the very heart of [the] litigation.'" *Oxbow Carbon*, 322 F.R.D. at 8.  In analyzing that question, a court should consider whether the discovery request as written appears designed to capture relevant and unique information.  *See id.* (considering whether the target's "records contain relevant and unique documents" and the proportion of such records in his possession).

EEOC seeks emails from Mr. Aresco (in RFP No. 10) and Ms. Williams (in RFP No. 11) in order to help elucidate each individual's actual job duties to determine whether the two did, in fact, perform substantially the same work. ECF No. 50 at 19.  It seeks Mr. Nero's emails in RFP No. 24 for the same reason, as well as in order to show that he treated Mr. Aresco more favorably than he did Ms. Williams in the terms of conditions of employment and access to advancement opportunities.  *Id.* at 19–20.  There is no doubt that the email accounts at issue here will contain relevant information, including details about day-to-day job duties of the relevant individuals.  However, EEOC has argued that each and every email in these accounts is relevant to a claim or defense in this case.  ECF No. 50 at 20; EEOC Letter Brief at 1.  The argument is not well-taken, and similar arguments have been rejected.  *See, e.g.*, *Krause v. Nev. Mut. Ins. Co.*, No. 2:12-cv-

0342, 2014 WL 496936, at *6 (D. Nev. Feb 6, 2014) ("The email account will, unquestionably, contain untold numbers of entirely irrelevant documents and information. . . .  It is [ ] absurd to believe that Plaintiff should be given unfettered access to every piece of information within or attached to her email account."); *see also Elsayed v. Family Fare LLC*, No. 1:18CV1045, 2019 WL 8586708, at *3 (M.D.N.C. Oct. 31, 2019) (in a discrimination case, stating that a request for the defendant to produce all emails for a three-year period that referred to the plaintiff without regard to the substance of the communications was overbroad and "constitute[d] a 'blatant fishing expedition[ ] essentially seeking all [communications] relating to Plaintiff rather than only those having any apparent or possible nexus to the issues in this case'" (alterations in original) (quoting *Ge v. Dun & Bradstreet, Inc.*, No. 6:15CV1029, 2017 WL 10059004, at *4 (M.D. Fla. Jan. 4, 2017))); *Borup v. CJS Sols. Grp., LLC*, No. 18-cv-1647, 2019 WL 582112, at *4 (D. Minn. Feb. 13, 2019) (in an FLSA misclassification case, finding overbroad a request for production seeking "all emails and other communications" by employees of the defendant to independent contractors working for the defendant, noting that while "many such communications may be relevant to show . . . similarity of job duties, many others may not"); *Konecny v. BNSF R. Co.*, No. 13-cv-2369, 2014 WL 2804034, at *3 (D. Kan. June 20, 2014) (rejecting document request for all emails among three individuals who allegedly were involved in employment discrimination against the plaintiff and therefore limiting request so it would more likely uncover relevant documents); *Osman-Dean v. Ill. State Police*, No. 11 C 1935, 2011 WL 6338834, at *1 (N.D. Ill. Dec. 19, 2011) (labeling a request in a gender discrimination case "obviously overbroad" that asked defendant to produce "all emails for the past seven years . . . sent or received by eight individuals" that included any of a list of 17 words or word roots).  Indeed, EEOC has apparently "agreed that, interpreted literally, the text of RFPs 10 and 11 would produce a lot of 'junk' that would be irrelevant to this

16

case."[7]  ECF No. 47-5 at 16 (GW summarizing the parties' positions during a meet and confer in October 2019); *see also id.* at 23.  The same is certainly true of the broader request in RFP No. 24. Nor is such discovery necessary.  EEOC does not need to discover every email in the three email accounts at issue in order to discern Ms. Williams' and Mr. Aresco's job duties—an endeavor which, in this case, would seem more efficiently accomplished by deposition or the review of other job-related documents.  *Cf. Ruggles v. WellPoint, Inc.*, 2010 WL 11570681, at *9 (N.D.N.Y. Dec. 28, 2010) ("A party does not need to discover every communication, note, or document relevant as to each class member to discern their job duties . . . .").

EEOC has thus weakened its position on this factor by insisting on such obviously overbroad discovery because, as written, the RFPs are not designed to capture relevant, unique information; rather, they are designed to capture great swaths of information without regard to whether that information is likely relevant and unique.  That is, although EEOC's asserted reasons for seeking emails from Mr. Aresco, Ms. Williams, and Mr. Nero are undoubtedly germane to this case, its manner of doing so—through promulgation of overbroad requests for electronically-stored information ("ESI")—dilutes the importance of the discovery that would be gained from these RFPs (if enforced as written).  Especially in light of the fact that GW has never asserted that it would refuse to produce emails from these three custodians—a position that would not, of course, survive scrutiny—this factor does not weigh in EEOC's favor.

### 6. The Burden or Expense of the Proposed Discovery

The bulk of the argument in this dispute has concerned this factor.  To assist in its assessment, the Court has required Defendant to establish the actual expense of complying with

---

[7] Judge Kollar-Kotelly was also apparently concerned about the prevalence of irrelevant emails in these two accounts, suggesting at the February 19, 2020 hearing that it would be unduly burdensome to require GW to "review everything that they might have sent, including lunch plans, or anything else."  ECF No. 38 at 6.

the discovery requests, including representations as to the amounts charged by e-discovery vendors to review the number of emails at issue her; the rate charged by Gibson Dunn counsel to GW for work on this case (including on document/privilege review); and the realization rate on the charges incurred in this case—that is, the percentage of charges billed that *GW* has paid.  The goal of this exercise has been to determine how much GW would *actually pay* to respond to the RFPs at issue.

EEOC contends that GW's "estimates are unreasonable, unreliable, and extremely inflated," asserting that "it is undisputed that Defendant already has run some targeted searched to come up with the 4,000 pages of emails it intends to rely on," but has not informed that Court "how many of all the emails at issue Defendant has already reviewed."  ECF No. 50 at 22–23.  It asks that "[b]efore any order finding undue burden is entered . . . Defendant should be ordered to produce the report of search terms [it] used and how many items came back that [it] reviewed."  *Id.* at 23.  EEOC has not previously argued that GW's estimates are inaccurate because certain emails from these accounts have already been reviewed.  No such suggestion appears in its response to Defendant's original cost estimate or in the transcript of the March 12, 2020 hearing before the undersigned.[8]  *See generally* ECF No. 42-1; Mar. 12 Tr.  As the Court noted at the hearing, this discovery dispute has been simmering for months; it is time for it to come to an end.  Mar. 12 Tr. at 86–87.  The parties and the Court have spent enough—perhaps too much—time on it.  At the Court's direction, GW has twice submitted estimates of the cost of responding to EEOC's discovery requests—exercises that have themselves imposed costs on GW.  The Court will not require GW to submit a third round of estimates.  EEOC's late-breaking proposal would merely

---

[8] There was discussion at that hearing of GW producing to EEOC the search terms that GW had used to identify relevant documents it intends to rely upon.  Tr. at 99–100.  GW was understandably leery of pursuing that compromise, especially as EEOC continued to maintain that the use of search terms to identify relevant emails would be inappropriate.  *Id.* at 100–01.  In any case, EEOC did not contend that GW's use of those search terms to identify and review emails at issue in these RFPs rendered their then-current cost estimate inaccurate.

cause further expense and delay; it is rejected.  In sum, the Court finds that GW has established that the estimates Gibson Dunn has provided—which total between $435,200 and $533,400—are accurate reflections of the costs Defendant would incur and pay in order to review and produce documents in response to the RFPs at issue (taking into account EEOC's narrowing of RFP No. 24).

