**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **UNITED STATES EQUAL** | ) | |
| **EMPLOYMENT OPPORTUNITY** | ) | |
| **COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 17-cv-1978 (CKK/GMH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE GEORGE WASHINGTON** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**<u>MEMORANDUM OPINION AND ORDER</u>**

This discovery dispute—the fifth referred to the undersigned in this gender discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d)—concerns claims of attorney client privilege and work product protection asserted by Defendant The George Washington University ("GW" or the "University") over documents created in connection with its internal investigation of a discrimination complaint filed by Sara Williams, née Mutalib, with the University's Equal Employment Opportunity Office. The Equal Employment Opportunity Commission (the "EEOC" or the "Commission"), which sues the University on behalf of Williams, seeks an order compelling the University to produce all withheld documents related to that investigation. The Commission contends that, contrary to the University's assertions, those documents did not seek, contain, or reflect legal advice, nor were they created in anticipation of litigation at the direction of counsel. The Commission further argues that, even if those documents were covered by work product protection or the attorney-client privilege, the University has waived that privilege either by asserting a so-called *Kolstad* defense

or by failing to claim or to support its claims of privilege on its privilege log.  Finally, the agency asserts that it has shown substantial need for the documents sufficient to overcome any work product protection.  After review of the extensive briefing on these issues,[1] the Court finds that the Commission's motion to compel should be denied.

## I.      BACKGROUND

Prior opinions have outlined many of the relevant allegations in this action.  Put simply, Williams was employed from mid-2014 through 2016 as Executive Assistant to the University's former Athletic Director at a salary of approximately $40,000 per year.  *U.S. EEOC v. George Washington Univ.* No. 17-cv-1978, 2020 WL 3489478, at *1 (D.D.C. June 26, 2020) [hereinafter *GW II*].  The EEOC alleges that, in 2015, the Athletic Director "began to give preferential treatment to a male employee"—Michael Aresco—who was promoted in January 2016 to the position of "'Special Assistant' in the Athletics Department to carry out work substantially equal" to that of Williams, but at a salary of over $77,000 per year. *U.S. EEOC v. George Washington Univ.*, No. 17-cv-1978, 2021 WL 7907064, at *1 (D.D.C. Sept. 23, 2021) [hereinafter *GW IV*].  In March 2016, Williams filed an internal grievance complaining of gender discrimination with the University's Equal Employment Opportunity Office, which is tasked with reviewing, investigating, and attempting to remediate such complaints.  *Id.* at *2.  The investigation was initially led by Vickie Fair and Danielle Reich, personnel in the Equal Employment Opportunity

---

[1] The following docket entries are most relevant to this dispute:  (1) the EEOC's motion to compel (ECF No. 91); (2) the University's opposition to that motion (ECF No. 93); (3) the EEOC's reply (ECF No. 94); (4) the EEOC's supplemental memorandum in support of its motion to compel (ECF No. 99); (5) the University's supplemental memorandum in opposition to the motion (ECF No. 100); (6) the University's notice of supplemental authority (ECF No. 101); and (7) the EEOC's response to the University's notice of supplemental authority (ECF No. 106).

In connection with this dispute, the EEOC sought leave to file under seal an unredacted version of its motion to compel along with two supporting exhibits.  *See* ECF No. 90.  That motion, which is still pending, is not within Judge Kollar-Kotelly's referral to the undersigned.  *See* ECF No. 105 (referring the EEOC's motion to compel, identified as ECF No. 91).  The undersigned has nevertheless reviewed both the unredacted memorandum in support and the two exhibits that the EEOC seeks to file under seal and taken the redacted information (material in five sentences in the Background section of the Commission's opening brief) into account in rendering this decision.

Office.  *Id.*  In July 2016, the University hired the law firm Saul Ewing Arnstein & Lehr LLP ("Saul Ewing") to "take over" the internal investigation and draft a Confidential Informal Grievance Report (the "Saul Ewing Report").  ECF No. 93 at 9.  In January 2017, the University reported to Williams that her claim of discrimination had been investigated and "could not be substantiated."  ECF No. 91-5 at 2.

Meanwhile, in October 2016, Williams filed a charge of discrimination with the EEOC. ECF No. 10-4 at 2.  In April 2017, the Commission issued a Letter of Determination finding reasonable cause to believe that the University had violated Title VII and the Equal Pay Act.  ECF No. 10-3.  Conciliation failed and the Commission filed this federal court action in September 2017.  *See U.S. EEOC v. George Washington Univ.*, No. 17-1978, 2019 WL 2028398, at *2 (D.D.C. May 8, 2019) [hereinafter *GW I*].  The University's motion to dismiss the Complaint was unsuccessful, *see id.* at *8, and it subsequently filed an Answer that included, as a defense, that Plaintiff's "claims for punitive damages are barred because the University engaged in good faith efforts to comply with Title VII," ECF No. 25 at 7.  That is sometimes known as a "*Kolstad* defense" after *Kolstad v. American Dental Association*, in which the Supreme Court held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'"  527 U.S. 526, 545 (1999) (quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting)).

A rocky discovery period commenced.  *See GW II*, 2020 WL 3489478 (resolving a dispute—developed over the course of approximately four months in two letter briefs, four regular briefs, and a hearing—over four of the Commission's requests for production of documents); *U.S. EEOC v. George Washington, Univ.*, 502 F. Supp. 3d 62 (D.D.C. 2020) [hereinafter *GW III*]

(finding that counsel for the EEOC had violated Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure by reviewing documents after the University informed her that they were privileged and rejecting the Commission's claims that privilege had been waived); *GW IV*, 2021 WL 7907064 (addressing, but not resolving, the argument that the University had waived privilege over documents related to its internal investigation of Williams' grievance by asserting a *Kolstad* defense). An outline of the history of this current dispute will be useful.

During discovery, the Commission propounded an Interrogatory asking for a "full statement of the facts supporting [the University's] contention" that punitive damages are unavailable because it "engaged in good-faith efforts to comply with Title VII." ECF No. 78-4 at 2. In response, the University stated the following: that it values a diverse environment and is an equal opportunity employer that maintains strong human resources policies and procedures prohibiting discrimination, including an Equal Employment Opportunity Office; that the compensation of Williams and Aresco was determined, in accordance with University policies, by the Compensation Department, which reviews the employee's merit, comparable job roles, and similarly situated individuals, and sets pay ranges; that Aresco was qualified for the Special Assistant job; and that, had Williams applied for the job (which she did not), her qualifications and experience, as well as her performance in the Executive Assistant position, would have weighed against hiring her. ECF No. 78-4 at 3–5. In its first request for production of documents, the EEOC requested that the University produce all documents related to the University's internal investigation of Williams' grievance. *See GW IV*, 2021 WL 7907064, at *2; *see also* ECF No. 80-5 at 13. The University objected on the basis of attorney-client privilege and work product protection (among other bases) and, according to an "Amended Supplemental Privilege Log" produced on December 30, 2020, *see* ECF No. 80-4, "withheld 80 unique documents 'regarding'

the '[i]nvestigation re S. [Williams] grievance' under either attorney-client privilege, work product protection, or both," *GW IV*, 2021 WL 7907064, at *2 (alterations in original).

In early April 2021, the parties informed Judge Kollar-Kotelly of a number of discovery disputes, among them the Commission's complaint that the University had asserted "that all documents related to its investigation of [Williams'] complaint, except for the grievance form[,] are privileged." Joint Statement Regarding Discovery Disputes at 2 (on file with the Chambers of the undersigned). The Commission argued that the University's interposition of "a 'good faith' (*Kolstad*) defense" put its "subjective intention" at issue and thus waived protection over those documents. *Id.* The University retorted that the internal investigation was privileged because it "was conducted at the request and direction of University counsel—first the University's Office of General Counsel, and then outside counsel at Saul Ewing"—and that it "did not somehow waive privilege by pleading the *Kolstad* defense." *Id.* Judge Kollar-Kotelly ordered the parties to submit simultaneous briefing on that issue in late April 2021.[2]  *See* ECF No. 76. The Commission's resulting brief again argued that the University's assertion of the *Kolstad* defense worked an implied waiver of protection over the documents concerning the internal investigation because they were inextricably intertwined with that defense. ECF No. 79-4 at 16–19. In addition, the Commission contended that the University's privilege log was deficient by (1) failing to log any documents related to the internal investigation created between March 10, 2016, when Plaintiff filed her internal grievance, and July 29, 2016; and (2) insufficiently supporting the University's claims to either attorney-client privilege or work product protection. *Id.* at 9–11. The Commission also asserted that the University could not show communications relating to the internal

---

[2] Other disputes the parties raised in their April 2021 joint statement were referred to the undersigned, *see* ECF Nos. 76–77. The undersigned resolved the first of those after a hearing. *See* ECF No. 81. The parties were able to resolve the second without further court intervention. *See* Minute Order (May 28, 2021); ECF No. 84.

investigation, which was conducted by personnel in the University's Equal Employment Opportunity Office, were made "'because of' any anticipated litigation" as required for work product protection or that they "were *not* made 'but for' the purpose of seeking legal advice" as required for attorney-client privilege.[3] *Id.* at 14–15 (emphasis added). Finally, the Commission argued that it had established a sufficient need to overcome any work product protection that might attach to the internal investigation documents. *Id.* at 15–16. For its part, the University asserted that the internal investigation "was conducted in anticipation of litigation at the direction and under the supervision of counsel," pointing to certain entries on its privilege log and attaching an email dated March 21, 2016, from Vickie Fair to Richard Weitzner, an attorney in the University's Office of General Counsel, that forwarded Williams' internal grievance package. ECF No. 78 at 11–12; ECF No. 78-1. The University further argued that it had not waived any protection over the internal investigation documents by interposing a *Kolstad* defense because it "has disclaimed any intent to rely on the conclusions or advice of counsel in the Internal Investigation to support" that defense. ECF No. 78 at 14. The University did not respond to the Commission's argument about the deficiency of its privilege log, presumably because it was unaware that the issue would be addressed in the agency's simultaneously-filed brief.

In September 2021, Judge Kollar-Kotelly addressed, but did not resolve, the parties' disputes. Specifically, she found that the University's "privilege log [did] not adequately support [its] present claims of attorney-client privilege and work product protection over its [80] internal investigation documents." *GW IV*, 2021 WL 7907064, at *1. She noted 40 documents (identified by the EEOC in its prior brief) for which the University's claims of privilege were inadequately supported. *Id.* at *3–4 & n.2. Six of those were emails neither created by nor addressed to an

---

[3] The Commission's formulation of the test for attorney-client privilege in this Circuit was mistaken in that brief and, as discussed below, in its opening brief supporting this motion.

attorney that the privilege log failed to establish were "plausibly related to the pursuit of confidential legal advice." *Id.* at *4. Thirty-four additional documents (identified "as either 'attachments' or 'EDOCs'"[4]) over which the University claimed both attorney-client privilege and work product protection, failed to "identify the person who produced the documents, their recipients, or even the date the documents were created," making it impossible to evaluate the claims of privilege. *Id.* at *3–4. More, Judge Kollar-Kotelly looked askance at the University's "claims of work product protection over *all* documents" related to the internal investigation, noting GW had not shown that they "were prepared 'because of' the prospect of anticipated litigation," especially in light of the fact that GW's internal grievance process "provided for an investigation of Ms. Williams' workplace discrimination complaint *irrespective* of whether any litigation was forthcoming." *Id.* at *5 (quoting *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015)). She therefore ordered the University to "file a revised privilege log covering the internal investigation documents" that provided "supplemental information to justify [the] claims of attorney-client privilege and work product protection" in accordance with the discussion in her decision. *Id.* at *6.

As ordered, the University filed an updated privilege log on October 8, 2021. ECF No. 88-1 (the "October 2021 Privilege Log"). It explained that, "[i]n an abundance of caution," it had logged all 40 documents identified in *GW IV*, as well as all other documents and emails relating to the internal investigation (excluding duplicates). ECF No. 88 at 2. The updated privilege log contained approximately 95 documents because the University had "logged additional documents" since it propounded the privilege log of December 30, 2020, which was discussed in the prior briefing. *Id.* at 2 n.2. The October 2021 Privilege Log included "all investigation-related materials

---

[4] An "EDOC" appears to be an electronic document that is neither an email nor an attachment to an email.

that were reflected on the [University's] privilege log dated June 28, 2021." *Id.*  It also reflected

that the University had withdrawn claims of privilege over some documents or parts of documents

it had previously claimed were protected.  *See generally* ECF No. 88-1.  In total, the University

claimed privilege over all or some part of documents reflected in approximately 37 unique (that

is, excluding duplicates) entries on the log.  *See generally id.*

      After supplementing its production of documents, the University met and conferred with

the Commission to iron out any remaining differences.  ECF No. 89 at 1.  As they reported to the

Court, however, the parties were unable to resolve their differences without court intervention, as

the Commission continued to seek the production of "all documents relating to the University's

investigation of the [Williams'] grievance" based on the same or similar arguments presented in

the Commission's April 30, 2021 brief.  *Id.* at 1–2.  Judge Kollar-Kotelly therefore set a briefing

schedule for the Commission's contemplated motion to compel.  Minute Order (Oct. 18, 2021).

Therein, the Commission argued (among other things that will be addressed later) that the October

2021 Privilege Log (the University's then-most-recent privilege log) was still insufficient because

it failed to "explain with reasonable particularity how the withheld document was *uniquely*

prepared because of the prospect of litigation and not through the ordinary course of GWU's

internal EEO grievance process."  ECF No. 91 at 16 (quoting *GW IV*, 2021 WL 7907064, at *6).

Without conceding that the October 2021 Privilege Log was deficient, the University filed with its

opposition to the motion to compel a revised privilege log as well as a declaration from Vickie

Fair of the University's Equal Employment Opportunity Office.  ECF Nos. 93-2 (the "Fair

Declaration"), 93-3 (the "November 2021 Privilege Log").  The Fair Declaration asserts in part

that "[a]lmost immediately after" Fair received Williams' grievance on March 11, 2016, she

"contacted the University's Office of General Counsel" for "legal advice regarding how the

University should approach its handling" of the grievance, having determined "that there was a likelihood of litigation." ECF No. 93-2 at 1–2. Attorneys in the Office of General Counsel—specifically Senior Counsel Richard Weitzner and Senior Counsel Betsy Wanger—provided her with "guidance" as to, "among other things, the individuals with whom [she] should speak and the questions [she] should ask." *Id.* at 2. Then, in late July 2016, the University retained Saul Ewing to "take over" the investigation. *Id.* at 3. Fair "spoke with several attorneys" at the firm "to update them on [her] preliminary findings and to seek their legal advice and input regarding next steps." *Id.* Saul Ewing's investigation culminated in a report "that contained Saul Ewing attorneys' analysis of the facts uncovered during the investigation, along with legal advice." *Id.*

The University's submissions did not satisfy the Commission, which characterized the Fair Declaration in its reply in support of its motion as comprising "bald assertions that *she*, who is not an attorney, believed there was a likelihood of litigation" and "conclusory assertions that the communications were made for the purpose of securing legal advice." ECF No. 94 at 6, 9. It further contended that the November 2021 Privilege Log showed that the University had not engaged in a reasonably diligent search for documents related to the internal investigation because the log did not include "any witness interview statements or summaries, or any communications related to those interviews." *Id.* at 12.

Two months later, in January 2022, the University filed another privilege log. ECF No. 96-1 (the "January 2022 Privilege Log"). The University reported that Fair, who was cleaning out her office before moving to a new job, had "located a hard-file copy of documents related to the internal investigation." ECF No. 96 at 2. The University then produced over 300 documents from that trove to the Commission, as well as four additional documents discovered in a supplemental search made "to ensure that no other responsive hard-copy documents inadvertently had been

omitted from prior productions." *Id.* The January 2022 Privilege Log—the most current privilege

log of which the Court is aware and the one that is at issue here—"reflects responsive documents

located in Ms. Fair's hard-copy file that are protected from disclosure by the attorney-client

privilege and/or the attorney-work-product doctrine," including a number of documents reflecting

notes from Fair's interviews of witnesses. *Id.*; *see also* ECF No. 96-1 at 8–9. It claims attorney-

client privilege or work product protection over all or parts of 54 unique documents or emails.[5]

Judge Kollar-Kotelly was also not satisfied with the University's submissions. In March

2022, she entered an order noting that the January 2022 Privilege Log "does not appear to list any

documents reflecting a conversation between a member of [the University's] Office of General

Counsel and Ms. Fair, as described in [the Fair Affidavit]." Minute Order (Mar. 31, 2022). She

therefore ordered the University to "provide the Court with any such document" for *in camera*

review or, if such a document did not exist, to meet and confer with the EEOC to schedule a

deposition of Fair "limited to the contents of her Declaration." *Id.* The University provided

documents for that review, *see* ECF No, 97,[6] but Judge Kollar-Kotelly found that they did not

"sufficiently resolve the key question" in the EEOC's pending motion to compel, that is, "whether

Vickie Fair conducted her EEO investigation at the behest and/or direction of counsel." Minute

---

[5] The University has labeled the documents on the January 2022 Privilege Log (as on all other privilege logs filed on the docket) with the prefix "PRIV-" and a number, as well as a Bates number. Attorney-client privilege, work product protection, or both are claimed over the following documents: PRIV-376; 380; 405; 418; 419 email 3; 419 email 4; 556; 558; 560; 562 email 1; 562 email 3; 581 email 1; 594; 595 email 4; 595 email 5; 595 email 7; 595 email 8; 595 email 9; 595 email 10; 596; 599 email 3; 599 email 4; 595 email 5; 624; 631 email 1; 632; 652; 676; 1008, email 1; 1009; 1021; 1023, email 6; 1023, email 7; 1024; 1025; 1027; 1028, email 6; 1029; 1137; 1138; 1139; 1140; 1141; 1142; 1143; 1144; 1145; 1146; 1147; 1148; 1149; 1150; 1151; and 1152. The foregoing includes only "unique" documents; that is, it excludes documents identified on the January 2022 Privilege Log as duplicates of other documents on that log, but, for the sake of completeness, the Court notes that the following documents are identified as duplicates: PRIV-626 (duplicate of 560), PRIV-628 (duplicate of 558); PRIV-630 (duplicate of 376); PRIV-653 (duplicate of 676). The University counts 56 rather than 54 documents at issue, ECF No. 100 at 5, but the Court is unclear how it arrived at that number.

 For the remainder of the documents listed on the January 2022 Privilege Log, which comprise just under 50 unique documents, the University has withdrawn its claims of privilege. *See generally* ECF No. 96-1.

[6] The undersigned has also reviewed those documents, which do not undermine the findings or analysis herein.

Order (Apr. 14, 2022).  Judge Kollar-Kotelly therefore ordered the University to make Fair available for a deposition and the parties to thereafter provide supplemental briefing addressing the effect of the deposition on the issues in the motion to compel.  *Id.*

The parties simultaneously filed their supplemental briefing on May 18, 2022.  ECF Nos. 99–100.  The University filed a Notice of Supplemental Authority on June 9, 2022, after which Judge Kollar-Kotelly referred the motion to compel to the undersigned for resolution.  ECF Nos. 102, 105.  The Commission responded to the University's Notice of Supplemental Authority in July, ECF No. 106, and the motion is now ripe for resolution.

## II.    LEGAL STANDARD

A party seeking discovery may move under Rule 37 of the Federal Rules of Civil Procedure for an order "compelling an answer, designation, production or inspection" from a party who fails to produce documents requested pursuant to the Federal Rules.  Fed. R. Civ. P. 37(a)(3)(B). Generally, "[t]he party moving to compel discovery has the burden of proving that the opposing party's answers were incomplete." *Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007).  "However, a party asserting a privilege or work-product protection bears the burden to establish that the privilege applies." *United States v. All Assets Held at Julius Baer & Co.*, 169 F. Supp. 3d 54, 56 (D.D.C. 2015).  A party meets that burden by "'adduc[ing] competent evidence in support of its claims,' something beyond 'conclusory statements, generalized assertions, and unsworn averments of its counsel.'" *FTC v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016) (quoting *In re Veiga*, 746 F. Supp. 2d 27, 33–34 (D.D.C. 2010)), *aff'd*, 892 F.3d 1264 (D.C. Cir. 2018); *Alexander v. FBI*, 192 F.R.D. 42, 45 (D.D.C. 2000) ("[T]he party asserting the attorney-client privilege . . . must demonstrate 'the applicability of the

privilege by way of affidavits or other competent evidence.'" (quoting *Alexander v. FBI*, 186 F.R.D. 102, 111 (D.D.C. 1998))).

### A.    Attorney-Client Privilege

"The attorney-client privilege protects confidential communications between clients and their attorneys made for the purpose of securing legal advice or services." *Boehringer Ingelheim*, 180 F. Supp. 3d at 16. The D.C. Circuit has "rejected a strict 'but for' requirement under which a communication could not be privileged if there was any purpose behind it other than seeking or providing legal advice"; instead, a communication is entitled to attorney-client privilege if "'one of the significant purposes' of the communication was to obtain or give legal advice." *Id.* (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757–60 (D.C. Cir. 2014)). Although the underlying facts on which an attorney-client communication rests are generally not privileged, purely factual exchanges can be protected when, among other things, they are provided at the request of an attorney for the purpose of enabling legal advice. *Id.* Indeed, even communications among corporate employees who are not attorneys are entitled to protection if the purpose of those communications was to marshal facts for counsel to use in rendering legal advice. *Id.* at 34; *see also United States v. AT&T Corp.*, No. 02-cv-164, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications between non-lawyer employees about matters which the parties intend to seek legal advice are likewise cloaked by attorney-client privilege."); *Santrade, LTD v. General Electric Co.*, 150 F.R.D. 539, 543 (E.D.N.C. 1993) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.").

### B.    Work-Product Protection

The work-product doctrine "protect[s] the mental processes and opinions of the drafter of the document in question," as well as "factual material that is bound up with the drafter's opinions

and recommendations." *All Assets*, 169 F. Supp. 3d at 57.  Under Rule 26(b)(3)(A), which "codified in substantial part" the federal work-product doctrine, "a party generally may not discover 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative.'"[7]  *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  In this Circuit, material is generated in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation."  *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 315 F.R.D. 103, 108–09 (D.D.C. 2016) (emphasis added) (quoting *Boehringer Ingelheim*, 778 F.3d at 149).  The litigation "need not be actual or imminent; it need only be 'fairly foreseeable.'"  *Hertzberg*, 273 F. Supp. 2d at 78 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)).  Importantly, the D.C. Circuit's "because of" test does not require that "anticipation of litigation be the 'primary motivating purpose' behind the document's creation"; rather "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation."  *United States v. Deloitte LLP*, 610 F.3d 129, 136–138 (D.C. Cir. 2010) (rejecting the "more demanding" primary motivating purpose test in favor of the "more lenient 'because of' test"); *see also Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at

---

[7] That is, it is not necessary for documents to have been prepared by an attorney or under the direction of an attorney, "so long as they were clearly prepared in anticipation of litigation" by a party's representative.  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 77 (D.D.C. 2003) (collecting cases); *see also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977) ("While the 'work product' may be, and often is, that of an attorney, the concept of "work product" is not confined to information or materials gathered or assembled by a lawyer."); *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213, 221 (S.D.N.Y. 2001) ("[D]ocuments prepared in anticipation of litigation need not be created at the request of an attorney."); *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, No. 95-cv-4856, 1996 WL 490710, at *2 (S.D.N.Y. Aug. 27, 1996) (same); 8 Charles A. Wright, *et al.*, Federal Practice and Procedure § 2024 (3d ed.) (noting that the 1970 amendment to Rule 26 "extended" work product protection to include not only documents and things prepared "by or for the attorney of the party from whom discovery is sought" but also "documents and things prepared for litigation or trial by or for the adverse party itself or its agent").

137).  However, "[w]here a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available." *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).

Moreover, "the work product privilege is a qualified privilege which may be overridden by a showing of substantial need by the requesting party." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1302 (D.C. Cir. 1980).  More specifically, so-called "fact work product," which is material prepared in anticipation of litigation that does not "reveal 'the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation,'" is discoverable where "the party seeking disclosure 'has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *All Assets*, 315 F.R.D. at 109 (first quoting Fed. R. Civ. P. 26(b)(3)(B), then quoting Fed. R. Civ. P. 26(b)(3)(A)(ii).  On the other hand, opinion work product—that is, material that does reveal the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative—is "virtually undiscoverable." *Id.* (quoting *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997)).  Although material created by non-attorneys may be protected as opinion work product, in order to be so protected, it must be closely intertwined with legal analyses, such as by "necessarily reflect[ing] a focus chosen by [a] lawyer." *United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 429, 432 (D.D.C. 2014) (quoting *United States v. Clemens*, 793 F. Supp. 2d 236, 252 (D.D.C. 2011)); *Deloitte*, 610 F.3d at 139 (remanding case to district court to view documents *in camera* to determine whether analyses by non-attorneys were "so intertwined with the legal analysis as to warrant protection under the work-product doctrine").

## III.    DISCUSSION

The fact that this dispute—or, really, *these disputes*, because the discrete issue presented in April 2021 (whether the University had waived protection over its internal investigation documents by pleading a *Kolstad* defense, *see* Joint Statement Regarding Discovery Disputes at 2) has since proliferated—has unfolded over the course of months and involved at least three iterations of the University's privilege log, a deposition, and five briefs (as well as other submissions) complicates matters somewhat.   With one small change, the discussion below follows the order of issues presented in the foundational document of this version of the parties' disputes, that is, the Commission's motion to compel filed on November 4, 2021, and referred to the undersigned in June 2022.   *See* ECF Nos. 91 (motion to compel), 102 (referral order), 105 (amended referral order).   The Court addresses first the Commission's argument that the University's privilege log is insufficient; second, whether the withheld or redacted internal investigation documents are privileged or protected as work product, including a discussion of whether the Commission has shown substantial need and undue burden under Rule 26(b)(3) of the Federal Rules of Civil Procedure sufficient to overcome the protection of fact work product; and third, whether the University has waived privilege over those documents by interposing a *Kolstad* defense.   Along the way, the Court addresses the Commission's objections to the Fair Declaration and makes findings of fact that guide the privilege and work product analyses.

### A.    Sufficiency of the January 2022 Privilege Log

Understandably, and through no fault of its own, the Commission's arguments as to the sufficiency of the University's privilege log have evolved as the University's privilege log has itself evolved over the course of the last several months.   When the motion to compel was filed in early November 2021, the Commission had four major complaints based on the October 2021

Privilege Log:  (1) the University's claims of work product protection did not "'explain with reasonable particularity how the withheld document was *uniquely* prepared because of the prospect of litigation and not through the ordinary course of GWU's internal EEO grievance process,'" as ordered by Judge Kollar-Kotelly; (2) its claims of attorney-client privilege "relie[d] solely on bald assertions" of privilege without factual support; (3) the October 2021 Privilege Log did not identify any items derived from interviews conducted during the University's internal investigation and therefore privilege over those documents had been waived; and (4) the log reflected entries with unknown recipients.  ECF No. 91 at 16–17 (quoting *GW IV*, 2021 WL 7907064, at *6).  In its reply in support of its motion to compel, which post-dates both the Fair Declaration and the November 2021 Privilege Log which the University filed in connection with its opposition brief, the Commission focused on the lack of entries for witness statements on November 2021 Privilege Log, arguing that the University failed to provide any factual support for its assertion that it engaged in a reasonably diligent search for such responsive documents and therefore waived any protection over such unlogged documents.  ECF No. 94 at 12–14.  In the supplemental briefing ordered by Judge Kollar-Kotelly, which post-dates both Fair's deposition and the now-operative January 2022 Privilege Log, the Commission continues that theme.   Recognizing that the University had again updated its privilege log and focusing—appropriately—on that January 2022 Privilege Log, the Commission asserts that even it fails to include documents that Fair testified had been created; specifically, notes taken by Fair during the interview of Aresco, interview notes taken by Reich, and interview notes taken by Saul Ewing attorneys during their interview of Williams.  ECF No. 99 at 18–19.  The Commission thus insists that privilege over any such documents has been waived.  *Id.*

The Commission's refinement of its challenge makes good sense.  The first two complaints from the Commission's opening brief on its motion to compel—that the University had not sufficiently supported its claims of attorney-client privilege or work product protection in the October 2021 Privilege Log—have been overtaken by events, not only because the privilege log has been updated (twice) since then, but also because Fair has submitted a declaration and provided testimony focused on the University's claims of privilege over the internal investigation documents on the now-operative privilege log from January 2022.[8]  The University addressed the fourth issue—the three privilege log entries that failed to list recipients—in the November 2021 Privilege Log, identifying the recipients as Fair, attorneys from the University's Office of General Counsel, and attorneys from Saul Ewing.  *See* ECF No. 93 at 17 n.5; *see also* ECF No. 96-1 at 3–4 (entries for PRIV-562, emails 1 & 3; PRIV-595, email 7; and PRIV-595, emails 3 & 4).  More, the January 2022 Privilege Log includes entries for interview notes, reflecting the paper documents discovered as Fair was cleaning out her office sometime between November 2021 and January 2022, thus addressing the Commission's third concern.  *See* ECF No. 96; *see also* ECF No. 96-1 at 8–9 (entries for PRIV-1138 through 1148).  Therefore, as noted, the remaining argument is that the University has waived privilege over internal investigation documents in its possession, custody, or control, that have not been logged—specifically notes of certain interviews performed by Fair, Reich, and Saul Ewing attorneys—and therefore must produce them.  ECF No. 94 at 14.

For its part, the University asserts (in its original opposition to the Commission's motion to compel) that it has "logged all documents located as a result of its reasonably diligent search that were responsive to the EEOC's discovery requests and that were being withheld on attorney-

---

[8] The combination of the January 2022 Privilege Log, the Fair Declaration, and the Fair Deposition has provided sufficient factual information to allow the Court to rule on the Commission's motion to compel.  More, the extensive briefing has given the parties the opportunity to perfect their arguments.  There is therefore no need for further review or argument over this dispute; it is ripe for resolution.

client-privilege and/or work-product grounds." ECF No. 93 at 17 n.5; *see also* ECF No. 96 at 2. That is to say, the University avers that it has fulfilled its obligation under Rule 34 of the Federal Rules of Civil Procedure to search for responsive documents and has claimed attorney-client privilege or work product protection over all internal investigation documents subject to those protections. *See, e.g.*, *Albert v. Lab. Corp. of Am.*, 536 F. Supp. 3d 798, 801 (W.D. Wash. 2020) ("Rule 34 requires the producing party to conduct a reasonable search for responsive relevant documents."). Or, to put it another way, the University says that there are no further internal investigation documents within its possession, custody, or control that are attorney-client or work product material that it has not logged.

It is axiomatic that a court "cannot compel a party to produce records that do not exist." *Holloway v. Cty. of Orange*, No. 19-cv-1514, 2020 WL 868026, at *3 (C.D. Cal. Jan. 15, 2020). An obvious corollary is that a court cannot declare that a party has waived privilege over documents that do not exist. *Cf. Kingsway Fin. Servs. v. Pricewaterhouse-Coopers LLP*, No. 03-cv-5560, 2006 WL 1295409, at *2 (S.D.N.Y. May 10, 2006) ("Under any analysis . . . it would be clearly irrational to hold that a waiver of privilege results from a failure to list documents that do not exist at the time the index is due."). However, the Court does not dismiss the Commission's argument out of hand because, as described above, after the initial briefing on this motion to compel—that is, after the University had first represented that it had produced or logged all relevant documents in its possession, custody, or control—Fair discovered additional responsive material, including documents the University now claims are protected, while she was cleaning out her office. *See* ECF No. 96 at 2. To be sure, that prompted the University to take "additional steps to ensure that no other responsive hard-copy documents inadvertently had been omitted from

prior productions." *Id.* But, after all that, it is not unreasonable to be skeptical of the University's assertion that there are no further responsive documents.

Still, the Court finds that it is premature to hold that the University has waived privilege over internal investigation documents that may or may not exist. *Cf., e.g.*, *Inova Health Care Servs. ex rel. Inova Fairfax Hosp. v. Omni Shoreham Corp.*, No. 20-cv-784, 2021 WL 6503725, at *6 (D.D.C. Jan. 29, 2021) (deciding that, "[a]lthough the Court share[d] [the] plaintiff's skepticism" that the defendant had produced all responsive documents, it would not order the relief the plaintiff requested—a new search and subsequent certification that all documents had been produced—but would instead order that "[s]hould further searches . . . turn up additional responsive material, [the defendant] shall supplement its document production"); *Johnson v. Ford Motor Co.*, 309 F.R.D. 226, 235 (S.D.W. Va. 2015) (declining to find privilege waived where the defendant's privilege log was deficient and instead ordering production of an updated log). Such caution is particularly appropriate here, where there seems to be some question as to whether the University was required to search for documents in the exclusive possession of Saul Ewing—an issue that is mentioned in the briefing but has neither been adequately discussed there nor, apparently, been the subject of a meet-and-confer; it is therefore not properly before the Court. *See* ECF No. 100 at 10 n.2 (stating, among other things, that "the University never agreed to include Saul Ewing or its attorneys as custodians for purposes of its document collection and review," "the EEOC never met and conferred with the University regarding custodians for its RFPs related to the Internal Investigation," and "to the extent that the EEOC now, for the first time, is arguing that the University should have logged each and every document in the possession of outside counsel at Saul Ewing related to the Internal Investigation, . . . the EEOC should have met and conferred with the University regarding that issue prior to raising it with the Court"). For

these reasons, the Court will not hold that the University has waived protection over hypothetical internal investigation documents. Instead, any issues regarding waiver of unlogged documents may be brought to the Court if such documents are discovered.[9]

**B.      Attorney-Client Privilege and Work Product Protection Claimed on the January 2022 Privilege Log**

As noted, the University has attempted to support its claims of attorney-client privilege and work product protection with the January 2022 Privilege Log, the Fair Declaration, and Fair's deposition testimony. The Commission, however, has challenged the University's reliance on the Fair Declaration, arguing that the Court should ignore it because Fair contradicted it during her deposition. Because resolution of that argument will clarify which evidence is fair game in the later analysis of, first, the University's claims of attorney-client privilege and, second, its claims of work product protection, the Court will begin there.

1.      The Fair Declaration

The Fair Declaration is dated November 24, 2021. ECF No. 93-2 at 4. In it, Fair states that she is an attorney (although she did not act as one for the University in connection with this matter) and that during the relevant time period, she was Assistant Vice President of Equal Employment Opportunity and Employee Relations. *Id.* at 1–3. As noted above, Fair asserts that "[a]lmost immediately after receiving [Williams'] grievance" in March 2016, she contacted attorneys in the University's Office of General Counsel "to obtain their legal advice regarding how the University should approach its handling" of the allegations. *Id.* at 1–2. She avers that was an unusual step that was taken only with "grievances that [she] believe[d] . . . likely to result in litigation," as she did with Williams' grievance. *Id.* at 2. Attorneys at the Office of General

---

[9] The Commission has repeatedly threatened to file a motion seeking sanctions, including sanctions terminating the case in its favor, for spoliation of evidence. ECF No. 94 at 14 n.1; ECF No. 99 at 19 n.3. No such motion has yet been filed; nor would such a motion be within Judge Kollar-Kotelly's referral to the undersigned.

Counsel—Weitzner and Wanger —"provided [her] with legal advice regarding the conduct of the investigation" and provided "guidance regarding, among other things, the individuals with whom [she] should speak and the questions [she] should ask." *Id.* She was also assisted by Reich (like Fair, an attorney who did not act as counsel for the University in connection with the grievance), who was an Equal Employment Opportunity and Employee Relations Manager at the University. *Id.* at 2–3. During the course of her handling of the investigation, Fair conducted several interviews over the phone. *Id.* at 3. Saul Ewing took over the investigation in late July 2016 and Fair thereafter spoke with several attorneys from the firm "to update them on [her] preliminary findings and seek their legal advice and input." *Id.* Saul Ewing then took over witness interviews and document collection and drafted a report "that contained Saul Ewing attorneys' analysis of the facts uncovered during the investigation, along with legal advice." *Id.* Saul Ewing sent her several drafts of the report and, at the firm's behest, Fair and Reich sent the firm "questions and comments" regarding the report, which Saul Ewing attorneys then answered or otherwise responded to. *Id.* at 3–4. Fair also identifies a number of documents (by "PRIV-" number) as drafts (including the final draft) of the Saul Ewing report, communications from Fair and Reich to Saul Ewing attorneys containing questions for and comments on the report, and responsive communications from Saul Ewing to Fair and Reich. *Id.*

The Commission argues that the Fair Declaration is contradicted by her more recent deposition and therefore should be excluded under the "'sham affidavit' doctrine." ECF No. 99 at 14. The argument is both misplaced and unnecessary.

As then-District Judge Ketanji Brown Jackson has explained:

> The sham affidavit rule "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony." The sham affidavit rule applies in cases where an affidavit

provided as a supplement to sworn testimony "clearly contradict[s]," rather than
clarifies, previous sworn testimony and provides no explanation for the change in
testimony.

*Raymond v. Architect of Capitol*, 49 F. Supp. 3d 99, 105 n.5 (D.D.C. 2014) (alteration in original)

(first quoting *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007), then quoting *St.

Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160 (D.D.C.

2008)). "The doctrine is designed to vindicate 'the utility of summary judgment as a procedure

for screening out sham issues of fact,' and champions testimony subject to cross-examination (such

as deposition testimony) over other statements because of its heightened reliability." *Lifeguard

Licensing Corp. v. Kozak*, No. 15-cv-8459, 2017 WL 908199, at *2 (S.D.N.Y. Mar. 7, 2017)

(quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)), *aff'd sub

nom. Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, 2017 WL 3142072 (S.D.N.Y. July

24, 2017).

The Commission recognizes that its motion is not one for summary judgment, but

nevertheless argues that the University is using the Fair Declaration "to create a 'sham issue of

material fact.'" ECF No. 99 at 14 (quoting *St. Paul Mercury Ins.*, 573 F. Supp. 2d at 160). But

the creation of an issue of fact does not have the same effect on a motion compel as it does on a

motion for summary judgment. If the party opposing a motion for summary judgment creates an

issue of material fact, the motion must be denied. The same is not true of a motion to compel.

Indeed, the University's mere creation of an issue of fact—sham or otherwise—on the question of

whether the internal investigation documents are privileged as attorney-client communications or

protected as work product would not get it very far because, as the Commission emphasizes, it is

the *University's burden* to establish that the documents are protected from disclosure. *See, e.g.*,

ECF No. 91 at 12 ("Defendant must clear the high burden required of the party asserting

22

privilege."); ECF No. 99 at 4 ("Defendant maintains the burden to prove that the documents are privileged or work product[.]").  Thus, an argument invoking a doctrine "designed to vindicate 'the utility of summary judgment'" by "screening out" manufactured issues of material fact, *Lifeguard Licensing*, 2017 WL 908199, at *2 (quoting *Perma Research & Dev.*, 410 F.2d at 578), is misplaced.

The sham affidavit argument is unnecessary here for a related reason.  This dispute requires the Court to determine the relevant facts and evaluate whether the University has shown that the documents it is withholding are protected from disclosure.  That is, there is no need for a "sham affidavit doctrine"; there is only a need for the Court to assess the evidence before it and decide whether the burden of showing privilege has been met.  For these reasons, the Court will not "exclude[ ] from consideration" the Fair Declaration, ECF No. 99 at 15, but will take it into account along with the other evidence and arguments of counsel, including the Commission's arguments that Fair contradicted her declaration during her deposition.[10]

> 2.    Findings of Fact

The Court has reviewed the record, including the Fair Declaration, the transcript of her deposition, the January 2022 Privilege Log, the documents submitted for *in camera* review, and the arguments of counsel, and makes the following findings of fact pertinent to this privilege

---

[10] The Commission emphasizes that Fair was unable to remember at the deposition "substantial swaths of information" about which she was asked.  ECF No. 99 at 11–12.  Much of that forgotten information, however, comprises details of events occurring between five and six years ago, such as "the first action she took when she received Williams' complaint," the number of discussions she had with the Office of General Counsel about the complaint, the number of discussions she had with Saul Ewing attorneys about the complaint, the specifics of those discussion, and the like.  *Id.*  Given the temporal distance and the fact that, as the Commission established at the deposition, Fair did not review any documents other than her declaration to prepare for the deposition, ECF No. 99-1 at 14, those lapses of memory— indicated most often by the answer "I don't recall" or "I can't recall," *see, e.g., id.* at 54, 57, 65, 69, 85, 86, 87, 100— do not go far in undermining the Fair Declaration.  *But cf. infra* note 13.  Nor, of course, do they help shoulder the University's burden to establish that the documents at issue are protected from disclosure by attorney-client privilege or work product protection.

dispute.[11]  *Cf., e.g.*, *In re Grand Jury*, 705 F.3d 133, 159 (3d Cir. 2012) (noting that "factual findings underlying the application" of attorney-client privilege and work product protection are reviewed for "clear error"); *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010) (same).

During the relevant time period, Fair, who is an attorney, was Assistant Vice President of Equal Employment Opportunity and Employee Relations, a position in which she did not represent the University as counsel.  ECF No. 93-2 at 1–2.  Rather, her job duties included serving as "the subject matter expert" on equal employment opportunity and investigating allegations of discrimination.  ECF No. 93-2 at 2–3; ECF No. 99-1 at 19, 23–24, 107.  Such investigations took different forms depending on the circumstances, but generally involved interviewing witnesses and sometimes involved writing an investigative report.  ECF No. 99-1 at 25–40, 52–53.  It was not her general practice to contact the Office of General Counsel at the outset of an investigation.  ECF No. 93-2 at 2; ECF No. 99-1 at 89–90.

Fair received Williams' grievance in March 2016.  ECF No. 93-2 at 1.  She determined that the complaint was likely to provoke litigation and was concerned about the broad scope of the complaint, in part because it included facts seemingly unrelated to Williams' own allegations of discrimination; she further noted that the complaint appeared to include information Fair thought was confidential and to which Williams should not have had access.  *Id.* at 2; ECF No. 99-1 at 56, 94–95, 103.  Therefore, within a few days of receiving the complaint, Fair contacted the Office of General Counsel to obtain legal advice about how to approach the investigation of the

---

[11] Except where noted, these facts are not controverted in any material way and, even where the record evinces contradictory statements, those issues are only tangential to the Court's later analyses.

allegations.[12]  ECF No. 93-2 at 2; ECF No. 99-1 at 55.  Reich assisted her in the investigation. ECF No. 93-2 at 2; ECF No. 99-1 at 76–77.  Prior to the University's retention of Saul Ewing, Fair had a number of discussions and meetings Weitzner and Wanger, attorneys with the Office of General Counsel, about Williams' complaint, including discussions by phone and in person.  ECF No. 99-1 at 57–58, 61–63, 65.  Those discussions covered strategy, including potential witnesses to interview, but Fair could not remember details of the discussions.  ECF No. 93-2 at 2; ECF No. 99-1 at 64–65, 69, 71.  Although the Office of General Counsel offered guidance concerning interview questions, the University has not shown that its attorneys provided Fair with specific interview questions to ask or topics to cover during the interviews.[13]  ECF No. 93-2 at 2; ECF No. 99-1 at 71, 73, 79, 104.  Fair reported back to the Office of General Counsel regarding the interviews she conducted and received guidance from attorneys there during the interview process; she also discussed her preliminary findings with that department before Saul Ewing was hired to continue the investigation.  ECF No. 99-1 at 79–82, 85.

---

[12] The Commission argues that Fair's testimony at her deposition that she contacted the Office of General Counsel because she was concerned about the scope of Williams' complaint and its apparent use of confidential information is inconsistent with Fair's assertion in her declaration that she contacted the Office of General Counsel because she anticipated litigation, including the filing of an administrative discrimination charge.  ECF No. 99 at 13–14.  The Court sees no contradiction between those statements.  Certainly, one might reasonably anticipate litigation based on the scope and content of a discrimination grievance.

[13] The Fair Declaration states that Weitzner and Wanger gave her "guidance regarding, among other things, the individuals with whom [she] should speak and the questions [she] should ask."  ECF No. 93-2 at 2.  When asked at the deposition whether Weitzner "provide[d] [her] questions to ask," Fair responded, "Not that I can recall."  ECF No. 99-1 at 71.  She responded the same way to the question, "Did [Weitzner] give you topics to cover during your interviews?" and "Did [the Office of General Counsel] provide you questions to ask witnesses regarding Ms. Williams' complaint?"  *Id.* at 73, 79.  The Court notes that is a different response with a different nuance than Fair's more typical responses of "I don't recall" or "I can't recall," *see supra* note 10, and indicates an answer in the negative.  At a later point, Fair answered a question about whether the Office of General Counsel gave her "questions or topics of conversation to ask witnesses" with the response, "More than likely," but she had no "specific memory" of the Office of General Counsel providing such information.  *Id.* at 83.  The Court finds insufficient the University's evidence that attorneys at the Office of General Counsel provided specific questions to Fair or directed her to address specific topics. However, that is not directly contradictory to Fair's assertion that they provided "guidance," nor is it dispositive on the issue of whether the documents at issue are protected.

After Saul Ewing was retained to take over the investigation in July 2016, Fair sent the firm a file including investigation materials—although she could not remember what specifically was included in the file—and communicated with attorneys at the firm to update them on her preliminary findings and seek legal advice regarding next steps.  ECF No. 93-2 at 3; ECF No, 96-1 at 8–9; ECF No. 99-1 at 86, 88–89.  Saul Ewing conducted at least one additional interview and eventually produced a report that included its attorneys' analysis of the facts collected during the investigation and legal advice.  ECF No. 93-2 at 3; ECF No. 99-1 at 87.  In late 2016 Fair engaged in back-and-forth communications with Saul Ewing about the report.  The firm sent Fair several drafts of the report; those drafts appear on the January 2022 Privilege Log at PRIV-418, 632, and 652.  ECF No. 93-2 at 3–4.  At the firm's request, she and Reich sent comments and questions seeking legal advice; those comments and questions appear on the January 2022 Privilege Log at PRIV-376, 405, 556, 558, 560, 624, 626, 628, and 630.  *Id.* at 4.  Saul Ewing responded to those questions and comments on documents reflected on the January 2022 Privilege Log at PRIV-594 and 1021.  *Id.*  Saul Ewing then produced a final report—the Saul Ewing Report—in early November 2016, which appears on the January 2022 Privilege Log at PRIV-653 and 676.  *Id.* Other entries on the 2022 Privilege Log are also identified as reflecting questions or responses regarding the report, copies of a draft report, or copies of the final report.  *See* ECF No. 96-1 at 6, 9 (entries for PRIV-1009, 1024–1025, 1027, 1029, 1149–1152).  Communications between the Office of General Counsel and Saul Ewing seeking or containing legal advice about Williams' complaint and its investigation continued from late 2016 until March 2017.  *See id.* at 4, 6–7 (entries for PRIV-599 emails 3–5 (dated March 2017), 1023 emails 6–7 (dated December 2016), 1028 (dated December 2016)).

3.      Attorney-Client Privilege

The University claims attorney-client privilege over each of the 54 documents it has refused to disclose from the January 2022 Privilege Log (identified *supra* note 5). Those entries can be divided into a number of subgroups (duplicates are omitted): (1) documents from between March 2016 and June 2016 reflecting notes from Fair's interviews with witnesses and a meeting with attorneys from the Office of General Counsel and Saul Ewing regarding Williams' complaint,[14] which total eleven entries: PRIV-1138–1148; (2) documents from late 2016 related to the draft and final versions of the Saul Ewing Report, including documents reflecting questions from Fair and/or Reich to Saul Ewing and documents reflecting Saul Ewing's responses, which total 21 entries: PRIV-376, 405, 418, 556, 558, 560, 594, 624, 632, 652, 676, 1009, 1021, 1024–25, 1027, 1029, and 1149–1152; and (3) miscellaneous emails sent between late July 2016 (approximately when Saul Ewing was retained) and late March 2017, which total 22 entries: PRIV-380, 419 emails 3 and 4, 562 emails 1 and 3, 581 email 1, 595 emails 4–5 and 7–10, 596, 599 emails 3–5, 631 email 1, 1008 email 1, 1023 emails 6–7, 1028 email 6, and 1137.[15] Seven of those emails, dated from July to November 2016, are between Fair and attorneys from the Office of General Counsel (PRIV-419 email 4, 595 email 4) or between Fair and Saul Ewing attorneys (PRIV-562 emails 1 and 3, 581 email 1, 631 email 1, 1137); fourteen, dated from August 2016 to March 2017, are among Saul Ewing attorneys and attorneys at the Office of General Counsel (PRIV-380, 595 emails 5 and 7–10, 596, 599 emails 3–5, 1008 email 1, 1023 emails 6–7, 1028 email 6). One email, dated October 2016, is from Reich to Fair (PRIV-419 email 3). That is, all but one of those emails includes as either author or addressee an attorney with the Office of General

---

[14] Two of those documents are undated. *See* ECF No. 96-1 at 8 (PRIV-1138, 1143).

[15] To be more specific, one of those documents is identified on the January 2022 Privilege Log as an attachment to an email from a Saul Ewing attorney to Weitzner; the attachment is itself an email among Saul Ewing attorneys. *See* ECF No. 96-1 at 1 (entry for PRIV-380).

Counsel or with Saul Ewing; none (with that single exception) is a communication between non-attorney personnel merely copied to one or more attorneys.  The Commission glosses over those facts, making a sweeping argument that none of the withheld documents is privileged as an attorney-client communication because the internal investigation "was not conducted by attorneys" and "was not conducted for the purpose of securing legal advice," but rather was "conducted in the regular business of the [Equal Employment Opportunity] Office."  ECF No. 91 at 20.

More, in making that argument, the Commission stumbles right out of the gate, applying an incorrect standard for the application of attorney-client privilege.  It cites *United States v. ISS Marine Services*, 905 F. Supp. 2d 121, 128 (D.D.C. 2012), for the proposition that "[i]n evaluating whether the purpose of a communication is to seek legal advice, this Court applies a 'but for' test, which examines whether the communication would not have been made 'but for' the fact that legal advice was sought."  ECF No. 91 at 18.  But in 2014 (nearly two years after the *ISS Marine* opinion and more than seven years before the Commission filed its motion to compel), the D.C. Circuit expressly "reject[ed] the . . . 'but-for' test as inconsistent with [Supreme Court precedent] and longstanding attorney-client privilege law."  *Kellogg Brown & Root*, 756 F.3d at 759 (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)).  Rather, the proper test is whether "obtaining or providing legal advice [was] *a* primary purpose of the communication, meaning one of the significant purposes of the communication."  *Id.* at 760 (emphasis in original).  The D.C. Circuit continued:

> [I]f one of the significant purposes of an internal investigation was to obtain or provide legal advice, the privilege will apply.  That is true regardless of whether an internal investigation was conducted pursuant to a company compliance program required by statute or regulation, or was otherwise conducted pursuant to company policy.

*Id.* Thus, the Commission's insistence that the internal investigation was "conducted in the regular business of the [Equal Employment Opportunity] Office," ECF No. 91 at 20, is not dispositive on this issue.  Rather, the evidence—as reflected in the findings of fact above—makes clear that obtaining legal advice was, at least, "*a* primary purpose" of the internal investigation and the documents from that investigation reflected on the January 2022 Privilege Log.  Fair contacted the Office of General Counsel within days of receiving Williams' complaint, having determined that litigation was likely.  ECF No. 93-2 at 2; ECF No. 99-1 at 55.  She received guidance from attorneys (including guidance on investigation strategy) throughout the interview process, reported back after interviews, and discussed her preliminary findings with the Office of General Counsel before Saul Ewing took over the investigation.  ECF No. 93-2 at 2; ECF No. 99-1 at 57–58, 61–65, 69, 71, 79–82, 85.  After Saul Ewing took up the investigation, Fair communicated preliminary findings to its attorneys and sought legal advice regarding next steps.  ECF No. 93-2 at 3; ECF No. 99-1 at 86, 88–89.  The firm sent Fair drafts of its report and, at the firm's request, she and Reich sent comments and questions seeking legal advice, which Saul Ewing provided.  ECF No. 93-2 at 3–4.  Saul Ewing then produced a final report that included its attorneys' analysis of the facts collected during the investigation and legal advice.  ECF No. 93-2 at 3; ECF No. 99-1 at 87.  Subsequently, communications continued between the Office of General Counsel and Saul Ewing seeking or containing legal advice.  *See* ECF No. 96-1 at 4, 6–7 (entries for PRIV-599 emails 3–5 (dated March 2017); 1023 emails 6–7 (dated December 2016); 1028 (dated December 2016)).  The Court finds that the internal investigation was conducted at the direction of counsel—first the Office of General Counsel and then attorneys at Saul Ewing, who completed the investigation and drafted a report including legal advice that was provided to the University.

Additionally, even assuming that the analysis of attorney-client privilege in *ISS Marine*
survives *Kellogg Brown & Root*,[16] it does not help the Commission here.  *ISS Marine* concerned
whether an audit report of the billing and accounting practices of a British affiliate of a company
known as Inchcape Shipping Services Holdings, Ltd. ("Inchcape") was protected by attorney-
client privilege.  905 F. Supp. 2d at 123–24.  The court had before it a declaration from a former
Senior Vice-President of Inchcape stating that the purpose of the investigation, conducted by a
non-attorney employee of the company, was to "obtain information to enable [two non-attorney
executives of Inchcape], the Inchcape audit committee, and the Inchcape Board of Directors to
make a business decision as to what further action, if any, Inchcape would take to address"
allegations of possible fraudulent conduct in Inchcape facilities in the Middle East.  *Id.* at 125.
The court found that Inchcape had "purposefully eschewed the involvement of outside counsel—
or any attorneys whatsoever—in the internal investigation and audit," which "militate[d] strongly
against applying the attorney-client privilege."  *Id.* at 130.  More specifically, the record was
"devoid of any evidence to suggest that [outside counsel] provided any consultation to ISS Marine
while the investigation was actually being conducted"; nor did counsel "participate in the interview
process or the review of documentary evidence."  *Id.* (quoting the record).  Rather, any
participation by counsel occurred prior to the investigation and consisted of "framing . . . the issues
related to potential liability" and providing "guidance about the types of documents that would be
helpful."  *Id.*  The company waited two months after the audit report was completed to transmit it
to outside counsel, but "[did] not even suggest[ ] that [outside counsel] provided legal advice based
on [the report]."  *Id.* at 132.  The court found that such "arms-length coaching" by counsel—or,

---

[16] The Court notes that it has not found a case from this Circuit post-dating *Kellogg Brown & Root* that relies on the
analysis of attorney-client privilege in *ISS Marine*.

"consultation lite"—"undercuts the purposes of the attorney-client privilege in the context of an internal investigation." *Id.* at 129–30.

Here, the Commission argues that *ISS Marine* dictates that attorney-client privilege does not protect documents created in connection with the internal investigation of Williams' complaint because "the record . . . shows that there was limited contact between counsel and Fair, and that Fair conducted the investigation without attorney involvement until late July 2016." ECF No. 94 at 10; *see also* ECF No. 99 at 15. But, as discussed above, the evidence tells a different story—one in which there was significant communication between Fair and attorneys from the Office of General Counsel and from Saul Ewing. The circumstances here, then, are unlike the "consultation lite" described by the *ISS Marine* Court. 905 F. Supp. 2d at 129.

Painting only with that broad brush, the Commission makes no other argument on this issue. That is, it does not point to specific documents on the January 2022 Privilege Log (or any previous one, for that matter) to challenge the University's characterization of them as reflecting attorney-client communications for the purpose of procuring legal advice. *See, e.g.*, *Boehringer Ingelheim*, 180 F. Supp. 3d at 16 ("The attorney-client privilege protects confidential communications between clients and their attorneys made for the purpose of securing legal advice or services."). The Commission has chosen its strategy, and the Court will not manufacture arguments on its behalf.[17] *See GW II*, 2020 WL 3489478, at *17 ("[T]he Court refuses to construct

---

[17] Given the length and breadth of the briefing concerning the present discovery dispute, the undersigned would not look kindly on a follow-up application in which the Commission attempted to do what it apparently elected not to do here and challenge privilege (or work-product protection) on a document-by-document basis. *See, e.g.*, *Cheng v. AIM Sports, Inc.*, No. 10-CV-3814, 2011 WL 13196557, at *3 (C.D. Cal. Mar. 30, 2011) ("[D]efendants will not be permitted to utilize Court resources and seek Court intervention for discovery disputes in a piecemeal fashion[.]"); *see also, e.g.*, *Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, No. 12-CV-6383, 2016 WL 4703656, at *10 (E.D.N.Y. Sept. 7, 2016) (The Court initially points out that it does not intend to adjudicate similar discovery disputes in a piecemeal fashion. . . . Such an approach is an altogether inefficient use of the Court's limited judicial resources and does not promote judicial economy."); *cf.* Fed. R. Civ. P. 1 ("[The Federal Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

an argument or to speculate further as to what EEOC might have said but did not.").  But, in light

of the findings above, any such arguments would likely fail.  For example, because the University

has established that the investigation was conducted at the direction of attorneys, Fair's notes of

her interviews are privileged.  *See, e.g.*, *Competitive Enter. Inst. v. U.S. EPA*, 232 F. Supp. 3d 172,

186 (D.D.C. 2017) ("The D.C. Circuit has extended *Upjohn* to include notes of interviews of non-

attorneys conducted by non-attorneys because 'the investigation . . . was conducted at the

[direction] of the attorneys.'" (ellipses in original) (quoting *Kellogg Brown & Root*, 756 F.3d at

758)).  Communications seeking or providing legal advice on drafts of the investigation report are

similarly privileged.  *See, e.g.*, *Jones v. Carson*, No. 15-cv-310, 2018 WL 11410070, at *13

(D.D.C. Mar. 30, 2018) (finding that communications seeking legal advice on drafts and the drafts

themselves were protected by attorney-client privilege); *see also, e.g.*, *BankDirect Cap. Fin., LLC

v. Cap. Premium Fin., Inc.*, 326 F.R.D. 176, 183 (N.D. Ill. 2018) ("[A]lmost all courts have

concluded that the process of drafting and editing, reflecting as it often does both requests for and

provision of, legal advice, is protected by the attorney-client privilege.").  The vast majority of the

miscellaneous emails listed above are either written by or addressed to an attorney and the 2022

Privilege Log reflects that they each ask for legal advice, seek information to enable the provision

of legal advice, or reflect legal advice.  *See, e.g.*, *Upjohn*, 449 U.S. at 394 ("[T]he [attorney-client]

privilege exists to protect not only the giving of professional advice to those who can act on it but

also the giving of information to the lawyer to enable him to give sound and informed advice.").

The single outlier, an October 2016 email from Reich to Fair, is copied to counsel at both Saul

Ewing and the Office of General Counsel and, according to the privilege log, is followed by a

response from Weitzner containing legal advice.  (ECF No. 19-1 at 2 (PRIV-419 emails 3–4)); *see,

e.g.*, *GW III*, 502 F. Supp. 3d at 79 ("[C]ommunications among non-attorneys can be entitled to

protection if they concern matters in which the parties intend to seek legal advice or reflect legal advice provided by an attorney." (quoting *GW II*, 2020 WL 3498478, at *11)).  The Court therefore finds that all the withheld documents on the January 2022 Privilege Log are entitled to the protection of attorney-client privilege.

4.      Work Product Protection

The finding that all the withheld documents listed on the January 2022 Privilege Log are privileged obviates the need to address work product protection.  For completeness, the Court will nevertheless briefly discuss, first, whether work product protection attaches to any of the documents over which it is claimed and, second, whether the Commission has established substantial need and undue burden under Rule 26(b)(3) sufficient to overcome the protection of fact work product.

a.      *Work Product*

The University claims work product protection over 41 unique documents on the January 2022 Privilege Log.  They comprise the eleven documents reflecting notes from Fair's interviews or meetings (PRIV-1138–1148); the 21 documents related to the draft and final versions of the Saul Ewing Report (PRIV-376, 405, 418, 556, 558, 560, 594, 624, 632, 652, 676, 1009, 1021, 1024–25, 1027, 1029, and 1149–1152); and nine (out of 22) emails identified above as "miscellaneous," each of which is authored by an attorney from either the Office of General Counsel or Saul Ewing (PRIV-380, 562 emails 1 and 3, 581 email 1, 595 emails 5 and 7, 596, 1023 email 7, and 1028 email 6).[18]

---

[18] That last category does not include the following documents, over which the University claims only  attorney-client privilege: the email between Reich and Fair (PRIV-419 email 3); two emails between Fair and the Office of General Counsel sent prior to the engagement of Saul Ewing (PRIV-419 email 4 and 595 email 4), two emails between Fair and a Saul Ewing attorney requesting and providing information to enable the provision of legal advice (PRIV-631 email 1 and 1137), four emails among attorneys from the Office of General Counsel and Saul Ewing sent at the outset of Saul Ewing's engagement at the end of July 2016 (PRIV-595 emails 4 and 8–10), three emails among attorneys from the Office of General Counsel and Saul Ewing sent in March 2017 (PRIV-599 emails 3–5), and one email from

As noted, for a document to be protected as work product, it must be prepared in anticipation of litigation or for trial. *See, e.g.*, *Boehringer Ingelheim*, 778 F.3d at 149. Material is generated in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *All Assets*, 315 F.R.D. at 108–09 (quoting *Boehringer Ingelheim*, 778 F.3d at 149). To be protected, documents need not have been prepared by or under the direction of an attorney, "so long as they were clearly prepared in anticipation of litigation" by a party's representative. *Hertzberg*, 273 F. Supp. 2d at 77. As with attorney-client privilege, "a document can contain protected work-product material even though it serves multiple purposes." *Deloitte LLP*, 610 F.3d at 138. However, "[w]here a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available." *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138). Or, said another way, the University must "explain with reasonable particularity" how the documents withheld as work product were prepared in their particular form "because of the prospect of litigation" or why they would have been prepared in a different form in the ordinary course of business. *GW IV*, 2021 WL 7907064, at *5.

Contrary to the Commission's arguments, *see, e.g.*, ECF No. 94 at 8–9, the University has adequately shown that it anticipated litigation at the outset of the internal investigation. The facts as found above show that Fair, a trained attorney, subject matter expert, and head of the Equal Employment Opportunity Office at GW, contacted the Office of General Counsel days after receiving Williams' complaint not in the ordinary course of business, but because she thought it likely to prompt litigation; thereafter, the Office of General Counsel provided guidance in the

---

December 2016 in which a Saul Ewing attorney requests information from the Office of General Counsel to enable provision of legal advice to Fair regarding a draft investigation report (PRIV-1023 email 6).

conduct of the investigation, including in discussions about the interviews Fair conducted and her preliminary findings.  This was not, then, a routine investigation; nor did it involve the Office of General Counsel only tangentially.  Thereafter, the University hired Saul Ewing to take over the investigation and produce a report, which was provided to the Office of General Counsel.  That "factual situation" (as outlined more fully in Sections III.B.2 and 3, *supra*) sufficiently establishes anticipation of litigation during the internal investigation.

Those circumstances also sufficiently establish that the majority of the withheld documents were created "because of" the prospect of litigation and would not have been "created 'in substantially similar form'" if litigation were not anticipated—that is, they are documents that would not have been created in the same form in the ordinary course of business.  *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).  As the University explains in the January 2022 Privilege Log, the 21 documents related to the Saul Ewing Report "would not have been created in substantially similar form but for the prospect of litigation because [Saul Ewing] would not have been hired to create the [Saul Ewing] Report absent the prospect of litigation." *E.g.*, ECF No. 96-1 at 1 (entry for PRIV-376).  Similarly, each of the nine "miscellaneous" emails is authored by or addressed to a Saul Ewing attorney, *see id.* at 1, 3–4, 6–7 (entries for PRIV-380, 562 emails 1 and 3, 581 email 1, 595 emails 5 and 7, 596, 1023 email 7, and 1028 email 6); those emails would not have existed but for the hiring of Saul Ewing, which, in turn, was accomplished because of the prospect of litigation.  Similarly, handwritten notes of a meeting among Fair, Reich, attorneys from the Office of General Counsel, and attorneys from Saul Ewing, which reflect the thoughts and mental impressions of those attorneys, *see id.* at 9 (entry for PRIV-1147) would also not have existed unless Saul Ewing had been hired in anticipation of litigation.  The Court therefore finds that the University has "explain[ed] with reasonable particularity" how those 31 documents

withheld as work product were prepared in their particular form "because of the prospect of litigation." *GW IV*, 2021 WL 7907064, at *6.

The ten documents comprising Fair's interview notes (PRIV-1138–1146, 1148) are a closer call.  Unsurprisingly, the University admits that "Fair's 'general practice' was to take interview notes even when she was investigating grievances that she did not believe would lead to litigation." ECF No. 100 at 19 (quoting ECF No. 99-1 at 43).  But it further argues that the notes "would not have been created in substantially similar form but for the prospect of litigation because absent the prospect of litigation, . . . attorneys [from the Office of General Counsel] would not have advised [her] regarding who to interview and what to ask." *Id.* at 19–20.  If that is what the records here had established, the University might well be right that the notes constitute work product. *See, e.g.*, *Deloitte*, 610 F.3d at 138 ("[A] document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation.").  But the Court has found that the University has not met its burden of establishing that attorneys at the Office of General Counsel provided specific questions to Fair or directed her to address specific topics. *See* note 13, *supra*.  While it has demonstrated that attorneys advised her about potential witnesses, the University has not explained how that resulted in Fair's preparation of the witness interview notes in a form that was not substantially similar to the form they would have taken during a more routine investigation not commenced in anticipation of litigation.  Nor does it provide any detail to support its assertion that "the content of the notes . . . was different . . . because [their] purpose . . . was to memorialize what witnesses told Fair so that she could obtain further legal advice in anticipation of litigation."  ECF No. 100 at 19–20.  The primary purpose of any notetaking is to "memorialize" what is observed.  How the fact that Fair would use those memorializations to obtain legal advice influenced them such that their form was

not substantially similar to interview notes taken in the ordinary course of business (absent anticipation of litigation) is left unanswered in the University's submissions. Therefore, the Court finds that the University has not "explain[ed] with reasonable particularity" how the interview notes logged on the January 2022 Privilege Log constitute work product. *GW IV*, 2021 WL 7907064, at *6. Nonetheless, as noted above, because those documents are protected by attorney-client privilege, the University need not produce them to the Commission.

b.      *Rule 26(b)(3)*

The Commission has suggested that Fair's interview notes contain, at most, fact work product. *See* ECF No. 91 at 28–30; ECF No. 94 at 20–21. Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that work product—particularly fact work product, which is the only type the Commission seeks here—is discoverable if the party seeking such discovery "shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."[19]   Fed. R. Civ. P. 26(b)(3)(A)(ii).   However, as discussed in the section immediately above, the Court has found those interview notes are not work product at all (although they are subject to attorney-client privilege, which is not overcome by a showing of substantial need and undue burden, *see* note 19, *supra*).   The Commission's briefing is unclear on whether it believes documents other than those interview notes contain fact work product.   The Court could find, therefore, that any such arguments have been forfeited.   However, in the service of completeness, the Court will address why the Commission has not met the requirements of Rule 26(b)(3) as to any fact work product included in the withheld documents.

---

[19] A showing of substantial need and undue burden does not, however, overcome attorney-client privilege, and so even if the Commission were to meet its burden under the rule—which it does not—the documents at issue would still not be discoverable. *See, e.g., Sidall v. Allstate Ins. Co.*, 15 F. App'x 522, 523 (9th Cir. 2001) ("[A] substantial need does not, as a matter of law, provide a legal basis for piercing the attorney-client privilege."); *U.S. Fire Ins. Co. v. City of Warren*, No. 10-cv-13128, 2012 WL 2190747, at *4 (E.D. Mich. June 14, 2012) ("[U]nlike the work product doctrine, under which a party may still obtain protected material upon a showing of substantial need, the attorney-client privilege is absolute, and no showing of need, no matter how great, provides a basis for piercing the privilege.").

The D.C. Circuit has explained that the "substantial need" and "undue hardship" requirements of the Rule are "generally met if [the movant] demonstrates that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself." *Boehringer Ingelheim*, 778 F.3d at 155. The Commission argues that it has shouldered that burden here. ECF No. 91 at 28–30; ECF No. 94 at 20–21. The Court does not belabor whether the Commission has demonstrated substantial need because it is clear it has not established that it "cannot, without undue hardship, obtain the[ ] substantial equivalent [of the internal interview documents] by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

The required showing of undue hardship is not easy to make. "Indeed, 'undue hardship' is generally found only in extreme circumstances such as unavailability due to death, brain injury or where a witness's geographic location is beyond the court's subpoena power." *FTC v. Staples, Inc.*, No. 15-cv-2115, 2016 WL 259642, at *3 (D.D.C. Jan. 21, 2016); *see also, e.g.*, *ISS Marine*, 905 F. Supp. 2d at 138–39 (finding undue hardship where the information sought was "beyond the scope of the subpoena power"); *United States v. First Tenn. Bank Nat'l Ass'n*, No. 94-cv-323, 1995 WL 440808, at *3 (E.D. Tenn. Apr. 21, 1995) ("Undue hardship can be shown if the witness cannot be found, has died, is antagonistic, will not cooperate, or claims some memory loss."). That is, generally, "[w]hether [fact work product] is discoverable typically will turn on whether the witness or other party who provided counsel with the factual information is *available* to be deposed." *Farkas v. Rich Coast Corp.*, No. 14-cv-272, 2016 WL 6618076, at *3 (M.D. Pa. Nov. 9, 2016) (emphasis added); *see also Mischler v. Novograaf Grp. BV*, No. 18-cv-2002, 2019 WL 6135447, at *10 (D.D.C. Nov. 19, 2019) (finding the Rule 26(b)(3) requirements were not met where the party seeking discovery "has had or will have the opportunity to depose" relevant

witnesses, and noting that the D.C. Circuit has indicated "that special circumstances for producing fact work product do not exist where the litigant seeking disclosure has deposed the witnesses who made the communications" (citing *Boehringer Ingelheim*, 778 F.3d at 155)). The Commission makes no showing of unavailability here. Indeed, as the University points out, "[t]he EEOC already has deposed the fact witnesses in this case who made the decisions regarding the hiring for the Special Assistant position, and who were responsible for determining [Williams'] pay and Michael Aresco's pay." ECF No. 93 at 27–28.

The Commission's single rejoinder is that the University "has objected during the depositions of key witnesses to EEOC's questions regarding the investigation into Williams' internal discrimination complaint and instructed those witness[es] not to answer."[20] ECF No. 91 at 29; ECF No. 94 at 21. But that misses the point. The "*investigation* into Williams' internal discrimination complaint" is not what is at issue in this case. Rather, the relevant facts surround the University's conduct in allegedly causing discriminatory disparities in pay, employment terms and conditions, and opportunities for advancement between Williams and Aresco, not its conduct in investigating such claims. *See GW I*, 2019 WL 2028398, at *2. The fact that asking unidentified "key witnesses" about the internal investigation did not bear fruit does not demonstrate that the Commission cannot, without undue hardship, obtain facts in the witnesses' knowledge relevant to the claims and defenses at issue. Even if it could, the Commission's argument is circular. By claiming that the University's instructions not to answer deposition questions about the internal investigation on the ground of work product protection created an undue burden, the Commission is effectively arguing that the mere fact that material is work product—and the party that created

---

[20] The Commission does not identify whether those instructions not to answer were based on attorney-client privilege or work product protection. However, as attorney-client privilege is not overcome by a showing of substantial need and undue burden, *see supra* note 19, the Court assumes for the purposes of this discussion that work product protection is at issue.

it protects it as such—creates an undue burden sufficient to overcome work product protection. That cannot be the law. If it were, Rule 26(b)(3)'s exception to the work product protection would come close to eviscerating the protection of fact work product altogether.

The Court therefore finds that the Commission has not met the requirements of Rule 26(b)(3)(A)(ii), as to any fact work product included in the withheld documents.

### C.      At-Issue Waiver

As noted, the Commission bases its argument that the University waived attorney-client privilege and work product protection over the internal investigation documents on the fact that the University has put those documents "at issue" by asserting a defense to the imposition of punitive damages based on the Supreme Court's decision in *Kolstad*. The argument proceeds in these steps: (1) in *Kolstad*, the Supreme Court held that a defendant in a Title VII case can avoid punitive damages by showing that it engaged in "good faith efforts to comply" with that statute, ECF No. 91 at 23–24; (2) by asserting that defense, the University put its "state of mind" at issue, particularly, its "intent and knowledge of the law," *id.* at 24–25 (quoting *United States v. Exxon Corp.*, 94 F.R.D. 246, 248 (D.D.C. 1981)); (3) the University has thus "placed at issue any documents and communications showing its state of mind with respect to Williams' internal discrimination complaint," thereby waiving any privilege or protection over documents related to the internal investigation, *id.* at 24. That is, the Commission contends that, by asserting that it made good faith attempts to comply with Title VII in connection with the conduct alleged here, the University waived privilege or other protection over any "material that might disprove or undermine that assertion" by putting such material "at issue" in this case. ECF No. 94 at 16 (quoting *Sparrow Fund Mgmt. LP v. MiMedx Group, Inc.*, No. 18-cv-4921, 2021 WL 1930294, at *5 (S.D.N.Y. May 13, 2021); *see GW III*, 502 F. Supp. 3d at 86 ("[P]rivilege can . . . be waived

when a party places privileged material at issue . . . .").  Importantly, the Commission argues that a litigant puts attorney-client material and work product at issue any time it asserts a defense that it made efforts to comply with the law, regardless of whether that litigant relies on protected material to support that defense.  The University balks at this expansive interpretation of the at-issue waiver doctrine.  It contends that it cannot have put the internal investigation documents at issue because it has expressly disclaimed that it will rely on advice of its counsel or on its internal investigation to show it made good faith efforts to comply with Title VII; rather, the University

> [i]ntends to rely on a host of other evidence in support of its *Kolstad* defense, including: (1) the University's strong antidiscrimination policy; (2) the robust procedures that the Compensation Department follows for setting an employee's compensation, which were followed in this case; and (3) the host of nondiscriminatory reasons for which [Williams] was not hired for the Special Assistant position.

ECF No. 93 at 20.

Federal courts' treatment of at-issue waiver has evolved significantly in the past half-century.  The Commission relies on the formulation announced in *Hearn v. Rhay*, 68 F.R.D. 574 (W.D. Wash. 1975), an opinion from the Western District of Washington that became an influential explication of the doctrine when it issued in 1975.  *See* ECF No. 94 at 18 (citing the 1981 case *Exxon*, 94 F.R.D. at 248, for the proposition that *Hearn* embodied "the most exhaustive treatment of th[e] subject [of at-issue waiver]").  The *Hearn* Court held that, "where [the following] three conditions exist, a court should find that the party asserting a privilege has impliedly waived it":

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

68 F.R.D. at 581.  That is, *Hearn* found that privilege would be waived when a litigant, through some affirmative act (even merely filing a complaint or asserting a defense), makes protected information "relevant" to the case.  *See, e.g.*, *Trs. of Elec. Workers Local No. 26 Pension Tr. Fund v, Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 13 (D.D.C. 2010) (stating that, under *Hearn*, "relevancy is the only criterion to consider"); *see also Hearn*, 68 F.R.D. at 581 (finding privilege waived where the defendant asserted a qualified immunity defense that made their understanding of the law "germane" to the case and, as a result of asserting privilege, "deprive[d] [the] plaintiff of information necessary to 'defend' against defendants' affirmative defense").  Subsequently, *Hearn*'s expansive view of waiver was subjected to pointed critique.  In *Rhone-Poulenc Rorer v. Home Indemnity Co.*, the Third Circuit rejected the teaching of *Hearn* and similar cases that protected material should be disclosed to an opposing party for the purpose of "test[ing] the client's contentions."  32 F.3d 851, 864 (3d Cir. 1994).  Such cases were "of dubious validity" because,

> [w]hile [they] dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed.  Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue.

*Id.*  The Second Circuit followed suit, stating that "the *Hearn* test cuts too broadly," and reasoning that

> privileged information may be in some sense *relevant* in any lawsuit.  A mere indication of a claim or defense certainly is insufficient to place legal advice at issue.  The *Hearn* test presumes that the information is relevant and should be disclosed and would open a great number of privileged communications to claims of at-issue waiver.

*In re Cty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008).  Convinced by the reasoning of *Rhone-Poulenc* and *County of Erie*, this court in *Trustees of Electrical Workers Local No. 26 Pension Trust Fund* similarly refused to apply *Hearn*, predicting that "the court of appeals for th[e] [D.C.] Circuit

would agree with the decisions of the Second and Third Circuits and with the courts and academics that have criticized *Hearn*."  266 F.R.D. at 13.  More recently, Judge Walton also rejected the *Hearn* standard, *see* Memorandum Opinion at 15, *Doe I v. The George Washington Univ.*, No. 18-cv-1391 (D.D.C. May 18, 2022), ECF No. 119 ("The Court agrees with the decisions that have criticized *Hearn*'s standard as too broad."), as have other courts outside this Circuit, *see, e.g.*, *First Am. Title Ins. Co. v. Bowles Rice, L.L.P.*, No. 16-cv-219, 2017 WL 6329961, at *4–5 (N.D.W. Va. Oct. 23, 2017) (noting that *Hearn* "has been widely criticized for its vagueness and overbreadth" and refusing to adopt it); *United States v. Ohio Edison Co.*, No. 99-cv-1181, 2002 WL 1585597, at *4–5 (S.D. Ohio July 11, 2002) (similar).  For these more current and, in the undersigned's view, better-reasoned cases, the paramount question is whether the party alleged to have waived protection has *relied* on protected material "to make his claim or defense."  *Cty. of Erie*, 546 F.3d at 229; *see also Rhone-Poulenc*, 32 F.3d at 863 ("The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."); *GW III*, 502 F. Supp. 3d at 87 (quoting *Cty. of Erie*, 546 F.3d at 228); *Trs. of Elec. Workers Local No. 26*, 266 F.R.D. at 13 (stating that, in order to effect at-issue waiver, a party must "predicat[e] . . . a claim or defense" on protected material).

Some difficulty may arise in determining what degree of reliance is sufficient to trigger an at-issue waiver.  In *Rhone-Poulenc*, the Third Circuit established a bright-line rule, reasoning that "certainty and predictability as to the circumstances of a waiver encourage clients to consult with counsel free from the apprehension that the communications will be disclosed without their consent":  a party waives protection over a privileged communication when it "asserts a claim or defense and attempts to prove this claim or defense by disclosing or describing a [protected] communication."  32 F.3d at 863–64; *see also King Drug Co. of Florence, Inc. v. Abbot Labs.*, No.

19-cv-3565, 2022 WL 1214169, at *3 (E.D. Pa. Apr. 25, 2022) ("[A] waiver related to an attorney's work product extends only to . . . documents disclosed and not beyond." (citing 6 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 26.70[6][c] (3d ed.))). Other courts, including at least one in this Circuit, have adopted a similar analysis, *see, e.g.*, *Trs. of Elec. Workers Local No. 26*, 266 F.R.D. at 13, 15 (finding that the plaintiffs did not waive attorney-client privilege because they did not "us[e] a portion of privileged information for [their] own benefit to assert a claim or defense and withhold[ ] that which will hurt that claim or defense" and did not waive work product protection because they did not disclose work product "in a manner that is inconsistent with preserving the secrecy of that information from an adversary"), as has a leading treatise, *see* 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2016.6 (3d ed.) (disapproving of courts that "have carried this [at-issue] waiver concept beyond the situation in which the privilege–holder affirmatively uses privileged materials to support a claim or defense, and also applied it . . . when the privilege–holder raises certain legal or factual issues" and asserting that such decisions "do not fit within any sensible concept of waiver, and might best be viewed as ad hoc adjustments by courts in the scope of privilege" (footnotes omitted)). So, in situations much like the one presented here, a number of courts have found that a party that has interposed a good faith defense but disclaimed reliance on privileged or protected materials—such as those created in connection with an internal investigation—does not waive protection over those materials. *See, e.g.*, *Martel v. Computer Scis. Corp.*, No. 17-cv-407, 2019 WL 2030281, at *1 (D.N.H. May 8, 2019) ("[The] principle [that a good faith efforts defense may waive privilege over internal investigation documents] is inapposite here because the defense has repeatedly indicated that it has no intention of relying on the contents or conclusion of the investigative report to defend this case. Instead, the defendant intends to support its affirmative defense 'with evidence of its

Equal Employment Opportunity Policy, Code of Business Conduct, employee acknowledgements, training practices, etc.'" (quoting the record)); *Pollitt v. N.C. Prisoner Legal Servs., Inc.*, No. 05-cv-220, 2006 WL 8438635, at *2 (E.D.N.C. Sept. 22, 2006) (holding that, although the defendant "maintain[ed] the good faith defense as it relate[d] to legitimate, non-discriminatory reasons for employment decisions or to the extent that it relate[d] to punitive damages," it did not waive privilege because it "disavow[ed] reliance upon [its] investigation[ ] as a defense"); *Robinson v. Time Warner, Inc.*, 187 F.R.D. 144, 146 (S.D.N.Y. 1999) (finding that neither attorney-client privilege nor work product protection were waived where the defendant "has not raised the adequacy of its investigation as a defense to [the plaintiff's employment discrimination claims], and has explicitly confirmed its position that [the] investigation will not be relied upon . . . as a defense"); *cf. Henry v. Quicken Loans*, 263 F.R.D. 458, 466, 470 (E.D. Mich. 2008) (affirming the principle that "asserting a claim of good faith as an affirmative defense does not imply reliance on counsel even where the party asserting the claim acknowledges seeking such advice" unless "*the party puts the content of that advice behind its claim of good faith*"; but finding waiver because the defendant explicitly argued that the decision at issue—"to classify the mortgage bankers as exempt"—"was made in ongoing consultation with counsel," thus "affirmatively assert[ing] advice of counsel as a basis for its good faith"). That is a sensible rule both for the reasons outlined by the Third Circuit in *Rhone-Poulenc* and because it complies with the tenet that, "[i]n discovery disputes, implied waivers are to be construed narrowly." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 378 (3d Cir. 2007); *see also, e.g.*, *In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005) ("Implied waivers are consistently construed narrowly.").

As noted, the Commission urges a more expansive rule, one that would threaten to find waiver whenever a litigant asserts a defense that it made efforts to comply with the law, regardless

of whether that litigant relies on protected material to support that defense.  *See* ECF No. 91 at 24 ("Defendant's state of mind is central to its affirmative defense, and, through the assertion of that defense, Defendant placed at issue any documents and communications showing its state of mind with respect to Williams' internal discrimination complaint.  Defendant thus waived any purported privilege or protection over documents reflecting its knowledge or intent.").  That is, the Commission appears to argue that a "good faith efforts" defense necessarily puts the advice of counsel at issue.  But the primary case it uses as support, when examined, does not support so expansive a view.  In *Abromavage v. Deutsche Bank Securities, Inc.*, the plaintiff alleged that his supervisors retaliated against him because he provided evidence supporting a prior complaint of workplace discrimination by a different employee that resulted in that employee's termination. No. 18-cv-6621, 2019 WL 6790513, at *1 (S.D.N.Y. Dec. 11, 2019).  A Deutsche Bank in-house attorney investigated the retaliation claim and produced a report that found it unsupported, after which, the plaintiff alleged, the retaliation continued, culminating in his own termination.  *Id.*  The plaintiff argued that Deutsche Bank had waived privilege over the report by asserting a *Kolstad* defense.  *Id.* at *2.  The court agreed with plaintiff, stating, in admittedly broad terms, that "[b]ecause the *Kolstad* defense relies on [Deutsche Bank's] subjective belief as to the lawfulness of its actions and those of its employees, relevant communications between [it] and its in-house counsel must be disclosed to avoid the unfairness contemplated by the waiver rule."  *Id.* at *4. However, the facts of the case undermine so sweeping a view of at-issue waiver.  Recall that the claim in *Abromavage* was that the plaintiff was retaliated against *after* an investigation found that the plaintiff's *earlier* allegation of retaliation was unfounded.  *Id.* at *1.  The court thus found that, "to prevail on its *Kolstad* defense, [Deutsche Bank] must show that it had an internal policy that prohibits unlawful retaliation and that it implemented that policy in good faith *when it investigated*

*[Abromavage's] complaints and found no retaliation*." *Id.* at *3 (emphasis added). More, in supporting its finding of waiver, the court asserted that the defendant was "necessarily relying, to some extent, on the actions and recommendations of its in-house counsel to prove that it adhered to anti-retaliation laws and policies in good faith" because it had "an established policy or practice of conducting an internal investigation [by in-house counsel] to ascertain the facts and then deciding whether further action should be taken against the accused based on in-house counsel's assessment of the law and the facts." *Id.* at *4 & n.3. Therefore, Deutsche Bank could not "establish that it 'complied with [its] well-established policies, programs, and procedures' in [the] case without arguing that it performed an investigation and reached its conclusion of no retaliation in good faith." *Id.* at *4 n.3 (first alteration in original) (quoting the record). That is, in the "specific context in which the privilege [was] asserted," *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000), the defendant could not establish that it acted in good faith without actually relying on the conclusions of the report because that report was central to its good faith defense.

Here, the Commission has not pointed to similar circumstances that would nudge the University's good faith defense into waiver territory. *See, e.g.*, *Henry*, 263 F.R.D. at 466 (affirming the magistrate judge's decision that the defendants' assertions in a summary judgment motion that "the opinions by in-house and outside legal counsel 'confirmed' [their] understanding on the exempt status question and 'reveal[ed] by direct implication the *content* of those communications'" constituted a "'plus factor' that pushed the defendants' assertions into an area of implied waiver" (second alteration in original) (quoting the magistrate judge's decision)). Instead, the evidence the University intends to rely on to show its good faith efforts to comply with the law are unconnected to the internal investigation:  it says will use materials such as "documents

and testimony from the individuals involved in hiring the Special Assistant to demonstrate that the hiring was conducted in a fair, nondiscriminatory manner" and "documents and testimony from persons in its Compensation Department to show that the University's decisions with respect to the Charging Party's and Aresco's pay also were made in good faith and in accordance with the University's nondiscrimination policy."  ECF No. 93 at 25.  That is, the University's *Kolstad* defense relies on evidence that the hiring and compensation decisions at issue here were made in a good faith effort to comply with the law.  Importantly, all those decisions predate the internal investigation because "[t]he University already had hired Aresco as Special Assistant and already had determined his and [Williams'] pay at the time that the Internal Investigation began."[21]  ECF No. 93 at 24 n.9.  Thus, unlike in *Abromavage*, the University does not have to show that "it implemented [its] policy [prohibiting unlawful retaliation] in good faith when it investigated Plaintiff's [grievance] and found no [violation of law]."  2019 WL 6790513, at *3.  More, and also unlike in *Abromavage*, it has not been established that the University has "an established policy or practice of conducting an internal investigation to ascertain the facts and then deciding whether further action should be taken against the accused based on in-house counsel's assessment of the law and the facts."  *Id.* at *4 n.3.  Rather, the University's non-discrimination policy does not require the advice or even the involvement of counsel.  *See, e.g.*, ECF No. 93-2 at 2.  In these circumstances, the University has not waived attorney-client privilege or work product protection over the internal investigation documents because it will not "*rely* on privileged advice from [its]

---

[21] In a footnote in its reply brief, the EEOC counters that "punitive damages are available when an employer ratifies the unlawful conduct," so "Defendant's state of mind *after* its investigation are relevant to whether Defendant acted in good faith, *at that point*, to implement Title VII."  ECF No. 94 at 18 n.3.  The Court finds that argument forfeited. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 132 n.8 (D.D.C. 2019) (arguments raised in footnotes are deemed forfeited).  In any case, the EEOC's argument does not change the fact that the University has explicitly disclaimed relying on evidence related to the internal investigation to prove its *Kolstad* defense.

counsel to make . . . [its] defense." *In re Cty. of Erie*, 546 F.3d at 229; *see also GW III*, 501 F. Supp. 3d at 87–88.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Commission's motion to compel (ECF No. 91) is **DENIED**.

**SO ORDERED.**

Date:  September 1, 2022

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE