**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff,

    v.

THE GEORGE WASHINGTON
UNIVERSITY,

        Defendant.

Case No. 17-cv-1978 (CKK)

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THE GEORGE WASHINGTON UNIVERSITY'S**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Williams's Tenure As Nero's Executive Assistant.................................. 3

    B.    Aresco's Tenure As An Assistant Athletics Director ............................. 4

    C.    The University Hires Aresco—The Only Applicant—For The New
         Special Assistant Position ...................................................................... 5

    D.    Aresco Serves As Nero's Special Assistant/Chief Of Staff................... 7

    E.    Nero Reprimands Williams, And Williams Responds By Filing An EEOC
         Charge .................................................................................................... 8

    F.    Williams Moves To A New Role At The University While Her EEOC
         Charge Remains Pending...................................................................... 10

    G.    The EEOC Seeks Wide-Ranging Discovery And Draws Criticism From
         Magistrate Judge Harvey On Several Occasions ................................. 10

STANDARD OF REVIEW ............................................................................... 12

ARGUMENT .................................................................................................... 12

I.    No Reasonable Juror Could Conclude That The University Violated The EPA ............. 12

    A.    The EEOC Cannot Show That Williams And Aresco Performed
         Substantially Equal Work. .................................................................... 13

         1.    Williams Performed Clerical Tasks As An Executive Assistant ............. 15

         2.    Aresco Handled Human Resources, Policymaking, and Sport
             Administrator Duties That Williams Did Not Share................................ 21

         3.    Any Similarities Between Williams's And Aresco's Jobs Were
             Superficial At Best. ................................................................................. 25

         4.    Williams's Ambitions Outpaced Her Actual Job Duties. ........................ 27

    B.    The Pay Differential Between Williams and Aresco Was Based On A
         "Factor Other Than Sex." ..................................................................... 30

II.    No Reasonable Juror Could Conclude That The University Violated Title VII.............. 32

         1.    The EEOC's Wage Discrimination Claim Fails Because Williams
             And Aresco Did Not Have Comparable Job Duties. ............................. 33

         2.    The EEOC's Failure to Promote Claim Fails For Multiple
             Independent Reasons. ............................................................................ 35

         3.    The EEOC Has Failed to Show Any Other Adverse Employment
             Action Cognizable Under Title VII. ....................................................... 40

    B.    The University Had Legitimate, Nondiscriminatory Reasons for Any
         Adverse Employment Action.................................................................. 43

C.      The EEOC Cannot Show That The University's Reasons For Selecting
        Aresco Were Pretextual Or That Anyone Intentionally Discriminated
        Against Williams. ............................................................................................... 44

CONCLUSION............................................................................................................................ 45

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................... 12

*Anderson v. Zubieta,*
    180 F.3d 329 (D.C. Cir. 1999) ......................................................................... 33, 34

*Adeyemi v. Dist. of Columbia*, 525 F.3d 1222 (D.C. Cir. 2008) ..................................... 45

*\*Baker-Notter v. Freedom Forum, Inc.,*
    No. 18-cv-2499, 2022 WL 798382 (D.D.C. Mar. 15, 2022) ........................... 13, 21

*Ball v. George Wash. Univ.,*
    No. 17-cv-507, 2019 WL 1453358 (D.D.C. Mar. 31, 2019) ................................ 45

*\*Baloch v. Kempthorne,*
    550 F.3d 1191 (D.C. Cir. 2008) ........................................................................... 41

*\*Barnette v. Chertoff,*
    453 F.3d 513 (D.C. Cir. 2006) ....................................................................... 32, 43

*\*Bostock v. Clayton Cty.,*
    140 S. Ct. 1731 (2020) ............................................................................. 2, 34, 35

*Brown v. Coach Stores, Inc.,*
    163 F.3d 706 (2d Cir. 1998) ................................................................................ 43

*Burlington Indus., Inc. v. Ellerth,*
    524 U.S. 742 (1998) .............................................................................................. 32

*\*Chambers v. Sebelius,*
    6 F. Supp. 3d 118 (D.D.C. 2013) ......................................................................... 42

*Clark v. Johnson & Higgins,*
    181 F.3d 100 (6th Cir. 1999) ............................................................................... 34

*\*Corning Glass Works v. Brennan,*
    417 U.S. 188 (1974) ....................................................................................... 29, 30

*Covington v. S. Ill. Univ.,*
    816 F.2d 317 (7th Cir. 1987) ............................................................................... 32

*Cty. of Wash. v. Gunther,*
    452 U.S. 161 (1981) ....................................................................................... 33, 34

*Cullen v. Ind. Univ. Bd. of Trustees*,
    338 F.3d 693 (7th Cir. 2003) ...........................................................................30

*Evans v. Sebelius*,
    674 F. Supp. 2d 228 (D.D.C. 2009) .................................................................36

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998).........................................................................................2

*Fischbach v. D.C. Dep't of Corr.*,
    86 F.3d 1180 (D.C. Cir. 1996) .......................................................................45

*Fleischhaker v. Adams*,
    481 F. Supp. 285 (D.D.C. 1979) .....................................................................37

*Forkkio v. Powell*,
    306 F.3d 1127 (D.C. Cir. 2002) ...............................................................32, 41

*Franks v. Edison Electric Inst.*,
    No. 20-cv-3393, 2022 WL 971157 (D.D.C. Mar. 31, 2022) .........................31

*Gaujacq v. EDF, Inc.*,
    601 F.3d 565 (D.C. Cir. 2010) ...............................................................12, 31

*Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*,
    815 F.2d 1519 (D.C. Cir. 1987) ...............................................................13, 14

*Hardy v. Bowen*,
    No. 85-cv-2119, 1986 WL 15710 (D.D.C. Nov. 19, 1986)............................28, 29

*Hendricks v. Geithner*,
    568 F.3d 1008 (D.C. Cir. 2009) ...............................................................39, 40

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ............................................................. *passim*

*Hopkins v. Whipple*,
    630 F. Supp. 2d 33 (D.D.C. 2009) .................................................................40

*Hutchinson v. Holder*,
    815 F. Supp. 2d 303 (D.D.C. 2011) ...............................................................29

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977).......................................................................................37

*Jackson v. Gonzales*,
    496 F.3d 703 (D.C. Cir. 2007) ...............................................................40, 45

*Jackson v. Winter*,
    497 F. Supp. 2d 759 (E.D. Va. 2007) ...................................................................................38

*Johnson v. Dist. of Columbia*,
    947 F. Supp. 2d 123 (D.D.C. 2013) ...............................................................................12, 29

*\*Johnson v. Wash. Metro. Area Transit Auth.*,
    No. 19-cv-3534, 2022 WL 4547527 (D.D.C. Sept. 29, 2022) ..............................14, 25, 29, 33

*Johnson v. Weld Cty.*,
    594 F.3d 1202 (10th Cir. 2010) ....................................................................................20

*Kelso v. Perdue*,
    No. 19-cv-3864, 2021 WL 3507683 (D.D.C. July 12, 2021) ..............................................41

*\*Kilby-Robb v. Duncan*,
    77 F. Supp. 3d 164 (D.D.C. 2015) .................................................................................38

*Lash v. Lemke*,
    786 F.3d 1 (D.C. Cir. 2015) ........................................................................................18

*\*Lathram v. Snow*,
    336 F.3d 1085 (D.C. Cir. 2003) .................................................................................2, 36

*Lester v. Natsios*,
    290 F. Supp. 2d 11 (D.D.C. 2003) ............................................................................42, 43

*Loyd v. Phillips Bros., Inc.*,
    25 F.3d 518 (7th Cir. 1994) ........................................................................................34

*\*Montgomery v. Chao*,
    546 F.3d 703 (D.C. Cir. 2008) .....................................................................................32

*Moore v. Hagel*,
    No. 10-cv-632, 2013 WL 2289940 (D.D.C. May 24, 2013)................................................36

*Morris v. U.S. Dep't of Justice*,
    298 F. Supp. 3d 187 (D.D.C. 2018) ..............................................................................34

*\*Musgrove v. Gov't of Dist. of Columbia*,
    775 F. Supp. 2d 158 (D.D.C. 2011) ...................................................................1, 13, 18, 30

*\*Oliver-Simon v. Nicholson*,
    384 F. Supp. 2d 298 (D.D.C. 2005) ........................................................................36, 38, 41

*Perry v. Shinseki*,
    783 F. Supp. 2d 125 (D.D.C. 2011) ..............................................................................38

*Pollis v. New Sch. for Social Research*,
  132 F.3d 115 (2d Cir. 1997)................................................................34

*Prince v. Rice*,
  570 F. Supp. 2d 123 (D.D.C. 2008) ....................................................39

*Prise v. Alderwoods Grp.*,
  657 F. Supp. 2d 564 (W.D. Pa. 2009).............................................14, 25

\*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000)................................................................33, 45

\*Savignac v. Jones Day*,
  539 F. Supp. 3d 107 (D.D.C. 2021) ....................................................13

*Scott v. Harris*,
  550 U.S. 372 (2007)................................................................18, 19

*Scott v. Pace Suburban Bus.*,
  No. 01-cv-1039, 2003 WL 1579166 (N.D. Ill. Mar. 23, 2003) .............43

*Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*,
  165 F.3d 1321 (10th Cir. 1999) ..........................................................40

*Smith v. City of Jackson*,
  544 U.S. 228 (2005)................................................................30

*Spencer v. Va. State Univ.*,
  919 F.3d 199 (4th Cir. 2019) ..........................................................14, 20

\*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993)................................................................43

*Stanley v. Univ. of S. Calif.*,
  13 F.3d 1313 (9th Cir. 1994) ..........................................................31

*Steele v. Schafer*,
  535 F.3d 689 (D.C. Cir. 2008)..........................................................12

*Stoyanov v. Winter*,
  643 F. Supp. 2d 4 (D.D.C. 2009)..........................................................36, 44

*Taylor v. White*,
  321 F.3d 710 (8th Cir. 2003) ..........................................................32

*Thompson v. Sawyer*,
  678 F.2d 257 (D.C. Cir. 1982)..........................................................14

*Tx. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) .................................................................................32, 33, 43

*Usery v. Columbia Univ.*,
    568 F.2d 953 (2d Cir. 1977) ...................................................................14

*VoteHemp, Inc. v. DEA*,
    567 F. Supp. 2d 1 (D.D.C. 2004) .............................................................12

*Waters v. Turner, Wood & Smith Ins. Agency*,
    874 F.2d 797 (11th Cir. 1989) .................................................................25

## STATUTES

29 U.S.C. § 206(d)(1) .................................................................... *passim*

42 U.S.C. § 2000e-2(a)(1) ...............................................................35

42 U.S.C. § 2000e-2(h) ...................................................................34

42 U.S.C. § 2000e, *et seq.* ...............................................................1

## RULES

Fed. R. Civ. P. 56(a) ........................................................................12

## TREATISES

Lindemann, Grossman & Weirich, *Employment Discrimination Law* (5th ed. 2012) ...........14, 25

## REGULATIONS

29 C.F.R. § 1620.14(a) .....................................................................14

## INTRODUCTION

Despite taking years' worth of burdensome, costly discovery, the United States Equal Employment Opportunity Commission ("EEOC") has failed to unearth a shred of evidence that the George Washington University violated either the Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"), or Title VII, 42 U.S.C. § 2000e, *et seq.*  According to the EEOC, the University violated both statutes by paying its former Special Assistant to the University Athletics Director—Michael Aresco—more than it paid a former executive assistant to the Athletics Director—Charging Party Sara Williams.  However, the tens of thousands of pages of documents produced by the University, as well as the ten depositions taken by the EEOC, all demonstrate that Williams and Aresco had vastly different qualifications and performed substantially different job duties.  Simply put, Williams worked as the assistant *to* the Athletics Director, while Aresco worked as *an Assistant* Athletics Director.  Because no reasonable juror could conclude that Williams and Aresco performed "substantially equal" work, or that the University denied Williams the Special Assistant position due to her gender—a position to which Williams never applied and for which she did not meet the minimum qualifications—the University is entitled to summary judgment.

To recover under the EPA, the EEOC must prove that there was a wage disparity between a male and female employee who performed "equal" or "substantially equal" work.  *Musgrove v. Gov't of Dist. of Columbia*, 775 F. Supp. 2d 158, 165 (D.D.C. 2011).  While there is no dispute that Aresco earned more than Williams, there is also no dispute that Aresco's job required substantially greater "skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).  As an executive assistant, Williams performed clerical functions such as answering the telephone, scheduling meetings, submitting receipts for reimbursement, and booking travel for her supervisor, the Athletics Director.  *See, e.g.*, Statement of Undisputed Material Facts ("SMF") ¶¶ 27, 31, 40, 41–42.  Aresco, meanwhile, helped manage human resources, oversaw the men's rowing program,

drafted significant contracts with the University's Office of General Counsel, and worked on the Athletics Department's Strategic Plan, which was presented to the University's Board of Trustees. *See, e.g.*, *id.* ¶¶ 240–42, 281, 299.  Aside from the word "assistant" in their titles, the positions of executive assistant and the Special Assistant had little in common.  And, even if they had, the EPA permits wage disparities based on "factor[s] other than sex," 29 U.S.C. §206(d)(1), which in this case include Aresco's superior educational credentials and experience.

The EEOC's Title VII claim fares no better than its EPA claim.  To recover under Title VII, the EEOC must prove that the University intentionally discriminated against Williams because of her sex.  *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020).  Here, the EEOC has failed to adduce evidence that the University subjected Williams to *any* disparate treatment—much less disparate treatment *because of* sex.  Williams did not apply for the Special Assistant position for which Aresco was hired.  As a matter of law, Williams's failure to seek an advertised position defeats the EEOC's failure-to-promote claim.  *See Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003).  And, even if the EEOC could prove that Williams suffered an adverse employment action, the University still would be entitled to summary judgment because the record is devoid of evidence that the University took any adverse action against Williams due to her sex.  *See Bostock*, 140 S. Ct. at 1740.  Tellingly, the event that "instigated" Williams's EEOC charge was an incident in which her supervisor reprimanded her for calling another university's athletics department without permission to disclose a basketball coach's alleged extramarital affair.  *See* SMF ¶¶ 309–25.  A supervisor's harsh words over an employee's poor judgment do not violate Title VII.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

For all these reasons, and those below, the University's Motion for Summary Judgment should be granted.

## BACKGROUND

### A.     Williams's Tenure As Nero's Executive Assistant

In June 2014, then-University Director of Athletics and Recreation Patrick Nero sought approval to hire an executive assistant.  SMF ¶ 4.  In his position justification memorandum for the job, Nero explained that he needed assistance with clerical tasks, such as "scheduling" and "telephone communications."  *Id.* ¶ 5.  Charging Party Sara Williams (née Mutalib) applied for the position.  *Id.* ¶ 8.  In her application, Williams highlighted her experience as an executive assistant at the Canadian Embassy, in which she had been "responsible for calendar, contact, and filing systems management; scheduling meetings; [and] coordinating logistical support for special events."  *Id.* ¶ 9.  When she applied, Williams held a bachelor's degree from St. Joseph's University in pharmaceutical and healthcare marketing; she did not have other higher education degrees.  *Id.* ¶ 10.  Williams also had not worked in collegiate athletics or athletics administration, although she had tutored college athletes while a student at St. Joseph's University.  *Id.* ¶ 13.

Williams was hired and worked as Nero's executive assistant from September 2014 through December 2016.  SMF ¶¶ 16, 336.  Consistent with the position posting, Williams provided "clerical support" to Nero; she sat at a receptionist desk and handled "receptionist functions," such as scheduling meetings, greeting visitors, and answering the telephone.  *Id.* ¶ 23. As Athletics Director, Nero traveled frequently, and Williams was responsible for booking his hotel reservations and submitting his travel expenses for reimbursement.  *Id.* ¶¶ 40–42.  Although Williams managed two student interns, she did not supervise any employees.  *Id.* ¶¶ 61–63, 65.

At first, Williams earned $18.73 per hour, or approximately $39,100 per year, but in January 2016, Williams's hourly rate was increased to $19.11, such that she earned approximately $39,900 per year.  SMF ¶¶ 17, 20.  There were several University officials involved in determining Williams's compensation, *see, e.g.*, *id.* ¶¶ 18–19, and her pay was commensurate with the amounts

that Nero's previous executive assistants had been paid, *id.* ¶ 21.

While working as Nero's executive assistant, Williams was actively applying for other positions at the University.  For example, Williams applied to be a Special Assistant in the University's Enrollment Management Department.   SMF ¶ 95. The University had several "Special Assistant" jobs at the time, which were approximately equivalent in terms of the level of responsibility required.  *Id.* ¶ 96.  Commensurate with its higher level of responsibility, this Special Assistant job came with a higher salary than Williams's executive assistant role, and Williams believed the position would be a "promot[ion]" for her.  *Id.* ¶ 97.  On her resume for the Special Assistant – Enrollment Management position, Williams described her duties as Nero's executive assistant to include "scheduling" and "supervis[ing] . . . interns," and "processing and filing financial receipts and tracking expenses."  *Id.* ¶ 98.  Williams described her duties similarly on her LinkedIn profile, in which she wrote that she was responsible for "oversee[ing] daily calendar [and] scheduling of meetings"; "[a]ssist[ing] with the hiring and management" of student interns; "[p]lan[ning] and manag[ing] Director of Athletics and Recreation travel and donor meetings, schedul[ing] appointments[,] and prepar[ing] travel itineraries"; and "[a]ssist[ing] in management of Athletic Director budget by processing and filing financial receipts and tracking expenses."  *Id.* ¶ 69.  Williams confirmed at her deposition that her LinkedIn profile "truthfully and accurately reflected her job experience."  *Id.*  Nowhere in her LinkedIn profile did Williams refer to having decision-making authority over the Athletics Department budget; to serving on the Department's senior staff; or to overseeing any sports team.  *Id.* ¶ 70.  In a draft email to herself toward the end of her tenure, Williams lamented:  "I don't want to just do the schedule anymore."  *Id.* ¶ 83.

### B.    Aresco's Tenure As An Assistant Athletics Director

Unlike Williams, Aresco held a master's degree in business administration when he applied to the University, and he also had significant prior experience in collegiate athletics.  *See* SMF

¶¶ 119–21.  In September 2012, Aresco started as the Athletics Department's Assistant Director of Events.  *Id.* ¶ 122.  Less than a year later, he was promoted to be Director of Events.  *Id.* ¶ 124. In October 2014, Aresco was promoted again to Assistant Athletics Director—a role that placed him on Nero's senior staff.  *Id.* ¶¶ 127, 152.

As an Assistant Athletics Director, Aresco oversaw major capital projects and facility improvements, including turf installation and weight and locker room upgrades.  SMF ¶ 131.  He also supervised the Athletic Department's equipment and helped manage a $2.4 million budget. *Id.* ¶ 132.  To meet the Department's budget goals, Aresco expanded the roster of outside groups renting the University's athletics facilities, ultimately growing revenue by 75%.  *Id.* ¶ 133.  Aresco negotiated the University's contracts with the Washington Kastles (a professional tennis franchise), which included the Kastles's rental of the Charles E. Smith Center for indoor tennis matches.  *Id.* ¶¶ 134–35.  Aresco also supervised four full-time employees.  *Id.* ¶ 130.  In addition, he worked as the "sport administrator" for the University's men's rowing team.  *Id.* ¶¶ 154–55. As a sport administrator, Aresco was responsible for supervising the rowing coach, developing a budget and financial projections for the team, attending regattas, monitoring rowers' academic performance, assisting with recruiting, and disciplining rowers, as necessary.  *Id.* ¶¶ 281–95.

As Assistant Athletics Director, Aresco earned approximately $75,000 per year.  SMF ¶ 129.  In January 2016, Aresco received an annual merit increase, such that his salary became approximately $77,250 per year.  *See id.* ¶ 136.  As with Williams's salary, several University officials—including Nero, interim Finance Director Natasha Dornbush, and at least one employee from the University's Compensation Department—approved Aresco's salary.  *Id.* ¶ 137.

### C.  The University Hires Aresco—The Only Applicant—For The New Special Assistant Position

In June 2015, as part of the Department's five-year plan, Nero completed a position

justification form for another Assistant Athletics Director.  SMF ¶¶ 165–66.  The form stated that

the position would include, among other things, "handling day-to-day operational decisions" and

acting "as a project manager for special projects in support of key priorities for" the Department.

*Id.* ¶ 167.  The position ultimately also included some of the duties that former Associate Athletics

Director for Administration Brian Hamluk had performed prior to leaving the University in the

summer of 2015.  *See id.* ¶¶ 180–82.  On January 4, 2016, the University's Human Resources

("HR") Department posted an internal advertisement for this role—which became known as the

Special Assistant position—and solicited applications from University employees.  *Id.* ¶ 188–89.[1]

The posting, which was approved by HR, identified as the job's minimum qualifications a

"[b]achelor's degree in an appropriate area of specialization plus 2 years of relevant professional

experience."  *Id.* ¶¶ 189, 192.  The preferred qualifications included "4+ years administrative

experience in a similar role" and "demonstrated experience in dealing with confidential

information." *Id.* ¶ 193.

Aresco applied for the job, and in his application, he highlighted his significant experience,

already having successfully served as an Assistant Athletics Director at the University.  SMF

¶¶ 207–08.  Although the University advertised the position internally for three days—as explained

by its former HR Client Partner, Kaitlyn Kayer, who helped manage the posting and hiring

process—no one aside from Aresco applied.  *Id.* ¶¶ 188, 209.  Despite the lack of other

applications, the University interviewed Aresco to ensure that he would be a good fit for the job.

*Id.* ¶¶ 210–11.  Specifically, Tanya Vogel (then a University Senior Associate Athletics Director

---

[1]  Nero created the Special Assistant position after having discussions with, among others,
University President Steven Knapp, who had both an executive assistant and a chief of staff.  Like
President Knapp, Nero sought to have both an executive assistant to perform clerical functions and
a chief of staff to help manage high-level Department priorities.  *See* SMF ¶¶ 169–71.

and the University's Senior Woman Administrator, now the University's Director of Athletics) interviewed Aresco and recommended that he be hired.  *Id.* ¶¶ 211–14.

Williams previously had conveyed her interest in the role to Kayer, and Kayer "specifically told" Williams to apply.  SMF ¶ 196.  Williams, however, "did not follow [Kayer's] advice."  *Id.* ¶ 197.  In Nero's view, Williams would not have met the minimum qualifications for the position even if she had applied because she did not have two or more years of "relevant professional experience":  She had never worked in athletics administration and had worked in the Athletics Department for only 16 months at the time of the posting.  *Id.* ¶¶ 199–200.  She also lacked the "preferred" experience, as she had never served in a role similar to that of the Special Assistant, and had a demonstrated inability to maintain confidential information.  *Id.* ¶¶ 199–201.  Nonetheless, Nero testified that Williams would have been considered had she applied.  *Id.* ¶ 198.

In light of Aresco's experience and education, as well as the recommendation of Vogel, Nero hired Aresco, and Aresco began as Special Assistant in February 2016.  SMF ¶¶ 215, 220.  The move from Assistant Athletics Director to Special Assistant constituted a "lateral move" for Aresco.  *Id.* ¶ 226.  Aresco therefore was paid the same amount as Special Assistant (approximately $77,250/year) that he had been paid as Assistant Athletics Director, and his salary remained the same until he left the University.  *Id.* ¶¶ 221–28.  Nero, Kayer, and the University's Compensation Department all were involved in deciding Aresco's Special Assistant salary.  *See id.* ¶¶ 222–28.

## D.    Aresco Serves As Nero's Special Assistant/Chief Of Staff

As Special Assistant, Aresco functioned as a chief of staff to Nero and helped ensure that Nero's goals for the Department were being accomplished.  SMF ¶ 238.  Aresco's job entailed substantive responsibilities in a variety of areas, as he oversaw human resources for the Athletics Department, managed special projects, and served as the Department's liaison to the Office of General Counsel ("OGC").  For example, Aresco worked to fill open positions in the Department

and played a leading role in recruiting coaches, interviewing them, and negotiating their contracts. *See, e.g.*, *id.* ¶¶ 240–59.  He worked with OGC to facilitate the contract approval process, *see, e.g.*, *id.* ¶ 275–80, and prepared Nero for Board of Trustees meetings regarding the Department's Strategic Plan and implementation of budget cuts.  *Id.* ¶¶ 274–75, 299.  He drafted policies to govern the Department, *id.* ¶¶ 263–67, managed the merit increase process for Department employees, *see id.* ¶ 260, and continued to serve as the sport administrator for men's rowing, *see id.* ¶¶ 281–95.

Williams recognized that Aresco, as Nero's Special Assistant, had higher-level responsibilities than she did:  After Williams would record minutes of meetings, she would send drafts of the minutes to Aresco to revise before circulating them more broadly.  *See, e.g.*, SMF ¶ 164.  And while Williams would just take notes during the meetings, Aresco would participate. *See, e.g.*, *id.* ¶¶ 162–63, 264.  Williams acknowledged and instructed those who inquired that "Mike Aresco handles all of [the Department's] HR and hiring information."  *Id.* ¶ 243.  Williams wanted a role like that of Aresco:  As she wrote in her 2016 self-evaluation, she aspired "to take on additional responsibilities" and to "grow" her "portfolio" to include the responsibilities of an Assistant Athletics Director—the position that Aresco already held.  *Id.* ¶ 85.

### E.   Nero Reprimands Williams, And Williams Responds By Filing An EEOC Charge

In March 2016, two months after she declined to apply for the Special Assistant position, Williams inserted herself into a controversy that brought a reprimand from Nero.  *See* SMF ¶¶ 309–14.  Specifically, an assistant men's basketball coach at the University received a "pretty descriptive" email from the wife of a basketball coach at another university, accusing that coach of "infidelities."  *Id.* ¶ 309.  When the University basketball coach approached Nero to ask how to respond, Nero told him to do nothing, as "we're not going to get involved in whatever happens at

[another university's] campus." *Id.* ¶ 310.  A few minutes later, Nero overheard Williams on the phone with the other university's athletics director's office, "talking about receiving this e-mail that the coach had been cheating on his wife." *Id.* ¶ 311.  Nero called Williams into his office and, with Vogel present, reprimanded Williams for "breaching confidentiality and breaching professionalism in spreading a rumor that had nothing to do with us." *Id.* ¶ 312.

Three days later, Williams filed an informal grievance with the University's Equal Employment Opportunity office, alleging that she had been discriminated against due to her gender and/or her Middle-Eastern heritage.  SMF ¶ 315.  The University "thoroughly reviewed" and investigated the grievance, and informed Williams after completing its investigation that her claims of discrimination "could not be substantiated." *Id.* ¶ 319, 321.  However, by then, Williams had already filed a formal charge of discrimination with the EEOC, in which she abandoned her national origin discrimination claim but continued to allege gender discrimination.  *See id.* ¶ 322. Even though Williams had declined to apply for the Special Assistant position, she alleged in her EEOC charge that the University had discriminated against her in violation of Title VII by selecting Aresco for the role. *Id.* ¶ 323.  She further alleged that the University had violated both Title VII and the Equal Pay Act by paying Aresco a higher salary as Special Assistant than it paid her as Nero's executive assistant. *Id.*  While Williams's EEOC charge focused exclusively on the University's alleged preferential treatment of Aresco, it listed the "earliest" date that she had experienced alleged gender discrimination as March 7, 2016—the date Nero reprimanded Williams for not properly handling sensitive information—***rather*** than February 2016—the date Aresco began working as the Special Assistant.  According to Williams, it was her reprimand from Nero that "instigated" her filing of the internal, informal grievance. *Id.* ¶¶ 316, 325.

## F.   Williams Moves To A New Role At The University While Her EEOC Charge Remains Pending

In October 2016—the same month that she filed her EEOC charge against the University—Williams applied to become an Associate in the University's Business Management and Analysis Group ("BMAG").  SMF ¶ 334.  Williams was offered the job, and she accepted.  *Id.* ¶ 335. Williams's last day as Nero's executive assistant was December 11, 2016.  *Id.* ¶ 336.  Aresco remained Special Assistant and the sport administrator for the men's rowing team through March 31, 2017, when he moved to New York.  *Id.* ¶¶ 152, 154–55, 220, 344.

For her part, Williams requested—and received—a salary of $80,000 for her BMAG position, which was approximately $2,750 more than Aresco's Special Assistant salary had been. SMF ¶ 337.  Williams received subsequent raises until BMAG's successor group was eliminated in 2020 due to COVID-19-related budget cuts.  *Id.* ¶ 338.  At the time that Williams's position was eliminated, her salary was approximately $85,000.  *Id.* ¶ 339.  Williams does not assert that the 2020 elimination of her BMAG position was in any way discriminatory or retaliatory.  *Id.* ¶ 340.

## G.   The EEOC Seeks Wide-Ranging Discovery And Draws Criticism From Magistrate Judge Harvey On Several Occasions

On April 21, 2017, the EEOC notified the University that it had found reasonable cause to believe that the University had violated the Equal Pay Act and Title VII.  After abruptly ending the conciliation process, the EEOC filed a complaint in this Court on September 26, 2017, asserting that the University violated (1) the Equal Pay Act by paying Williams $40,000 and Aresco $77,000 for performing "substantially equal" work, *see* Compl. ¶¶ 17, 24, 29, 32 (Count I); and (2) Title VII by "engaging in disparate pay practices," depriving Williams "of employment opportunities and advancement because of her sex," and generally "minimizing" her while "enhancing Aresco's importance and future opportunities," *id.* ¶¶ 20, 37–38 (Count II).  Specifically, the EEOC asserted that the University had "created" the Special Assistant position for Aresco; promoted him to that

role; and "dissuaded and deterred" Williams from applying. *Id.* ¶¶ 25–26. Among other remedies, the EEOC sought to recover the difference between Williams's and Aresco's wages during their approximately 16 months of overlapping tenure—approximately $53,000. *Id.*

The University moved to dismiss or, alternatively, to stay the proceedings to require the EEOC to conciliate in good faith. *See* Dkt. 10. Although the Court denied the University's motion in May 2019, it warned that evidence other than the complaint's threadbare allegations "would be necessary to survive summary judgment." Dkt. 23 at 16.

A lengthy and acrimonious discovery period followed. All told, five discovery disputes were referred to Magistrate Judge Harvey for resolution, three of which generated lengthy written decisions. First, after the EEOC refused to agree to narrow its overly broad discovery requests, the Court issued a 43-page opinion, substantially narrowing the EEOC's requests, and reprimanding the EEOC for "insisting on such obviously overbroad discovery." Dkt. 53 at 17. Approximately four months later, this Court referred the parties to Judge Harvey again after the EEOC violated Federal Rule of Civil Procedure 26(b)(5)(B) by reviewing the University's attorney-client privileged documents, which the Charging Party had taken from the University without its consent, and which the EEOC had reviewed ***after*** being notified by the University that the documents were privileged. Although Judge Harvey stopped short of levying sanctions against the EEOC for having violated the Federal Rules, he "warned [the EEOC] to assiduously comply with the letter and spirit of the Federal Rules of Civil procedure and its ethical responsibilities" moving forward. Dkt. 69 at 39. Most recently, Judge Harvey denied the EEOC's motion to compel the production of documents that the University had withheld and logged as attorney-client privileged, finding that the documents had been properly withheld and logged; that the privilege had not been waived; and that the EEOC had "stumble[d] right out of the gate, applying an

incorrect standard" for attorney-client privilege and misstating the law.  Dkt. 107 at 28.

## STANDARD OF REVIEW

A district court "shall" grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008).  "Summary judgment is mandated if a party fails to establish an element essential to that party's case on which that party will have the burden of proof at trial." *VoteHemp, Inc. v. DEA*, 567 F. Supp. 2d 1, 10 (D.D.C. 2004).

## ARGUMENT

### I.    No Reasonable Juror Could Conclude That The University Violated The EPA

The EPA bars employers from paying unequal wages to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  A female plaintiff asserting an EPA violation must prove by a preponderance of the evidence that she earned less than a male employee performing "equal" or "substantially equal" work.  *Johnson v. Dist. of Columbia*, 947 F. Supp. 2d 123, 130 (D.D.C. 2013).  If the plaintiff carries that burden, the defendant still can "avoid liability" by establishing any one of four affirmative defenses, including that the pay differential was "based on any other factor other than sex." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575 (D.C. Cir. 2010) (quoting 29 U.S.C. § 206(d)(1)).

Here, the EEOC's EPA claim cannot survive summary judgment for two separate reasons. *First*, there is no genuine dispute of material fact as to whether Williams, an executive assistant, and Aresco, a sport administrator and Assistant Athletics Director, performed "equal" or "substantially equal" work:  They did not.  *See Musgrove*, 775 F. Supp. 2d at 165.  The University paid Aresco more than it paid Williams because his job required a more sophisticated skillset and entailed substantially greater responsibilities.  Unlike Williams, who performed mostly clerical duties and had no supervisory responsibilities, Aresco oversaw the men's rowing program, managed human resources for the Athletics Department, and participated in the development and execution of the Department's Strategic Plan.  No reasonable juror could conclude that these roles were substantially equal.  *Second*, even assuming that the EEOC somehow could prove that Williams and Aresco engaged in substantially equal work, the EEOC's EPA claim still fails because the difference in Williams's and Aresco's pay was justified by a "factor other than sex," 29 U.S.C. § 206(d)(1)—namely, by Aresco's superior qualifications and work experience.

### A.    The EEOC Cannot Show That Williams And Aresco Performed Substantially Equal Work

The EPA mandates equal wages for employees of the opposite sex only if the employees perform "equal" or "substantially equal" work.  *Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 815 F.2d 1519, 1524, 1527 (D.C. Cir. 1987).  The statute defines "equal work" as work on jobs requiring "equal skill, effort, and responsibility."  *Savignac v. Jones Day*, 539 F. Supp. 3d 107, 114 (D.D.C. 2021) (quoting 29 U.S.C. § 206(d)(1)).  Skill encompasses "such factors as experience, training, education, and ability," while effort refers to "the physical or mental exertion needed for the performance of a job," and responsibility "is concerned with the degree of accountability required in the performance of the job."  *Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499, 2022 WL 798382, at *7 (D.D.C. Mar. 15, 2022) (citations omitted).  "The terms

constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a). Thus, even if two jobs require the same skill, the positions are not equal if one entails greater responsibility, such as discretionary authority, oversight of other employees, or greater mental effort. *See, e.g.*, *Usery v. Columbia Univ.*, 568 F.2d 953, 960 (2d Cir. 1977).

The "substantial equality" standard demands that the jobs "must be more than merely comparable," *Goodrich*, 815 F.2d at 1524; instead, they must be "virtually identical," *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019); *see also Thompson v. Sawyer*, 678 F.2d 257, 271 (D.C. Cir. 1982) (recognizing that "the jobs in question" need not be "exactly alike," but must be more than "merely comparable"). "The 'substantial equality' inquiry requires courts to consider not just selected aspects of the relevant jobs, but the positions in their totality; at the same time, courts focus on the primary duties of each job, not those which are incidental or insubstantial." *Johnson v. Wash. Metro. Area Transit Auth.*, No. 19-cv-3534, 2022 WL 4547527, at *3 (D.D.C. Sept. 29, 2022). "That some aspects of two jobs are the same does not mean that the jobs overall are substantially identical." Lindemann, Grossman & Weirich, 1 *Employment Discrimination Law* § 19-24 (5th ed. 2012). Rather, the jobs must share "a 'common core' of identical (or substantially similar) tasks." *Prise v. Alderwoods Grp.*, 657 F. Supp. 2d 564, 613 (W.D. Pa. 2009).

Here, the EEOC's EPA claim fails at the outset because Williams performed clerical tasks and had no supervisory or policymaking authority. *See, e.g.*, SMF ¶¶ 22–23, 74. Aresco, by contrast, served on the senior staff of the Athletics Department, where he managed other employees, participated in hiring and salary decisions, drafted and advised on Department policies, and served as the sport administrator for the men's rowing team with disciplinary, oversight, and recruiting responsibilities. *See, e.g.*, *id.* ¶¶ 130, 152, 241, 263, 281–95. Williams admittedly performed none of these functions. *Id.* ¶¶ 65, 75–77, 143–46.

1.      Williams Performed Clerical Tasks As An Executive Assistant

There is no genuine dispute of material fact that Williams's work as Nero's executive assistant consisted predominantly of clerical support tasks.  *See* SMF ¶¶ 22–23.

In its barebones Complaint, the EEOC alleges that Williams's duties as Nero's executive assistant consisted of "providing high-level administrative support to the director of athletics," "coordinating administrative staff members," "maintaining the external face of the Office of the Director of Athletics," liaising with other University departments, "acting as project manager for special projects," and serving on the Athletics Department's "senior staff."  Compl. ¶ 15.  But discovery has shown that Williams "coordinat[ed]" staff members by asking their availability for meetings and soliciting information for meeting agendas.  *See, e.g.*, SMF ¶¶ 27–30, 160.  She "maintain[ed] the external face of the Office" by answering the telephone and greeting walk-in visitors.  *See, e.g.*, *id.* ¶¶ 23, 31–33.  She liaised with other departments by contacting other *executive assistants*—*e.g.*, her counterparts in the Provost's office—to set up meetings for her boss, the Athletics Director.  *Id.* ¶ 35.  The "special projects" that Williams assisted with included sending out the Athletics Department's holiday card and helping to plan a breakfast for graduating athletes.  *Id.* ¶ 68.  And no witness—other than Williams herself—characterized her as a member of the senior staff, *see id.* ¶¶ 139–40, nor does her name appear on any organizational chart as a member of the Department's senior leadership, *see, e.g.*, *id.* ¶ 141.  Members of the senior staff had private offices, *id.* ¶¶ 150, 153; Williams sat at the receptionist's desk, *id.* ¶¶ 33, 151.

Williams's own description of her job duties confirms that her role was primarily clerical.  According to the self-evaluations she completed in 2015 and 2016, Williams on "a daily basis" provided "clerical support" to the University's Athletics Director and handled various "receptionist functions for the athletic office including managing calendars, answering phones, responding to messages and assisting with walk-ins."  SMF ¶ 23.  Her LinkedIn profile—an online resume,

which she verified at deposition "truthfully and accurately reflected her job experience"—describes her role in similar terms, explaining that she provided "administrative support" to the Athletics Director, oversaw his daily calendar, scheduled meetings, managed task lists, planned travel itineraries, processed receipts, and documented the Athletic Director's contacts with donors. *Id.* ¶ 69. Nowhere on her LinkedIn profile did Williams describe her duties to include the significant budgetary authority she belatedly claimed at deposition to have exercised. *See id.* ¶ 70.

Nero—Williams's boss, and the sole person responsible for providing her with work—said that she served as a "receptionist," and that her primary tasks consisted of "scheduling" and helping him "put together [his] expense reports." SMF ¶¶ 24–27, 31, 40. Tanya Vogel—then a Senior Associate Athletics Director and now the Director of Athletics—likewise described Williams's responsibilities as managing Nero's calendar, booking his travel and submitting expenses, scheduling meetings, reserving conference rooms, and ordering catering. *Id.* ¶ 27. Williams *herself* acknowledged that the University hired her to perform these clerical tasks and that they consumed as much as *80%* of her time.[2] *See id.* ¶¶ 39, 44, 60.

---

[2] Specifically, Williams testified that clerical support duties such as scheduling meetings, managing tasks lists, and coordinating communication among Athletics Department staff members took 50% of her time, SMF ¶ 39; booking travel and submitting receipts took another 20-25%, *id.* ¶ 44; and filing took 5%, *id.* ¶ 60, for a total of 75–80%. Williams later interjected that the 50% of her job spent on clerical support also included "special projects," *id.* ¶¶ 66–67, but those special projects were themselves clerical. For example, she sent out the Department's holiday card, and made "sure that the card was going out to the right people." *Id.* ¶ 68. Williams also attempted to revise her original testimony that she spent 20–25% of her time booking travel and submitting receipts, asserting that this collection of tasks included "managing budgets," and that managing said budgets occupied 30–40% of her time. *Id.* ¶ 45. As noted below, Williams's assertions regarding her budgetary responsibilities are contradicted by the record. *See* pp. 17–20, *infra*. But even if these assertions were credited, it is irrelevant whether Williams spent time "managing budgets" (or how much time she did so) because Aresco's job included substantial responsibilities beyond budget management that Williams's job did not. Thus, even if Williams were to be believed, her budgetary tasks would not render her job responsibilities "substantially equal" to those of Aresco.

Hundreds of emails from 2014 to 2016—emails that the EEOC insisted all must be produced—confirm that clerical duties dominated Williams's workday. Nero asked Williams to make appointments and schedule meetings, SMF ¶ 27; print documents, *id.* ¶ 34; book travel, *id.* ¶ 41; submit expenses for reimbursement, *id.* ¶ 40; address envelopes, *id.* ¶ 38; and update his email contacts, *id.* Agendas for Williams's weekly meeting with Nero show that she and Nero discussed his hotel reservations and when he wanted meetings to occur. *See id.* ¶ 41.

As Nero's executive assistant, Williams had no supervisory role and only "[l]imited" authority to take "independent action" without the approval and supervision of her boss, Nero. SMF ¶¶ 65, 73–74. No regular employees reported to her, *id.* ¶ 65; she simply managed and trained two student interns who were hired to assist with copying, mailings, and other clerical duties, *id.* ¶¶ 61–63. Nero assigned Williams work and required her to seek his approval before taking on assignments from other senior members of the Department. *Id.* ¶¶ 24–25. Nero also would review, revise, and approve any correspondence that Williams drafted on his behalf and the agendas and minutes she prepared for senior staff meetings. *Id.* ¶¶ 57, 161. Aresco also reviewed and edited Williams's drafts. *Id.* ¶ 164.

Despite Williams conceding that she spent as much as 80% of her time on clerical tasks, SMF ¶¶ 39, 44, 60, the EEOC nonetheless attempts to defeat summary judgment on its EPA claim by arguing that Williams somehow exercised substantial responsibility over the Athletics Department budget. However, for at least two separate reasons, Williams's unsupported assertion that she managed the Athletic Department's "Administrative, Championship, and Athletics Director budgets"—worth as much as $1.5 million—cannot salvage her EPA claim. *Id.* ¶¶ 46, 48.

*First*, Williams's contention regarding the scope of her budgetary responsibilities rests on her own self-serving testimony—which is contradicted by the documentary record, including her

own written descriptions of her job duties, *see* pp. 18–20, *infra*—and thus, is not sufficient to create a "genuine" issue of material fact.  While the Court must view the facts on summary judgment in the light most favorable to the nonmoving party, that obligation "only attaches if there is a 'genuine' dispute as to those facts."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007). In other words, "[i]f the evidence favoring the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted."  *Musgrove*, 775 F. Supp. 2d at 164. Here, Williams's testimony that her expansive budgetary duties included tasks like "five-year forecasting" of Athletics Department expenses, SMF ¶ 47, is not "significantly probative" and does not create a genuine dispute of material fact.

Multiple witnesses—including Nero—made clear that Williams exercised ***no*** planning or oversight role with respect to any Athletics Department budgets.  When the EEOC's lawyer asked Nero whether Williams managed "administration, AD, and championship budgets worth over 1.5 million in operating expenses," Nero responded with an unambiguous "no."  SMF ¶ 48; *see also id.* ¶¶ 49–51.  Vogel concurred, testifying that Williams "didn't manage any budgets," and that forecasting future expenditures "was not part of [her] role."  *Id.* ¶ 52.  Again, consistent with Nero and Vogel's testimony, Williams's own LinkedIn profile, which she confirmed was "accurate[]," described her budgetary responsibilities to include only "processing and filing financial receipts and tracking expenses."  *Id.* ¶ 69.  Her job applications from 2016 repeat this language, representing that her alleged "[m]anage[ment]" role with respect to ">$1.5M" budgets was limited to "processing and filing financial invoices and tracking expenses."  *Id.* ¶ 98.

Nor would it have made any sense for Williams to exercise planning or oversight authority over a $1.5 million budget:  She had no background or experience in finance, or in athletics administration.[3]  SMF ¶ 13–14.  As Nero explained, to the extent that Williams had any role with respect to the budget, it was merely to submit expenses for reimbursement and to confirm that those expenses were paid from the correct Department budget allocations.  *Id.* ¶ 49.  Williams occasionally would retrieve information that Nero requested from employees who had actual responsibility for developing and overseeing the Athletics Department's budget—but that was limited to "print[ing]" monthly budget reports prepared by the Finance Director, Rosemarie Sanchez Chee-Wah, and "bring[ing] them" to weekly meetings where Nero "would look them over."  *Id.* ¶ 50.  As Nero testified with respect to these rote tasks:  "From my standpoint, she didn't manage [the budget]. . . .  'Management' would not be a word I would use."  *Id.* ¶ 48.

Williams's claim that she was at times responsible for "managing the men's basketball budget," SMF ¶ 144, is also "blatantly contradicted by the record," such that no reasonable jury could believe it.  *Scott*, 550 U.S. at 380.  As Nero—who served for a time as sport administrator for men's basketball—explained, Williams lacked "any authority or responsibility [over] that budget."  *Id.* ¶¶ 145, 147.  This is confirmed by the results of an independent "desk audit" of the Athletics Department, which was completed in late 2016 to assess employees' financial responsibilities.  *Id.* ¶ 326.  The audit identified nine sport administrators who were "[r]esponsible for the Department's financial performance" and worked with head coaches of various teams and the Finance Director "to develop budgets [and] financial projections."  *Id.* ¶ 328.  Aresco was

---

[3] Williams attended, but did not graduate from, West Chester University, where she received a D+ grade in her financial accounting course and several other classes.  SMF ¶ 12.

among the nine individuals; Williams was not.  *Id.* ¶ 329.[4]  Williams, indeed, conceded during her

desk audit interview that she had no "approval authority for finance related activity" and that "*[a]ll*

*activity is approved by Finance Department or Senior Leadership*."  *Id.* ¶ 332 (emphasis added).

      *Second*, and more importantly, even if there were a genuine dispute of material fact as to

the precise nature of Williams's budgetary duties, that still would not save the EEOC's EPA claim.

Even assuming that Williams spent 20 to 30% of her time managing the "Administrative,

Championship, and Athletics Director budgets"—responsibilities curiously absent from her

LinkedIn profile and her job applications—her job would in no way be "virtually identical" to that

performed by Aresco.  *Spencer*, 919 F.3d at 203; *see also* SMF ¶ 46.  Although Aresco had

oversight of the men's rowing budget, he also handled multiple other management and

policymaking functions that Williams admittedly did not share.  *See, e.g.*, SMF ¶¶ 240–43, 263–

73, 281–95.  Even under Williams's version of events, she performed only "the financial

components of [the] sport administrator function" for men's basketball for a period of time, while

disavowing that she performed the full suite of a sport administrator's duties:  "I did not say that I

performed all functions.  I performed some of the functions of the sport administrator for the men's

basketball team," she testified.  *Id.* ¶ 144.  As detailed below, the additional "responsibility" vested

in Aresco, and the additional "skill" and "effort" required for his job, preclude any reasonable juror

from finding that he and Williams engaged in substantially equal work.  29 U.S.C. § 206(d)(1);

*see also Johnson v. Weld Cty.*, 594 F.3d 1202, 1215 (10th Cir. 2010) (plaintiff failed to prove

substantially equal work "when the higher paid managers had . . . a greater array of responsibilities,

---

[4] Although the audit recommended that Williams be given a raise to $49,000—well below the
$77,000 annual salary the EEOC claims she should have been paid—it found that her fiscal duties
were equivalent only to those of a "finance associate," not to those of a sport administrator.  SMF
¶ 330.  The Finance Director at the time, Rosemarie Sanchez Chee-Wah, described the finance
associate position as a "worker bee" role that involved "just processing expense reports."  *Id.* ¶ 331.

and the plaintiff did not perform all of the functions that these managers performed").

    2.    <u>Aresco Handled Human Resources, Policymaking, and Sport Administrator Duties That Williams Did Not Share</u>

Unlike Williams, Aresco did not spend the majority of his time on clerical tasks in the Athletics Department.  *See* SMF ¶¶ 229–37.  To the contrary, Aresco was among a handful of administrators who served on Nero's senior staff.  *See id.* ¶ 141.  As Special Assistant to the Athletics Director and Nero's chief of staff, Aresco oversaw human resources for the Department, participated in coach hiring and salary decisions, researched and developed Department policies, prepared bid packages to host NCAA championship events, drafted significant contracts, made day-to-day operational decisions on behalf of the Department, engaged in strategic planning for the Board of Trustees, and served as the sport administrator for the men's rowing program.  *Id.* ¶ 239.  Each of these functions demanded greater "accountability" and a more sophisticated skillset than that of Nero's executive assistant.  *See Baker-Notter*, 2022 WL 798382, at *7.

***Human Resources Responsibilities***.  One of Aresco's principal duties as Special Assistant was "overseeing HR" for the Athletics Department.  SMF ¶ 240.

As part of his human resources portfolio, Aresco managed the Athletics Department's hiring process.  He drafted hiring plans for new coaches, trainers, and other employees, which typically included both a salary proposal and a plan for funding the position out of team or Athletics Department budgets—figures Aresco developed in part by researching pay practices at peer universities.  SMF ¶¶ 244–46.  Coaches at the University "aggressive[ly]" sought to fill vacant positions on their staff, and Aresco ensured that human resources timely posted job openings.  *Id.* ¶ 247.  He also reviewed job applications and participated in interviews for leading candidates.  *Id.* ¶ 249.  Williams indisputably did not handle any of these tasks.  *Id.* ¶¶ 75–76.

Aresco played an "instrumental" role in the "extremely sensitive and confidential" process

for hiring the head women's basketball coach, Jennifer Rizzotti.  SMF ¶ 251.  He worked with the University's HR Department to develop the job posting and, with Vogel, conducted the initial telephone interview with Rizzotti.  *Id.* ¶¶ 253–54.  To facilitate contract negotiations with Rizzotti, he reviewed coaching contracts from other universities and excerpted language from them to help "pull together a contract that [was] going to work for the University and for the coach." *Id.* ¶ 255. He then shepherded the contract through the University's contract approval process, ensuring that "everybody had looked at it and signed it, ultimately, to make sure it was an executed contract." *Id.* ¶ 257.  As Vogel described it, Aresco participated in the hiring process "from A to Z"—that is, from building the contract in collaboration with the University's Office of General Counsel to overseeing the press conference at which Rizzotti's hiring was announced.  *Id.* ¶¶ 252, 256, 258. Williams played no part in the hiring of Rizzotti or any other coach.  *See id.* ¶ 75.

Beyond his hiring responsibilities, Aresco also participated in deliberations about whether to fire a coach for misconduct.  SMF ¶ 261.  Williams had no involvement in disciplinary or personnel decisions relating to the University's coaching staff.  *Id.* ¶ 76.

***Athletics Department Policies and Management***.  As Special Assistant, Aresco was "in charge" of developing multiple written policies for the Athletics Department.  SMF ¶ 263.  At senior staff meetings, Aresco would "drive the conversation" concerning "what types of policies" the Department needed, *id.* ¶ 264, and then he would research best practices among other universities, draft the policy, circulate it for comment, and ultimately, "tighten it up and finalize it," *id.* ¶¶ 265–66.  The policies that Aresco created included a relocation guide for new hires, a policy for priority hires, a team family travel policy, a policy concerning students who were cut, dismissed from, or quit athletic teams, a guide to the duties of sport administrators, and a guide to awarding bonuses.  *Id.* ¶ 267.  Williams did not draft any Athletics Department policies.  *Id.* ¶ 77.

In a similar vein, Aresco was the senior member of the Athletics Department responsible for "driving the process" of revising the Department's Strategic Plan. SMF ¶ 296. One focus of the Strategic Plan was to implement a 20% budget cut the University mandated for the Department. *Id.* ¶ 297. Aresco contributed to senior staff deliberations over how to fund scholarships and whether to eliminate certain sports in light of the budgetary retrenchment. *Id.* ¶ 298. And he was "very involved" in drafting presentations for the Board of Trustees and preparing for "extensive meetings and conversations" between the Athletics Department and the Board regarding which programs would bear the impact of the budget cuts. *Id.* ¶ 299. Williams did not participate in strategic planning for the Department or drive decisions about where to trim spending. *Id.* ¶ 78.

***Championship Bids***. Above and beyond his human resources and policymaking duties, Aresco spearheaded the University's submission of bids to host conference and NCAA championships—an "incredibly competitive" process. SMF ¶ 268. If a coach wanted to bid to host the championship event for a particular sport, the University would assemble a bid committee with approximately 10 members, and Aresco would "run" the bid meetings. SMF ¶¶ 269–70. He also was "primarily[ ] responsible" for creating the comprehensive bid package, which included information about University facilities and locker rooms, guaranteed ticket sales, security, information technology, and nearby transportation, restaurants, and hotels, among other details. *Id.* ¶¶ 271–72. Multiple bids that Aresco prepared ultimately yielded a conference or NCAA championship event for the University. *Id.* ¶ 273. Williams did not oversee the creation of any championship bid packages, successful or otherwise. *Id.* ¶ 80.

***Men's Rowing Administrator***. Nero also served as the sport administrator for the men's rowing program—a role that enmeshed him in budget oversight, fundraising and donor meetings, financial aid planning and compliance, roster management, student-athlete discipline, team travel,

and special events.  SMF ¶ 281.  With respect to budget oversight, Aresco reviewed coaches'
requests for major purchases and team travel to ensure that the team had sufficient funding or could
raise the necessary money from donors.  *Id.* ¶ 285.  Aresco also planned and executed the rowing
program's major fundraising event, the GW Invitational—an annual regatta on the Potomac River
attended by "a very active and generous donor base."  *Id.* ¶ 289.

The men's rowing coach, Mark Davis, reported directly to Aresco.  SMF ¶ 283.  Aresco
met weekly with Davis, advising him on issues such as how to divide his scholarship budget among
student-athletes and whether the rowing program could provide tuition-assistance packages that
combined athletic scholarships with need-based financial aid.  *Id.* ¶ 284.  Aresco ensured the
rowing team complied with the sport's rules and regulations.  *Id.* ¶ 287.  And he reviewed and
approved Davis's expenses and conducted his annual performance review.  *Id.* ¶ 288.  Along with
Nero and Davis, Aresco was also responsible for disciplining misbehaving rowers.  *Id.* ¶ 290.

Again, there is no dispute:  Williams performed none of these tasks.  As she conceded
during her deposition, Williams never served as a sport administrator for any sport, even on an
interim basis.  SMF ¶ 143; *see also id.* ¶¶ 328–29 (desk audit concluding Williams was not a sport
administrator).  She had no authority to approve travel or other expenditures for any sports team,
nor did she participate in disciplinary decisions for student-athletes.  *Id.* ¶¶ 147–48.  By her own
admission, no coaches reported to her, and she was not "part of the process" for conducting their
annual performance reviews.  *Id.* ¶¶ 65, 76.  Although Williams asserts that she performed "the
financial components of [the] sport administrator function" for the men's basketball program for
a time, she acknowledges that she did not handle *other* aspects of the sport administrator's role at
any point—indeed, she did not even know precisely what this role entailed.  *Id.* ¶¶ 144, 146.  And,
in any event, Williams appears to have understood that any tasks she performed for the basketball

team were not part of her job: She claims to have performed these "financial" functions for the team for only a few months after the departure of a senior associate athletic director.  *Id.* ¶ 144. "An employee temporarily filling in for a higher-paid person cannot normally be said to be performing the same job."  Lindemann, *supra*, § 19-30 (citing *Waters v. Turner, Wood & Smith Ins. Agency*, 874 F.2d 797, 799 (11th Cir. 1989)).  And "'[a]ssisting with' a task is not the same as having ultimate responsibility" for it.  *Holcomb v. Powell*, 433 F.3d 889, 898 (D.C. Cir. 2006).

3.   Any Similarities Between Williams's And Aresco's Jobs Were Superficial At Best

During discovery, the EEOC attempted to show that Williams and Aresco shared overlapping duties, such as scheduling meetings for Nero, printing documents for him, forwarding voicemails, taking minutes at meetings, and working on Athletics Department contracts.  The fact that Williams and Aresco occasionally each performed routine office tasks should not be surprising; nearly every person who works in a modern office environment sometimes schedules meetings, prints documents, and forwards communications.  But these tasks were "incidental" to Aresco's primary job responsibilities and consumed an "insubstantial" amount of his time, *Johnson*, 2022 WL 4547527, at *3; SMF ¶¶ 230–237, whereas for Williams, they were the "main purpose" of her job as executive assistant, *id.* ¶ 22.  The undisputed evidence not only fails to show that Williams and Aresco shared "a 'common core' of identical (or substantially similar) tasks," *Prise*, 657 F. Supp. 2d at 613, but underscores just how far apart their job duties actually were.

Take, for example, scheduling meetings: The EEOC introduced a stack of emails at Aresco's deposition for the evident purpose of demonstrating that scheduling meetings for Nero was an element of Aresco's job, as it was for Williams's job.  *See* SMF ¶ 230.  But these documents show only that Nero sometimes asked Aresco to coordinate logistics for meetings *in which Aresco would then substantively participate*.  *Id.* (noting "Mike" would participate in meeting Nero asked

him to schedule); *id.* ("Can you get the four of us together the week after men's basketball A10 to discuss."); *id.* ("Please set up an hour next week for the three of us to get together"); *id.* ("Any chance you have time for a brief call with Patrick and I some point this week?"). Williams, on the other hand, had the purely clerical function of finding open calendar slots for Nero to meet with *others*. In her words: "I don't have anything to do with the meeting except setting it up." *Id.* ¶ 37.

The pattern repeats with Williams's and Aresco's supposedly shared role of taking minutes at meetings. Williams and Aresco both took notes—she at senior staff meetings, he at leadership meetings. SMF ¶¶ 162, 306. But Williams's role was *limited* to memorializing the discussion; she did not substantively contribute to it. *Id.* ¶ 163. That is why Nero advised her she did not need to attend head coaches' meetings: "Since we do not take minutes at these meetings it is really not necessary for you [to] attend." *Id.* ¶ 37. Aresco's role, by contrast, was far more than stenographic: "It wasn't just minutes." *Id.* ¶ 307. Aresco *participated* in leadership meetings and was responsible for "follow[ing] up" after the meetings to ensure that the initiatives discussed during those meetings were *accomplished*. *Id.* ¶ 306–07. Further highlighting the gap in their responsibilities, Aresco reviewed and revised the minutes that Williams drafted for senior staff meetings before she circulated them to others. *Id.* ¶ 164. By contrast, Williams did not review the minutes that Aresco took at leadership meetings, which she did not even attend. *Id.* ¶ 308.

Williams's and Aresco's duties with respect to Athletics Department contracts further underscores the substantial differences between their two roles. Williams asserts that she was responsible for the "administration" of "game contracts" in which the University agreed to compete in athletic events against other schools. SMF ¶ 36. But that role involved little more than data entry and did not require Williams to exercise judgment about the content of those agreements. *See id.* The University Office of General Counsel ("OGC") prepared a standard "template" game

contract, and Williams would fill in that form with a list of games emailed to her by coaches. *Id.* Aresco, by contrast, served as the Athletics Department's "liaison" to OGC for "any type of contract that was of significant value" or that involved hiring. *Id.* ¶ 274. Aresco not only reviewed those contracts for substance, but also completed "a lot of the drafting" of the contracts that the University entered with Nike and the Washington Kastles, among others. *Id.* ¶¶ 134–35, 275–80.

And although Williams and Aresco both occasionally booked travel, they did so under substantially different circumstances. One of Williams' "principal responsibilities" was assisting Nero with booking routine flights, hotels, rental cars, and taxis for his work trips. SMF ¶ 41. Aresco, by contrast, did not plan routine business travel for Nero or other senior staff. *Id.* ¶ 233. Instead, he spearheaded the men's basketball team's tour through Japan—a one-time project that involved not only coordinating travel for players, coaches, and guests, but also planning and scheduling games with Japanese teams and determining who would receive the revenue generated from ticket sales, television and radio broadcasts, and advertising.[5] *Id.* ¶¶ 278–80, 302.

### 4. Williams's Ambitions Outpaced Her Actual Job Duties

The record reflects that Williams grew dissatisfied with her clerical role and sought to aggrandize her own position within the Athletics Department as a result. But the fact that Williams strived to advance her career does not mean that she *in fact* performed substantially equal functions to Aresco. To the contrary, Williams's attempts to freelance beyond her job description forced her supervisors to remind her to "stay in her lan[e]" and to focus on the job duties assigned to her rather than the ones she had ambitions to perform. SMF ¶¶ 86, 93–94.

In a May 2016 email she sent herself to prepare for her annual performance review,

---

[5] The fact that Aresco, not Williams, planned this tour further belies her unsupported assertion that she performed sport-administrator functions for the men's basketball team. *See* pp. 19–20, *supra*. Williams also complained that Nero gave approval for Aresco (but not her) to attend the Japan trip—even though Aresco (but not she) *planned the trip.* SMF ¶¶ 81, 278–80, 302–04.

Williams lamented, "I don't want to just do the schedule anymore" and opined: "[I am] capable of doing so much more."  SMF ¶ 83.  She made it known to her colleagues that "she didn't want to be an executive assistant."  *Id.* ¶ 84.  In service of these ambitions, Williams "would try doing additional work that was not hers," with the result that she would "not hold[] up her end of managing her duties" as Nero's executive assistant.  *Id.* ¶¶ 87, 89.  In one notable example, Williams neglected to cancel a lunch as Nero had requested, and Nero's would-be lunch companion was left stranded at the restaurant.  *Id.* ¶ 90.

Far from acceding to Williams's efforts to bootstrap her way into a promotion, Nero and other senior staff reminded Williams to focus on the job that she had been hired to perform.  Nero stressed to Williams that her job duties did not extend past the 9-to-5 workday and that she had no official role at games or after-hours events.  SMF ¶ 86.  Vogel had to "talk with Sara about what fell into her job duties" and remind her to prioritize "[Nero's] needs, his calendar, his schedule." *Id.* ¶ 91.  Williams's performance review reflected that "Sara's primary role is as EA to the AD and it is important for her to find balance in providing support outside of her role so it does not become detrimental."  *Id.* ¶ 92.  HR Director Suzanne Alrutz recalled concerns that Williams "was going outside of her scope of responsibilities without consultation, [or] guidance."  *Id.* ¶ 93.  Vogel likewise testified that "Sara needed to bring things to [Nero] before she moved forward," given her attempts to act outside the bounds of her limited authority.  *Id.* ¶ 86.

The facts of this case closely parallel those of *Hardy v. Bowen*, No. 85-cv-2119, 1986 WL 15710 (D.D.C. Nov. 19, 1986), in which the plaintiff failed to make out an EPA claim, *id.* at *1.  There, as here, a plaintiff whose job "primary" duties were "of a clerical or administrative nature" aggressively sought promotion within her department.  *Id.* at *8.  Although that plaintiff received strong performance reviews, the court concluded that her ambition did not entitle her to the same

pay as her male colleagues who had "much broader qualifications and skills and depth of experience." *Id.* "Though she routinely sought to do tasks more challenging than typing and other purely clerical matters, Mrs. Hardy was not performing the same work as those male directors who were in higher grades and receiving higher salaries." *Id.* at *9. Nor could the plaintiff rest her EPA claim on the "few similarities" she identified between her work and that of her alleged male comparators because the few tasks that they had in common "proved to be only incidental to her primary duties of handling telephone complaints." *Id.*; *see also Johnson*, 2022 WL 4547527, at *3 (a comparison of "incidental" job duties cannot support an EPA claim).

So, too, here. The EPA demands only "equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). It is not a mechanism for plaintiffs to arrogate job duties that belong to others or to de facto grant themselves the promotions they believe they deserve. *Cf. Hutchinson v. Holder*, 815 F. Supp. 2d 303, 313 (D.D.C. 2011) (recognizing that reduction in duties would not constitute adverse employment action for purposes of Title VII where the plaintiff "was merely performing these duties on her own initiative"). While Williams may have wished to hold an athletics administration position equivalent to Aresco's and grasped for more sophisticated work, the undisputed evidence shows that her actual job duties were not "substantially equal" to his. *See Johnson*, 947 F. Supp. 2d at 130; 29 U.S.C. § 206(d)(1). That is presumably why, in Williams's 2016 self-evaluation, Williams expressed her ambition "to take on additional responsibilities" and "grow[] [her] administration portfolio to pursue a career as an assistant AD for administration," SMF ¶ 85—a position of the seniority that Aresco *already held*. Williams's professed desire to "grow" her "portfolio" into a position like Aresco's would make little sense if she and Aresco already were performing the same work. *See id.* (Williams expressing hope that Nero "would consider [her] if [M]ike Aresco left tomorrow").

Ultimately, the EEOC has nothing to support its EPA claim beyond Williams's "self-serving assertions" that her job closely tracked Aresco's—assertions that are manifestly "insufficient to survive a motion for summary judgment." *Musgrove*, 775 F. Supp. 2d at 166.

**B.      The Pay Differential Between Williams and Aresco Was Based On A "Factor Other Than Sex"**

Even if the EEOC somehow could prove that Williams and Aresco performed substantially equal work, that would not be sufficient to salvage its EPA claim.

Once a plaintiff shows that "the employer pays workers of one sex more than workers of the opposite sex for equal work," the employer has the opportunity to prove "the differential is justified under one of the Act's four exceptions," including the catchall exception for pay differences based on "any other factor other than sex." *Corning Glass Works*, 417 U.S. at 196 (quoting 29 U.S.C. § 206(d)(1)).  The "factor other than sex" defense bars recovery if the employer shows that the wage disparity was based on "*any*" factor, whether "reasonable or unreasonable," other than the employee's sex. *Smith v. City of Jackson*, 544 U.S. 228, 239 n.11 (2005) (emphasis added).  Here, even if Williams did perform substantially equal work to that of Aresco—and she did not—the EEOC still could not recover under the EPA because Aresco's higher salary was justified by a "factor other than sex"—namely, his superior qualifications and work experience.

Aresco outpaced Williams in educational attainment, "a relevant consideration in determining whether disparate salaries exist for reasons other than sex." *Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 702 (7th Cir. 2003).  Aresco held a master's degree in business administration from Wagner College and an undergraduate degree with a major in economics and a minor in business administration from the University of Connecticut, which were considered in determining his compensation.  SMF ¶¶ 118–19, 224, 227.  Williams, by contrast, had an undergraduate degree in pharmaceutical and healthcare marketing—a field with no relevance to

her executive assistant role or to athletics administration—and no graduate degree.  *Id.* ¶ 10.

Aresco also had far more relevant work experience than Williams did.  By the time he became Special Assistant in 2016, Aresco had held multiple positions within college athletics departments with increasing levels of responsibility, which the University considered in appointing him to that role.  SMF ¶¶ 121–22, 124, 127–28, 215.  Most recently, he had served as the University's Assistant Athletics Director for Operations, Events, and Facilities—a position on Nero's senior staff in which he managed a $2.4 million budget, oversaw facility improvements and other capital projects, and negotiated a major revenue-generating contract with the Washington Kastles.  *Id.* ¶¶ 131–35, 152.  Williams, by contrast, had worked as an EMT, a nanny, a corporate trainer, an executive program assistant, and a store manager at an embassy commissary.  *Id.* ¶ 15.  Before she became Nero's executive assistant, Williams had no athletics experience other than tutoring college athletes as an undergraduate.  *Id.* ¶ 13.  The substantial differences between Williams's and Aresco's education and experience in athletics administration qualify as a "factor other than sex" that independently justifies the discrepancy in their pay.  *See Gaujacq*, 601 F.3d at 575–76 (sustaining "factor other than sex" defense at summary judgment and recognizing that pay differential may be "justified based on experience, training or ability of an employee"); *Stanley v. Univ. of S. Calif.*, 13 F.3d 1313, 1322 (9th Cir. 1994) ("Employers may reward professional experience and education without violating the EPA."); *Franks v. Edison Electric Inst.*, No. 20-cv-3393, 2022 WL 971157, at *4 (D.D.C. Mar. 31, 2022) (rejecting EPA claim where pay disparity was based on male employee's "superior . . . experience and . . . subject-matter expertise").

In addition, for Aresco, the Special Assistant position was a "lateral move" from his previous role as Assistant Athletics Director for Operations, Events, and Facilities.  SMF ¶ 226.  Consistent with University policy, Aresco kept his same salary when he transitioned to the Special

Assistant position in February 2016 because "the University typically does not reduce an employee's salary when he or she makes a lateral move." *Id.* ¶ 225; *see also id.* ¶ 226 (Aresco's salary as Special Assistant was based on his status "as [a] lateral transfer"). Aresco's salary history at the University is yet another "factor other than sex" that justifies the difference between his and Williams' pay and bars the EEOC's EPA claim. *See Taylor v. White*, 321 F.3d 710, 720 (8th Cir. 2003) (rejecting argument that "a salary retention policy cannot serve as a factor other than sex"); *Covington v. S. Ill. Univ.*, 816 F.2d 317, 322–23 (7th Cir. 1987) (concluding that the wages the "present employer" paid the employee "in another position" constitute a "factor other than sex").

## II.    No Reasonable Juror Could Conclude That The University Violated Title VII

To establish a prima facie case of disparate treatment under Title VII, the EEOC must prove that Williams (1) is "a member of a protected class," (2) "suffered an adverse employment action," and (3) "the unfavorable action gives rise to an inference of discrimination." *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006). An "adverse employment action" is "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added). "Purely subjective injuries, such as dissatisfaction with a reassignment or public humiliation or loss of reputation, are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (citations omitted).

Where, as here, "the plaintiff's evidence of discrimination . . . is circumstantial, the familiar *McDonnell Douglas* framework applies." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). Under that framework, once the plaintiff establishes a prima face case of discrimination, "the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions." *Id.* The defendant's burden of production is "minimal," *Barnette*, 453 F.3d at 516, and "need not persuade the court that it was actually motivated by the proffered reasons," *Tx. Dep't of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the defendant carries that burden, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [i]s discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142–43 (2000). Plaintiff thus must prove that her sex "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* at 141. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Here, the EEOC asserts that the University violated Title VII by paying Williams less than Aresco due to her sex, denying her "promotional opportunities" that were allegedly afforded to Aresco, "enhancing" Aresco's importance while "minimizing" hers, and subjecting her to alleged indignities such as having to run "personal errands" for Nero. Compl. ¶¶ 20, 37, 38. But the EEOC has failed to produce evidence sufficient to support even its prima facie case, as there is no evidence that Williams was subject to *any* adverse action, much less that any such action was motivated by sex-based animus. *See Holcomb*, 433 F.3d 899.

        1.      The EEOC's Wage Discrimination Claim Fails Because Williams
                  And Aresco Did Not Have Comparable Job Duties

To the extent the EEOC's Title VII claim is predicated solely on the pay disparity between Williams and Aresco, it merely duplicates the EPA claim and fails for the same reasons.

As with an EPA claim, a female plaintiff claiming wage discrimination under Title VII must prove she performed work "substantially equal" to that of male employees "compensated at higher rates." *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999); *Johnson*, 2022 WL 4547527, at *6 (same). While there may be circumstances in which a Title VII pay discrimination claim may be sustained without proof of substantially equal work—such as where an employer uses "a transparently sex-based system for wage determination," *Cty. of Wash. v. Gunther*, 452

U.S. 161, 178–79 (1981)—the EEOC has not made such a claim here.  Thus, "the Title VII claim and EPA claim are subject to review under the same standard."  *Clark v. Johnson & Higgins*, 181 F.3d 100 (6th Cir. 1999) (table decision).

As with the EPA claim, then, the EEOC's Title VII wage discrimination claim fails because the clerical functions that Williams performed, such as scheduling, making lunch reservations, and printing documents, did not require "substantially equal" skill, effort, or responsibility as the athletics administration functions that Aresco performed, such as overseeing hiring decisions, developing policies, drafting and negotiating contracts, supervising the men's rowing program, and making operational decisions on behalf of the Athletics Department.  *See Anderson*, 180 F.3d at 338; Section I.A, *supra*.  And, as with the EPA claim, the wage disparity also was justified by Aresco's superior educational credentials and substantial prior work experience in college athletics.  *See* 42 U.S.C. § 2000e-2(h) (incorporating Equal Pay Act defenses into Title VII); *Morris v. U.S. Dep't of Justice*, 298 F. Supp. 3d 187, 194 (D.D.C. 2018) (same); Section I.B, *supra*.

If anything, the EEOC's Title VII claim is even weaker than its feeble EPA claim.  Unlike the EPA, which includes no scienter requirement, Title VII prohibits only "*intentional*" discrimination.  *Bostock*, 140 S. Ct. at 1740 (emphasis added); *see also Holcomb*, 433 F.3d at 899 (demanding proof of "unlawful animus"); *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 525 (7th Cir. 1994) (requiring "actual desire to pay women less than men because they are women").  Courts have no basis infer unlawful intent from a "comparison of wages in dissimilar jobs."  *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 123 n.4 (2d Cir. 1997).  Yet that is all the EEOC has here.[6]

_____

[6] To the extent the EEOC's theory is instead that Nero was homosexual and was sexually attracted to Aresco and gave him preferential treatment as a result, *see* Dkt. 50 at 36, that theory is both offensive and lacking in evidentiary support.  The only "evidence" previously cited by the EEOC in support of this theory is a publicly available video of Nero socializing with other men, which the EEOC argued was probative of Nero's alleged bias in favor of all males.  *See* EEOC's Jan. 29,

2.      The EEOC's Failure to Promote Claim Fails For Multiple
        Independent Reasons

The EEOC also asserts that the University violated Title VII by providing "promotional opportunities" to Aresco that it denied to Williams when it created the Special Assistant position for him and allegedly "dissuaded and deterred" her from applying for the job.  Compl. ¶¶ 20, 25–26.  But the undisputed evidence shows each of these premises to be false:  The University did not "promote" Aresco into the Special Assistant position, nor did it "deter" Williams from applying for the job.  And, absent a showing that the University treated Aresco and Williams differently by affording only him (and not her) a promotion, the EEOC has failed to satisfy a basic requirement of Title VII: disparate treatment.  42 U.S.C. § 2000e-2(a)(1); *Bostock*, 140 S. Ct. at 1740 (defining discrimination under Title VII as "intentionally treat[ing] a person worse because of sex").

Here, the EEOC's claim that the University granted "promotional opportunities" to Aresco while denying such opportunities to Williams fails at the starting gate because the Special Assistant position was not a promotion for Aresco at all, but a "lateral move."  SMF ¶ 226.  The job that Aresco held immediately before he became Special Assistant was Assistant Athletics Director for Operations, Events, and Facilities.  *Id*. ¶¶ 128, 220.  Notwithstanding its distinct name, the Special Assistant job "was considered an assistant athletic director[] position," and Nero and Aresco used the "Special Assistant" title interchangeably with the title "Assistant Athletics Director for Administration." *Id.* ¶ 191.  Thus, both before and after his alleged "promotion," Aresco remained in the exact same tier in the Athletics Department hierarchy: an Assistant Athletics Director.  Although the complaint alleges that Aresco received "subsequent pay raises" after becoming Special Assistant, Compl. ¶ 29, discovery has shown that to be false.  As Assistant Athletics

---

2020 Ltr. Br. to Kollar-Kotelly, J. at 2.  Judge Harvey already rejected that argument, correctly finding that the video was "probative of nothing relevant to this case."  Dkt. 53 at 41 n.14.

Director for Operations, Events, and Facilities, Aresco earned an annual salary of approximately $75,000.  SMF ¶ 129.  In January 2016, before he applied to become Special Assistant, Aresco received a 3% pay increase as part of the University's annual merit raise program.  *Id.* ¶ 136.  He received *no additional raises* before he left the University for another job in March 2017.  *Id.* ¶¶ 221, 228.  In other words, his salary as Special Assistant was the same as it had been prior to his transition to that role; it was not a "promotion."  Williams, meanwhile, accepted another position at the University in December 2016 where she earned $80,000, *id.* ¶¶ 335, 337—more than the supposed beneficiary of the University's allegedly unlawful discrimination in this case.  In short, the University did not "discriminate" against Williams in violation of Title VII when it moved Aresco *laterally* into a position that would have been a *promotion* for her.  *See Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 309, 311 (D.D.C. 2005) (granting summary judgment to employer that passed plaintiff over for promotion in favor of employee making a lateral move).

Williams cannot proceed to trial on her failure-to-promote claim for another reason:  She never applied for the Special Assistant position that she now claims to have been wrongfully denied.  SMF ¶ 197.  A basic element of a Title VII failure-to-promote claim is that the charging party actually "applied for" an "available" promotion.  *Holcomb*, 433 F.3d at 895.  Failure to satisfy this basic prerequisite "defeat[s]" a Title VII claim as a matter of law.  *Lathram*, 336 F.3d at 1089; *see also Evans v. Sebelius*, 674 F. Supp. 2d 228, 246 (D.D.C. 2009) (holding that "failure to apply for" a "properly advertised" job "dooms the sustainability" of a "non-promotion claim"); *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 12–13 (D.D.C. 2009) (holding that failure to apply for a promotion is "fatal" to plaintiff's prima facie case); *Moore v. Hagel*, No. 10-cv-632, 2013 WL 2289940, at *2 (D.D.C. May 24, 2013) ("Not being selected for a position for which she did not apply cannot be considered an adverse employment action.").  "Title VII provides no remedy to those who

presume they will be discriminated against and therefore do not even bother to apply for a position." *Fleischhaker v. Adams*, 481 F. Supp. 285, 293 (D.D.C. 1979).  That is the case here.

Williams concedes that an HR representative—Kaithlyn Kayer—"specifically told" her to apply for the Special Assistant role.  SMF ¶ 196.  Williams chose to ignore that advice, *id.* ¶ 197, which was her prerogative—but her failure to "even bother to apply for [the] position" precludes a suit based on the University's failure to hire her.  *Fleischhaker*, 481 F. Supp. at 293.  The EEOC attempts to excuse this fatal error by alleging that the University "created" the Special Assistant position for Aresco and "decided to hire him" even before posting the job, such that Williams's application would have been futile.  Compl. ¶ 25.  Again, though, discovery has failed to yield any evidence that the University's hiring decision was a *fait accompli*.  Although Aresco was an obvious candidate in light of his experience, both Nero and Aresco testified that no one promised Aresco the position.  *See* SMF ¶¶ 205–06.[7]  To the contrary, the University advertised the job opening to internal applicants for three days consistent with its normal procedures.  *Id.* ¶ 188. Before posting the Special Assistant job, the two employees who managed the hiring process— Tanya Vogel and Kayer, both women—made plans to interview "at least 3" applicants.  *Id.* ¶¶ 185, 187.  As it turned out, only Aresco applied, but the communications between Vogel and Kayer demonstrate that the University opened the search process to other applicants.  *Id.* ¶ 209.  And of course, Williams concedes that Kayer herself encouraged Williams to apply.  *Id.* ¶ 196.

Even if it were true that the University had anointed Aresco from the outset, that fact alone would not give rise to a Title VII claim.  Preselecting a job candidate based on merit or other

---

[7] To the extent the EEOC argues that it would have been futile for Williams to apply for the job, such an argument requires evidence of "gross and pervasive discrimination . . . so successful as totally to deter job applications from members of minority groups."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977).  No such evidence exists in this case.

considerations does not violate federal antidiscrimination laws. *See Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164, 170 (D.D.C. 2015); *see also Oliver-Simon*, 384 F. Supp. 2d at 310 ("preselection does not violate Title VII when . . . based on the qualifications of the party"). "For preselection to raise an inference of discrimination, evidence must demonstrate that the employer preselected a candidate out of a discriminatory motive or that the employer broadly uses preselection as a method of disguising discrimination and did so in a particular case." *Kilby-Robb*, 77 F. Supp. 3d at 170; *see also Perry v. Shinseki*, 783 F. Supp. 2d 125, 143 (D.D.C. 2011) (requiring evidence that "the pre-selection itself was discriminatorily motivated"); *Jackson v. Winter*, 497 F. Supp. 2d 759, 770 (E.D. Va. 2007) (same). No such evidence exists here. The University "preselected" Aresco, if at all, only because he was "already successfully performing the specific requirements of the new job in [his] existing role." *Kilby-Robb*, 77 F. Supp. 3d at 170. The Special Assistant's job included duties that previously had been performed by Brian Hamluk, who left the University in the summer of 2015. SMF ¶¶ 172, 176. After Hamluk's departure, Aresco—at the time, a peer of Hamluk's as a fellow member of the Department's senior staff—handled some of Hamluk's duties "on an interim basis" and "excelled" in doing so. *Id.* ¶¶ 174–75, 178. By the time the University posted the Special Assistant job in January 2016, which formally included some of Hamluk's prior duties in the description, Aresco already "had done a very good job" handling the duties on an interim basis, and, as Nero said, "if he was the best candidate that applied, then certainly we were going to hire him." *Id.* ¶ 205. Such merit-based selection does not create an inference of discrimination, particularly where, as here, the charging party's own job-related conduct suggests she would not have been an equally good fit for the role. *See* p. 44, *infra*.

The EEOC further attempts to excuse Williams's failure to apply for the Special Assistant role by alleging that an unnamed University employee supposedly "dissuaded and deterred" her

from submitting her name.  Compl. ¶ 26.  Discovery has revealed that unidentified naysayer to be Aresco, who told Williams during an informal conversation that he did not believe she was qualified for the Special Assistant role.  SMF ¶¶ 202–04.  Aresco recounted:  "She asked my opinion.  I gave her my opinion.  She had no athletic administration experience.  The job was designed for athletic administration."  *Id.* ¶ 204.  Williams recalled the conversation differently, with Aresco supposedly telling her that she should not apply because he "had already been promised this role."  *Id.* ¶ 202.  Whatever the precise contents of their dialogue, it is undisputed that Aresco was not a decisionmaker with respect to the Special Assistant job; he was an applicant.  *Id.* ¶¶ 186, 207.  Williams cannot maintain a Title VII claim based on discouraging words from a *competing candidate*, who lacked any authority to make the hiring decision (and displayed no sex-based animus in discouraging her application).  *See Holcomb*, 433 F.3d at 899.

That is all the more true here, where Williams received specific encouragement to apply for the position from the HR representative who, together with Vogel, actually ran the search process for the Special Assistant job.  Kayer "specifically told" Williams to submit her candidacy.  SMF ¶ 196.  Despite this prodding, Williams conceded:  "I did not follow her advice."  *Id.* ¶ 197.  Ignoring an HR representative's affirmative suggestion to apply for an advertised job vacancy is the very opposite of an adverse employment action under Title VII.  *See Prince v. Rice*, 570 F. Supp. 2d 123, 133 (D.D.C. 2008) (granting summary judgment to employer where hiring supervisor "encouraged" plaintiff "to apply for the position announced by the vacancy posting").

Even if Williams had applied for the Special Assistant role and lost out to Aresco, the EEOC's failure-to-promote claim could not survive summary judgment for yet another reason:  the EEOC has not shown that Williams "was 'significantly' or 'markedly' more qualified for the job than was the candidate who actually received it."  *Hendricks v. Geithner*, 568 F.3d 1008, 1012

(D.C. Cir. 2009).  "In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination."  *Holcomb*, 433 F.3d at 897; *see also Hopkins v. Whipple*, 630 F. Supp. 2d 33, 39 (D.D.C. 2009) (requiring the "disparities in qualifications" to be "so apparent as to virtually jump off the page").  This stringent requirement allows employers a margin of error to choose between job candidates with similar credentials without having to fear Title VII liability if a judge or jury disagrees about the candidates' relative merits.  Title VII serves "to prevent unlawful hiring practices," not to turn the courts into "a 'super personnel department' that second guesses employers' business judgments" about which employees have earned a promotion.  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999); *see also Holcomb*, 433 F.3d at 897 (similar).  "Without such a decisive showing, [courts] rightfully defer to the business judgment of an employer and have no cause to infer discrimination."  *Hendricks*, 568 F.3d at 1012.

Here, the EEOC cannot possibly make such a "decisive showing."  No reasonable juror would conclude that Williams, whose work history includes stints as a nanny and manager of an embassy commissary, was "discernibly better" qualified for the Special Assistant role than Aresco, a seasoned sport administrator with a graduate degree to boot.  *See Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007).  Tellingly, even Williams does not assert that she was more qualified than Aresco.  Her sworn EEOC charge alleges only:  "I am *as* qualified, if *not more qualified* than my male counterpart."  SMF ¶ 324 (emphasis added).  That concession dooms her Title VII claim.

### 3.    The EEOC Has Failed to Show Any Other Adverse Employment Action Cognizable Under Title VII

The EEOC's final theory of discrimination seems to be that the University subjected Williams to disparate treatment by "minimizing" her while "enhancing Aresco's importance and future opportunities" and "assigning her to tasks such as running personal errands."  Compl. ¶ 20.

Although the complaint alleges no facts that would place the University on notice of how it allegedly "minimized" Williams in favor of Aresco, the theory appears to be that Nero reassigned at least one or more of Williams's job duties to Aresco; that the University "reclassified" the Special Assistant position into an "assistant director of athletics" position while denying Williams a reclassification; and that Nero asked her to pick up eye medication and run other personal errands for him.  SMF ¶ 72.  None of these allegations amounts to an adverse employment action.

*Reassigning Duties to Aresco*.  At her deposition, Williams asserted that Nero reassigned responsibility for "managing the HR and hiring process" from her to Aresco.  SMF ¶ 177.  But this alleged reassignment does not constitute an adverse employment action because, as Williams conceded, this "HR and hiring" function was never part of her regular job duties in the first place. Instead, William simply "supported Hamluk when he was in charge of it" and then—according to her—temporarily "took over that function once he left."  *Id.* ¶ 176.  The loss of a job function that fell to plaintiff on an interim basis because of staff turnover does not give rise to a Title VII claim. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) (holding no adverse employment action occurred where the plaintiff lost certain duties after his employer returned "the team back to its former numbers"); *Forkkio*, 306 F.3d at 1131 (concluding that loss of participation in management meetings after temporary position expired was not an adverse action); *Oliver-Simon*, 384 F. Supp. 2d at 312 (rejecting Title VII claim by employee not selected to fill a position to which she had been "temporarily detailed").  That is because a plaintiff must show that the reassignment of her duties left her with "qualitatively inferior work," *Baloch*, 550 F.3d at 1197, which she cannot do when the reassignment simply returns her to the status quo ante, *see Kelso v. Perdue*, No. 19-cv-3864, 2021 WL 3507683, at *7 (D.D.C. July 12, 2021) (concluding that "loss of prestige" from reassignment of plaintiff's "most critical tasks" was not an adverse action where

tasks she retained were not "meant for someone far below her level"); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 28 (D.D.C. 2003) ("Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary.").

**Failure to Reclassify Williams's Position**.  At her deposition, Williams asserted that the University "reclassified" the Special Assistant position into "an assistant athletic director" role, which gave Aresco an opportunity to enter the "management stream . . . without competition" that the University did not afford to her.  SMF ¶ 347.  But the record contains no evidence beyond Williams's confused testimony that the University ever "reclassified" the Special Assistant position.  That position was always referred to as an Assistant Athletics Director position, and Aresco was qualified for it when he applied in 2016 because he was already serving as Assistant Athletics Director for Operations, Events, and Facilities at the time.  *Id.* ¶ 191 (document referring to position as "Asst AD Chief of Staff" one month before it was advertised).  This supposed "reclassification" appears to be nothing more than a product of Williams's imagination.

In any event, Williams cannot show that the University treated her differently because she asked for far more than the "reclassification" that Aresco supposedly was granted.  In October 2016, Williams emailed Nero an unsolicited proposal to create an entirely "new role" for her as "an Assistant AD for Staff and Student-Athlete Development," SMF ¶ 103—a position that neither existed at the University at the time nor was created at any point during Nero's tenure, *id.* ¶ 104.  The promotion that Williams envisioned for herself would, under her proposal, "be accompanied with additional compensation."  *Id.* ¶ 105.  Nero never responded.  *Id.* ¶ 107.  But the University cannot be liable under Title VII for failing to promote Williams to a position that did not exist.  *See Chambers v. Sebelius*, 6 F. Supp. 3d 118, 127 (D.D.C. 2013) (Kollar-Kotelly, J.) ("In addressing failure to promote claims . . . , courts in this Circuit have focused on the need for

showing an available position for which promotion was denied."); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710–12 (2d Cir. 1998) (requiring plaintiff to show she "applied for a specific position . . . rather than merely asserting . . . she . . . generally requested promotion").

     ***Asking Williams to Run Personal Errands***.  Williams asserts, finally, that Nero subjected her to disparate treatment by asking her to fetch coffee, wait at his house for the "Comcast person," and pick up his eye medication on a single occasion—"personal tasks" he allegedly did not assign to male employees.  SMF ¶¶ 72, 349.  But Williams *volunteered* to perform such errands because she recognized that her assistance enabled Nero to be "successful" and efficiently use his time.  *Id.* ¶¶ 71–72.  Even if Williams had not voluntarily assumed these duties, however, "undesirable work assignments . . . do not rise to the level of adverse employment actions."  *Lester*, 290 F. Supp. 2d at 29; *Scott v. Pace Suburban Bus.*, No. 01-cv-1039, 2003 WL 1579166, at *4 (N.D. Ill. Mar. 23, 2003) (personal errands).

    **B.**    **The University Had Legitimate, Nondiscriminatory Reasons for Any Adverse Employment Action**

     Even assuming that Williams had suffered an adverse employment action—and she did not—the University has met its burden of producing evidence of a legitimate, nondiscriminatory reason for failing to promote Williams and for hiring Aresco to serve as Nero's Special Assistant. At this stage, the University "need not persuade the court that it was *actually* motivated by the proffered reasons," *Burdine*, 450 U.S. at 254 (emphasis added), but must simply produce "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  The University readily satisfies that "minimal" burden of production.  *See Barnette*, 453 F.3d at 516.

     First and foremost, the University failed to promote Williams because she did not apply for the job.  That failure alone is "fatal" to her Title VII claim to the extent the claim is premised

on her not being hired as Special Assistant.  *Stoyanov*, 643 F. Supp. 2d at 12–13.  The University had yet another legitimate, nondiscriminatory reason for failing to hire Williams: Aresco had superior educational credentials and more relevant work experience.  *See, e.g.*, SMF ¶¶ 199–200, 212–15; pp. 30–31, *supra*.  These qualifications also better-positioned Aresco to take over the "HR and hiring" duties that Hamluk had previously performed and that Williams (allegedly) handled on an interim basis.  SMF ¶¶ 176–77.  Aresco, unlike Williams, was already an Assistant Athletics Director—a role similar to the one Hamluk had when he left the University.  *See id.* ¶¶ 128, 176.

The University also failed to promote Williams within the Athletics Department because Nero had significant concerns about her capacity to keep confidences—concerns that were shared by other senior members of the Athletics Department.  SMF ¶¶ 108–17, 201.  In Nero's view, "one of the most important skills" for the Special Assistant was the ability "to understand confidentiality and embrace it."  *Id.* ¶ 194.  Yet Williams repeatedly displayed a propensity for leaking sensitive information and nosing through confidential papers not intended for her review.  *Id.* ¶¶ 108–17.  While Williams's call to the other university's athletics department regarding the allegedly cheating spouse-coach is perhaps the most egregious example, it is far from the only one.  Williams disclosed to coaches that athletes had met with Nero to share concerns about those coaches or their teams, when Department protocol required such meetings to be kept confidential.  *Id.* ¶¶ 109–10.  In another incident, Williams opened a folder marked "Nero" and "confidential" and made notes on an enclosed student-athlete's exit interview—even though the folder was not addressed to her.  *Id.* ¶¶ 112–14.  Any one of these incidents would have disqualified Williams from a position on Nero's senior staff, even if she had otherwise been qualified.  *Id.* ¶ 201.

### C.  The EEOC Cannot Show That The University's Reasons For Selecting Aresco Were Pretextual Or That Anyone Intentionally Discriminated Against Williams

Once the University has carried its burden of production, the EEOC must prove that "the

employer's given explanation was pretextual and that this pretext shielded discriminatory motives." *Jackson*, 496 F.3d at 707.  "It is not enough for the plaintiff to show that a reason given for a job action is not just, fair, or sensible." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  She "must show that the explanation given is a *phony* reason." *Id.* (emphasis added); *see also id.* ("the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers").  "[A]n employer [is] entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue." *Reeves*, 530 U.S. at 148.

Here, the EEOC has not produced an iota of evidence that the University is "lying about the underlying facts that formed the predicate for the employment decision." *Ball v. George Wash. Univ.*, No. 17-cv-507, 2019 WL 1453358,*8 (D.D.C. Mar. 31, 2019).  Nor has the EEOC shown that the University's reasons for not appointing Williams to the Special Assistant position, and for not paying her an Assistant Athletics Director's salary, resulted from discriminatory animus—as opposed to her failure to apply for the Special Assistant position, her lack of credentials, her poor record of confidentiality, or other reasons having nothing to do with her sex.  *See Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (requiring "sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the plaintiff on a prohibited basis").  To conclude on this record that "discriminatory animus motivated the . . . claims" would "go far beyond reasonable inference and into the realm of unfettered speculation." *Holcomb*, 433 F.3d at 901.  As Tanya Vogel, the current Athletics Director, testified: "I did not believe that [Williams] was subject to gender discrimination."  SMF ¶ 353.  No reasonable juror could.

## CONCLUSION

For all these reasons, the University is entitled to summary judgment.

Dated:  November 22, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jason C. Schwartz

Jason C. Schwartz, D.C. Bar No. 465837
Molly T. Senger, D.C. Bar No. 995975
Katherine Moran Meeks, D.C. Bar No. 1028302
Matthew P. Sappington, D.C. Bar No. 1616305
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:   202.955.8500
Email:  JSchwartz@gibsondunn.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Jason C. Schwartz, counsel for the George Washington University, certify that on November 22, 2022, I caused a copy of the foregoing Memorandum of Points and Authorities in Support of the University's Motion for Summary Judgment to be electronically filed and served on all counsel of record via CM/ECF.  All parties required to be served have been served.


Dated:  November 22, 2022                     /s/ Jason C. Schwartz
                                              Jason C. Schwartz
                                              *Counsel for the George Washington University*