Nevertheless, EEOC challenges the necessity and cost of the procedures GW proposes to ensure that attorney-client privileged or other protected material is filtered out of the production. ECF No. 50 at 18.  Again, GW's cost estimates are based on document-by-document review by attorneys to ensure that such protected material is not produced.  EEOC believes those cost estimates are unreasonable because cheaper procedures could be used to review and filter protected material from the contents of the email accounts.  *Id.* at 22–23.  EEOC proposes a less rigorous procedure by which Gibson Dunn or its e-discovery vendor would "use filtering and targeted searches" (for example, searches for attorneys' names and the names of law firms (ECF No. 42-1 at 3)) to segregate protected material; attorneys would then review those documents to confirm that they contain protected information, redact such information, and create a privilege log.  *Id.* at 18.  Importantly, the remaining emails (which did not "hit" on any of the search terms) would be produced to EEOC without further document-by-document review by GW to ensure they do not contain protected material.  *Id.*  In the event that this less rigorous procedure were to result in the production of protected material, EEOC would permit GW to use "the clawback provisions of Rule 502 [of the Federal Rules of Evidence]" to reclaim it.  *Id.*  EEOC estimates that using such a process would cost "around $31,000." *Id.* at 24.  GW asserts that EEOC's proposed method would likely result both in privileged material being produced—GW has determined that the email accounts at issue include potentially privileged material, for example, communications between

the Athletic Director's office and GW's General Counsel's office (Mar. 12 Tr. at 63–64)—and in non-privileged material being withheld.  ECF No. 47 at 19.  EEOC replies that, in light of Rule 502 and the protective order entered in this case, GW's concerns that anything short of document-by-document review presents an unacceptable risk that protected information will be disclosed are overblown.  ECF No. 50 at 18–19.

Some background will be helpful here.  Prior to the enactment of Rule 502(b), the D.C. Circuit had held that disclosure of privileged material, even if inadvertent, resulted in a waiver of privilege not only as to the specific document disclosed, but also "to all other communications relating to the same subject matter."  *In re Sealed Case*, 877 F.2d 976, 980–81 (D.C. Cir. 1989) (quoting *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982)).  "Rule 502(b), enacted on September 19, 2008, [overrode that] long-standing strict construction of waiver" and "protects from waiver a privileged document that has been disclosed inadvertently" (and in doing so, safeguards against subject-matter waiver) as long as "the holder of the privilege or protection took reasonable steps to prevent disclosure" and "the holder promptly took reasonable steps to rectify the error."  *Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 52 (D.D.C. 2009) (citing Fed. R. Evid. 502(b)).  The change was apparently motivated by "the increased prominence of electronic discovery that may involve the production of thousands of pieces of electronically stored information," which "led fortunes to be spent analyzing every piece lest the inadvertent production of one be deemed a waiver . . . as to all others that relate to the same subject matter."  *Id.* at 52 n.1. Moreover, Rule 502(d) now allows a court to enter an order "that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other federal or state proceeding."  Fed. R. Evid. 502(d). That is, Rule 502(d) can be read to protect a party from subject-matter waiver without regard to

whether a court finds that the disclosure was inadvertent pursuant to Rule 502(b).  *See, e.g.*, *United States v. Caroleo*, No. 17-cr-177, 2019 WL 5869690, at *1 (E.D.N.Y. Nov. 11, 2019) ("Even if the disclosure is not 'inadvertent' under Rule 502(b), . . . a court may nevertheless 'order that privilege or protection is not waived by disclosure connected with the litigation pending before the court.'" (quoting Fed. R. Evid. 502(d))); *Whitaker Chalk Swindle & Sawyer, LLP v. Dart Oil & Gas Corp.*, No. 4:08-cv-684, 2009 WL 464989, at *4 (N.D. Tex. Feb. 23, 2009) (finding that Rule 502(d) is not limited to inadvertent disclosures); *see also* Sedona Conference Journal, *The Sedona Conference Commentary on Protection of Privileged ESI*, 17 Sedona Conf. J. 95, 104 (2016) [hereinafter, *Protection of Privileged ESI*] ("[A] federal court could enter a Rule 502(d) order to prevent waiver without regard to the reasonableness of the procedures use to identify privileged documents."); *but cf., e.g.*, *Smith v. Best Buy Stores, L.P.*, No. 4:06-cv-0296, 2017 WL 3484158, at *3–4 (D. Idaho Aug. 14, 2017) (holding that Rule 502(d) does not protect intentional disclosures from effecting a waiver); *Potomac Elec. Power Co. & Subsidiaries v. United States*, 107 Fed. Cl. 725, 731–32 (2012) (same).

EEOC contends that Rule 502(d) was drafted for cases just like this one, "so that document-by-document pre-production privilege review does not have to be performed, and will not be cost prohibitive, in large-volume e-discovery situations" and urges the Court to enter a Rule 502(d) order even if GW has not agreed to entry of such an order.  ECF No. 50 at 23, 29.  In fact, no order pursuant to Rule 502(d) has been entered in this case.  However, EEOC argues that the Court could enter such an order and, indeed, that the parties contemplated that eventuality, pointing to the parties' protective order.  That negotiated protective order includes a provision governing inadvertent production of privileged or otherwise protected material that basically implements procedures under Rule 502(b) when a party discovers that it has inadvertently disclosed privileged

information.  ECF No. 33, ¶ 10.1.  Thereafter, the order clarifies that the provision "is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without privilege review."  *Id.*, ¶ 10.2.

Although EEOC's position is somewhat muddled, the Court understands it to raise two related possibilities, each based on the notion that entry of a Rule 502(d) order would allow GW to lower its costs by permitting it to produce documents without robust privilege review: (1) the Court could enter an order under Rule 502(d) and then require GW to utilize the cheaper review protocol EEOC prefers, which would substantially lower the cost of complying with the RFPs at issue and therefore affect the proportionality analysis such that GW should be required to respond to them as written (but with EEOC's concession as to RFP No. 24); or (2) the Court could enter an order under Rule 502(d) and then allow GW to utilize whatever review protocol it prefers, but the Court should consider only the lower cost of the review protocol the EEOC prefers in its proportionality review, again affecting the proportionality analysis in EEOC's favor.  Either of these proposals would, in EEOC's estimation, result in the Court ordering GW to produce the entirety of the email accounts of Mr. Aresco, Ms. Williams, and Mr. Nero for the identified time periods and to bear the cost of such production itself.

At the outset, it is worth noting that the text of Rule 502(d) says nothing about the necessity or reasonableness of any particular privilege-review procedure.  Rather, it merely allows a court to enter an order that attorney-client privilege or work product protection will not be waived by disclosure of protected information during discovery.  The advisory committee's note, of course, suggests that the provision was motivated by a desire to allow litigants to "reduce the costs of pre-production review for privilege and work product."  Fed. R. Evid. 502(d), advisory committee's note.  But "[t]he Advisory Committee Note is not the law, the rule is."  *Bear Rep. Brewing Co. v.*

*Cent. City Brewing Co.*, 275 F.R.D. 43, 48 (D. Mass. 2011) (quoting *United States v. Carey*, 120 F.3d 509, 512 (4th Cir. 1987)); *see also* Edwin M. Buffmire, *Enter the Order, Protect the Privilege: Considerations for Courts Entering Protective Orders Under Federal Rule of Evidence 502(d)*, 81 Fordham L. Rev. 1621, 1633 (2013) [hereinafter, *Enter the Order*] ("Rule 502(d) does not mandate a reduced privilege review and the consequent cost-savings . . . ."). If the drafters had wanted to encourage courts to prohibit a party from engaging in document-by-document privilege review without that party's consent, they could have said so more clearly.

In any case, the first proposal—that the Court enter a Rule 502(d) order and then *require* GW to use EEOC's preferred privilege-review protocol—is, for the undersigned, a non-starter. To be sure, some courts have entered orders under Rule 502(d) and then relied on those orders to dictate to a party its privilege-review protocol. For example, in *Adair v. EQT Production Co.*, the district court overruled objections to a magistrate judge's order and required the defendant to produce documents using search terms to identify potentially relevant documents and attorney's names to filter out potentially privileged documents, relying on a "Clawback Order" pursuant to Rule 502(d). *Adair*, Nos. 1:10CV0037, 1:10CV0041, 2012 WL 2526982, at *2–3 (W.D. Va. June 29, 2012). The court reasoned that the order did not require the defendant to produce privileged documents, but merely recognized that "in the world of ESI, new perspectives and approaches are needed to complete discovery in an efficient and reasonable manner." *Id.* at 4. The defendant's concern that "privileged or nonrelevant documents [might] slip through the cracks and be turned over to the other side" was discounted by the court because "inadvertent production can occur and does occur whether the documents are searched and reviewed electronically or by human eyes" and the defendant had not "shown that the use of electronic searching would substantially increase the number of inadvertently produced privileged documents." *Id.* Similarly, in *Fairholme Funds,*

23

*Inc. v. United States*, the Court of Federal Claims determined that it had the authority to order the government to use a "quick peek procedure"[9] under Rule 502(d) without its consent. 134 Fed. Cl. 680, 687–88 (Fed. Cl. 2017). That court focused primarily on the efficiency of the process, contending that if it denied the plaintiffs' request for use of the procedure, they "would file [a] motion seeking the court's in camera review of all of the remaining 1,500 documents," which, in view of "the court's heavy caseload and limited resources," was not an "attractive option." *Id.* at 678; *see also id.* at 688 ("The court's sole purpose in utilizing the procedure is to bring jurisdictional discovery to an end so that the case may move forward.").

Both of those cases are distinguishable from this one. In *Adair*, for example, the defendant—the producing party—had previously proposed the very process ordered by the court. 2012 WL 2526982, at *4. Moreover, the court found it "reasonable to assume that, knowing that costs of review and production [would] not be shifted to the plaintiffs, [the defendant] would not want to pay such costs and would prefer to rely on the production process" ordered by the court. *Id.* at *5. That is not a reasonable assumption here, where (1) GW has not argued that it is unable to pay and (2) counsel for GW repeatedly asserted that she would not advise a client to use search terms rather than document-by-document review to protect privileged material and that she had never performed privilege review in that manner. Mar. 12 Tr. at 33, 57, 67–68, 71. In *Fairholme Funds*, the court explicitly disavowed that its use of the quick peek procedure was "motivated by a need to (1) protect inadvertently disclosed materials [or] (2) address the high cost of discovery in cases involving large quantities of ESI"; instead, it was rather merely an expedient way to

---

[9] The "quick peek" procedure, also known as "make available production," allows "the production of information without any privilege review, subject to an assurance that privileged documents produced through such a production will be returned without a later claim of waiver." Sedona Conference Journal, *The Sedona Conference Commentary on Protection of Privileged ESI*, 17 Sedona Conf. J. 95, 135 (2016).

complete jurisdictional discovery.   134 Fed. Cl. at 688.   Neither party has expressed that expediency is a motivating factor here.

More significant than the factual distinctions that can be made, however, are the courts and commentators—including the Sedona Conference, which EEOC recognizes as an authority on "preserving and producing ESI" (ECF No. 50 at 26)[10]—that have disapproved of practices,like those discussed above,that are likely to have the effect of compelling production of protected material.   It is well-established that materials protected by privileges such as the attorney-client privilege "must be protected against compelled disclosure." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981); *see also In re Dow Corning Corp.*, 261 F.3d 280, 284 (2d Cir. 2001) (per curiam) ("[C]ompelled disclosure of privileged attorney-client communications, absent waiver or an applicable exception, is contrary to well established precedent.").   Thus, for example, in *In re Sealed Case (Medical Records)*, the D.C. Circuit vacated a district court's order requiring the production of records potentially protected by the psychotherapist privilege—a privilege that "[t]he Supreme Court has determined . . . is important enough to rank with the attorney-client privilege as one of only a handful of privileges cognizable under Federal Rule of Evidence 501"— without their being screened, holding that "[b]ecause that order could compel the disclosure of material subject to a federal privilege, it constitute[d] an abuse of the district court's discretion." 381 F.3d 1205, 1210, 1214 (D.C. Cir. 2004).

To be sure, *In re Sealed Case* predates the enactment of Federal Rule of Evidence 502. More recently, however, the court in *Winfield v. City of New York*, has cogently explained why it is inappropriate for a court to "mandate disclosure of privileged information pursuant to Federal

---

[10] The Sedona Conference is a "nonprofit legal policy research and education organization," which has a working group comprising judges, attorneys, and electronic discovery experts "dedicated to resolving electronic discovery document production issues."   *Aguilar v. ICE*, 255 F.R.D. 350, 355 (S.D.N.Y. 2008).   It has published guidance concerning such issues that federal courts have found instructive.   *See, e.g.*, *id.*

Rule of Evidence 502(d)." *Winfield*, No. 15-cv-5236, 2018 WL 2148435, at *5 (S.D.N.Y. May 10, 2018). There, the plaintiffs sought an order from the court requiring the defendant to allow them a "quick peek" at more than 3,000 documents that had been designated as privileged. *Id.* at *2. The court refused, explicitly disagreeing with the reasoning of *Fairholme Funds* "for a number of reasons." *Id.* at *5 First, while it recognized that a trial court "has broad discretion to fashion discovery orders, [a court] nevertheless must do so in accordance with the Federal Rules of Civil Procedure," including Rule 26(b)(1), which "limits the scope of discoverable information to *nonprivileged* information." *Id.* at *5. Thus, information protected by a privilege "is presumptively not discoverable absent a waiver, voluntary disclosure, or other legally recognized exception." *Id.* Second, the court noted that "the Federal Rules of Evidence do not abrogate common law privileges." *Id.* at *6. Indeed, Rule 502(d) "authorizes a court to issue an order *protecting* privilege," rather than "creat[ing] an exception to the law of privilege or authoriz[ing] a court to compel disclosure of privileged information in the absence of a legally recognized exception." *Id.* Third, the Rules Enabling Act prohibits rules of procedure or of evidence "from abridging, enlarging, or modifying any substantive right," including privilege rights. *Id.* (citing 28 U.S.C. § 2702). That is, a court "is precluded from interpreting the Federal Rules of Civil Procedure and the Federal Rules of Evidence in a manner that infringes on" privilege rights. *Id.* It is clear, then, that Rule 502(d) does not supersede controlling case law forbidding a court from compelling disclosure of protected information "absent waiver or other applicable exception." *Id.* at *8; *see also Enter the Order*, 81 Fordham L. Rev. at 1636 ("When a court orders the disclosure of information without review, it effects a substantive change in privilege law because the party no longer has that right to confidentiality over those documents.").

Were the Court to order GW to produce the requested emails pursuant to EEOC's proposed procedure, it would likely have the effect of requiring production of privileged material. The proposed search terms—attorney's names and law firm's names (suggested by EEOC (ECF No. 42-1 at 3)) and words or phrases such as "attorney-client," "work product," "confidential, and "privileged" (suggested by the Court (Mar. 12 Tr. at 68))—are rather blunt instruments to employ for a procedure that could use a more delicate touch. For example, communications among non-attorneys can be entitled to protection if they concern matters in which the parties intend to seek legal advice or reflect legal advice provided by an attorney, *see, e.g.*, *Mischler v. Novagraaf Grp. BV*, No. 18-cv-2002 (TJK/GMH), 2019 WL 6135447, at *4 (D.D.C. Nov. 19, 2019); *Lazare Kaplan Int'l, Inc. v. KBC Bank, N.V.*, 11-cv-9490, 2016 WL 415274, at *3 (S.D.N.Y. July 22, 2016) ("[T]he attorney-client privilege extends to communications of legal advice obtained from lawyers among [ ] employees who were responsible for obtaining or acting on that advice . . . ."), and there is no requirement "that a document be labeled as privileged in order for it to be subject to . . . privilege, *Lifewise Master Funding v. Telebank*, 206 F.R.D. 298, 301 (D. Utah 2002). Moreover, courts have recognized that it is risky for a litigant to rely exclusively on keyword searches precisely because of the potential that privileged material will be produced. *See, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 256–57 (D. Md. 2008) ("[W]hile it is universally acknowledged that keyword searches are useful tools for search and retrieval of ESI, all keyword searches are not created equal; and there is a growing body of literature that highlights the risks associated with conducting an unreliable or inadequate keyword search or relying exclusively on such searches for privilege review."). Under the circumstances of this case, such an order would also be an abuse of discretion under the D.C. Circuit's decision in *In re Sealed*

*Case*.[11]   381 F.3d at 1214 (finding that an order requiring production of potentially protected material without screening was an abuse of discretion because it "could compel the disclosure of material subject to a federal privilege").

Moreover, courts are "not normally in the business of dictating to parties the process they should use when responding to discovery," including "the manner in which [they] should review documents . . . for privilege" and "whether [that] document review should be done by humans or with the assistance of computers." *Hyles v. New York City*, No. 10 Civ. 3119, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) (quoting *Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*, 143 T.C. 9, 2014 WL 4636526, at *3 (T.C. 2014)); *see also In re Viagra (Sildenafil Citrate) Prods. Liability Litig.*, No. 16-md-2691, 2016 WL 7336411 (N.D. Cal. Oct. 14, 2016) (finding that the court did not have the authority to order a party to use a particular method of searching for and reviewing ESI). Indeed, The Sedona Principles clearly state that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information."   The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 118 (2018) [hereinafter, *The Sedona Principles*].   As *The Sedona Principles* recognize, "a responding party, not the court or requesting party, is generally best suited to determine and implement appropriate procedures, methodologies, and technologies" to "identify, preserve, collect, process, analyze, review, and produce relevant and discoverable ESI," and "[n]o Federal Rule 'has given judges the

---

[11]  The Court neither holds nor implies that the use of keywords or search terms is always an inappropriate or insufficient method for conducting privilege review.  Such an approach might well be suitable in a case where, for example, there is a showing that the universe of documents to be reviewed is unlikely to contain a significant number of potentially privileged communications, there is a more robust record as to the crafting and administration of the searches, or the keyword searches will be used in conjunction with other technologies.  But under the circumstances of *this case*, the Court does not find that the use of the proposed search terms alone would be sufficiently protective of GW's privileged material.

authority . . . to dictate'" to parties how to search their documents.  *The Sedona Principles*, 19 Sedona Conf. J. at 117–18 & n.92 (ellipses in original) (quoting Hon. James C. Francis IV, *Judicial Modesty: The Case for Jurist Restraint in the New Electronic Age*, Law Tech. News (Feb. 2013)).

There are practical reasons, too, that a litigant should not be forced to produce material that has not gone through a thorough privilege review.  The attorney-client privilege exists for the benefit of the client, to protect its confidences.  *See, e.g.*, *Moody v. IRS*, 654 F.2d 795, 801 (D.C. Cir. 1981).  While a protective order coupled with a claw-back order may provide significant protection from waiver, it is nevertheless "common sense observation" that "[i]f an adverse party is provide access to privileged material, then a 'pertinent aspect of confidentiality will be lost.'" *Dow Corning*, 261 F.3d at 284 (quoting *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 165 (2d Cir. 1992)); *see also* The Sedona Conference, *Protection of Privileged ESI*, 17 Sedona Conf. J. at 136 ("[E]ven though a Rule 502(d) order can require return of [ ] privileged documents and ensure there is no waiver, once it is produced, the opposing party knows its contents.").  For these reasons, the Court finds that it is not appropriate to order GW to use EEOC's preferred method of privilege review, notwithstanding that it would significantly reduce the cost of production of the material at issue.

Nor is it appropriate for the Court to ignore the fees GW will incur in producing the requested information  when balancing whether the cost of such production outweighs its likely benefit.  As noted, GW has established that its estimated cost to comply with RFP Nos. 10, 11, and 24 using its more rigorous filtering methodology is between $435,200 and $533,400.  Counsel for GW has also asserted that document-by-document privilege review is common practice at Gibson Dunn and that she would not advise a client to rely on the procedure urged by EEOC.  Mar. 12 Tr. at 57, 67–68, 71, 73.   Indeed, some courts have stated that "[t]he law demands that a legitimate

claim of privilege can only be made after a document by document examination." *Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 415 F. Supp. 3d 827, 829 (N.D. Ill. 2019); *see also Hilson v. GEICO Gen. Ins. Co.*, No. 8:11-cv-13, 2012 WL 3128953, at *1 (M.D. Fla. Aug. 1, 2012) ("Ordinarily, review [for attorney-client privilege] . . . requires a document-by-document study . . . ."). It is not necessary to go that far here. It is enough to find that the costs for the procedure that GW proposes are within the realm of reasonableness. Here, GW's cost estimates are supported by attestations that the hourly rates and filtering procedures on which the estimates are based are comparable to what GW has actually paid in the past.[12] ECF No. 47-7 at 3. There is considerable precedent holding that "negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness." *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F. Supp. 2d 226, 230 (S.D.N.Y. 2002); *see also Cobell v. Jewell*, 234 F. Supp. 3d 126, 167–68 (D.D.C. 2017) ("There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay." (alteration omitted) (quoting *Cobell v. Norton,* 231 F. Supp. 2d 295, 302–03 (D.D.C. 2002)), *aff'd sub nom. Cobell v. Zinke*, 741 F. App'x 811 (D.C. Cir. 2018)). That tends to be true even if there is a cheaper alternative. *Cf. Bleecker.* 212 F. Supp. 2d at 231 ("Certainly, the [plaintiff] could have found cheaper lawyers, but it was not required to do so. The [plaintiff] chose *these* lawyers, agreed to be responsible for their fees, and paid them . . . ."). Commentary, too, suggests that a court should not take into account the potential cost savings of a Rule 502(d) order when analyzing the burden of production under Rule 26. *Enter the Order*, 81 Fordham L. Rev. at 1635 (recommending that,

---

[12] If anything, the estimates are cheaper than Gibson Dunn's past practice—even in this case—of tasking its associates with first-level privilege review, instead of incorporating the work of significantly less expensive contract attorneys to conduct that initial review as Gibson Dunn proposes here. *Id.* at 3, 6; Mar. 12 Tr. at 42, 46. If the entire review were performed by Gibson Dunn attorneys (as some clients require) the cost of review would be "significantly higher." Mar. 12 Tr. at 42–43, 46.

although a court may "point out that less expensive, often equally thorough, electronic searches are available," it should not allow the "presence of the 502(d) order" to affect its analysis of "the burden and expense of producing information"). Here, as noted above, there has been no showing that the lower-cost alternative proposed by EEOC will be sufficiently protective of GW's privileged material.

The Court acknowledges that failure to weigh less expensive alternatives to document-by-document privilege review could create an incentive for litigants to overstate the cost and the necessity of such review in an effort to avoid responding to legitimate discovery requests. That is a concern to be taken up in a different case. Here, the Court has required Defendant to establish the actual rates that it has paid for work in this case. Defendant has not suggested that it cannot or will not pay the costs of production should the Court order it to respond to the RFPs as written. Counsel has also represented that document-by-document privilege review is the norm for the legal work it performs for its clients and that it has engaged in such review for GW in this case. Mar. 12 Tr. at 71; ECF No. 47-7 at 3. And GW is not trying to avoid responding to the discovery requests altogether; it is, rather, seeking to reach a compromise that is fair and reasonable. Therefore, the Court will use GW's cost estimates based on a document-by-document filter review in balancing the burden against the likely benefit.

### 7. Balance of Burden Against Likely Benefit and Remedy

In this case, the Court is faced with the following situation. Defendant has shown that complying with the three RFPs at issue would cost hundreds of thousands of dollars—around $484,200—slightly more, than EEOC's best-case scenario recovery in this case of $480,000. The Court finds that cost to be disproportionate to the benefit that could be derived from a complete response to the RFPs. To be sure, the issues at stake in this litigation are undeniably important,

but EEOC's overbroad RFPs are not the only means available for it to discover the information it needs to advance its claims.  Notably, even counsel for EEOC admitted at the hearing that it was unlikely the agency would authorize hundreds of thousands of dollars if it was ordered to share with GW the cost of complying with the RFPs as written.  Mar. 12 Tr. at 32.  Engaging in the case-by-case analysis that is required when analyzing the proportionality of requested discovery, *see Oxbow Carbon*, 322 F.R.D. at 6, it is clear that the burden imposed on GW to comply with these discovery requests as written outweighs the likely benefit.  EEOC's motion to compel a full response to RFP Nos. 10, 11, and 24 will be denied.

As for the path forward, the Court could simply deny the motion to compel as to these RFPs as written and leave it to the parties to work out a compromise.  But the history of the parties' negotiations suggests that would result in a further impasse, extending this dispute into the foreseeable future.  For that reason, the Court crafts a resolution that incorporates the parties' concessions and strikes a balance, providing EEOC with a plethora of relevant emails from the accounts while allowing GW to keep its costs down.  Of course, EEOC may, at its own election, pay for GW to perform searches for relevant material from these three accounts beyond that required below.  Barring that development, GW shall produce the following documents at its own expense:

> (1)      In response to RFP No. 10, all non-privileged emails from Mr. Aresco's email account that include Mr. Nero or Ms. Williams as a sender or recipient, for the time period identified in the RFP.  In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.[13]

> (2)      In response to RFP No. 11, all non-privileged emails from Ms. Williams' email account that include Mr. Nero or Mr. Aresco as a sender or recipient,

---

[13] Because this resolution anticipates that GW will engage in document-by-document privilege review, it is unnecessary to address the parties' arguments directed to protected information under FERPA.  GW will be able to review and redact that information during its privilege review.

for the time period identified in the RFP.   In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.

(3)    In response to RFP No. 24, all non-privileged emails from Mr. Nero's email account between Mr. Nero and third-parties that include a reference to Mr. Aresco or Ms. Williams, for the period between September 1, 2014 (when Ms. Williams began working as Mr. Nero's Executive Assistant), through March 31, 2017 (when Mr. Aresco left his position as Mr. Nero's Special Assistant).  In addition, GW shall produce all non-privileged emails in this account that are either to or from Ms. Williams or Mr. Aresco and are not duplicative of those produced as directed above in (1) and (2).   In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.

(4)    In addition to those emails, a random sampling of ten percent of the remaining non-privileged emails from each of those three email accounts. GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83. GW shall redact information protected from disclosure by FERPA.

Two of these directions require further explanation.  First, with respect to the random sample, GW has previously offered to provide EEOC a random sampling of ten percent of the emails in these accounts, but as an alternative to, rather than in conjunction with, its offer to produce emails between Mr. Aresco and Mr. Nero, between Ms. Williams and Mr. Nero, and between Mr. Nero and third parties if they mention Mr. Aresco or Ms. Williams.  Tr. at 94, 101–02.  The Court orders production of the random sample to provide EEOC with emails that may include additional relevant material about its claims—such as information reflecting Ms. Williams' and Mr. Aresco's job duties or Mr. Nero's alleged discrimination—that is not included in the other emails GW will produce.

Second, EEOC has requested that, in response to RFP No. 24, GW should also use search terms to "conduct[ ] targeted searches" of Mr. Nero's email account for the period between April 2011 (when Mr. Nero began his employment in GW's Athletics Department) and September 1,

2014 and between March 31, 2017, and June 2018 (when Mr. Nero left the Athletics Department) (ECF No. 50 at 9).  That request is denied for two independent reasons.  To begin, relevance: documents from those periods would not be relevant to the job duties that Mr. Aresco and Ms. Williams performed, because neither Mr. Aresco nor Ms. Williams was performing the duties of their relevant positions in the Athletics Department during those periods.  For the same reason, they are unlikely to be relevant to EEOC's argument that Mr. Nero "groom[ed] [Mr] Aresco for advancement to [Ms.] Williams' detriment."  EEOC Letter Brief at 2 & Exh. F.  Nor has EEOC explained why it believes that emails from those periods would be relevant to Mr. Nero's alleged "bias in favor of male employees."  *Id.*  The resolution above provides EEOC emails from the most relevant period; that is sufficient.  Second, as noted, the parties have waged this discovery dispute for months and it is time to resolve it.  EEOC's proposal, which includes no suggested search terms—would only further delay that resolution.

### B.   RFP No. 20

This RFP seeks documents relating to "any report or complaint . . . that Patrick Nero subjected any employee or student of Defendant to any discrimination, harassment, retaliation, abuse, mistreatment, or inappropriate conduct."  ECF No. 47-5 at 10.  GW contends that, as this is a case alleging gender and pay discrimination against GW employee Ms. Williams, the request is overbroad and seeks irrelevant information insofar as it asks for complaints about any kind of discrimination, harassment, or inappropriate conduct, for the entire period of Mr. Nero's employment with GW.  ECF No. 47 at 27.  GW has offered to produce complaints made by Ms. Williams against Mr. Nero (*id.* at 28; ECF No. 47-5 at 11), but stated that it would consider producing "gender-based pay equity complaints brought against [Mr.] Nero [ ] from anyone in the

[A]thletic [D]epartment" (Mar. 12 Tr. at 108–09).    Neither party's position reflects a fair interpretation of the requirements of the law in this area.

Generally, a plaintiff in an intentional discrimination case can discover evidence of other discrimination claims of the same type as that the plaintiff alleges.   The court in *Sorrell v. District of Columbia*, explained:

> [O]nly discrimination of the same character and type as that alleged is probative. To establish that a prior discriminatory act is probative of the intention or motive of the defendant, there must be some reason to believe that his motivation or intention in the acts in question was similar to his motive or intention on the prior occasion.  But, there is nothing in human experience which suggests that a person who is bigoted as to race is equally likely to refuse to accommodate a disabled person unless one wants to say that certain folks are "like that" and always act a certain way as to people who are different from them.  But to say that is to draw the very inference the law never permits a finder of fact to draw.

252 F.R.D. 37, 40 (D.D.C. 2008) (quoting *White v. U.S. Catholic Conference*, No. Civ.A. 97-1253TAF/JMF, 1998 WL 429842, at \*5 (D.D.C. May 22, 1998)); *see also Breiterman v. U.S. Capitol Police*, 324 F.R.D. 24, 32–33 (D.D.C. 2018) (finding an interrogatory in a gender discrimination case overbroad in part because it would require the defendant to disclose information about an employee disciplined "for engaging in types of discrimination that [were] not at issue in [the] complaint"); *Johnson v. Jung*, No. 02 C 5221, 2007 WL 1752608, at \*1 (N.D. Ill. June 14, 2007) (noting that discovery requests "seeking disclosure of every conceivable type of discrimination ever made against a defendant are generally deemed overly broad and impermissible").   Complaints of discrimination of a type similar to the charged discrimination against the alleged perpetrator of the discrimination are relevant even if made by individuals other than the plaintiff (or, as in this case, the charging party) because "an individual plaintiff may introduce evidence of systematic or general discrimination when developing her individual discrimination claims." *Breiterman*, 324 F.R.D. at 33 (quoting *Marcus v. Geithner*, 813 F. Supp.

2d 11, 20 (D.D.C. 2011)).  Thus, in a discrimination case, "discovery 'should be reasonably related to the circumstances involved in the alleged discrimination,'" as well as "to a time frame involving the alleged discriminatory conduct and the individuals who are allegedly involved in that conduct." *Pleasants v. Allbaugh*, 208 F.R.D. 7, 9 (D.D.C. 2002) (quoting *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617, 618–19 (D.D.C. 1983)); *see also Pleasants*, 208 F.R.D. at 14 (deciding, in a racial discrimination case, that "the proper scope of discovery seeking other complaints of discrimination against defendant must be limited in time [and] type of action complained of or type of discrimination alleged" and therefore limiting interrogatories "to complaints based on race and in the particular division(s) where [the] plaintiff worked").  As discussed below, these principles establish that RFP No. 20, as written, is vastly overbroad and GW's proposed compromise is unjustifiably narrow.

       1.     Time Frame

RFP No. 24 has no explicit temporal limitation.  Its *de facto* limitation is the over seven years—April 2011 to June 2018—during which GW employed Mr. Nero.  Mar. 12 Tr. at 8. "[D]iscovery of other discriminatory acts must be related in time in order to establish the inference of similar motivation."  *Glenn v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002).  A period of ten years or over has generally been held to be too long.  *See, e.g.*, *id.* (finding ten years "an inordinate length of time" in a case alleging a pattern of discrimination); *see also Willingham v. Ashcroft*, 226 F.R.D. 57, 61–62 (D.D.C. 2005) (narrowing a request from a period of fifteen years to approximately four years).  But courts have allowed discovery of other discrimination complaints for "a reasonable number of years both prior to and following" the period at issue in the case.  *See, e.g.*, *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649, 655 (D. Kan. 2004).  Here, the period of alleged discrimination at issue, interpreted generously, is the approximately two-and-a-half years

between September 2014, when Ms. Williams began working in the Athletics Department, and March 2017, when Mr. Aresco left his job there. Moreover, it is unlikely that there will be complaints about Mr. Nero for any significant period of time after he left the employ of GW in June 2018—and, indeed, EEOC has clarified that it does not seek complaints that post-date "Mr. Nero's tenure." ECF No. 50 at 44.

In this case, a period of five years is reasonable. *See, e.g.*, *Sanchez v. City of Fort Wayne*, No. 18-cv-0397, 2019 WL 6696295, at *3 (N.D. Ind. Dec. 9, 2019) (noting that courts have found "five-year discovery periods reasonable"); *cf. Mitchell v. Nat'l R.R. Passenger Corp.*, 208 F.R.D. 455, 457, 460 (D.D.C. 2002) (allowing discovery into other discrimination complaints for a period of four years prior to the plaintiff's termination). Therefore, RFP No. 20 is limited to the time period between June 2013—which is just over one year before Ms. Williams joined the Athletics Department—and June 2018—which is both when Mr. Nero left the Athletics Department and just over one year after Mr. Aresco left that department.

### 2. Types of Complaints

EEOC's claim here is that GW, through Mr. Nero, discriminated against Ms. Williams on the basis of her gender. That discrimination was allegedly accomplished not only through pay inequity but also through other unequal treatment in the workplace. ECF No. 1, ¶¶ 17, 20–21, 24, 29, 32, 38, 421–42. There are no claims of discrimination on any ground other than gender—there is no claim, for example, of discrimination based on race or age or disability. Therefore, the universe of potentially relevant complaints is narrowed, at the outset, to complaints relating to gender discrimination.

GW argues that this RFP should be further limited to either (1) complaints made by Ms. Williams against Mr. Nero or (2) "complaints of other gender-pay discrimination claims" against

Mr. Nero.  ECF NO. 47 at 28–29.  That proposal appears to be based on a misreading of the complaint and a crabbed interpretation of the case law.  First, as noted above, EEOC claims more than mere pay inequity.  It also alleges that, for example, Mr. Nero treated Mr. Aresco more favorably than Ms. Williams by "enhancing [Mr.] Aresco's opportunities while minimizing" those of Ms. Williams as part of a pattern of providing preferential treatment to males.  ECF No. 1, ¶ 20–21, 38.  Second, as the cases cited above establish, courts routinely allow discovery into other complaints of the same category of discrimination that a plaintiff has alleged.  *See, e.g.*, *Sorrell*, 252 F.R.D. at 40 ("[T]he sexual harassment of others, if shown to have occurred, is relevant and probative of [the alleged harasser's] general attitude of disrespect toward his female employees . . . ." (second alteration in original) (quoting *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995)); *Pleasants*, 208 F.R.D. at 15 (in case alleging discrimination based on race, allowing discovery of "complaints of the same type, i.e., race discrimination" in the office where the plaintiff worked). Moreover, "courts have recognized that . . . evidence of one type of discrimination may be relevant to a claim for another type of discrimination if there is a sufficient nexus between the two types." *Sidari v. Orleans Cty.*, No. 95-CV-7250, 2000 WL 33407343, at *4 (W.D.N.Y. Oct. 3, 2000)).  For example, as the Ninth Circuit has explained:

> [S]exual harassment may be symptomatic of gender-based hostility, the employer or supervisor using sexual harassment primarily to subordinate women, to remind them of their lower status in the workplace, and to demean them. In this latter circumstance, the "sexual" element of the harassment is only secondary.  Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based employment discrimination.

*E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 897–98 (9th Cir. 1994) (internal citation omitted); *see also, e.g.*, *Rivera v. Baccarat, Inc.*, No. 95 Civ. 9478, 1997 WL 7778877, at *2 (S.D.N.Y. Dec. 15, 1997) (noting that, in *Famer Brothers*, the Ninth Circuit admitted sexual harassment evidence

in a case of gender discrimination because a nexus existed between the two types of discrimination).  At least one case has allowed a plaintiff even broader discovery.  In *Kennicott v. Sandia Corp.*, a case alleging gender discrimination that was "most prominently manifested in pay, promotions, and performance evaluations," the court allowed discovery into complaints by female employees of "pregnancy discrimination, sexual harassment, gender-based hostile work environment, and retaliation for making [those] categories of complaints."  327 F.R.D. 454, 471–72 (D.N.M. 2018).

Here, EEOC has not explained why the net should be cast as wide as it was in *Kennicott*, and, indeed, the Court is not convinced that, as a general matter, there is a sufficient nexus between claims of disparate treatment in pay, promotions, and employment opportunities and claims of retaliation against those who filed gender discrimination claims.  Rather, EEOC asks that if there is a constraint on the subject matter of RFP No. 20, GW should "at least" disclose "gender cases, gender discrimination cases, sexual harassment cases, and claims of inappropriate sexual conduct."  ECF No. 50 at 46.  The Court admits to being stumped as to what EEOC can mean by "gender cases," as opposed to "gender discrimination cases" and "sexual harassment cases."  The term "gender cases" appears to have been used at times as a shorthand to describe litigation addressing gender classifications under the Equal Protection Clause.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 472 n.24 (1985) (Marshall, J., concurring in part); *Lamprecht v. FCC*, 958 F.2d 382, 406–408 (D.C. Cir. 1992) (Mikva, C.J., dissenting).  Such classifications are not at issue here.  The phrase is therefore vague and ambiguous in this context, and GW will not be required to produce complaints in "gender cases," whatever they are.  Nor will GW be required to produce complaints of "inappropriate sexual conduct."  Many courts have found the adjective "inappropriate" vague when used in discovery requests.  *Kaiser v. Gallup, Inc.*, No. *:13CV218,

2014 WL 7014042, at *3 (D. Neb. Dec. 11, 2014) (finding a discovery request vague that used the term "inappropriate behavior" without further clarification); *Mathews v. Denver Newspaper Agency LLP*, No. 07-cv-2097, 2008 WL 3845262, at *1–2 (D. Colo. Aug. 14, 2008) (indicating that the term "inappropriate conduct" is vague without further clarification); *Williams v. Hernandez*, 221 F.R.D. 414, 417 (S.D.N.Y. 2004) (finding a request for admission asking whether a defendant had been disciplined "for inappropriate conduct" was "vague and contain[ed] terms that are not clearly defined"). Therefore, RFP No. 20 is further narrowed to reports and complaints of gender discrimination (including pay discrimination based on gender) and sexual harassment.

        3.    Other Issues

Two issues remain. EEOC seeks discovery of complaints or reports (limited here to gender discrimination and sexual harassment) made against Mr. Nero not only by GW employees, but also by GW students. It also seeks discovery of claims of sexual harassment made against Mr. Nero by men. ECF No. 50 at 43; EEOC Letter Brief at 2. That request is apparently inspired by the existence of a video of Mr. Nero that allegedly shows him "harassing a male student." EEOC Letter Brief at 2. EEOC argues that the video might be evidence of a "pattern of bias in favor of males" (*id.*) and expounds that "it is not difficult to make the connection between complaints that [Mr.] Nero engaged in sexual harassment of a male and the complaint in this case—that he was biased towards and favored male employees over females, including in his pay decisions" involving Mr. Aresco and Ms. Williams (ECF No. 50 at 43; *see also* Mar. 12 Tr. at 110).

EEOC—like any other litigant before a federal court—would be better served by spelling out its argument than by trusting that it is self-evident. Indeed, "perfunctory and underdeveloped argument, and arguments that are unsupported by pertinent authority" may be deemed forfeit, *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013), and the Court does so deem EEOC's

argument here. In any event, it is hard to understand how harassing a male student shows bias in favor of males or how evidence of harassment of men helps EEOC prove that in this case Mr. Nero had a bias against Ms. Williams based on her gender. Perhaps EEOC is suggesting that an individual who would harass a man would also be likely to engage in other bad acts, such as gender discrimination against women. But that is precisely the kind of "inference the law never permits a finder of fact to draw." *Sorrell*, 252 F.R.D. at 40. In any event, the Court refuses to construct an argument or to speculate further as to what EEOC might have said but did not. As this case involves alleged bias against a woman, GW shall not be required to produce reports or complaints of gender discrimination or sexual harassment made against Mr. Nero by men.[14]

However, in light of the discussion above relating to this RFP, the Court finds that GW has not shown that complaints of gender discrimination or sexual harassment made by female students against Mr. Nero are irrelevant to the claims in this case. Such discrimination is of the same "type" as that charged her—*i.e.* based on gender—and could be probative of "gender-based hostility" used to "subordinate" or "demean" women. *Farmer Bros.*, 31 F.3d at 897. A complaint, for example, that during the relevant time frame Mr. Nero, as Athletic Director, discriminated against female student athletes with respect to some part of GW's athletic program may be probative of his bias against women more generally. Therefore, in response to RFP No. 20, GW shall produce non-privileged documents relating to any report or complaint that Mr. Nero subjected any female GW employee or GW student to sexual harassment or discrimination on the basis of sex or gender during the period between June 2013 and June 2018.[15]

---

[14] For what it's worth, the Court has reviewed the video that EEOC cites as support for its request and finds it probative of nothing relevant to this case.

[15] GW's interposition of a so-called *Kolstad* defense to punitive damages under Title VII does not change this conclusion. In *Kolstad v. American Dental Association*, the Supreme Court held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" 527 U.S. 526, 545 (1999)

## IV.    CONCLUSION

Courts rely on the parties to cooperate when discovery disputes arise with a "full and diligent effort to resolve any disagreements with a *meaningful view towards reasonable compromise.*" *Osborn v. Prime Tanning Corp.*, No. CV 11-2346, 2011 WL 13220316, at *2 (C.D. Cal. Aug. 2, 2011) (emphasis omitted and emphasis added); *see also Scruggs v. Getinge USA, Inc.*, 258 F.R.D. 177, 180 (D.D.C. 2009) ("It bears repeating again: it is the Court's hope—indeed, its expectation—that the parties will resolve any remaining discovery disputes through negotiation and compromise."). To foster that spirit of cooperation and compromise, parties must recognize that "[t]he Federal Rules of Civil Procedure do not require perfection or guarantee that every possible responsive document will be found and/or produced." *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 124 (E.D. Mich. 2019) (quoting *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. Civ. 10-0541, 2013 WL 6159177, at *10 (S.D. Cal. Nov. 25, 2013)). The Court expects the parties to keep that in mind going forward.

For the reasons discussed above, it is hereby

**ORDERED** that GW shall produce the following documents:

(1)    In response to RFP No. 10, all non-privileged emails from Mr. Aresco's email account that include Mr. Nero or Ms. Williams as a sender or recipient, for the time period identified in the RFP. In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails

---

(quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting)). Courts have recognized that pleading such a "good faith efforts" defense "open[s] the door to proof of other employment discrimination cases against [the defendant]." *Estes v. Georgetown Univ.*, 231 F. Supp. 2d 279, 285 n.7 (D.D.C. 2002), *vacated pursuant to settlement* (Oct. 23, 2003). However, cases cited by both parties here recognize that, at most, the defense allows discovery into other complaints of the same type of discrimination pleaded in the plaintiff's complaint. *See, e.g.*, *EEOC v. Mgmt. Hospitality of Racine*, 666 F.3d 422, 439 (7th Cir. 2012) (indicating, in a sexual harassment case, that the employer's conduct in connection with sexual harassment claims made by individuals other than the plaintiff were relevant to the issue of whether the employer engaged in good faith efforts to comply with Title VII), *cited in* ECF No. 50 at 44 (EEOC's supplemental brief); *Lowery v. Circuit City Stores*, 206 F.3d 431, 446 (4th Cir. 2000) (indicating, in a racial discrimination case, that the employer's conduct in connection with other racial discrimination claims was relevant to its good faith efforts to comply with the law), *cited in* ECF No. 47 at 28 (GW's supplemental brief). That is precisely the standard for relevance that the Court has applied here.

based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.

(2)     In response to RFP No. 11, all non-privileged emails from Ms.  Williams' email account that include Mr. Nero or Mr. Aresco as a sender or recipient, for the time period identified in the RFP.  In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.

(3)     In response to RFP No. 24, all non-privileged emails from Mr. Nero's email account between Mr. Nero and third-parties that include a reference to Mr. Aresco or Ms. Williams, for the period between September 1, 2014 (when Ms. Williams began working as Mr. Nero's Executive Assistant), through March 31, 2017 (when Mr. Aresco left his position as Mr. Nero's Special Assistant).  GW shall also produce all non-privileged emails in this account that are either to or from Ms. Williams or Mr. Aresco and are not duplicative of those produced as directed above in (1) and (2).  In compliance with its representation at the March 12, 2020 hearing, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by FERPA.

(4)     In addition to those emails, a random sampling of ten percent of the remaining non-privileged emails from each of those three email accounts.  Again, GW shall not withhold emails based on relevance.  Mar. 12 Tr. at 82–83.  GW shall redact information protected from disclosure by attorney-client privilege, work product protection, or FERPA.

(5)     In response to RFP No. 20, non-privileged documents relating to any report or complaint that Mr. Nero subjected any female GW employee or GW student to sexual harassment or discrimination on the basis of sex or gender during the period between June 2013 and June 2018.

**SO ORDERED.**

Date:  June 26, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE