# Plaintiff's Exhibit D (PX D)

Michael Aresco                                    March 18, 2021

                                                    Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3      - - - - - - - - - - - - - - - - x

4      UNITED STATES EQUAL EMPLOYMENT:

5      OPPORTUNITY COMMISSION,        :

6                  Plaintiff,         :

7         vs.                         : Civil Action No.

8      THE GEORGE WASHINGTON          : 17-1978 (CKK)

9      UNIVERSITY,                    :

10                 Defendant.         :

11     - - - - - - - - - - - - - - - - x

12       VIRTUAL VIDEOTAPED DEPOSITION OF: MICHAEL ARESCO

13     DATE:        Thursday, March 18, 2021

14     TIME:        9:05 a.m.

15     LOCATION:    Remote Proceedings

16     REPORTED BY: Denise M. Brunet, RPR

17                  Reporter/Notary

18

19

20

21

22     Job No. CS4500311

Michael Aresco                                                    March 18, 2021

                                                        Page 17

1        A     Yes.

2        Q     So let's talk about the first position

3    that you held at GWU.  What was the title of the

4    first position that you held?

5        A     Assistant director of events.

6        Q     And when did you begin that position?

7        A     September 2012.

8        Q     What were your job duties as an assistant

9    director of events?

10       A     One of the main duties was handling the

11   scheduling software.  George Washington U

12   athletics has over 2,000 events scheduled a year,

13   so I was handling the scheduling software through,

14   I believe, USI.

15             Also, I was a gatekeeper in the front

16   door for all event inquiries, event planning,

17   staffing for the events, both intercollegiate as

18   well as external and internal departmental-wide.

19       Q     Okay.  So you said that you handled

20   scheduling.  What did handling scheduling entail?

21             MS. SENGER:  Objection.

22   Mischaracterizes.

Michael Aresco                                        March 18, 2021

Page 18

1          You can answer.

2          THE WITNESS:  I was putting in scheduling

3   and overseeing scheduling conflicts for the entire

4   department from games, from practices, meetings.

5   We had roughly 15 different sites of which

6   athletic events, meetings would take place.  And I

7   was handling that.

8   BY MR. COWART:

9      Q    So if there was a conflict in scheduling,

10  what did you do about it as the assistant director

11  of events?

12     A    I would reach out to all parties, in a

13  sense, mediate between the two of them to figure

14  out who would receive the space.

15     Q    And how would you mediate?

16     A    I'd talk to both parties like a human

17  being, address the situation, build a relationship

18  and make sure both were happy.

19     Q    Okay.  Anything else that you did to

20  handle scheduling conflicts?

21     A    I do not recall.

22     Q    Okay.  So you stated that there were

Michael Aresco                                    March 18, 2021

Page 19

1    2,000 events at GWU.  Was that per year?

2            MS. SENGER:  Objection.  Asked and

3    answered.  Mischaracterizes.

4            You can answer.

5            THE WITNESS:  Give or take, yes.

6    BY MR. COWART:

7        Q    And how many of those would have

8    scheduling conflicts?

9        A    I do not recall.

10       Q    Okay.  Was it more than ten?

11       A    Yes.

12       Q    Was it more than a hundred?

13       A    Yes.

14       Q    More than 200?

15       A    200 is a great guess.

16       Q    Is it a guess or is it an estimate?

17       A    A guess.

18       Q    Okay.  So what would be your best

19   estimate?

20       A    Between 100 and 400.

21       Q    You stated that you were the gatekeeper.

22   What did being the gatekeeper entail?

Page 20

1        A    E-mail inquiries coming into the athletic

2    department for events.  As inquiries would come

3    into the department, I would handle scheduling

4    meetings with potential event holders.  I would

5    schedule meetings to go over their -- if we moved

6    forward with the actual event, I'd schedule the

7    logistical piece for that.

8        Q    And who were the event holders that you

9    were scheduling for and gatekeeping with?

10       A    Can you please clarify?

11       Q    Right.  So were these sports teams?  Were

12   these recreational teams?  What kind of categories

13   of organizations were you scheduling for?

14       A    Everything.  Sports teams, recreation,

15   external stakeholders across campus in provost's

16   office, president's office, student affairs,

17   housing, then the external constituents who may

18   have been at the White House, held presidential

19   events, external sporting entities.

20       Q    Anyone else that you can remember?

21       A    No, not that I recall.

22       Q    Okay.  So we talked about scheduling and

Page 21

1    acting as a gatekeeper.  Anything else that you

2    did as the assistant director of events?

3         A    On-site event management.

4         Q    And what did on-site event management

5    entail?

6         A    Being the point person for events that

7    were on GW facilities.

8         Q    And how did you act as the point person?

9         A    I would coordinate logistically the run

10   of show for sporting events, for athletic

11   contests.  And then, for external events, I would

12   be a liaison to the external constituents who were

13   hosting the event in the facility.

14        Q    And what logistics were you coordinating?

15        A    Arrivals, departures.  For instance, if

16   we were hosting a career fair, the logistics for

17   that would begin with a pre-meeting with the

18   specific individual from the career development

19   department at George Washington University.  I

20   would then send over a rental form that includes

21   rental rates, get their signature, get the

22   approval.

Michael Aresco                                    March 18, 2021

Page 22

1           Once we had the signed agreement, we'd

2      set up a more detailed walk-through meeting to go

3      over their specific event.  Once we learned more

4      about the event -- for instance, in this event,

5      there's purchases that are needed -- I would then

6      procure the purchases, tables, chairs, drapes,

7      electrical.  I'd reach out across campus.  I'd

8      work with life safety, GWPD, EMeRG, schedule them

9      to be on site.

10          Once that was complete, I would then work

11     on student staffing, which is needed, make sure

12     there's student staffing for a pre-setup event and

13     post-setup.

14          From there, working, getting the actual

15     equipment on site.  There is enormous logistical

16     challenges that go into flipping a basketball

17     arena into a career fair, which I was responsible

18     for.

19          And during the event, I was an on-site

20     emergency contact.  I oversaw the event, was also

21     there for the liaison -- as a liaison for the

22     entity running the event.  Anything he or she

Page 23

1    needed, I would always do everything in my power

2    to accomplish.

3            Obviously, after I scheduled GWPD, EMeRG,

4    life safety, when they arrived on site, I met

5    them, went over their responsibilities, their

6    expectations and their duties.  Same with the

7    student staff.

8            Post --

9       Q    Did you say --

10      A    Post-event, I would coordinate the

11   student staff coming for that event, for that

12   scheduled shift.  I would coordinate the teardown

13   of the equipment, the pickup of the equipment, and

14   then the conversion of, say, an arena back to

15   basketball practice or volleyball practice, which

16   was scheduled the following day.  This was often

17   done at 11:00 p.m. at night.

18      Q    Okay.  Did you say you coordinated with

19   EMeRG?  Did I hear that correctly?

20      A    EMeRG.

21      Q    EMeRG.

22      A    Yep.  It's emergency services, ambulance,

Page 24

1  medics.

2      Q    And -- so for student staff, how did you

3  staff students?

4      A    If I recall, we had a listserv with our

5  student staff, and I would e-mail out a header

6  that said, like, for instance, October 1st, 2013,

7  something along those lines, a date, shift title,

8  shift time.  In the e-mail, I would say, you know,

9  we need two leads, eight staff members, manual

10  labor, here's the shift; first -- you know, first

11  to respond gets a position, get the hours.

12      Q    And these would be paid student staff; is

13  that correct?

14      A    Yes.

15      Q    So how many on-sites did you run the

16  logistics for per year as the assistant director

17  of athletics?

18      A    Do you mean how many on-site events?

19      Q    Correct.  Yes.

20      A    Give me a second, please, while I

21  recount.

22      Q    Certainly.  Take your time.

Michael Aresco                                                    March 18, 2021

Page 25

1      A    Best estimate, 20.

2      Q    Okay.  So we've now talked about

3  scheduling, acting as a gatekeeper, running the

4  logistics for on-site events.  Anything else you

5  did as the assistant director of events?

6      A    GWorld access was, if I recall, under the

7  realm of this position, ensuring those who would

8  be going to practice from a student athlete

9  perspective early and late, ensuring that they had

10  access, and working with the GWorld office to put

11  in requests for any alterations.  But those were

12  the main duties.

13      Q    Who else worked in facilities when you

14  were the assistant director of events?

15      A    Sam Williams, Alan Zebrak, Andrew

16  Browser, Jason Wilson, Mike Walters.

17      Q    Anyone else?

18      A    Not that I recall.

19      Q    And who did you report to?

20      A    Sam Williams.

21      Q    And what was Mr. Williams' title?

22      A    Director of events.

Page 26

1      Q     Okay.  When you were assistant director

2  of events, did anyone work with you on scheduling?

3            MS. SENGER:  Objection.  Vague.

4  BY MR. COWART:

5      Q     Anyone in the athletics department.

6      A     Not that I recall.

7      Q     Did anyone in the athletics department

8  also work as a gatekeeper?

9      A     Not that I recall.

10      Q     Did anyone work on on-site logistics?

11      A     Yes.

12      Q     And who worked on on-site logistics with

13  you?

14      A     Sam Williams and Alan Zebrak.

15      Q     And what was Alan Zebrak's title?

16      A     I do not recall.

17      Q     Did he perform the same job duties as you

18  did with relation to on-site events?

19      A     Yes, to the best of my recollection.

20      Q     Okay.  At some point while you were

21  working in facilities, did your job duties change?

22      A     Can you please clarify?

Page 27

```
 1       Q    Yes.  Did you -- after you joined the

 2    university in September 2012 -- we've just talked

 3    about those job duties -- Did you ever have any

 4    other job duties when you were working at

 5    facilities?

 6       A    Yes.

 7       Q    And what other job duties did you have in

 8    facilities?

 9            MS. SENGER:  Objection.  Vague as to time

10    frame.

11            You can answer.

12    BY MR. COWART:

13       Q    I can ask you first, when did your job

14    duties change, to the best of your recollection?

15       A    Yes.  I had an initial change in duties

16    in August of 2013 where I took on an even bigger

17    role from the event perspective.  I had more of a

18    say in our actual rental rates, in designing that

19    true, like, living, breathing form.  We had less

20    employees within the team, so I was more of an

21    on-site -- my on-site responsibilities for events

22    became bigger because there were less individuals
```

Page 28

1   to cover events.  I oversaw concessions.  I took

2   on more of a leadership role.

3          Then, in -- at another time I took on

4   additional responsibilities from the facilities

5   side where I --

6      Q    Can we take just a second to go through

7   these?  I want to make sure that we covered them

8   all.  I don't mean to cut you off.  We'll

9   certainly get back to those.

10          So the first that you mentioned -- and

11  the change in August 2013 is that you had

12  responsibility for rental rates.  What was your

13  responsibility with respect to rental rates?

14     A    So putting together a living, breathing,

15  long-term document that had all of our rental

16  rates and increases based on our revenue goals.

17  This document had rental rates for each and every

18  facility for services that would be provided,

19  going back to the EMeRG, medical, life safety,

20  George Washington police department.  It had

21  additional prices for audio/visual.

22          It was a well-vetted, well-thought-out

Page 29

1   document that was approved through the department.

2   Yeah.

3       Q    So did you set those rental rates?

4            MS. SENGER:  Objection.  Asked and

5   answered.

6            You can answer, Mr. Aresco.

7            THE WITNESS:  I put the rates on the

8   piece of paper, yes.

9   BY MR. COWART:

10      Q    But there was some amount that was set

11  for renting the facility, right?

12      A    Yes.

13           MS. SENGER:  Objection.  Vague.

14  BY MR. COWART:

15      Q    Did you determine how much a facility

16  would cost?

17      A    Yes.

18      Q    And how would you determine that?

19      A    I went off past precedence as well as

20  area -- other area rental fees.

21      Q    Okay.  While you -- when you had these

22  new job duties, did you have independent authority

Michael Aresco                                                           March 18, 2021

Page 30

1    to increase the price of a rental rate?

2         A     No.

3         Q     Could you offer a new rental rate?

4         A     Yes.

5         Q     And how would you go about offering a new

6    rental rate?

7         A     I would -- I would offer a new rental

8    rate.

9         Q     Would you have to get approval from

10   anyone before doing that?

11        A     It would depend on the scenario.

12        Q     What would it depend on?

13        A     I'd say internal risk, what the event

14   was, the price point of the event.  For instance,

15   if it was in a club, such as the Colonials Club or

16   Champions Club, some hospitality areas, I had more

17   leniency and ability to change rates because

18   there's less repercussions, less risk.

19             I was making realtime decisions based on

20   what value that would add to the athletic

21   department.  For instance, if there was a -- an

22   event that came through for 9:00 p.m. on a

Michael Aresco                                          March 18, 2021

Page 31

1    Thursday, and they didn't want to pay the 1250

2    rental rate, but they would pay a thousand

3    dollars, I would make that change.

4         Q    Okay.  And on this list of prices, it

5    also included prices for EMeRG, the police

6    department and AV; is that right?

7         A    Yes.

8         Q    And did you have authority to set those

9    prices?

10        A    Yes.

11        Q    And how would you go about setting those

12   prices?

13        A    There's a set price from the university

14   that those entities charge, and then I would take

15   an overage on top of that.

16        Q    So you would upcharge from what the

17   university charged to whoever was buying that

18   service; is that right?

19        A    Yes.

20        Q    And who -- who set the overage

21   percentage?

22        A    I do not recall.

Michael Aresco                                                    March 18, 2021

Page 32

1      Q     Did you set the overage percentage?

2      A     My best estimate would be I set the

3   percentage and sent it along for approval.

4      Q     And who would have approved that?

5      A     Best of my knowledge, Jason Wilson.

6      Q     And what was Mr. Wilson's title at this

7   time?

8      A     Associate athletic director for

9   facilities and events.

10     Q     So how many different facilities did you

11  oversee at this point --

12           MS. SENGER:  Objection.  Vague as to --

13  BY MR. COWART:

14     Q     -- with respect to pricing?

15           MS. SENGER:  -- time frame.

16  BY MR. COWART:

17     Q     As of August 2013.

18     A     From a facilities standpoint, we would

19  have events in the Smith Center, Champions Club,

20  Colonials Club, auxiliary rooms -- there are two

21  of those; that would be five.  Mount Vernon soccer

22  field, six.  Softball field, seven.  Swimming pool

Michael Aresco                                                     March 18, 2021

Page 33

1    in Smith Center, eight.  Swimming in -- at Mount

2    Vernon, nine.  Tennis center, ten.  Best estimate,

3    ten.

4         Q    And as of August 2013, did you change the

5    prices on any of these rental rates for any of

6    these ten?

7         A    I do not recall the time frame of when

8    that document was changed.

9         Q    Okay.  Did the document exist before you

10   changed it?

11        A    There was a version of it, yes.

12        Q    And when was that version -- that

13   previous version -- created?

14             MS. SENGER:  Objection.  Foundation.

15             Mr. Aresco, you can answer, if you know.

16             THE WITNESS:  I do not recall.  Do not

17   know.

18   BY MR. COWART:

19        Q    Do you know who created it?

20        A    I would -- no.

21        Q    Would it have been Mr. Wilson?

22             MS. SENGER:  Objection.  Asked and

Michael Aresco                                    March 18, 2021

Page 34

1    answered.  The witness testified he did not know.

2         MR. COWART:  Molly, you can say asked and

3    answered, but "testified he did not know" -- come

4    on.

5    BY MR. COWART:

6         Q    Do you know the title of the person who

7    might have created it?

8         A    No.

9         Q    Do you know when it was created?

10        A    No.

11        Q    Do you know anything else about this

12   previous version?

13        A    No.  It was -- no, I do not.

14        Q    Okay.  Do you know when you went about

15   editing this previous version?

16        A    I do not recall.

17        Q    Do you know what changes you made to that

18   previous version?

19        A    I adjusted rental rates.  I added in GWPD

20   and additional --

21             THE REPORTER:  I'm sorry.  You added

22   in...

Michael Aresco                                    March 18, 2021

Page 35

1          THE WITNESS:  I added in additional

2   services.  I changed -- as previously mentioned, I

3   changed rental rates.  I made the document into a

4   PDF so it was a more clear, clean-looking

5   document.  The main piece was the rental rates.

6   We had to increase revenue, and I was in charge of

7   increasing revenue while I was director of events.

8   So there was an element of -- in order to meet

9   targeted goals, we had to increase rates.  So

10  that's what I did.

11       Q    And who told you to adjust the rental

12  rates?

13       A    I believe Jason Wilson.

14       Q    Did Jason Wilson give you any guidance on

15  how to adjust the rates?

16       A    I do not recall.

17       Q    Did you talk to anyone else about

18  changing this document?

19       A    I do not recall.

20       Q    Did you receive feedback on this

21  document?

22       A    Yes.

Michael Aresco                                                March 18, 2021

Page 36

1       Q     And who provided you feedback?

2       A     Jason Wilson.

3       Q     And what was that feedback?

4       A     I do not recall.

5       Q     In the previous version, did it include

6    an overage of the ancillary services, such as

7    police, EMeRG and AV?

8       A     I do not recall.

9       Q     Before this document was edited, was it

10   practice of the facilities department to seek an

11   overage of those services?

12      A     I do not recall.

13      Q     Okay.  So we've talked about rental rates

14   now.  Is there anything about those rental rates

15   that we have not discussed that you would like to

16   include?

17            MS. SENGER:  Vague.

18   BY MR. COWART:

19      Q     You can answer.

20      A     I'm happy to -- the rental rates were --

21   the document and everything was -- it became of

22   light because there are revenue goals which, as

Michael Aresco                                                    March 18, 2021

Page 37

1    the director of events, I was responsible for.  So

2    I took the initiative and found a document that I

3    thought needed to be updated and better used for

4    myself and us as a department, made a better

5    version, updated increased rental rates, increased

6    revenue.  And that's kind of the essence of that

7    document.

8         Q    Okay.  So you stated also that as of

9    August 2013, your on-site responsibilities became

10   bigger.  How did your on-site responsibilities

11   become bigger?

12        A    For an example, if there were ten events

13   prior, say, those events would have been split up

14   between two people, so each would have five

15   events.  At this time, I was taking on all ten

16   events.

17        Q    So at this point, as of August 2013, you

18   were the only person responsible for on-site

19   events; is that your testimony?

20        A    As I recall, Sam Williams was director of

21   events.  Once he was no longer there and I was the

22   director of events, I was then responsible for all

Michael Aresco                                    March 18, 2021

Page 38

1    the events.

2        Q    Did you -- did the university hire

3    another assistant [sic] of events when you took on

4    the director of events title?

5        A    I do not believe immediately.

6        Q    During your time as director of events,

7    did they ever hire another assistant director of

8    events?

9        A    Yes, I believe so.

10       Q    And approximately when did that happen?

11       A    I do not recall.

12       Q    Was it more than a month after you became

13   director of events?

14       A    I do not recall.  My best guess would be

15   it was over six months.

16       Q    Okay.  Once an assistant director of

17   events was hired, did your on-site

18   responsibilities change?

19       A    Minimally.

20       Q    And how did they change?

21       A    As -- I don't recall.

22       Q    Well, you no longer had to be responsible

Page 45

1   authority.  Is that fair to say?

2       A    Organizational structure is probably a

3   better word.  And there was -- I do not recall --

4   there was a time when there was an assistant

5   director of events who reported to me, and that

6   was also added into this role.

7       Q    And so at some point, the assistant

8   director of events -- are we talking about

9   Mr. Lundt?

10      A    Yes.

11      Q    Mr. Lundt reported to you when you were

12  director of events?

13      A    Yes.  Best I recall, yes.  As we went

14  over that search process previously, that took a

15  very long time to hire.  It was offered to one

16  individual and the posting was closed.  She turned

17  the job down.  The posting was reopened.  It was

18  offered to another individual.  She turned the job

19  down.  And then Andrew Lundt was hired.

20           So that process took a very long time;

21  hence, why I do not recall when it took place.

22      Q    Okay.  And what was your authority over

Page 46

1   Mr. Lundt?

2       A    I was his --

3            MS. SENGER:  Objection.  Vague.

4            Mr. Aresco, you can answer.

5            THE WITNESS:  Under some time frame, I

6   was his direct manager as director of events, if I

7   recall.

8   BY MR. COWART:

9       Q    And what's entailed at this point with

10  being Mr. Lundt's direct manager?

11      A    So as he was assistant director of

12  events, he was overseeing scheduling, he was

13  overseeing that, like, initial gatekeeping per se.

14  As someone with well documented experience as

15  that, or in that, I was overseeing his day-to-day

16  management of those two pieces, as well as

17  training him in terms of George Washington

18  University's event management protocols, policies,

19  procedures and guidelines, in addition to being

20  his daily manager, having weekly one-on-ones

21  communicating with him as a colleague and a direct

22  report to me.

Page 49

1    not.  I, with a high level of confidence, can say

2    sometime during my tenure I signed off on an

3    Andrew Lundt review.

4         Q    Okay.  And when you were assistant

5    director of events, did the director of events

6    sign off on your performance review?

7         A    I don't believe the director of events

8    was ever there to give me a performance review.

9         Q    So at the time that performance reviews

10   were finalized, the director of events had left

11   that position?  Is that your recollection?

12        A    That is what I recall.

13        Q    At some point after August 2013, while

14   you were still in facilities, did your job duties

15   ever change again?

16        A    After August 2013, yes, they did.

17        Q    Actually, before we go on to that, we

18   didn't talk about concessions, so let's talk about

19   concessions briefly.  So you stated, as the

20   director of events, that you had authority over

21   concessions; is that correct?

22        A    Yes.

Michael Aresco                                          March 18, 2021

Page 50

1      Q    Okay.  And what was your authority over

2  concessions?

3      A    I was responsible for concessions

4  opening, closing, fiscal management, revenue

5  management and product, stock, staffing of the

6  concession stand, quality, time in the lines --

7           THE REPORTER:  I'm sorry.  Time...

8           THE WITNESS:  Quality and times in line

9  for concessions.  That was mainly a concern at GW

10  men's and women's basketball home events.

11  BY MR. COWART:

12      Q    Okay.  And how many concession stands did

13  you manage?

14      A    I had a goal of having concessions at all

15  home George Washington intercollegiate events.

16      Q    Sorry.  Intercollegiate?  Is that what

17  you said?

18      A    Yes.

19      Q    Okay.

20      A    I do not have that number off the top of

21  my head, so I apologize.

22      Q    To the best of your recollection, what

Page 51

1    sports had concessions?

2        A    Men's and women's soccer, men's and

3    women's basketball.  We sold water for men's and

4    women's swimming and women's water polo.

5    Baseball, we had concessions.  I do not recall on

6    softball.

7        Q    Okay.  And before you became director of

8    events, what sports had concessions?

9        A    To the best of my knowledge, men's and

10   women's basketball.

11       Q    So --

12       A    I viewed the additional concessions as a

13   win/win on two levels.  One, additional revenue;

14   two, an additional amenity provided to our fans.

15       Q    Okay.  So at some point after

16   August 2013, you expanded concessions to soccer,

17   water at swimming and baseball.  Is that fair to

18   say?

19       A    Soccer, baseball, swimming, diving, water

20   polo, volleyball.

21       Q    Anything else?

22       A    Not that I recall at the moment.

Michael Aresco                                    March 18, 2021

Page 52

1      Q    So let's talk about your budget

2   responsibilities as of August 2013.  You stated

3   that there was a need to increase revenue; is that

4   correct?

5      A    Yes, as I recall.

6      Q    Okay.  And who told you that there was a

7   need to increase revenue?

8      A    My best recollection, Jason Wilson.

9      Q    And did you have conversations with

10  Mr. Wilson about how to increase revenue?

11     A    Yes.

12     Q    And did Mr. Wilson direct you how to

13  increase revenue?

14     A    No.

15     Q    Who came up with the idea of expanding

16  concession sales?

17     A    I did.

18     Q    And who did you work with in order to

19  expand concession sales?

20     A    Very heavily, myself.

21     Q    Did you work with anyone else?

22     A    I think -- as I recall, it varied

Michael Aresco                                    March 18, 2021

Page 53

1    throughout the process.  The beginning, as

2    mentioned, very heavily me.  Student staff, I

3    needed them to staff the actual booths for soccer

4    and those sports where we didn't have a large

5    concession setup, so student staff were

6    instrumental in this getting up and running.

7          I also would -- I'd go to Costco or BJ's

8    and buy product.  I had somebody presumably with

9    me.  I do not recall who.  And then further down

10   the road, at a more distant future, Andrew Lundt

11   was instrumental as well in growing concessions.

12   So -- yeah.

13        Q    And how was Andrew Lundt instrumental in

14   expanding or growing concessions?

15        A    Helping with the operations of it,

16   helping with getting product-creative solutions to

17   our difficult situations of how to get food and

18   product in front of our fans, helping with the

19   cash flow, making sure we had petty cash on hand

20   to handle the financial aspects of transactions.

21   There was a piece -- and I -- yeah.  So...

22        Q    There was a piece -- sorry?

Page 54

```
 1      A    There -- I don't recall a time frame.

 2   There's a contractual piece of working with

 3   vendors that he was -- that I believe he had a

 4   hand in, so --

 5      Q    Okay.

 6      A    I do not recall a time frame.

 7      Q    And to the best of your recollection, how

 8   much revenue did the concessions bring in when you

 9   were director of events?

10      A    I do not recall.

11      Q    Okay.  Do you know -- well, let's just

12   talk about increase in the amounts of concession

13   revenue.  Was the increase in concession revenue

14   more than a thousand dollars after you sought to

15   expand it?

16      A    Yes.

17      Q    Was it more than $10,000?

18      A    No.

19      Q    Was it more than $5,000?

20      A    No.

21      Q    Was it more than $3,000?

22      A    Yes.
```

Michael Aresco                                              March 18, 2021

Page 55

1       Q    Okay.  So an estimate would be between

2    3,000 and $5,000.  Is that --

3       A    That would be my best recollection.  I

4    can tell you with a hundred percent confidence the

5    soccer, the water polo, baseball, volleyball,

6    those lost money.  That was a purposeful decision

7    to improve fan experience, which was also

8    something that was under my purview as director of

9    events.  And the increase was really from open

10   help concessions to other events, such as we had a

11   science fair where we sold more water than one can

12   ever imagine.

13      Q    Okay.

14      A    As well as in commencement, which is

15   another responsibility of mine that was very

16   large.

17      Q    So -- well, let me put a note in that and

18   we will come back.  So let's talk about your

19   budget and expenditures and revenue duties as

20   director of events.

21      A    Uh-huh.

22      Q    So you stated that there was -- as of

Page 56

1   August 2013, there was a need to increase revenue;

2   is that right?

3        A    Yes.

4        Q    And why was there a need to?

5        A    I do not recall.

6        Q    And the --

7             THE REPORTER:  You're on mute,

8   Mr. Cowart.

9             MR. COWART:  Apologies.  I didn't even

10  touch anything.  I don't know what happened.

11  BY MR. COWART:

12       Q    So the two ways, Mr. Aresco, that you

13  sought to increase revenue as of August 2013 was

14  through concessions and through increases in the

15  rental fees for facilities; is that right?

16       A    Those are two ways, correct, not the only

17  two ways.

18       Q    Okay.  So what other ways did you seek to

19  increase revenue?

20       A    I think there's a piece of that -- so the

21  gatekeeper element that I had mentioned

22  previously, as we have inquiries that come into

Michael Aresco                                    March 18, 2021

Page 57

1    the athletic department, taking a harder look at

2    how we could make some of those events occur in

3    our facilities.  Previously, if there was a

4    potential negative effect to our athletic

5    programs, it would almost always be a let's not do

6    this event, and instead it became a how can we get

7    creative with timing of events.

8              There was some event outreach.  It was

9    more of, instead of the event kind of being

10   secondary to intercollegiate events and athletics,

11   it was a change of focus to we had a revenue goal;

12   we can't use an excuse of the facility wasn't

13   available.

14             So there was a piece of outreach that I

15   did as well as this open mind and creative nature,

16   trying to be malleable and agile to get events to

17   fit into our already crammed 2,000-plus event

18   schedule.

19        Q    So who recommended increasing these

20   non-intercollegiate events?

21        A    I do not recall.

22        Q    Did you decide that it should be a focus

Michael Aresco                                          March 18, 2021

Page 58

1   of the athletic -- or, sorry -- the events

2   department to focus on events outside of

3   intercollegiate sports?

4        A    The best of my recollection is I looked

5   up one day, had an increased revenue goal without

6   a way of getting there and had to think

7   creatively.  So that's the best of -- how I can

8   remember it.

9        Q    Did you discuss with anyone this change

10  or additional focus in non-intercollegiate sports

11  events?

12       A    I do not recall.

13       Q    And to the best of your recollection,

14  what was the increase, if any, in revenue brought

15  about by this additional focus in

16  non-intercollegiate events?

17       A    I believe we increased our revenue by

18  75 percent.

19       Q    And this was primarily to

20  non-intercollegiate events' rental fees?

21       A    Yes.

22       Q    Okay.  So now let's talk about how you

Michael Aresco                                    March 18, 2021

Page 59

1    went about placing these events on the schedule.

2    So you stated previously that there were 2,000

3    events at -- held in GW facilities as of

4    September 2012, right?

5         A    Uh-huh.

6         Q    How many events were being held after you

7    got this new revenue goal?

8         A    I do not know.

9         Q    Was it more than 2,000?

10        A    I do not know.  What I do know is revenue

11   increased.

12        Q    Okay.  So now let's talk about

13   commencement.

14             MS. SENGER:  Mr. Cowart, perhaps after

15   that, could we maybe take a short break?  We've

16   been going for about an hour and a half.  After --

17   just in the next few minutes at some point.

18             MR. COWART:  Before I get on to this,

19   Ms. Senger, why don't we just -- can we take a

20   ten-minute break now?

21             MS. SENGER:  That's fine with me.  Does

22   that work for you, Mr. Aresco?

Page 64

1    August 2013?

2              MS. SENGER:  Objection.  Vague.

3              THE WITNESS:  I think that's accurate.

4    BY MR. COWART:

5         Q    Okay.  At some point after August 2013,

6    while you were still in facilities, did your job

7    duties change?

8         A    Yes.

9         Q    And when did they change?

10        A    I would say I started taking on more

11   responsibilities around June-ish of 2014.

12        Q    And what did you take on then?

13        A    There was an added element that was

14   needed of facility oversight and a more -- a

15   larger need for facility maintenance, capital

16   projects that were upcoming, those type facility

17   elements, more -- not just the Smith Center, but

18   also up at Mount Vernon, as I recall.

19        Q    Okay.  So let's take these one at a time.

20   As of June 2014, what were your responsibilities

21   in facility oversight?

22        A    General maintenance and planning for

Michael Aresco                                          March 18, 2021

Page 65

```
 1   upcoming potential capital projects, as I recall.

 2       Q    Okay.  For maintenance, what were your

 3   responsibilities?

 4       A    It would mainly be revolving around

 5   preventative maintenance in the pool and in the

 6   basketball arena, turf on a field, those type

 7   elements.

 8       Q    Okay.  So for the preventative

 9   maintenance of the pool, what was your

10   responsibility?

11       A    It would have been draining of the pool,

12   making sure there are no cracks, leaks, every

13   summer, making sure that HVAC unit is running, has

14   a contract, all those pieces, kind of overseeing

15   it from a high level.

16       Q    And when you say oversee from a high

17   level, how did you oversee that maintenance?

18       A    I made -- if it was the Smith Center,

19   there was an individual named Mike Walters, who

20   was the facility contact on that site.  So working

21   with him to make sure that those pieces were being

22   held up.
```

Michael Aresco                                          March 18, 2021

Page 66

1          And at some point, there was an

2    individual named Peter Lusk, who was there as well

3    who was a facilities staff member.  So working

4    with them to ensure that they were on top of those

5    items.

6          Q    Okay.  So you oversaw Mike Walters and

7    Peter Lusk, who were -- were they actually

8    performing the maintenance themselves?

9          A    No.  There were just staff members.  And

10   I wouldn't say I oversaw them at this point in

11   June.  There was a need for responsibilities and I

12   was asserting myself.

13         Q    And how did you assert yourself?

14         A    I asked questions.  I made sure that

15   items did not get dropped and that things were

16   still complete.  I had a great knowledge of the

17   facilities, what needed to be done on a cyclical

18   and annual schedule, and asserted that knowledge

19   with co-workers and worked hand in hand with them

20   to make sure we didn't drop those items.

21         Q    Okay.  Did you negotiate any contracts

22   regarding maintenance of the pool?

Michael Aresco                                                    March 18, 2021

Page 67

```
 1       A     I do not recall.

 2       Q     Did you schedule the maintenance of the

 3  pool?

 4       A     I do not recall.

 5       Q     Did you direct any person to maintain the

 6  pool?

 7       A     I do not recall time frames of that.  So

 8  I do not recall.

 9       Q     At some point, did you direct any person

10  to maintain the pool?

11       A     Yes.

12       Q     And who did you direct?

13       A     Mike Walters.

14       Q     Did you -- when did you begin directing

15  Mike Walters in any fashion?

16       A     I do not recall.  I mean, I guess -- I do

17  not recall.  In the event realm, there were things

18  that I'd ask him and direct him to do, but that --

19  I mean, it wasn't directly as his supervisor.

20       Q     Okay.  So you didn't supervise

21  Mr. Walters?

22             MS. SENGER:  Objection.  Asked and
```

Michael Aresco                                    March 18, 2021

Page 68

1   answered.

2           THE WITNESS:  At the time we're speaking

3   of, I did not directly -- he did not directly

4   report to me.

5   BY MR. COWART:

6       Q    Okay.  Did you supervise Mr. Lusk?

7       A    At the time we're speaking of, no.

8       Q    Okay.  Did you work with any outside

9   personnel outside of the university regarding the

10  maintenance of the pool?

11      A    Yes.  There was an external company who

12  held a contract for the HVAC, and I do not recall

13  who was the -- it could have been the same

14  company.  I do not recall who handled the drainage

15  and fixing of any cracks, leaks and painting and

16  maintenance in the actual pool or on the pool

17  deck.

18      Q    Did you work with that external company

19  on the maintenance of the pool?

20      A    Can you please describe work?

21      Q    Did you handle any contracts?  Did you

22  negotiate any contracts?  Did you do any

Page 69

1    scheduling?  Anything of that sort?

2              MS. SENGER:  Objection.  Compound.

3              THE WITNESS:  Scheduling, yes.  If I

4    recall, there was a contract already in place.

5    BY MR. COWART:

6         Q    Okay.  Let's talk about your

7    responsibilities with respect to the turf.  What

8    were those responsibilities as of June 2014?

9         A    Every year, turf fields, the soccer

10   field -- softball at the time I believe was still

11   grass -- and then baseball needs a preventative

12   maintenance generally more than once a year, but

13   provided -- sometimes that wouldn't be allowed to

14   take place, but it was more of a, say, quarterly

15   or yearly, however it played out, maintenance

16   where we'd work with -- I believe it was King Turf

17   to come out and provide a maintenance to keep the

18   fibers from the field vertical and not getting

19   matted down, to keep all the turf fields to be

20   playing as realistic to real grass as possible.

21        Q    Okay.  And did George Washington have a

22   contract with King Turf?

Page 70

1      A    I do not believe it was a contract.  I do

2  not recall, though.

3      Q    Did you negotiate with King Turf over

4  payment for their resurfacing or maintenance?

5      A    No.

6      Q    Did you schedule when King Turf needed to

7  provide their services?

8      A    I'm not sure I directly handled that

9  scheduling, no.

10      Q    So you oversaw -- how did you oversee

11  this maintenance project with respect to the turf?

12      A    So to the best of my recollection, we had

13  an employee named Alan Zebrak who left somewhere

14  in the summer, as I recall, and upon his

15  departure, there was a need to make sure these

16  things were still occurring.

17           As the -- I believe was the longest

18  tenured employee was in that entity, I had what I

19  felt was the most knowledge base on these items

20  and asserted myself to make sure, in our weekly

21  meetings, nothing that was done previously was

22  dropped.  So I worked with the other colleagues as

Page 71

1    previously mentioned, Mike Walters and Peter

2    Lusk -- I believe he was there at this point,

3    and -- as they were the true -- they were

4    facilities as, you know, I was events then with

5    Andrew Lundt -- I worked with them to make sure

6    that their facility duties were still being

7    maintained.

8         Q    Okay.  So how did you go about making

9    sure those were happening?  Did you check in with

10   Mike and Peter?

11            MS. SENGER:  Objection.  Vague.

12            THE WITNESS:  Yes, I did.

13   BY MR. COWART:

14        Q    Okay.  What else did you do besides

15   asking them whether or not these maintenance

16   activities were happening?

17        A    I worked with them on a weekly basis.  So

18   as I said, we met every week.  There was a staff

19   member who used to oversee them who is no longer

20   doing that.  He's no longer with the university.

21   We had items that I knew were things we had to

22   hit, so I took the opportunity and was the point

Page 72

1    person in these meetings, the point person going

2    through an agenda item, going through what needed

3    to be done, and made sure it was getting done.

4              So to your question of checking in, yes,

5    I checked in with them every week in meetings.  If

6    there was something on that list that I knew was

7    not being done, I'd say, okay, what are we doing

8    here?  The Smith Center floor needs to be

9    refinished.  How are we going about doing that?  I

10   know Larry Wiers is the contact who always does

11   this.  Mike, have --

12             THE REPORTER:  I'm sorry.  You need to

13   slow down, please.  I know Larry Wiers...

14             THE WITNESS:  I know Larry Wiers is the

15   contact for doing the floor.  Mike, is he

16   scheduled?  Yes?  No?  No.  Okay.  Let's make sure

17   we get him scheduled.  Can you please reach out to

18   him and get that scheduled?

19             Andrew Lundt, what's the schedule look

20   like this summer?  When can they get in and do the

21   floor?

22             So it was -- I took an opportunity to

Page 73

1   start managing the team when there was a gap that

2   was left.

3   BY MR. COWART:

4       Q    Got it.  Okay.  So you led meetings with

5   facilities.  Is that correct to say?

6       A    I led facilities, events and operations

7   meetings, yes.

8       Q    Besides those weekly meetings with Peter

9   and Mike, did you have any other responsibilities

10  with respect to maintenance?

11      A    Not that I recall, at that time.

12      Q    So -- okay.  After June 2014 -- well,

13  let's talk about as of June 2014, did you take on

14  any other responsibilities besides the facility

15  oversight duties that we just talked about?

16      A    For one.  Besides -- that's a large

17  overtaking [sic] that I took on.  So I think

18  that's important to note.  It's not just a --

19  like, toss it in the good enough bin.  So that was

20  a large --

21          THE REPORTER:  I'm sorry.  Can you repeat

22  what you just said, please?

Michael Aresco                                                    March 18, 2021

Page 75

1       A    I do not recall.

2       Q    Okay.  And as of June 2014, how many

3   hours per week would you say you were working on

4   these facility oversight issues?

5       A    I'd say an additional ten hours per week.

6       Q    Okay.  Anything else that you took on as

7   of June 2014?

8       A    It's not -- I took on -- similar to -- I

9   took on a leadership role, as somebody in this

10  facilities and operations group had to be

11  reporting and providing updates to Jason Wilson,

12  and I assumed that role.

13      Q    And how would --

14      A    So there was a leadership quality that I

15  took on, knowing that there was a gap of what

16  needed to get done, and that required me reaching

17  out to Jason and saying, here's where we stand on

18  this or that.  So...

19      Q    Okay.  And how did you report those

20  updates to Wilson?

21      A    I had a one-on-one with him that was

22  standing, I believe.

Page 76

1        Q     And during that one-on-one, you would

2    provide updates for events and facilities as of

3    June 2014?

4        A     Yes, as I recall.

5        Q     Okay.  Any other responsibilities you

6    took on as of June 2014?

7        A     No, not that I recall.

8        Q     Okay.  While you're still in facilities,

9    did you take on any other job duties after

10   June 2014?

11       A     Yes, I eventually became the manager for

12   all facilities, operations, events or

13   operations -- events, facilities, whatever order.

14   So I had direct reports that were Mike Walters,

15   Andrew Lundt, Andrew Maguire, and I believe Peter

16   Lusk was one at one point as well.

17            Additionally, that required to be on

18   senior staff.  That required to be part of head

19   coaches meetings.  And I was the sports supervisor

20   for the men's rowing intercollegiate athletic

21   program, in addition to taking on a more

22   structured and detailed role of the facilities

Michael Aresco                                                    March 18, 2021

1    piece and all of operations, events, and

2    facilities.

3        Q    Okay.  And when did you take on these

4    responsibilities?

5        A    I do not recall how -- or when the role

6    began.

7        Q    But that was after June of 2014?

8        A    Yes.

9        Q    Was it three months after June 2014?

10       A    Men's rowing -- I'm trying to remember

11   the time frame.  I don't recall when that would

12   have been.  The team reporting to me would be

13   roughly around October.  That's the extent of what

14   I can remember.

15       Q    October 2014?

16       A    Yeah.  Yes.

17       Q    Okay.  So let's talk about your role as

18   manager of these direct reports.  How did you

19   operationalize being a manager for these direct

20   reports?

21            MS. SENGER:  Objection.  Vague.

22            THE WITNESS:  Can you please clarify?

Page 78

```
 1   BY MR. COWART:

 2       Q    Certainly.  So prior, you were directing

 3   some of their work in facilities; is that right?

 4       A    Yes.

 5       Q    And then at some point after June 2014,

 6   you became their formal manager; is that right?

 7       A    Yes.

 8       Q    So what changed between June 2014 and

 9   after you took on these new roles as formal

10   manager?

11            MS. SENGER:  Objection.  Vague.

12            THE WITNESS:  I mean, the best way --

13   nothing specific besides a reporting structure

14   that was more set in stone.  As previously

15   mentioned, I was already -- had already asserted

16   myself as the point of contact for information to

17   flow through.  So I continued building on that.

18            I had a really good relationship with

19   that group due to personally great managerial

20   style and working really well with them, building

21   relationships with them on a personal and

22   professional level.  So when this change was
```

Michael Aresco                                    March 18, 2021

Page 79

1   there, we just continued working.  And when I

2   asked questions, we had already gotten through the

3   phase where they know if they're not going to do

4   it, I'll -- like, I'll show them how to do it and

5   we'll do it together.  So they just went and did

6   it without having their boss breathing down their

7   neck.

8           So that relationship had already been

9   built, so we were able to just continue operating

10  where I would run meetings, make sure we were on

11  top of things, make sure that they were following

12  up, crossing their Ts, dotting their Is.

13          THE REPORTER:  I'm sorry.  Crossing...

14          THE WITNESS:  Crossing their Ts and

15  dotting there is.

16  BY MR. COWART:

17      Q   Okay.  How did the reporting structure

18  change?

19      A   So --

20          MS. SENGER:  Objection.  Asked and

21  answered.

22          THE WITNESS:  The reporting structure, as

Michael Aresco                                    March 18, 2021

Page 80

1    I recall, was I was reporting to -- I think I was

2    reporting to Jason Wilson.  Then there was

3    assistant director of events reporting to me.  And

4    then you had Mike Walters, as operations

5    specialist, and Peter Lusk, as the facilities

6    director, reporting to me.  And then I believe I

7    was reporting to Jason Wilson to begin with, as I

8    recall.

9    BY MR. COWART:

10       Q    Okay.  So this -- and under this

11   reporting structure, your -- who you were

12   reporting to didn't change.  Is that fair to say?

13       A    As I recall, yes.  There's also Andrew

14   Maguire was Mount Vernon campus who also reported

15   to me.

16       Q    Andrew Maguire.  Okay.  At any point when

17   you were in facilities after you officially became

18   the -- after Andrew and the assistant director of

19   events, the ops specialist and facilities started

20   reporting to you, did you take on any other duties

21   while you were in facilities?

22            MS. SENGER:  Objection.  Asked and

Michael Aresco                                          March 18, 2021

Page 81

1   answered.

2          THE WITNESS:  Do I need to answer?

3   BY MR. COWART:

4       Q    Yeah.  Did you take on any other

5   responsibilities after that point?

6       A    Yes.

7       Q    Okay.  While you were in facilities?

8       A    Yes.

9       Q    Okay.  And what job duties did you take

10  on?

11      A    Took on sport administration, the men's

12  rowing program.  There was a larger capital

13  projects element.  As mentioned, there was a

14  softball field that we were working on.  There

15  was -- Barcroft Park I don't think had anything.

16          THE REPORTER:  I'm sorry?  Barcroft...

17          THE WITNESS:  I said Barcroft Park did

18  not have any projects.  I was thinking out loud, I

19  apologize.

20          The Smith Center had a large design

21  project from a facilities standpoint that I helped

22  work from a design perspective, a negotiation

Michael Aresco                                              March 18, 2021

Page 82

1   perspective, installation perspective.  There

2   was -- I handled a large office move, swapping

3   offices throughout the entire athletic department,

4   from townhouses, Smith Center, a building across

5   the street.  That was facility related.

6           Additional branding in the pool and

7   auditorium.  There was a facilities project in

8   Mount Vernon Lloyd gym where we revamped the

9   gymnasium in there as a world-class strength and

10  conditioning facility.  I was the project manager

11  for that.  Yeah.  That's what I recall.

12  BY MR. COWART:

13      Q    Okay.  So let's take these one by one.

14  Sports administrator for rowing.  You took that

15  over in approximately October of 2014; is that

16  right?

17      A    I do not recall.

18      Q    What were your duties as sports

19  administrator for rowing?

20      A    So as the sport administrator, it was a

21  variety of duties that were wide-ranging.  So I

22  helped with their budget, helped budget oversight.

Page 83

1    I helped with recruiting from a roster management

2    perspective.  I helped with financial aid and

3    planning.  I helped with student athlete

4    discipline.  I helped with planning, scheduling

5    trips and their home event.  I was their point of

6    contact for any potential compliance concerns.  I

7    was a mentor/individual who the team could come to

8    with concerns or complaints.

9          Those are, to name a few, of what entails

10   those duties, not -- as part of that, going to

11   practice, going to championships and away events,

12   meeting with donors, going to training trips,

13   being present with the team as their direct link

14   to the athletic department.

15     Q    Okay.  So let's talk first about budget

16   oversight.  What were your responsibilities in

17   budget oversight as the sports administrator for

18   rowing?

19     A    So they had a budget that they had to

20   stay within.  They also had a fundraising budget

21   and a fundraising goal that they had to hit.

22   Ultimately, if those goals were not met and they

Michael Aresco                                    March 18, 2021

Page 84

1   were not within budget and meeting their

2   fundraising goal, it would reflect upon me.  So I

3   was responsible for making sure that they either

4   were within budget or they had additional

5   fundraising to help fund it.

6           When they had items come up that they

7   wanted to purchase, such as the rowing truck, a

8   truck to row their -- to tow their rowing boats,

9   or a trip to Maine for a team bonding experience

10  or a trip to England for the Royal Henley regatta,

11  it was my responsibility to work through the

12  budget with the head coach and ensure that they

13  had the money, show that to finance, show it's

14  earmarked, and prove that they're going to be

15  within budget and where the money is coming from.

16      Q    Okay.  And did you determine what

17  expenses were proper for the team budget?

18          MS. SENGER:  Objection.  Vague.

19          THE WITNESS:  Yes, on a -- yes.

20  BY MR. COWART:

21      Q    And how did you make those

22  determinations?

Michael Aresco                                    March 18, 2021

Page 85

1      A     I'll say common sense.

2      Q     Were there guidelines that you followed?

3      A     For that specifically, no.  It was common

4  sense and understanding of the industry.

5      Q     Who was the rowing coach at this point?

6      A     Mark Davis.

7      Q     Did you ever deny Mark Davis a budget

8  line that he requested?

9      A     Yes.  If I recall correctly, yes.

10      Q     And what did you deny Mr. Davis?

11      A     He wanted his program to go to

12  Sacramento, California, I believe, for a training

13  trip, bonding trip before they went to England for

14  the Royal Henley regatta.  And I said it was -- if

15  I recall, it was an irresponsible use of money to

16  fly across the country, to fly back across the

17  country to go to London.

18      Q     And how did Mr. Davis respond to that

19  denial?

20      A     He said, okay.

21      Q     Anything else?

22            MS. SENGER:  Objection.  Vague.

Michael Aresco                                    March 18, 2021

Page 86

1          THE WITNESS:  I worked with him to get

2     his training trip to Maine where he was able to

3     drive up and then fly from the East Coast to

4     London.

5     BY MR. COWART:

6          Q    Okay.  And who recommended a training

7     trip to Maine?

8          A    If I recall, I recommended finding

9     something that wasn't across the country.

10          Q    Okay.  And how would you go about

11     ensuring that the budget was met?

12          A    We had a weekly standing one-on-one,

13     maybe biweekly.  In that, there was a line item,

14     budget.  So it was a constant discussion.

15          Q    A one-on-one between you and Mr. Davis?

16          A    Yes.

17          Q    And what about fundraising goals?  How

18     did you ensure that the fundraising goals were

19     met?

20          A    I would speak with him, make sure that

21     the -- make sure what was in the account is what

22     he was saying.  I think it was called a C fund, if

Page 87

1    I recall.  And if I had to, I could reach out to

2    development and ask to see a -- not ask to see,

3    but ask to clarify that there is, like, a standing

4    gift agreement.  But I don't recall ever having to

5    do so.

6        Q    And so how would the rowing team go about

7    fundraising?

8        A    They would host events.  So they have a

9    royal -- they have a GW regatta that's on the

10   Potomac.  They do that event every single year.

11   That would have a -- generally they'd have some

12   sort of -- gala would be the inappropriate -- an

13   inaccurate word, but some sort of gathering fancy

14   event that would bring back previous alums.

15            And there was a -- already in place a

16   very active and generous donor base.  And I think,

17   for them, it was continuing the engagement through

18   those type events where they were able to have

19   yearly donations.  I know I spoke specifically

20   with Mark about trying to get people to donate a

21   set amount every single month, especially young

22   alumni who were part of the program and recently

Michael Aresco                                          March 18, 2021

Page 88

1    left, could they donate ten bucks a month every

2    year, try to increase it by a dollar and, over

3    time, that could be a humongous benefit to the

4    program down the road.

5        Q    And who had responsibility for planning

6    the regatta?

7        A    Interestingly, I did.

8        Q    And how did you go about planning the

9    regatta?

10       A    There are elements -- it was somewhat

11   tricky.  We had to get permitting through National

12   Park Service, I believe, NPS, because it was

13   partly on their property.  So we get permitting

14   through them.

15            Logistically, we would -- I mean, I'll

16   run through a few things.  One, you obviously need

17   student staff.  We'd have to hire a GWPD officer

18   to go down and watch the boats, because they're

19   left overnight.  We didn't want anybody to steal

20   them.  We'd hire a -- I worked with the coaching

21   staff to hire a portable Jumbotron that would come

22   in and park on the docks of the Georgetown

Michael Aresco                                    March 18, 2021

Page 89

1    riverfront.  Had to ensure electrical was there.

2            Then there was a tent that we would put

3    up.  Along with that tent was an external company

4    that was paid for out of the rowing budget that

5    was filming the event.  So there was a boat on the

6    Potomac River with a camera filming everybody

7    rowing, sending it back to the tent where I was

8    operating out of, and it was then streamed online

9    and onto the video board.

10           We had crowd control, staff members that

11   we had to hire.  That was through the staff

12   outreach process we had discussed earlier.  It's a

13   three-day event in terms of prep.  It would be, I

14   believe, Friday, and it was a Saturday, Sunday,

15   something like that.  I mean, early in the

16   morning, 5:00 a.m., you'd get back on site.  You

17   make sure the tent is up, electrical was plugged

18   back in.

19           I mean, that's logistically -- I'd get

20   porta-potties on site, had to organize that.

21   Cleaning each night, organize that.

22       Q    As far as -- when you say organize, did

Page 90

1    you personally seek out vendors?

2        A    Yes, whether it was this specific year as

3    I was sport administrator or previous years as

4    director of events or assistant director of

5    events, somewhere in that process I certainly was

6    the direct person calling.  I would, to the best

7    of my recollection, believe further down I may

8    have asked Andrew Lundt to make that phone call

9    and organize those items.

10       Q    Okay.  And did you approve those expenses

11   as sports administrator?

12       A    Yes.  The expenses that would hit the

13   men's rowing budget, yes.

14       Q    Okay.  Any other job duties that you had

15   as a sports administrator as it relates to budget?

16       A    I think that covers it fairly well.

17       Q    Okay.  Let's talk about roster

18   management.  What were your responsibilities as a

19   sports administrator with respect to roster

20   management?

21       A    A large part would be understanding the

22   landscape of men's rowing, so getting a sense of

Page 94

1   role as a sport administrator.  He had asked me,

2   can I stack my financial aid with athletic aid?

3   And as I recall, the university was unable to do

4   that at the time.  Maybe they can now; maybe they

5   can't.  But I took that question from him.  I

6   reached out, got somebody from financial aid

7   across campus -- I forgot the name -- but came to

8   a head coaches meeting and was there for all

9   coaches to address that topic, ask questions and

10  understand what was going on.

11          So on things I was not necessarily the

12  right contact, I viewed it as my job to give

13  support to that coach and that program, to the

14  best of my ability.

15      Q    So you provided answers to questions

16  regarding scholarships, but did not make

17  scholarship decisions independently; is that

18  right?

19      A    Correct.  I did not -- yes.  Correct.

20      Q    So what were your responsibilities with

21  respect to student athlete discipline?

22      A    So this was a topic that arose on

Page 95

1    occasion, student athletes getting in trouble

2    whether on campus and/or off campus.  These

3    situations were always brought to my attention,

4    either by the coach or sometimes by Patrick,

5    depending -- Athletic Director Patrick, depending

6    on where the information came from.  Sometimes it

7    would get funneled to us through GWPD.  Other

8    times the coach would get ahead of it and let us

9    know prior.

10          Generally, these were decisions that were

11   made as an athletic department, not as a sport

12   administrator.  So, for instance, there was a

13   group of kids, student athletes who got in trouble

14   for some college shenanigans, and we met as -- I

15   think it was Patrick and I met with the coach to

16   discuss a discipline for this instance.  So it was

17   a decision that was made group wide.

18          Once these decisions were made, I took it

19   upon myself to build a relationship with the

20   individual and try to get a true sense of what was

21   going on:  Why did you do that?  How can you

22   redeem yourself?  Like, how can I help him get

Michael Aresco                                               March 18, 2021

                                                          Page 96

1   back onto the good graces of the coaching staff so

2   he can still be an adequate part of that program

3   and not have that define his career as a GW men's

4   rower.

5        Q    Got it.  And when you said these

6   decisions would be made group-wide, who is

7   included in that group?

8             THE REPORTER:  I'm sorry.  If you could

9   please repeat the question.

10  BY MR. COWART:

11       Q    When you state that decisions regarding

12  student athlete discipline were made group-wide,

13  who were you referring to?

14       A    As I recall, those decisions were made

15  between Patrick Nero, Mark Davis, and myself.

16       Q    Okay.  Did you ever make recommendations

17  about student discipline?

18       A    Yes.

19       Q    When did you make a recommendation about

20  student discipline?

21            MS. SENGER:  Objection.  Vague.

22            THE WITNESS:  When we were talking about

Page 97

1    student athlete discipline with the student.

2    BY MR. COWART:

3        Q     Was there a specific instance that you

4    remember where you recommended the discipline of a

5    student?

6        A     Yes.

7        Q     And what is that instance?

8        A     There was a student athlete who was part

9    of a group who threw a pumpkin off of a fourth

10   floor, some higher area, and hit their neighbors

11   air conditioner and broke it.

12       Q     And what was your recommendation?

13       A     I do not recall my recommendation.  I

14   recall being in a room with what -- I believe Mark

15   Davis, Patrick Nero, discussing what we were

16   saying.  And we all went through and gave an

17   opinion of what we thought the punishment should

18   be.

19       Q     Okay.  Do you remember what the

20   punishment was?

21       A     I do not.

22       Q     Are there any other instances where you

Michael Aresco                                              March 18, 2021

Page 100

1      Q    Okay.  And what did you do at those

2   practices?

3      A    I would ride in a boat with the head

4   coach, Mark Davis, observe the coaching style, the

5   way he spoke to the student athletes, and take in

6   practice, learn, be a sponge, pick up as much

7   information as I could about the nuances of the

8   sport but, more importantly, observe and be a

9   supportive figure for the program.

10     Q    Okay.  And would you -- did you supervise

11  Mark Davis?

12          MS. SENGER:  Objection.  Vague.

13          THE WITNESS:  Yes.

14  BY MR. COWART:

15     Q    How did you supervise Mark?

16     A    Can you please clarify?

17     Q    Certainly.  Did you discipline Mark?

18     A    No.

19     Q    Did you approve leave requests for Mark?

20     A    No.

21     Q    Did you direct Mark how to coach?

22     A    No.

Page 101

1       Q    Did you have authority to -- independent

2  authority to raise Mark's salary?

3       A    No.

4       Q    Did you complete Mark's performance

5  review?

6       A    Yes.  As far as I recall, yes.

7       Q    Did you sign Mark's performance review?

8       A    I do not recall.

9            MR. COWART:  Bob, if we could pull up

10  GWU_4563 and mark it as Exhibit 1.  We're really

11  behind on our exhibits here.

12            (Deposition Exhibit Number 1 was marked

13  for identification.)

14  BY MR. COWART:

15       Q    Mr. Aresco, if you could just let me know

16  when you've pulled that up.

17       A    I'm in the Exhibit Share.  Where would it

18  be?

19            THE CONCIERGE:  So you should click on

20  that marked exhibits folder each time an exhibit

21  is introduced.  It will refresh.  Okay?

22            THE WITNESS:  Thank you.  Got it.

Page 102

1  BY MR. COWART:

2      Q    Okay.  Great.  So do you recognize this

3  document?

4      A    Please clarify.

5      Q    Have you ever seen this document before?

6      A    I've seen --

7           MS. SENGER:  If you give us a second --

8  I'm still trying to get this to work.  If you

9  could just give me --

10          MR. COWART:  Yeah.  No problem, Molly.

11          MS. SENGER:  Okay.  I've got it.

12  Apologize.

13  BY MR. COWART:

14      Q    Mike, do you see it as well?

15      A    Yes.  Yes.

16      Q    So this states, "Performance review

17  form."  Have you seen other performance review

18  forms similar to this one before?

19      A    Yes.

20      Q    Have you seen this one specifically?  Do

21  you remember?

22      A    I cannot confirm.

Michael Aresco                                            March 18, 2021

                                                    Page 103

1       Q    Okay.  Do you see where it says,

2    "Employee name:  Mark Davis"?

3       A    Yes.

4       Q    That's the same Mark Davis you've been

5    talking about, right?

6       A    Yes.

7       Q    And you see review period is from

8    September 1, 2014 to June 1, 2015?

9       A    Yes.

10      Q    And you would have been the sports

11   administrator during that period?

12      A    I do not -- I do not recall when I became

13   the sport administrator for men's rowing.

14      Q    Okay.  I believe you testified earlier

15   that you became sports administrator in

16   October 2014, but if that's not correct, please

17   let me know.

18      A    I believe I stated I do not recall.

19      Q    Okay.  Well, let's just go through and

20   look at this -- look at this document.  So let's

21   first scroll to the last page, page 4.  Under your

22   signatures -- do you see where it states,

Page 104

1    "Signatures"?

2        A    Yeah.

3        Q    And this isn't signed by you, correct?

4            MS. SENGER:  Apologies.  I don't see a

5    signature on page 4.  I see one on page 3.  Is

6    that what you're talking about?

7            MR. COWART:  Oh.  I am looking at a PDF

8    copy.  It might be a little different.  Yes.

9    BY MR. COWART:

10       Q    So do you see a signature block on

11   page 3?

12       A    Yes.

13       Q    And you didn't sign this, correct?

14       A    No, I did not.

15       Q    Okay.  So let's scroll back to page 1.

16       A    Uh-huh.

17       Q    So the self-assessment, that part would

18   have been filled out by Mr. Davis, correct?

19           MS. SENGER:  Objection.  Foundation.

20           You can answer if you know.

21           THE WITNESS:  Yes.  In general -- yes.

22   That portion of performance reviews is to be

Michael Aresco                                            March 18, 2021

                                                          Page 105

1    filled out by the coach.  I cannot confirm if Mark

2    Davis filled that out.

3    BY MR. COWART:

4        Q    Correct.  Okay.  But you understand that,

5    as a general process in performance reviews, the

6    self-assessment would be filled out by the person

7    that's listed in employee name; is that right?

8        A    Yes.

9        Q    Okay.  So under reviewer comments -- do

10   you see that, where it says, "Reviewer comments on

11   goals and accomplishments"?

12       A    Yes.

13       Q    Okay.  That is generally written by the

14   reviewer; is that correct?

15       A    Yes.

16

17

18

19

20

21

22

Michael Aresco                                                    March 18, 2021

Page 106



Michael Aresco                                    March 18, 2021

Page 107



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21    Q    Thank you.  You can put that to the side.
22         So do you remember ever writing an
```

Michael Aresco                                    March 18, 2021

Page 118

1       A    I reached out -- I do not recall the

2    name.  I reached out to somebody across campus and

3    worked with them to put together a packet for the

4    RFP and -- yeah.

5       Q    So did you write the RFP?

6       A    Yes.

7       Q    Okay.  And what information did you

8    provide in that RFP -- in an RFP?

9       A    I do not recall.

10      Q    Okay.  Is there anything else that

11   relates to your job responsibilities that goes to

12   capital projects?

13           MS. SENGER:  Objection.  Vague.

14           THE WITNESS:  I'm trying to recount if

15   there were any other capital projects that were in

16   the works that I was working on that never got

17   green lit so I can give you a full breadth of -- I

18   think that's all of them.

19   BY MR. COWART:

20      Q    Okay.  Were you responsible for budgeting

21   for those capital projects?

22           MS. SENGER:  Objection.  Vague.

Michael Aresco                                          March 18, 2021

Page 119

1          THE WITNESS:  Yes.

2  BY MR. COWART:

3      Q    And what was your involvement in

4  budgeting for these projects?

5      A    So each one of the projects, they had a

6  budget that we had to stay within, and it was my

7  responsibility to ensure we did not go over that

8  budget that's allocated.

9      Q    And who provided you with the allocated

10  budget number?

11      A    It varied per project.

12      Q    Okay.  Did you ever determine what an

13  appropriate budget should be for any of these

14  projects?

15      A    Yes.

16      Q    Which one of those projects?

17      A    If I recall, the volleyball project.

18  Part of that was funded out of the program's

19  fundraising fund, and I came forth with, this is

20  what it will cost that can be potentially split

21  between fundraising and GW administration.  Here's

22  the budget, here's what it will cost, project has

Page 120

1    been planned, budgeted for.

2           Similarly, the branding project, as I

3    recall, there may have been a budget that was

4    held, like, here's what we have to spend on this

5    project.  And it was my job to go build the --

6    what we could get done in that budget in that

7    price range.

8       Q    Okay.  So someone provided you the

9    external budget and you were constrained by that

10   budget and tried to determine what could work

11   within that budget.  Is that fair to say?

12          MS. SENGER:  Objection.

13   Mischaracterizes.

14          THE WITNESS:  For that specific project

15   that was the branding project, that is how I

16   recall that project, yes.

17   BY MR. COWART:

18      Q    Were there any capital projects that you

19   independently determined needed to happen?

20      A    The Lloyd gym project was one I was an

21   advocate for.  I do not recall if it was

22   independent or not.

Michael Aresco                                    March 18, 2021

Page 129

1      Q    This is a -- Mr. Aresco, this is a

2  relatively large document, so I'm going to direct

3  your attention to certain pages.  I'm now looking

4  at the version that's on -- that's directly on

5  SharePoint [sic] so we should be on the same page.

6      A    Where --

7           MS. SENGER:  And I don't have it at all

8  yet Mr. Cowart, so if you could wait until I get

9  it.

10          MR. COWART:  Of course.

11          THE WITNESS:  I have it pulled up.

12 BY MR. COWART:

13     Q    Okay.  And I'll direct your attention to

14 page 18.

15          MS. SENGER:  Mr. Cowart, can you identify

16 what Bates number you're directing your attention

17 to.

18          MR. COWART:  Yes.  It's 1340.

19 BY MR. COWART:

20     Q    So, Mr. Aresco, if you look in the very

21 bottom corner, you will see GWU_ and a number.

22 We're looking at GWU_1340.

Michael Aresco                                    March 18, 2021

Page 130

```
 1      A     Okay.

 2      Q     So on this page, it lists your employee

 3   title as director of events; is that right?

 4      A     On this page, yes.  This page does, yes.

 5      Q     And have you seen this request for a

 6   bonus payment before?

 7      A     No.

 8      Q     Do you remember receiving a $9,000 bonus?

 9      A     I remember receiving a bonus.

10      Q     Okay.  And do you see where it says,

11   "This bonus is paid for using Merit pool funds"?

12      A     Yes, I see that.

13      Q     And do you see that it's dated

14   November 10th, 2014?

15      A     Yes.  I see that.

16      Q     Which is after you received that

17   evaluation for the period ending June 30th, 2014,

18   correct?

19            MS. SENGER:  Objection.

20   Mischaracterizes.

21            THE WITNESS:  Isn't that review through

22   2015?
```

Michael Aresco                                                March 18, 2021

Page 131

```
 1   BY MR. COWART:

 2       Q    Let's look at the document.  So it covers

 3   the period -- right? -- if you look at it, July 1,

 4   2014, and this is after that period began,

 5   correct?

 6       A    The review would be for -- the review

 7   would be coming in July 2015.  It's from July 1 to

 8   June 30, 2015.  The review is post June 30, 2015.

 9       Q    Okay.  So let's look at the next page.

10   This is Bates number 1341.

11       A    Uh-huh.

12            MS. SENGER:  Mr. Cowart, you're now going

13   back to Exhibit 3; is that correct?

14            MR. COWART:  Correct.

15            MS. SENGER:  Okay.  Can you give us a

16   second to navigate back, because I was just at

17   Exhibit 2?

18            THE WITNESS:  Okay.  I'm there.

19   BY MR. COWART:

20       Q    Okay.  And on this page, it states your

21   title is director of events, correct?

22       A    Yes.
```

Michael Aresco                                    March 18, 2021

Page 132

1        Q    And you will see the requested bonus

2    amount of $4,000.  Do you see that?

3        A    Yes, I do.

4        Q    Do you remember receiving a bonus for

5    $4,000?

6        A    I remember receiving a bonus.

7        Q    How much was that bonus for?

8        A    Total was, I believe, $13,000.

9        Q    So you received both this 4,000 bonus and

10   the $9,000 bonus that's on the previous page at

11   the same time.  Is that valid?

12       A    As I recall, yes.

13       Q    And did you talk to anyone about this

14   bonus before receiving it?

15       A    I do not recall.

16       Q    So you did not talk -- you do not

17   remember talking to Mike Cohen before receiving

18   this bonus?

19       A    I do not remember ever talking to Mike

20   Cohen, as far as I remember.

21       Q    Do you remember talking to Patrick Nero

22   about this bonus?

Page 133

1      A    I remember talking with Patrick Nero

2   about some compensation for job -- for taking on

3   additional duties.

4      Q    And who initiated that conversation?

5      A    I did.

6      Q    And when did that conversation occur?

7      A    October of 2014.

8      Q    Shortly before this bonus was approved;

9   is that right?

10      A    Yes.

11      Q    And what was your conversation with

12   Mr. Nero?

13      A    I had a briefing with him, informing him

14   that I had a job offer at another institution.

15      Q    And how did he respond?

16      A    He said he can't -- he'd rather not lose

17   me.  I've done too good of a job managing the

18   team.  I said back -- I've been doing additional

19   responsibilities since, say, mid-summer; I'd like

20   to be recognized for that.  And he took it as an

21   opportunity to offer me a promotion.

22      Q    Okay.  And what was that promotion?

Michael Aresco                                          March 18, 2021

Page 134

1        A     To assistant athletic director --

2        Q     Okay.  And --

3        A     -- for operations, events and facilities.

4        Q     And did you apply for that position?

5        A     No.

6        Q     To your knowledge, was there any

7   conversation with EEO about that promotion?

8        A     Not to my knowledge.

9              MS. SENGER:  Objection.  Vague.

10  BY MR. COWART:

11       Q     To your knowledge, was there any

12  communication between the finance department about

13  this promotion?

14             MS. SENGER:  Same objection.

15             THE WITNESS:  Not that I'm aware.

16  BY MR. COWART:

17       Q     Was there any conversation with any HR

18  personnel about this promotion, to your knowledge?

19             MS. SENGER:  Objection.  Vague.

20             THE WITNESS:  Not that I'm aware.

21  BY MR. COWART:

22       Q     Did you specifically request any specific

Page 157

1    to be a posting of an assistant AD and chief of

2    staff, at the same time as there's going to be an

3    opening for a director of facilities, is it not

4    the case that you were exiting your position as

5    director of facilities and taking on this

6    assistant AD chief of staff position?

7            MS. SENGER:  Objection.  Asked and

8    answered.

9            You can answer.

10           THE WITNESS:  It's -- no, it's not the

11   case.  There was contingency planning in place in

12   case that were to be what happened.

13   BY MR. COWART:

14       Q    So did you have conversations with anyone

15   about taking over as an assistant AD chief of

16   staff position before sending this e-mail on

17   December 4th, 2015?

18       A    Yes.

19       Q    Who did you speak to?

20       A    Patrick Nero.

21       Q    And what was your conversation with

22   Patrick Nero?

Michael Aresco                                                March 18, 2021

Page 158

1    A    Patrick asked me, after Brian Hamluk

2   left, if I would be interested in potentially

3   switching over to a more human resource and

4   department-wide policy-type role, and a special

5   projects role, trying to corral the entire

6   department to, instead of getting 20 percent of

7   what he wanted done, making it be 80 percent,

8   working across the entire athletics department as

9   well as university.

10    Q    So at the time of this posting, were you

11   intending -- at the time of this e-mail, were you

12   intending to apply for this position that you're

13   discussing with Ms. Kayer?

14    A    Yes.

15    Q    And why were you intending to apply?

16    A    Ultimately, for me, it was a chance to

17   take a risk and have a different specific

18   portfolio in the athletic department.  Like I said

19   earlier, I had had six years' experience in

20   athletic administration on the facilities side.  I

21   thought it would be good to see if I had -- if I

22   was able to get the job, the opportunity to grow

Page 161

1          MS. SENGER:  Objection.  Calls for

2     speculation.

3          THE WITNESS:  I do not know.

4     BY MR. COWART:

5      Q    To the best of your knowledge, who is in

6     charge of determining how -- the title of

7     positions that are posted?

8      A    To the best of my knowledge, somebody

9     across campus in central HR.

10     Q    So not Kaithlyn Kayer?

11     A    To the best of my knowledge, it would not

12    be Kaithlyn Kayer.

13     Q    So looking at this exhibit, Exhibit 5,

14    point 2, it states that "Tanya will handle the job

15    search"; is that right?

16     A    Yes.

17     Q    And at this point, you had already talked

18    to Tanya about filling that special assistant

19    position, right?

20          MS. SENGER:  Objection.  Foundation.

21          THE WITNESS:  Yes.

22    BY MR. COWART:

Page 163

1   position?

2        A    Yes.

3        Q    Who's that?

4        A    Sara Williams.

5        Q    Anyone else.

6        A    Not that I recall.

7        Q    Did you talk to anyone about the salary

8   for the special assistant position before you

9   applied?

10       A    No.

11       Q    Did you engage in any negotiation of the

12  salary for the special assistant position?

13           MS. SENGER:  Objection.

14           THE WITNESS:  No.

15  BY MR. COWART:

16       Q    Not after you applied either?

17       A    No.

18       Q    Okay.  So you stated that you talked to

19  Ms. Williams about the special assistant position.

20  When did you talk to Ms. Williams about the

21  special assistant position posting?

22       A    I do not recall -- well, there were two

Michael Aresco                                    March 18, 2021

Page 164

1   instances.  I do not recall either date.  I can

2   recall where I was and what was going on.

3        Q    Okay.  So let's take both of those.  So

4   the first instance, what was going on at the time?

5        A    There was an event in Smith Center, some

6   speaker talking to student athletes.

7             THE REPORTER:  I'm sorry.  Some

8   speaker...

9             THE WITNESS:  There was a speaker in the

10  Smith Center presenting to student athletes.

11  BY MR. COWART:

12       Q    Okay.  And how did the conversation

13  between you and Ms. Williams start?

14       A    I don't recall how it started.  I do

15  recall that she asked me if I thought she should

16  apply for this role.

17       Q    And what did you say?

18       A    I said, if it were me, I would not.

19       Q    And why did you say that?

20       A    If I were unqualified for a job and I

21  applied for it, I think that would look poor upon

22  me.  For instance, if I -- if the water polo coach

Page 165

1  opened up and I applied for it without the

2  qualifications, I think it might look poor upon me

3  in the department.  So I answered the question as

4  a colleague the way I felt.

5      Q    So the meaning behind that was that you

6  perceived Ms. Williams as unqualified for the

7  position; is that right?

8      A    Yes.

9      Q    And why did you feel that Ms. Williams

10  was unqualified for the position?

11     A    It was an athletic administration

12  position, heavy in athletic administration.

13     Q    It was heavy in athletic administration

14  and that made you feel that Sara was unqualified?

15     A    She asked my opinion.  I gave her my

16  opinion.  She had no athletic administration

17  experience.  The job was designed for athletic

18  administration.

19     Q    How did you know that she had no athletic

20  administration experience?

21     A    Because she had mentioned her background

22  was as an administrative assistant.  I forgot

Michael Aresco                                    March 18, 2021

Page 166

1   where, but I know it was as an administrative

2   assistant before she came here, before she came to

3   George Washington.  Once again, she asked my

4   opinion.  I gave my opinion.

5       Q    So the extent of your knowledge about her

6   background was that she was an administrative

7   assistant?

8       A    Yeah, that's my understanding.

9       Q    And that made you feel that she was

10  unqualified for the position?

11      A    Yes.

12      Q    Any other reasons that you thought she

13  was unqualified for the position?

14      A    It takes a high level -- that role would

15  take a high level of trust and confidentiality.

16      Q    And you perceived Ms. Williams during

17  this event to not have a high level of trust and

18  confidentiality?  Is that your testimony?

19      A    Yes.

20      Q    And why did you feel that she didn't have

21  a high level of trust?

22      A    I'll use one example.  It goes back

Michael Aresco                                    March 18, 2021

Page 167

1   years, but -- maybe it doesn't go back years.  But

2   when I had that conversation with Patrick, she --

3   when I had that conversation with Patrick about

4   the job offer at North Carolina, I had

5   mentioned -- I eventually -- I don't know if I was

6   married at the time.  Girlfriend, fiancee, I don't

7   remember.  Eventually I cannot keep working 24/7

8   four years in a row.

9           And at some point down the road, Sara

10  made a comment to me about the fact that I told

11  Patrick I wanted to start a family and needed,

12  like, his help in changing my role, which was

13  false, but something that she said to me.  So one

14  would assume she was listening in on a

15  conversation that was private in nature and then,

16  two, lied about what she heard and then

17  misrepresented it to me.

18     Q    So during that conversation with Nero

19  that Sara, you state, overheard, what was actually

20  said?

21     A    I simply said to him that I'm not -- I

22  can't work the hours forever.  And that's one of

Michael Aresco                                    March 18, 2021

Page 168

1    the reasons why I was looking at this job at North

2    Carolina.  That was the extent of what was

3    mentioned.

4           And then she told me that I told him I

5    wanted to have a family, which I think is proven

6    false considering I don't have a family.

7       Q    And when you told Nero that you couldn't

8    work these hours forever, how did Nero respond?

9       A    I don't recall.

10      Q    And Sara stated to you that you told Nero

11   that you wanted to start a family; is that right?

12      A    Yes.

13      Q    To your knowledge, did Sara tell anyone

14   besides you that?

15      A    I do not know.

16      Q    Was Sara inquiring at the time whether or

17   not you wanted to start a family?

18      A    No.

19      Q    So how did this comment arise in which

20   Sara told you about this conversation that you had

21   with Nero?

22      A    I do not recall.

Page 169

1        Q    Was it during -- well, let's take it one

2    at a time.  Was it during this event at the Smith

3    Center in which you were talking about the SA

4    position?

5        A    I do not recall.

6        Q    Okay.  Anything else that makes you

7    believe that Sara did not have a high level of

8    trust or could not keep confidential information?

9        A    Not that I can remember off the top of my

10   head at the moment.

11       Q    So going back to this conversation that

12   you had with Patrick about the North Carolina

13   position, did he offer any solutions to the hours

14   that you were working?

15       A    No.

16       Q    But he did give you a raise, right?

17       A    He gave me a promotion and a raise, yes.

18       Q    Was there anything else mentioned in that

19   conversation that you had with Patrick about the

20   North Carolina job besides the hours, your extra

21   job duties, the promotion and the raise?

22       A    He said I'm too valuable and too good to

Michael Aresco                                    March 18, 2021

Page 177

1        Q     You do understand, as an HR person for

2    the university, that there are individual

3    contributor streams and management streams,

4    correct?

5              MS. SENGER:  Objection.

6    Mischaracterizes.

7              You can answer.

8              THE WITNESS:  I do not recall that.

9    BY MR. COWART:

10       Q     Okay.  At some point, Patrick asked you

11   to send him your job description.  Do you remember

12   that?

13             MS. SENGER:  Objection.  Foundation.

14             THE WITNESS:  I do not recall that off

15   the top of my head.

16   BY MR. COWART:

17       Q     No problem.

18             MR. COWART:  Can we pull up GWU at 784

19   and mark it as an exhibit, please.

20             (Deposition Exhibit Number 6 was marked

21   for identification.)

22             MS. SENGER:  Mr. Cowart, maybe we can

Michael Aresco                                    March 18, 2021

Page 178

1    take a break after this document.  We've been

2    going for a while after lunch.

3            MR. COWART:  Yeah.

4    BY MR. COWART:

5        Q    Just let me know when you have it up.

6        A    I have it up now.

7        Q    Great.  So let's just -- let's start in

8    the first e-mail.  So it's reverse chronology.  So

9    at 784, GWU_784, and at -- on Wednesday,

10   August 17, 2016.  Do you see that?

11       A    Yes.

12       Q    So it says, Patrick -- and this is an

13   e-mail from you to Patrick -- "Patrick, attached

14   is the job description for the executive assistant

15   to the athletic director.  Below is some

16   information on exempt versus non-exempt.  Mainly

17   refers to hours worked and pay, but it's all I've

18   currently found from the university handbook.

19   They really do not go into much more detail."

20           Do you remember sending this e-mail?

21       A    I don't remember sending it, no.

22       Q    Do you remember talking about Patrick

Michael Aresco                                    March 18, 2021

Page 179

1    requesting you to send this position description,

2    job description?

3        A    I remember the exempt versus non-exempt

4    question and looking into that.

5        Q    Okay.  Why did Patrick ask you to look

6    into that, to the best of your knowledge?

7        A    If I recall, because Sara was not

8    following instruction from Patrick.  He would tell

9    her she does not have any duties outside of, like,

10   9:00 to 5:00, or whatever her standard hours were,

11   and during basketball games or other events she

12   would come up continuously and, like, try working

13   and being part of things that she wasn't.

14            And I believe, from my understanding, he

15   was worried that she was working outside --

16   additional hours as a non-exempt employee and he

17   would have -- and there would have to be

18   additional pay associated with her even though she

19   was -- like, he was telling her not work and she

20   was working, so he was afraid of what this would

21   mean for her hours and pay.

22            So I believe, as I recall, that's why I

Page 180

1    sent this non-exempt position piece.

2         Q    Okay.  And then it seems like Mr. Nero is

3    asking for your job description also.  Do you see

4    that?

5         A    Yes.

6         Q    And do you know why he was asking for

7    your job description?

8         A    No --

9              MS. SENGER:  Objection.  Calls for

10   speculation.

11             THE WITNESS:  I do not recall.

12   BY MR. COWART:

13        Q    Do you remember Patrick ever having a

14   conversation about your job description versus

15   Sara's?

16        A    Yes.

17        Q    And when did that -- sorry.

18        A    No, go ahead.

19        Q    When did you have that conversation?

20        A    I do not recall.

21        Q    Okay.  Do you remember why you had that

22   discussion?

Page 181

1       A    Yes.  There were -- if I recall, there

2    were pieces and elements of Sara's job that she

3    was unable to handle properly and would try doing

4    additional work that was not hers, and it was in

5    an attempt to make sure that the two jobs were, in

6    fact, being -- in fact, both parties were doing

7    their specific roles.

8       Q    And when was this conversation?

9       A    I do not recall.

10      Q    Was it, to the best of your

11   recollection -- I know you said you don't recall

12   the date, but do you know if it was around the

13   same time that you sent these job postings?

14      A    I do not know.

15      Q    And so what was the outcome of that

16   conversation with Patrick about your different job

17   duties -- I mean, your duties compared to

18   Ms. Williams' duties?

19           MS. SENGER:  Objection.  Vague.

20           THE WITNESS:  As I recall, it was put on

21   both Tanya and I to work with Sara to make sure

22   she stayed in her lane for her job and focused on

Michael Aresco                                    March 18, 2021

Page 182

1   doing that, because she was not -- she was not

2   holding up her end of managing her duties and she

3   was trying to do others that were not in her

4   portfolio.

5          So he had asked Tanya to make sure that

6   she stayed to calendar management, answering the

7   phone, her administrative assistant duties, and

8   not branching off, to make sure she was able to

9   focus on those, as I recall.

10  BY MR. COWART:

11      Q    And you said it was put on you and Tanya;

12  is that right?

13      A    Yes.  That is how I remember it.

14      Q    And so how did you personally go about

15  making sure that Sara stayed in her lane?

16      A    I do not recall.  I believe -- as I

17  remember, I believe a portion of -- a good portion

18  of it fell on Tanya.

19      Q    Do you remember doing anything about

20  trying to keep Sara in her lane?

21      A    I had a conversation with her in my

22  office.  She came in in tears because she felt

Michael Aresco                                          March 18, 2021

                                                        Page 181

1          A     Yes.   There were -- if I recall, there

2     were pieces and elements of Sara's job that she

3     was unable to handle properly and would try doing

4     additional work that was not hers, and it was in

5     an attempt to make sure that the two jobs were, in

6     fact, being -- in fact, both parties were doing

7     their specific roles.

8          Q     And when was this conversation?

9          A     I do not recall.

10         Q     Was it, to the best of your

11    recollection -- I know you said you don't recall

12    the date, but do you know if it was around the

13    same time that you sent these job postings?

14         A     I do not know.

15         Q     And so what was the outcome of that

16    conversation with Patrick about your different job

17    duties -- I mean, your duties compared to

18    Ms. Williams' duties?

19               MS. SENGER:   Objection.   Vague.

20               THE WITNESS:   As I recall, it was put on

21    both Tanya and I to work with Sara to make sure

22    she stayed in her lane for her job and focused on

Michael Aresco                                    March 18, 2021

Page 182

1   doing that, because she was not -- she was not

2   holding up her end of managing her duties and she

3   was trying to do others that were not in her

4   portfolio.

5           So he had asked Tanya to make sure that

6   she stayed to calendar management, answering the

7   phone, her administrative assistant duties, and

8   not branching off, to make sure she was able to

9   focus on those, as I recall.

10  BY MR. COWART:

11      Q    And you said it was put on you and Tanya;

12  is that right?

13      A    Yes.  That is how I remember it.

14      Q    And so how did you personally go about

15  making sure that Sara stayed in her lane?

16      A    I do not recall.  I believe -- as I

17  remember, I believe a portion of -- a good portion

18  of it fell on Tanya.

19      Q    Do you remember doing anything about

20  trying to keep Sara in her lane?

21      A    I had a conversation with her in my

22  office.  She came in in tears because she felt

Page 183

1    like she was -- she didn't know what her purpose

2    was, I guess is a good way to put it.  She didn't

3    like the way things were going.

4            And I politely -- as I recall, politely

5    said, focus on your job description.  The way to

6    get out of this is to do what you're here to do

7    and do it really, really well, not, you know, make

8    mistakes on a calendar.  There was a point Patrick

9    either did or he threatened to take his own

10   calendar management back.  There's -- because of

11   all the mistakes that she was making.  So there's

12   an element of, like, I was trying to tell her, you

13   have to do what you are here to do.

14           And then from there, there's another

15   discussion at that point, like, if you're getting

16   a phone call from a news reporter asking about

17   another Atlantic 10 coach who apparently is

18   cheating on his wife and you're spreading that

19   rumor throughout that A10 -- throughout the GW

20   athletic department, that's a problem, which is

21   something that happened; you are not doing your

22   job as Patrick's assistant if that's what you're

Michael Aresco                                    March 18, 2021

Page 190

1      Q    That's helpful.  Okay.  So let's get into

2   your duties as a special assistant.  Let's just

3   start overview.  What were your job -- what

4   categories of things did you work on as a special

5   assistant?

6      A    So buckets -- HR, which obviously has a

7   variety of different buckets under it, but for

8   your category question, HR, departmental policies,

9   which would have guidelines and, like,

10  organizational structure.

11          There is, once again, sport

12  administration, sport oversight, leadership team

13  responsibilities, championships -- was in charge

14  of championship travel parties.  There was a

15  foreign trip to Japan that I helped plan and was

16  expected to go on until a last-minute adjustment.

17  That was for men's basketball.  Championship

18  rings, part of the championship bucket.  Cell

19  phones.  Coaching -- this is under HR bucket, but

20  coaching decisions, on-boarding, off-boarding.

21     Q    Okay.  So let's take those one at a time.

22  So the leadership meetings, what was your role and

Page 191

1   duty in the leadership meetings?

2        A    I was there with -- from an HR

3   perspective, to provide updates with our human

4   resources, as well as I had a purpose and role

5   that was partly taking notes, partly project

6   management.

7            In those meetings, we would have a

8   significant number of, like, tasks that would come

9   up, and it would be, Garrett, I need you to make

10  sure we follow up and get this done.  And it was

11  my job to corral that information and not just

12  take notes.  It wasn't just minutes.  It was

13  document, follow up and share that those projects

14  were being completed.

15       Q    Got you.  And how long would you say per

16  week you worked on leadership meetings work?

17       A    Five hours.

18       Q    Okay.

19            MR. COWART:  Can we pull up exhibit

20  compilation agendas, please -- mark it as an

21  exhibit.

22            (Deposition Exhibit Number 7 was marked

Michael Aresco                                    March 18, 2021

Page 192

 1   for identification.)

 2          THE WITNESS:  I have it up.

 3   BY MR. COWART:

 4      Q    So let's look at page 1, the second

 5   e-mail on the page where it says -- from you to

 6   Tanya, Garrett, Andre Julien, Ed Scott.  Do you

 7   see that?

 8      A    Yes.

 9      Q    And this e-mail:  "All, attached is the

10   leadership team agenda.  Please let me know if

11   anything else should be added."

12          Do you see that?

13      A    Yes.

14      Q    Is this a typical e-mail that you would

15   send out for these leadership meetings?

16      A    Yes.  In terms of -- as mentioned -- so

17   this is the agenda piece which I was responsible

18   for, and sending this out.  Also, in conjunction

19   with that, I was responsible for working with

20   every one of these individuals on their actual

21   tasks.  So to make sure -- yes, this is a small

22   portion of what my role was in the leadership

Michael Aresco                                          March 18, 2021

Page 193

1    teams.

2          In -- for example, in this e-mail, Tanya

3    asking me do I think it's an appropriate time to

4    bring something up.  I was part of those

5    discussions, part of the high-level athletic

6    discussions for where the department was going

7    with, in this instance, Nike and an apparel deal.

8          THE REPORTER:  I'm sorry.  Could you

9    repeat the end of your answer?

10          THE WITNESS:  It's part of a high-level

11   discussion involving Nike and an apparel deal.

12   BY MR. COWART:

13     Q    Okay.  Let's go to page number 2,

14   Mr. Aresco, and it's Bates stamped JHU [sic]

15   RandomSample_6286.

16     A    Okay.

17     Q    Is this another example of you seeking

18   agenda items?

19     A    Yes, it's another example of me compiling

20   information for our agenda, yes.

21     Q    Okay.  Let's go to the next page,

22   RandomSample_6219.  Is this another example of you

Michael Aresco                                    March 18, 2021

Page 194

1   adding an agenda item for Tanya to the leadership

2   agenda?

3        A    6219?  Okay.  I got it.  Sorry, I was

4   looking at this one for the last one, but to both

5   your answers [sic], yes.

6        Q    Yeah.  No problem.  There's a lot of

7   Bates stamps and a lot of numbers going around.

8   So I just want to make sure we're on the same page

9   references.

10       A    Yes.

11       Q    If you can scroll down to page 6 in the

12  document, and it's Bates stamped 6 -- 5802.  And

13  is this another e-mail -- well, is this an e-mail

14  where you state that the leadership team meeting

15  has been canceled?

16       A    Yes.

17       Q    And if a leadership team meeting was

18  canceled, would you be the one to send out that

19  notification?

20       A    Yes.

21       Q    Okay.  Let's go down to page 8 and that's

22  Bates stamped 10086.  Is this an e-mail --

Michael Aresco                                           March 18, 2021

Page 198

1    hundred percent meeting.

2    BY MR. COWART:

3         Q    Do you remember a leadership team meeting

4    where you discussed Sara M.'s position?

5         A    No, I do not.

6         Q    Part of your duties at these meetings was

7    taking minutes, correct?

8         A    Yes.

9         Q    And after you wrote up the meetings

10   [sic], would you send them out?

11        A    I do not recall.

12        Q    Did you ever send out minutes to the

13   other people in the leadership meeting?

14        A    Yes, I believe I did.

15        Q    Did you store the minutes?

16        A    Yes, I believe I did.

17        Q    How did you store them?

18        A    On my desktop.

19        Q    Where on your desktop?

20        A    In a folder.

21        Q    What was the folder called, titled?

22        A    I do not recall.

Michael Aresco                                    March 18, 2021

Page 199

1          Q    Did you have a naming convention that you

2     used for titling the minutes?

3          A    I do not recall.

4          Q    You didn't generally use something

5     that's, like, leadership team meeting, date, or

6     anything of that nature?

7               MS. SENGER:  Objection.  Asked and

8     answered.

9               THE WITNESS:  I do not recall.  I may

10    have; I may not have.  I do not recall.

11    BY MR. COWART:

12         Q    Okay.  No problem.  I'm just asking

13    questions.

14         A    Of course.

15         Q    Did you ever delete minutes from your

16    computer?

17         A    No.

18         Q    So if you created minutes for this

19    meeting, they would still be on your computer?

20         A    Yes, I would assume.

21         Q    While you were on the team, did anyone

22    else take minutes of the meeting?

Michael Aresco                                      March 18, 2021

Page 200

1        A    Not that I recall.

2        Q    Okay.  So let's talk about your human

3    resource duties.  What were your duties under

4    human resources?

5        A    So I would work with our HR partner

6    across campus to make sure we had jobs get posted.

7    I would work with the hiring manager on review of

8    candidates.  I'd work with -- across campus from

9    an EEOC perspective.

10            If there were -- obviously, all these

11   positions need a position justification form.  I

12   would get that form filled out, get it passed to

13   Patrick Nero for signature, sent across campus so

14   the job could be posted.

15            I was responsible for background checks.

16   Once a selected candidate was hired, I would often

17   reach out to them, give them the information about

18   the background check, here's what you have to do.

19   It will probably be in your spam; please look for

20   it.  Click the button.  That was from the -- your

21   standard hiring, whether it's an entry-level

22   position or a higher-level administrative

Michael Aresco                                                March 18, 2021

                                                    Page 201

1   position.

2           I was also in charge of our

3   department-wide policies.  I personally created a

4   relocation guide policy.  I created a sport

5   administrator guide policy.  I created a team

6   family travel policy.  I created a priority hiring

7   policy which came because of the women's

8   basketball search and subsequent hire, which I had

9   a huge hand in administratively, organizationally.

10  And we had lessons learned.  I made sure I worked

11  with our constituents across campus to have that

12  documented.

13          I worked with contracts.  I helped draft

14  and bridge the gap on Jennifer Rizzotti's

15  contract, the women's basketball coach who was

16  hired --

17          THE REPORTER:  I'm sorry.  Jennifer...

18          THE WITNESS:  Rizzotti.  She was hired

19  five years ago.  I worked with her to get her to

20  sign the contract.  I worked with our partners

21  across campus.  I brought her over to see the

22  president's chief of staff, coordinated her

Michael Aresco                                        March 18, 2021

Page 202

1    interview with Patrick, was instrumental in an

2    extremely confidential and sensitive hire in that.

3         Cell phones, in theory, fell under human

4    resources, so I put together the forms, get the

5    phones, get them situated.

6         When Jonathan Tsipis resigned, I worked

7    with the business office to get an invoice for a

8    hundred thousand dollars to send over to the

9    University of Wisconsin.  I got him off-boarded.

10        I worked with other staff to get them

11   off-boarded and then hiring all of the new women's

12   basketball assistants, getting them their car

13   allowance stipends connected with HR.

14        THE REPORTER:  I'm sorry.  Getting

15   their...

16        THE WITNESS:  Car allowance stipends.

17        As part of HR, we had a coach who went

18   missing and we -- there was a meeting between

19   Tanya Vogel, myself, Nicole Early and Patrick to

20   discuss what to do.  Nicole Early was the sport

21   administrator.  I was there as HR.  Tanya and

22   Patrick were there as -- as athletic

Page 203

1    administrators.  And we all had a piece of paper

2    and wrote down what is to -- what our

3    recommendation was for firing or retaining this

4    coach that went missing, got arrested and had an

5    incident.

6    BY MR. COWART:

7         Q    Okay.

8         A    And then I drafted a letter that went to

9    him to meet him at the tennis center to receive

10   his badge and keys and have him pack up all his

11   equipment from the tennis center.

12        Q    Okay.  Who ultimately made that decision

13   to fire the coach?

14        A    Ultimately, it was Patrick Nero.

15        Q    Okay.

16             MR. COWART:  Can we pull up exhibit

17   compilation HR, please, and mark it.

18             (Deposition Exhibit Number 8 was marked

19   for identification.)

20             THE WITNESS:  I have it pulled up.

21   BY MR. COWART:

22        Q    Great.  So let's scroll down.  Because

Michael Aresco                                    March 18, 2021

Page 204

1    we're going to look at this chain, first one.

2    It's page 2, and i9t's GWU_4552.

3             MS. SENGER:  Mr. Cowart, if you could

4    just give me a second.  I'm behind.

5             MR. COWART:  Of course.

6             THE WITNESS:  All right.  Got it.

7    BY MR. COWART:

8        Q    Okay.  So is this an e-mail from Kaithlyn

9    Kayer to Rosemarie Sanchez Chee-Wah, I believe,

10   and you?  It says, On Thursday, February 25th,

11   2016.

12       A    Yes.

13       Q    Okay.  And it says, "Mike, please attach

14   the request for interim duties form once

15   complete."

16             Do you see that?

17       A    Yes.

18       Q    And then your response to that is, "I

19   have Nicole" -- Nicole Early, I'm assuming --

20   "filling out the interim duties form."

21             Is that Nicole Early?

22       A    I cannot confirm.  I would assume yes.

Michael Aresco                                          March 18, 2021

Page 205

1     Q    And then it says, "Rose, once you get

2   this signed, can you please send my way and I will

3   compile with the interim duties and send back to

4   the group?"

5         Do you see that?

6     A    Yes.

7     Q    So is this an example of you compiling

8   interim duties and sending it around for a

9   personnel action?

10    A    Yes.

11    Q    Is this a job function that you would

12  typically do as part of your HR duties as special

13  assistant?

14    A    Yes.

15    Q    Let's scroll down to GWU_20758.  It's

16  page 4 in the document.  Are you there?

17    A    Yeah, I'm there.

18    Q    So this appears to be a request from

19  Rosemarie Sanchez Chee-Wah to yourself requesting

20  all coaches' employment contracts, appointment

21  letters and agreements.  Do you see that?

22    A    Yes.

Michael Aresco                                    March 18, 2021

Page 206

1        Q    Is this a type of request that you would

2    typically field from Ms. -- is it Sanchez or

3    Chee-Wah?  Do you know which one she goes by?

4        A    I think Sanchez.

5        Q    Okay.  That's good to know.  Is this a

6    typical request that you would field from

7    Ms. Sanchez?

8        A    I'd say this is atypical.  This wasn't

9    something that was routinely -- as I recall, this

10   is probably a one-off; something came up and there

11   was questions about something specific.  It

12   wasn't -- this wouldn't have been something that

13   happened every year, as far as I recall.

14       Q    But would Ms. Sanchez request documents

15   from you routinely?

16            MS. SENGER:  Objection.  Vague.

17            THE WITNESS:  Yes.  I would work in

18   conjunction with Rose, yes.

19   BY MR. COWART:

20       Q    Okay.  Sorry, some of these e-mails are

21   long.  So let's scroll down to GWU_32897.  It's

22   page 10.  Are you there?

Michael Aresco                                    March 18, 2021

Page 207

1      A     Yes.

2      Q     Great.  And so this is an e-mail from you

3   to Patrick.  And it says, "Patrick, attached are

4   the men's basketball coaching salaries."

5            Do you see that?

6      A     Yes.

7      Q     Is this a typical duty that you would

8   perform, providing Patrick information that he

9   needed from HR?

10           MS. SENGER:  Objection.  Vague.

11           You can answer if you understand.

12           THE WITNESS:  This -- as I recall, this

13   did not come from HR.  This was a document that I

14   compiled of head coaching salaries either in A10

15   or like institutions for Patrick's knowledge.

16   BY MR. COWART:

17     Q     Okay.  So you understand that you

18   actually compiled these salaries; is that right?

19     A     If it's what I remember, yes.  He had

20   asked me -- he wanted to know -- he was trying to

21   get an understanding of what he would be needing

22   to pay a coach.  And I was compiling information

Michael Aresco                                              March 18, 2021

Page 208

1    from a variety of different institutions that -- I

2    do not believe that this was pulled from HR.

3         Q    Okay.  Thank you for that.  Please

4    correct me if any of these are incorrect.

5              So let's go to page 11,

6    GWU_RandomSample_2763.

7         A    Okay.

8         Q    And so, again, if we go to the bottom of

9    the e-mail chain from Patricia Garcia to a few

10   other people, including yourself, and it's asking

11   for whether or not ███████████████ used any sick

12   leave.  Do you see that?

13        A    Yeah.  Let me read it real quick, please.

14        Q    Of course.

15        A    Yep, got it.  Yes.

16        Q    And then you send it to Chris Hennelley

17   and say, "FYI, this needs to be completed."

18             Do you see that?

19        A    Yes.

20        Q    Is this a typical duty where you would

21   liaise between people in order to make sure HR

22   tasks get completed?

Michael Aresco                                          March 18, 2021

Page 209

1          MS. SENGER:  Objection.  Vague.

2          THE WITNESS:  Yes.

3   BY MR. COWART:

4      Q    Okay.  Let's go down to page 13 in the

5   document.  It's RandomSample_5939.

6      A    5939.  Okay.

7      Q    Actually, apologies.  It actually starts

8   on 5940.  It's the problem of the reverse

9   chronology on these e-mails.

10     A    Not a problem.

11     Q    So in the middle of the page, there's an

12  e-mail from you to Patricia on August 12th, 2016.

13  And you're asking for HR protocol or guidance.  Do

14  you see that?

15         MS. SENGER:  If you could just give us a

16  second.  I'm still reading the bottom of the

17  e-mail, Mr. Cowart.

18         THE WITNESS:  I'm ready whenever

19  everybody else is.

20         MS. SENGER:  Now I am.

21  BY MR. COWART:

22     Q    Okay.  Is this a routine action that you

Michael Aresco                                        March 18, 2021

                                                    Page 210

1    would take, seeking out HR protocols from the

2    human resources department?

3            MS. SENGER:  Objection.  Vague.

4            THE WITNESS:  Can you please describe

5    routine?

6    BY MR. COWART:

7       Q    Would you routinely reach out to -- would

8    you commonly reach out to HR about protocols and

9    guidance?

10           MS. SENGER:  Same objection.

11           THE WITNESS:  Yes.

12   BY MR. COWART:

13      Q    And then let's scroll up to Rosemarie's

14   response.  Let me know when you finish reading.

15      A    I'm done reading it.

16      Q    Great.  So Rosemarie is asking for

17   clarification as to the request that was made.  Is

18   that a valid representation of that e-mail?

19      A    I would -- no.  I -- no.

20      Q    Tell me -- how would you represent this

21   e-mail?  What does this e-mail mean to you?

22      A    She's not responding to an e-mail from

Page 214

1          MS. SENGER:  Okay.  So I think this is a

2    chain that starts at the -- it starts at 18174 and

3    continues through 18173.  Okay?

4          THE WITNESS:  Yes.  I follow.

5    BY MR. COWART:

6      Q    And is this a routine function that you

7    would perform, seeking updates on positions?

8          MS. SENGER:  Objection.  Vague.

9          THE WITNESS:  Yes.

10   BY MR. COWART:

11     Q    Okay.  Let's go down to page 19, JHU

12   [sic] RandomSample_018191.  And the e-mail does

13   start below that, but I'm not going to ask you

14   about that.

15         MS. SENGER:  Sorry.  Can you repeat the

16   number one more time?  My thing is freezing when

17   I'm scrolling.

18         MR. COWART:  No problem.  It is 18191.

19         THE WITNESS:  I'm at page 018191.

20   BY MR. COWART:

21     Q    Okay.  And this is an e-mail from you to

22   Kaithlyn Kayer.  Do you see that?  At the very top

Michael Aresco                                              March 18, 2021

Page 215

1   of the page.

2        A     Yes, I see it.

3        Q     And this is you sending a position

4   description to Kaithlyn Kayer.  Do you see that?

5        A     Yes, I do.

6        Q     Is that a routine function that you would

7   perform as special assistant?

8        A     Yes.

9        Q     Okay.  Let's go to J --

10   GWU_RandomSample_018199.

11        A     I'm there.

12        Q     Okay.  And this is an e-mail from you to

13   Kaithlyn Kayer, subject, "Forward:  WLax assistant

14   position."

15              Do you see that?

16        A     Yes.

17        Q     And this is a forward from you to

18   Kaithlyn requesting an update regarding that

19   women's lacrosse position, correct?

20        A     Yes.

21        Q     And is that a routine function that you

22   would perform as -- when you were special

Michael Aresco                                    March 18, 2021

Page 216

1    assistant.

2            MS. SENGER:  Objection.  Vague.

3            THE WITNESS:  Yes.

4            MR. COWART:  Okay.  Can we pull up and

5    mark GWU_13981.

6            (Deposition Exhibit Number 9 was marked

7    for identification.)

8            THE WITNESS:  I'm ready whenever.

9            MS. SENGER:  Mr. Aresco is faster than

10   me.  If you could give me just a second, Dylan.

11           MR. COWART:  No problem.  Generally, you

12   know, when we have hard copies and we're just

13   passing them around, things go a little faster.

14           MS. SENGER:  Okay.  I have it.  Thank

15   you.

16   BY MR. COWART:

17       Q    Okay.  Great.  So let's look at the first

18   chronology, but second e-mail on the page.  It's

19   on Monday, August 8th, 2016, at 9:32 p.m.  do you

20   see that?

21       A    Yes.

22       Q    Okay.  So this is an e-mail from you, and

Michael Aresco                                    March 18, 2021

Page 227

1   well.

2          THE REPORTER:  And taking us off the

3   record.

4          THE VIDEOGRAPHER:  The time is 3:33 p.m.

5   We are going off the record.

6          (Whereupon, a short recess was taken.)

7          THE VIDEOGRAPHER:  The time is 3:41 p.m.

8   We are back on the record.  Please proceed,

9   Counsel.

10         MR. COWART:  Can we pull up exhibit

11  compilation scheduling and mark it, please.

12         (Deposition Exhibit Number 12 was marked

13  for identification.)

14         THE WITNESS:  I have it up.

15  BY MR. COWART:

16     Q    Okay.  So this is an e-mail -- and we can

17  just look at the first two e-mails here on this

18  chain.  On Friday, July 15th, 2016 at 3:06 p.m.

19  you send an e-mail to Patrick Nero saying, "Does

20  the 22nd of August for this meeting work for you?

21  Wanted to confirm with you prior to setting in

22  stone."

Michael Aresco                                                    March 18, 2021

Page 228

1          Do you see that?

2     A     Yes.

3     Q     And then Patrick said, "Yes, this should

4   work."

5          Do you see that?

6     A     Yes.

7     Q     Did you routinely schedule meetings

8   similar to this for Mr. Nero?

9          MS. SENGER:  Objection.  Vague.

10         THE WITNESS:  As I recall, it wouldn't

11  have been routine per se, but I'm sure there are

12  instances where I did.

13  BY MR. COWART:

14    Q     Okay.  Let's scroll down to GWU_31579.

15  It is -- it's pretty far down.  It's page 14 in

16  the document.

17    A     Okay.  579?

18    Q     579, yes.

19    A     Okay.

20    Q     Are you there?

21    A     Yes.

22    Q     Okay.  So this is an e-mail where Qundeel

Michael Aresco                                    March 18, 2021

Page 229

1   Khattak -- I'm sure I butchered that -- to you,

2   gives availability of President Knapp in April.

3   Do you see that?

4       A    Yes.

5       Q    And you forward that to Patrick and ask

6   him for his availability.  Do you see that?

7       A    Yes.

8       Q    Okay.  Is this something that you

9   routinely did?

10          MS. SENGER:  Objection.  Vague.  Asked

11   and answered.

12          THE WITNESS:  Similarly -- I wouldn't say

13   it was routine, but it definitely -- at that time,

14   yes, these type e-mail exchanges in scheduling

15   occurred.

16   BY MR. COWART:

17       Q    Okay.  Let's go down to GWU_32157.  Are

18   you there?

19       A    Yes.

20       Q    Great.  So this is a request from Patrick

21   to you that says, "Mike, can you get all four of

22   us together to speak after men's basketball A10 to

Page 230

1   discuss."

2           Do you see that?

3       A    Yes.

4       Q    And you report, "Will do," correct?

5       A    Yes.

6       Q    So this is an example of you scheduling

7   for a meeting between you, Patrick, Chandra and

8   Jamie, right?

9       A    Yes.

10      Q    Okay.  Let's scroll down to 032480.

11          MS. SENGER:  Can you tell us what page of

12  the PDF that is?

13          MR. COWART:  22.

14  BY MR. COWART:

15      Q    Are you there?

16      A    Yes, I am.

17      Q    Okay.  And this first e-mail is adding a

18  meeting for you, Patrick and Garrett about the

19  rowing budget; is that right?

20      A    Yes.

21      Q    Okay.  Let's go to page 24 of the PDF

22  which is 32693.  Are you there?

Michael Aresco                                      March 18, 2021

Page 231

1        A    Yes.

2        Q    Okay.  And so this is an e-mail from

3   Nicole to Nero, cc'ing you, and stating, here "are

4   the folks that need to receive the attached letter

5   (from GWAD) with the following text."

6             GWAD, what does that refer to?

7        A    That is a -- that is an athletic director

8   alias for a public e-mail address.

9        Q    Okay.  And so Nicole is asking you to

10  send out the below text from that alias; is that

11  correct?

12       A    Yes, I would interpret it that way.

13       Q    And is this a duty that you routinely

14  performed?

15            MS. SENGER:  Objection.  Vague.

16            THE WITNESS:  Once again, I wouldn't say

17  it was routinely performed.  There are times I did

18  it, and I think it became more common on things

19  that were confidential or Patrick did not want

20  Sara to be handling from a confidentiality and

21  trust standpoint, and that's where I believe some

22  of these came from.

Michael Aresco                                    March 18, 2021

Page 232

1   BY MR. COWART:

2       Q    Okay.  Let's go down to page 29 of the

3   PDF.  It's 32862.

4       A    862?

5       Q    Yes.

6       A    Okay.

7       Q    And on this, you are providing potential

8   meeting times to Chandra Bierwirth, correct?

9       A    Yes.

10      Q    And those are meeting times for Patrick,

11  correct?

12      A    I do not know.

13      Q    Okay.  So let's scroll up.  The next

14  e-mail is from Chandra to Daniel Small saying,

15  "Dan and Rene, Patrick asked that we schedule a

16  meeting to discuss financial aid....  Patrick and

17  I are available the following days and times next

18  week.  Please let me know if any of these times

19  work for your schedule."

20           And it provides those times that you

21  provided to Chandra.  Do you see that?

22      A    Yes.  Thank you for the context.

Page 233

1      Q    No problem.  There's a lot of e-mails.  I

2   understand.  Okay.  Let's put that one aside.

3           MR. COWART:  Let's pull up compilation

4   voice messages.

5           (Deposition Exhibit Number 13 was marked

6   for identification.)

7   BY MR. COWART:

8      Q    Let me know when it's up.

9      A    I have it up.

10     Q    Great.  So let's look at the first one.

11  It's from you to Patrick, subject, forward, voice

12  mail [sic] from Babson College.  Do you see that?

13     A    Yes.

14     Q    And this is you forwarding Patrick a

15  voice message; is that right?

16     A    I do not know.

17     Q    Okay.  And you -- do you see the

18  attachment VoiceMessage.mp3?

19     A    Yes.

20     Q    So you're giving Patrick a voice message

21  to listen to?

22     A    To the best of my knowledge, yes.

Michael Aresco                                    March 18, 2021

Page 234

 1       Q    All right.  Let's go to page number 2 in

 2  this PDF.  That's GWU_9074.

 3       A    I'm there.

 4       Q    Okay.  And this is from you to Patrick,

 5  and you're also forwarding a voice message to him,

 6  correct?

 7       A    Yes.

 8       Q    Let's go to page 3.  This is Bates

 9  number 9095.

10       A    Okay.

11       Q    Here we see you to Patrick Nero and,

12  again, we have an attachment of a voice message;

13  is that right?

14       A    To the best of my knowledge, yes.

15       Q    Okay.  Let's go to page 4.  This is

16  GWU_031547.

17       A    Okay.

18       Q    And this is you forwarding a voice

19  message from Lynsay Belshe to Patrick; is that

20  correct?

21       A    Yes.

22       Q    Okay.  And then let's go down to page 7

Michael Aresco                                    March 18, 2021

Page 235

1  which is GWU_31564.

2       A    Okay.

3       Q    And this is a message from you to Patrick

4  with a voice message, correct?

5       A    Yes.

6       Q    Okay.  Let's go to page 8 and it's

7  GWU_032769.  And this is an e-mail from you to

8  Patrick Nero with attachments VoiceMessage.mp3.

9  Do you see that?

10      A    Yes.

11      Q    And this is you forwarding a voice

12  message regarding the men's basketball search; is

13  that right?

14      A    Yes.

15      Q    So is forwarding voice messages to

16  Patrick something you routinely did as a special

17  assistant?

18           MS. SENGER:  Objection.  Vague.  Asked

19  and answered.

20           You can answer.

21           THE WITNESS:  No.

22  BY MR. COWART:

Michael Aresco                                              March 18, 2021

Page 236

1     Q    Okay.  So you're saying you didn't send

2  many voice messages to Patrick?

3          MS. SENGER:  Objection.

4  Mischaracterizes.

5          You can answer.

6          THE WITNESS:  Routinely, I was doing so

7  much more.  Yes, I have at times forwarded e-mails

8  that were voice messages to Mr. Nero.  To

9  routinely say that is undermining way too much of

10  the work I was doing.  But, yes.

11  BY MR. COWART:

12     Q    I'm not trying to undermine your work.

13  I'm just trying to see if we have an understanding

14  that these are things that you did --

15          THE REPORTER:  I'm sorry.  We have an

16  understanding...

17  BY MR. COWART:

18     Q    That you did these things over a period

19  of time.

20     A    Yes.  I sent voice mails to Patrick.

21     Q    Let's pull up compilation copies and mark

22  it as an exhibit.

Michael Aresco                                    March 18, 2021

Page 237

```
 1            (Deposition Exhibit Number 14 was marked

 2    for identification.)

 3    BY MR. COWART:

 4        Q    Let me know when you have it up.

 5        A    Yes, I have it up.

 6        Q    So let's look at the first page.  This is

 7    an e-mail from Patrick to you, "Re:  Flight

 8    receipts."  Do you see that?

 9        A    Yes.

10        Q    And this is a request from Patrick for

11    you to print and scan flight receipts; is that

12    right?

13        A    Yes.

14        Q    Okay.  So let's go to page 2 in the PDF,

15    which is Bates number 5928.

16        A    5928.  Okay.

17        Q    So let's scroll down to the first e-mail

18    from Sara dated Wednesday, November 5th, 2014.  It

19    says, "Mark Ein would like to set up a call with

20    you."

21            Do you know who Mark Ein is?

22        A    Yes.  Mark Ein.
```

Michael Aresco                                          March 18, 2021

Page 238

1      Q    Ein.  Who is Mark Ein?

2      A    He's the owner of the Washington Kastles

3  professional tennis team and the founder of Kastle

4  Systems, I believe.

5      Q    And so then Patrick says, Okay, "Sara, I

6  can do this."

7           And then he asks you, can you -- "at

8  least 30 minutes before, can you go -- can you get

9  with me and go over numbers?  I want a sheet in

10  front of me that I can have for the call."

11           Do you see that?

12      A    Yes.

13      Q    And then you respond and say, No problem.

14  I'll meet with you and give you some hard copies.

15  Do you see that?

16      A    Yes.

17      Q    Okay.  Let's go to page number 4 in the

18  PDF.  It's Bates stamped 008776.

19      A    Okay.

20      Q    So I will direct you to the first

21  chronological e-mail at the bottom of the page

22  from Patrick to Tanya, Ed Scott, Garrett, Andre

Michael Aresco                                    March 18, 2021

Page 239

1    and you.

2         A    Uh-huh.

3         Q    It states at the -- the last sentence

4    before "thanks," it says, "Mike, please bring hard

5    copies of the strategic plan for all of us."

6              Do you see that?

7         A    Yes.

8         Q    Do you remember if you brought hard

9    copies of the strategic plan to this retreat?

10        A    No, I do not recall.

11        Q    Okay.  Let's go to the next page.  It's

12   page 5, GWU_9600.

13        A    Okay.

14        Q    So the e-mail at the top of the page is

15   from Patrick to you and he's asking you, can we

16   add this agenda [sic] to the agenda for leadership

17   team and bring copies of the e-mail to the

18   meeting?

19             Do you see that?

20        A    Yes.

21        Q    Okay.  Let's go down to page 7, which is

22   GWU_15212.

Page 240

1      A    Okay.

2      Q    And this is an e-mail from Patrick to you

3    and he says, "Mike, here is the first document....

4    Can you please bring six copies with you on

5    Saturday?"

6           Do you see that?

7      A    Yes.

8      Q    Do you remember whether you brought six

9    copies?

10     A    I do not recall.

11     Q    Okay.  Let's go down to page 8, which is

12   GWU_44306.  And this is an e-mail from Patrick to

13   Sara and you.  And Patrick says, "Mike/Sara, three

14   items."

15          If we look at item number 2, Patrick

16   says, "Discuss the exit interview data and

17   analysis.  Mike, you will need to get this data

18   from me beforehand so we can have hard copies to

19   distribute."

20          Do you see that?

21     A    Yes, I do.

22     Q    So is it fair to say that Mr. Nero would

Michael Aresco                                              March 18, 2021

Page 241

1   routinely ask you to print things for him?

2          MS. SENGER:  Objection.  Vague.

3   Mischaracterizes.

4          You can answer.

5          THE WITNESS:  Yes, at times I printed

6   pieces of paper.

7   BY MR. COWART:

8      Q    Okay.  For Mr. Nero?

9      A    Yes, for Mr. Nero.

10     Q    Okay.

11         MR. COWART:  Let's bring up compilation

12  supply orders and mark it as an exhibit.

13         (Deposition Exhibit Number 15 was marked

14  for identification.)

15  BY MR. COWART:

16     Q    Let me know when you have it up.

17     A    I have it up.

18     Q    Okay.  Let me direct you to page 3 of the

19  PDF.  And that's GWU_RandomSample_33895.

20     A    33895.  Okay.  I'm there.

21     Q    Okay.  So -- I think this has to do with

22  championship rings; is that correct?

Michael Aresco                                      March 18, 2021

                                                    Page 248

1    presumably could have something to do with it.

2              MR. COWART:  Okay.  Let us -- can we

3    bring up compilation travel and mark it as an

4    exhibit?

5              (Deposition Exhibit Number 16 was marked

6    for identification.)

7              THE WITNESS:  I have it pulled up.

8    BY MR. COWART:

9        Q    Great.  So let's look at this first one.

10   It's an e-mail from you to Ivelaw Christie.  Am I

11   saying that correctly?

12       A    I believe so.

13       Q    And it's a request to have Patrick's cell

14   be activated for the international cell plan; is

15   that right?

16       A    Yes.

17       Q    And is this a duty that you took care of

18   under your responsibilities for phones?

19             MS. SENGER:  Objection.  Vague, including

20   as to time frame.

21             THE WITNESS:  Yes, I believe so.

22   BY MR. COWART:

Page 249

1      Q    You testified earlier that cell phones

2    were under your HR purview; is that correct?

3      A    Yes.

4      Q    And so would this fall under that purview

5    or is it outside of it?

6      A    Yes, I believe so.

7      Q    Let's go to page number 2, which is

8    RandomSample_033715.

9      A    Okay.

10     Q    So this is an e-mail chain between you

11   and Rosemarie about a travel routing sheet; is

12   that right?

13     A    Yes.

14     Q    And Anthony Travel is a company that the

15   university uses to schedule travel; is that right?

16     A    Yes.

17     Q    And so you were working with others in

18   the department to schedule travel.  Is that fair

19   to say?

20          MS. SENGER:  Objection.  Vague.

21          THE WITNESS:  If I recall, this was in

22   association with a trip to Japan, I believe,

Michael Aresco                                        March 18, 2021

Page 250

1    which -- in that case, yes, for the trip to Japan.

2    I was -- I had to have a hand in the travel.   I

3    also had a hand in the entire trip, talking to

4    constituents in Japan, planning itinerary for that

5    trip, games, television.   So -- but yes, to your

6    question.

7    BY MR. COWART:

8        Q    Okay.   Let's go down to page number 10 in

9    this document, GWU_RandomSample_034343.

10       A    Yep.   I'm there.

11       Q    Okay.   And the first chronological

12   e-mail, the one from Garrett to you, states, "Per

13   Ivelaw's instruction, I'm writing to notify you of

14   the need for international cell phone service."

15            Do you see that?

16       A    Yes.

17       Q    And then you forwarded that e-mail to

18   Ivelaw requesting that international cell service;

19   is that right?

20       A    Yes.

21       Q    Okay.   And that's another example of what

22   you did for Patrick when he was going out of the

Page 251

1   country; is that right?

2           MS. SENGER:  Objection.  Vague.

3           THE WITNESS:  Will you please confirm?

4   BY MR. COWART:

5      Q    Yeah.  So we just went over an e-mail

6   that you sent to Ivelaw to provide Patrick for --

7   international cell service when he was in Spain.

8   Do you remember that?

9      A    Yes.

10     Q    Is this another example of you performing

11  that duty for Mr. Klassy?

12     A    Yes.

13     Q    And did you routinely interface with

14  Mr. Ivelaw to get international cell service

15  provided to members of the team?

16          MS. SENGER:  Objection.  Vague.

17          THE WITNESS:  No.

18  BY MR. COWART:

19     Q    How often would you say that you worked

20  with Mr. Ivelaw?

21     A    No more than ten times a year to get

22  international service --

Page 252

1      Q    Okay.

2      A    -- is my best estimate.  So roughly 15

3  minutes a year.

4      Q    And what were your other duties related

5  to phones?

6      A    I would, working with Mr. Ivelaw, put in

7  a request for new phones for employees, new

8  employees, and shutting phones off during an

9  off-boarding process.

10     Q    And you would send those requests to

11  Mr. Ivelaw?

12     A    Yes, as I recall.

13     Q    Would Mr. Ivelaw connect to the phone

14  company to get those phones shut off, to the best

15  of your knowledge?

16     A    Yes, to the best of my knowledge.

17     Q    Okay.

18          MR. COWART:  Can we pull up and mark

19  GWU_RandomSample_092319.

20          (Deposition Exhibit Number 17 was marked

21  for identification.)

22          THE WITNESS:  I'm there.

Michael Aresco                                    March 18, 2021

Page 269

1    scheduling and screening requests for meetings

2    wasn't -- yes, that was part of the job.  I would

3    not put it that high in terms of the importance of

4    it.

5         Q    Okay.  Would you state -- is there

6    anything else that's incorrect about that

7    function?

8         A    No.

9         Q    Okay.  Would you say that you spend

10   approximately 45 percent of your time providing

11   those functions outside of scheduling?

12        A    Yeah.  I guess.  Give or take, yes.

13        Q    Let's look at the second one.  "Leads the

14   administrative function of the office of the

15   director of athletics and recreation.  Manages

16   administrative staff members (including full-time,

17   part-time and student staff).  Maintains

18   appropriate organizational structure and division

19   of labor between administrative staff."

20             Do you agree that that was an essential

21   job function when you were special assistant?

22        A    As I recall, no.

Michael Aresco                                    March 18, 2021

Page 270

1      Q    Okay.  What's incorrect?

2      A    I don't recall managing administrative

3   staff members.  Yeah, I don't recall managing

4   administrative staff.

5      Q    Okay.  The other two sentences, are those

6   functions that you performed?

7      A    Very high-level administrative

8   function -- I'm not sure I fully followed the last

9   sentence, but yes.

10     Q    Okay.  And would you spend approximately

11  25 percent of your time working on that function?

12          MS. SENGER:  Objection.  Vague.

13          THE WITNESS:  Which function?

14  BY MR. COWART:

15     Q    This -- not considering the managing

16  administrative staff members, but the other two

17  lines, leading the administrative function of the

18  office of director and maintaining appropriate

19  organizational structure and division of labor,

20  would that take 25 percent of your time?

21     A    No, it took less.

22     Q    Okay.  How much?

Michael Aresco                                    March 18, 2021

Page 273

1    80 percent of time.

2            So in my role, I view that as being

3    someone that can leverage trust and make sure that

4    those large projects -- that can be someone who

5    can work across campus, build those relationships,

6    manage those projects, stay on path, ask for

7    deliverable on deadlines and make sure we get it

8    and close the gap and loop on so many of these

9    projects.

10   Q    Okay.  And for the other duties as

11   assigned, what do you understand to -- that to

12   contain?

13   A    I'll say one thing that's not mentioned,

14   and it's roughly 15 percent of my job, would be

15   sport administration, sport oversight.

16   Q    And so we talked about the sports

17   administration roles earlier when we were talking

18   about your time in facilities.  Are there

19   additional duties relating to sports

20   administration that don't relate to the sports

21   administrator role?

22           MS. SENGER:  Objection.  Vague.

Page 274

1            THE WITNESS:  I don't follow.

2    BY MR. COWART:

3        Q    So we talked about how you worked as the

4    sport supervisor for the rowing team, right?

5        A    Uh-huh.

6        Q    Are there other duties outside of that

7    role that you are grouping as sports

8    administration?

9        A    No.

10       Q    Okay.  Did your duties as a sports

11   administrator for rowing change when you moved

12   into administration?

13           MS. SENGER:  Objection.

14   Mischaracterizes.

15           THE WITNESS:  Not that I recall.

16           MR. COWART:  Okay.  Let's take -- I have

17   just a little bit left, but let's take just a

18   quick five-minute break so that I'm not wasting

19   people's time.

20           THE VIDEOGRAPHER:  The time is 4:56 p.m.

21   We are going off the record.

22           (Whereupon, a short recess was taken.)

Michael Aresco                                          March 18, 2021

Page 277

1        A    Handling Patrick's calendar and answering

2    phone calls, managing the front desk and handling

3    his expense reports.

4        Q    Okay.  Did you ever handle expenses for

5    Patrick?

6        A    I believe I did at times, yes.

7        Q    Do you remember when you handled expenses

8    for Patrick?

9        A    I do not remember when.  I just vaguely

10   remember taking it over after there were repeated

11   errors and mistakes coming from the work from

12   Sara.

13       Q    So at some point you took over tracking

14   Mr. Nero's expenses?

15       A    I don't recall if it was an official I

16   now am doing it every single week.  I do recall at

17   some point I was doing it to some level, yes.

18       Q    Okay.  Did you ever look through his

19   personal AmEx statement?

20       A    Not that I recall.

21       Q    Okay.  Any other job duties besides

22   calendar, front desk, handling expenses, and the

Director of Events, Athletics

## Position Description

Position Description

**Employee First Name:**

**Employee Middle Name:**

**Employee Last Name:**

**Position Title:**          Director of Events, Athletics

**FTE:**                     1.00

**Appointment %:**

**Total Hours Per Week:**    40+

**Work Schedule:**           Monday through Friday 8:30 am to 5:30 pm plus evenings and weekends as necessary

**Is this a grant/research funded position?**    No

**Emergency Designation:**    No

**Telework:**                No

**Desired Qualifications:**   Experience as an event manager, sales manager, assistant sales manager, or director of sales of an organization/facility in a similar field.

Certification in Basic First Aid, CPR & AED is preferred.

The ability to work nights, weekends, and holidays as needed.

**Positon Reports to:**      501580

**Subordinates:**

Labor Distribution

This section is to identify the funding for your position and must add up to 100%. Part time positions should be identified through FTE.

**Account Code**             51211 - SALARY NON-FACULTY REGULAR FULLTIME

**Org**                      564101 SMITH ACTIVITIES CENTER

**Other Org**

**Percent Distribution**     100

## Job Duties

Job Duties

**Function:**                Manage all aspects of event management for athletic facilities including but not limited to: budgets, event staff training and coverages, concessions, hospitality, parking, logistics, ticketing, emergency preparedness, etc.

**Exhibit 0003**

GWU_001323

Case 1:17-cv-01978-CKK   Document 139-1   Filed 02/02/23   Page 151 of 180

| | |
|---|---|
| **Function Type:** | Essential |
| **Percentage:** | 20 |
| **Function:** | Prepare appropriate reports, correspondence, memoranda, agreements and budget projections as required and submit them on a consistent basis. |
| **Function Type:** | Essential |
| **Percentage:** | 20 |
| **Function:** | Establish and maintain effective relationships with representatives of department, university, local and external user groups. |
| **Function Type:** | Essential |
| **Percentage:** | 15 |
| **Function:** | Researches, identifies, and establishes the appropriateness of groups for the facility through daily cold calling and solicitations as its primary sales representative. |
| **Function Type:** | Essential |
| **Percentage:** | 10 |
| **Function:** | Oversee the master schedule including daily operations and events for all athletic department facilities including gyms, fields, pools, courts, meeting rooms, etc while maintaining an effective balance of external events that generates revenue but limits disruptions to intercollegiate teams. |
| **Function Type:** | Essential |
| **Percentage:** | 10 |
| **Function:** | Manage contract and rental agreements with outside groups wishing to use the athletic department facilities. |
| **Function Type:** | Essential |
| **Percentage:** | 5 |
| **Function:** | Meet with coaches to ensure all intercollegiate sports facilities needs are met for practices and competition. |
| **Function Type:** | Essential |
| **Percentage:** | 5 |
| **Function:** | Prepare budget including but not limited to participating in |

GWU_001324

developing annual operating budget for events and be able to project staffing costs. Preparing and ensuring receipt of event expenses for all applicable events. Generate approved revenue projections annually while continually seeking methods to cut expenses and increase profit.

| | |
|---|---|
| **Function Type:** | Essential |
| **Percentage:** | 10 |

| | |
|---|---|
| **Function:** | Perform other duties as assigned. |
| **Function Type:** | Marginal |
| **Percentage:** | 5 |

## Compensation

Compensation

| | |
|---|---|
| **Employee Class Code/Category:** | S1 - UV Staff - Exempt - RFT |
| **FLSA:** | Exempt |
| **Classification Code/Title:** | 01HA1 - UV Dir University Events FT |
| **Approved Position Number:** | 501426 |
| **Full-Time/Part-Time:** | Full-Time |
| **Salary Table:** | SA |
| **Pay Grade:** | 17 |
| **Minimum Salary:** | $44,568.35 |
| **Maximum Salary:** | $77,995.14 |
| **Minimum Qualifications:** | Bachelor's degree in an appropriate area of specialization and four years of relevant experience. Degree requirements may be substituted for an equivalent combination of education, training and experience. |
| **EEO Skill Code:** | 30 - Other professionals |
| **EEO Position Group:** | 3B - Professionals II |
| **Responsibility Code:** | 54 - Managerial/Supervisory |
| **Classification Code (PCLS):** | 42SA1 |

## Supplemental Documents

No documents have been attached.

## Employee

GWU_001325

**Seated User**

Details

**First Name**

**Middle Name**

**Last Name**

GWU_001326

THE GEORGE WASHINGTON UNIVERSITY

WASHINGTON, DC

## PERFORMANCE REVIEW FORM

| | |
|---|---|
| **Employee Name:** Michael Aresco | |
| **Employee Title:** Assistant Director of Events | |
| **Department:** Athletics and Recreation | |
| **GWID:** Redacted | |

| Review Period: | From 10/1/2013 to 7/1/2013 (MM/DD/ |
|---|---|
| Review Type: | X | **Annual Performance Review** |
| | | **Introductory Period Review** |
| | | **Transfer Period Review** |

### GOALS AND ACCOMPLISHMENTS

Comment on the extent to which goals agreed upon for this review period were achieved. Highlight significant accomplishments and include any special recognition received throughout the year. Employees may include self-assessment comments on the key performance factors in this section. See guidance online for assistance.

**Self-Assessment:** Goals – Increase ways to monitor memberships and revenue – accomplished. Increase ability and comfort delegating tasks – Improved – still a work in progress. Make at least one improvement to MBB, WBB, VB ops – TBD. Find ways to improve scheduling. Accomplished – always a work in progress, but overall its getting better. Using google calendar for events so we have a comprehensive schedule on our phones at all times is a great step

**Reviewer Comments on Goals and Accomplishments (Key Performance Factors reviewed below):** Michael has done a fantastic job gaining an understanding of the University and Athletic department's priorities and landscape to effectively manage events. He has given great customer service to all clients and in the short time as the interim lead events position has identified several revenue producing events that will help the entire athletic department and give great media exposure.

### PROFESSIONAL DEVELOPMENT PLAN

Identify professional development opportunities pursued last year (e.g., on-the-job learning such as projects and special assignments, certifications obtained/maintained). Describe what is needed for professional development in the upcoming performance period. See guidance online for assistance.

**Self-Assessment:** Professional development – Went to NACDA/CEFMA. Great learning experience + networking. In addition on the job training in scheduling, event hospitality and customer satisfaction was all developed. Professional development in the upcoming performance period is to continue to learn ways to become more efficient and effective.

**Reviewer Guidance:** Continue to be exposed national affiliations within Athletics to grow his network and resources. Also conduct site visits and research peer institutions to improve our scheduling, event services and concessions experiences.

### KEY PERFORMANCE FACTORS

Use this section to indicate to what extent the key performance factors were demonstrated in accomplishing goals and job responsibilities. **Rating Descriptions:**

- **Strength** – Demonstrates and applies knowledge and skills to excel in a consistent and sustained manner. Applies knowledge by using facts and lessons learned.
- **Proficient** – Demonstrates a sufficient level of knowledge and/or skills to perform effectively.
- **Needs Improvement** – Demonstrates the need to improve to meet job requirements or perform more consistently. Needs to develop by increasing knowledge or building skills.

*Communication – Fosters an environment that supports a continual, candid exchange among appropriate members of the University community. Escalates compliance, ethics, and civility related issues to appropriate levels. Encourages expression of new and creative ideas. Listens without interruption. Regularly communicates useful, well organized, and accurate information orally and in writing. Provides regular, timely, and constructive feedback in a straightforward and sensitive manner.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | X | • Excellent communication skills, both written and oral. |
| Proficient | | • Is concise and clear in written. |
| Needs Improvement | | • Able to address large groups of members, coaches and staff. |

*Customer Service – Commits to pursuing excellence to achieve the highest standards. Understands our responsibility to exceed the expectations of others who depend on our actions. Solves problems at the first point of contact whenever possible; if unable to do so, escalates to an appropriate resource. Responds to all customer requests in a timely manner. Considers customer feedback and explores creative approaches to enhance service and increase efficiency.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | X | • Great temperament and positive attitude in dealings with people. |
| Proficient | | • Able to say "no" with great customer service. |
| Needs Improvement | | • Willing to explore alternate ideas with constituents. |

*Job Skills/Technical Skills – Demonstrates the knowledge and skills necessary to perform the job effectively. Complies with GW policies, external laws and regulations. Maintains the highest-level of ethics in all actions on behalf of the university. Performs responsibilities in accordance with job procedures and expectations. Remains current on new developments in areas of responsibility. Acts as a resource upon whom others rely for assistance.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | X | • Has full command of responsibilities. |
| Proficient | | • Always willing to learn new technology and endeavors. |
| Needs Improvement | | • Has outperformed area and is able to balance 2 positions. |

*Productivity (Quantity/Quality of Output) – Gets the job done. Produces the quantity and quality of work required for the position. Demonstrates initiative. Sets priorities and organizes work efficiently and effectively. Completes work assignments in a timely manner. Delivers high quality work products. Uses sustainable practices whenever possible.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | X | • Outstanding in turning around requests and questions. |
| Proficient | | • Able to multi-task multiple items at one time and not let quality drop off at all. |
| Needs Improvement | | |

*Teamwork – Demonstrates the GW Values in all interactions. Treats others with courtesy, respect, and dignity. Encourages collaboration to meet common goals and produce a sense of shared responsibility. Encourages the expression of different points of view, resolves disagreements in a collegial manner, and supports decisions once they are made. Contributes to the success of the team by working effectively, helping solve problems, and meeting deadlines. Develops the capacity of others through information sharing, mentoring, and/or coaching.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | X | • Quickly became leader of group for ability to think quickly and knowledge of subject. |
| Proficient | | • Able to work with multiple departments across campus and is well respected by all. |
| Needs Improvement | | • Is always willing to pitch in and will always cover for any of the other staff members. |

*Management/Supervisory Skills (if applicable) – Models and reinforces the GW Values. Documents and communicates compliance, ethics, and civility escalation procedures. Takes ownership and accountability for area of responsibility. Acts as a coach to motivate staff and support their professional development. Sets goals and clarifies expectations of staff. Invests time to manage and facilitate the work of others. Responds to the ideas, concerns and needs of direct reports. Demonstrates skill in hiring, developing, and retaining staff. Engages in regular discussions to address performance issues and/or provide recognition when appropriate. Completes annual performance reviews in a timely manner.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | | • Able convey instructions to part time and event staff. |
| Proficient | | • Has good ability to handle and communicate requests in proper tone. |
| Needs Improvement | | • Needs to be able to enhance training of staff to utilize more efficiently. |

*Optional: [Enter Optional Factor here] – If applicable, record any additional factor that was identified during the previous review period in the space above. Note that an individual cannot be evaluated for an optional factor unless it was documented in the last performance review.*

| Reviewer Rating | | Reviewer Comments: |
|---|---|---|
| Strength | | |
| Proficient | | |
| Needs Improvement | | |

## REVIEWER SUMMARY ASSESSMENT

Assess the individual's overall performance based on **BOTH** goal achievement and demonstrated competence for all performance factors. Please select one of the following:

| Role Model Performance | Exceptional Performance [X] | Valued Performance | Fair Performance | Unacceptable Performance |
|---|---|---|---|---|
| Consistently far exceeds expectations; outstanding performance achieving all goals. An individual whom others look to as a standard of performance excellence. | Meets and often exceeds expectations; performance that generally exceeds goals and job requirements and who consistently delivers. An individual who often outperforms others in the same job. | Consistently meets expectations; performance that satisfies all job requirements and meets all goals. An individual who is consistently reliable to get the job done. | Sometimes meets expectations; performance that is to the standard required in most aspects of the job with opportunity for development. An individual with the potential to be a valued performer. | Does not meet expectations; performance where significant improvement is required to satisfy job requirements. An individual who is not performing at acceptable levels. |

**Reviewer Comments:** Michael has really outperformed his position and his relied on by both senior administrators and coaches as well high university personnel to plan and manage events within the athletic facilities. He has excelled at "making things happen" when there was no game plan and limited financial means. Has a great sense of the job responsibilities and the ability to problem solve.

## SIGNATURES

### (1) Supervisor

| Supervisor Name: | Supervisor Title: |
|---|---|
| Supervisor Signature: | Date: |

### (2) Next Level Approver

| Next Level Approver Name: Jason Wilson | Next Level Approver Title: Assoc. AD |
|---|---|
| Next Level Approver Signature: | Date: 9/3/13 |

### (3) Employee

Employee Signature: 9-9-13

*By signing above, you acknowledge that you received this review and it was discussed with you. Signature does not indicate agreement or disagreement with the content of this review. Employees may attach comments.*

This review was discussed with me on the following date:

| Ethical Principle Statement and GW Values | INITIAL BELOW |
|---|---|
| I have read and understand the George Washington University Statement of Ethical Principles and the GW Values. | MSA  9/18/13 |

Submit completed performance reviews to your Human Resources Client Partner. If you have any questions, please contact University Human Resources at 202-994-8500.

GWU_001329



**THE GEORGE**
**WASHINGTON**
**UNIVERSITY**

WASHINGTON, DC

University Human Resources

August 6, 2013

Michael Aresco
1401 N Taft Street
Arlington, VA  22201

Dear Olivia:

On behalf of The George Washington University (GW), congratulations on your internal transition! This letter confirms your acceptance of the role of **Director of Events, Athletics** within the Athletics Department. Your new salary will be **$48,000.00** annually and will be paid bi-weekly.  Your effective transfer date, into your new role, will be **August 12, 2013.**

To ensure that all hires are properly screened, all offers of employment are contingent upon the satisfactory outcome of a personal background screening and favorable feedback of professional references. Additionally, some University positions may require current employees to undergo periodic background screenings, as necessary for their position.

This is a **full-time, exempt** position.  In accordance with the Fair Labor Standards Act (FLSA), employees in exempt positions are not eligible to receive overtime pay and are not subject to the provisions of the FLSA based on the duties and responsibilities of the position. Exempt employees are expected to fulfill their responsibilities on an on-going basis and are paid a salary for the duties they perform, not the hours worked.

We look forward to your continued efforts and success to provide excellent services to the University community and to create an environment that supports high quality education, health care, and research.

Sincerely,

*Marsden*

Sr. Recruitment Partner
Human Resources

To accept this offer of employment, please sign in the space provided below and return to me, via fax at **(202) 994-9680**, scanned email, or in person.  Additional time for consideration of this offer can be requested from the Department of Human Resources. By signing below, you acknowledge that the provisions of this offer of employment have been read, understood, and accepted.  A copy of this letter should be kept for your files, as it will become a permanent addition to your personnel record.

Offer accepted by:

Print Name: _____  Signature: _____  Date: _____

2121 Eye Street, N.W., Suite 101  |  Washington, DC 20052
**t** 202-994-8500  |  **f** 202-994-8580  |  www.gwu.edu/hr

GWU_001330



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

HUMAN RESOURCES

September 25, 2012

Michael Aresco
1410 North Scott Street
Arlington, VA 22209

Dear Michael:

Congratulations! On behalf of The George Washington University (GW), I am pleased to offer you the position of **Assistant Director of Events within Athletics**. The University is committed to attracting the best and the brightest talent and we're excited that you have decided to join us. This letter includes important information to help you get started.

To ensure that all hires are properly screened, all offers of employment are contingent upon the satisfactory outcome of a personal background screening and favorable feedback of professional references. Additionally, some University positions may require current employees to undergo periodic background screenings, as necessary for their position. Upon successful completion of your pre-employment screening, you will be assigned a personalized GWID number to minimize use of your Social Security number at the University. This GWID number is important, as you will need it to log into the GWEB Information System at the University's web page. Please maintain a record of your GWID number in a secure location.

### Benefits and Pay
Your starting compensation will be **$38,500.00** annually and is to be paid **bi-weekly**. In addition to your base compensation, The George Washington University offers a generous benefits package which includes coverage such as Health, Life, Dental, Disability, as well as various retirement options and a tuition benefit program. To help you understand the benefits that are available to you, and for detailed information about important benefit deadlines, please visit:
http://www.gwu.edu/hr/newemployee/benefits_perks.html.

### New Employee Orientation
Your effective date of hire will be **September 26, 2012**. Your departmental contact is Brian Hamluk and can be reached at (202) 994-6650. Please make contact, prior to your first day, to discuss your arrival time and location. To formally welcome you to the university, you are scheduled to attend the following new employee orientation events:

> **Event:** **Weekly Orientation Breakfast**
> **Date:** **October 1, 2012**
> **Time:** **9:00am – 12:00pm**
> **Location:** **Marvin Center, Room 301**
> **Address:** **800 21st Street, NW**
> **Washington, DC 20052**
>
> **Event:** **Quarterly New Employee Forum**
> **Date:** **October 4, 2012**
> **Time:** **10:00am – 1:00pm**
> **Location:** **Marvin Center, Grand Ballroom**
> **Address:** **800 21st Street, NW**
> **Washington, DC 20052**

The Weekly Orientation Breakfast is an opportunity for you to learn about GW as an employer and as a community, explore various GW benefits, and address key questions and concerns as you start your new role. The Quarterly New Employee Forum is an opportunity for you to learn about the GW values and how they define our culture; meet members of GW's senior leadership team; and discover the resources, programs, and initiatives that enhance your experience as a GW employee. To view agendas for the aforementioned events, please visit: http://www.gwu.edu/hr/newemployee/orientation.html. These events have been designed

GWU_001331



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

HUMAN RESOURCES

with you in mind to ensure you have the resources and support you need to succeed at GW! We also encourage you to explore key resources on the new employee website: http://www.gwu.edu/hr/newemployee/action_setps.html to help with your transition into the GW community.

**Employment Guidelines**
This position is a **full-time, exempt** position. In accordance with the Fair Labor Standards Act (FLSA), employees in exempt positions are not eligible to receive overtime pay and are not subject to the provisions of the FLSA based on the duties and responsibilities of the position. Exempt employees are expected to fulfill their responsibilities on an on-going basis and are paid a salary for the duties they perform, not the hours worked.

This letter is intended as an outline of some of the important aspects of the conditions of employment, and should not be construed as a contract of employment. This position is considered At-Will, which means that as you retain the right to resign for any reason or no reason at all, GW has the same right with respect to termination. Your employment is for no specific period of time, regardless of any other oral or written statement made by any George Washington University officer or representative.

It is the policy of GW to provide reasonable accommodations for employees with disabilities at all stages of the employment experience. If you need any accommodations during this process, please contact our office for Equal Employment Opportunity & HR Policy Compliance at 202-994-9656 for assistance.

In addition, the university is required by federal law to verify the eligibility of an employee to legally work in the United States by completing an Employment Eligibility Verification Form (I-9). To download the I-9, which includes a complete list of acceptable documentation for proving identity and employment eligibility, please visit: http://www.gwu.edu/hr/hris/I-9.pdf. The I-9 and other tax related documents should be completed directly at the Faculty & Staff Service Center (FSSC), located in Rice Hall, at 2121 Eye Street – Suite 101. The FSSC's office hours are Monday – Friday, 8am-5pm, excluding university holidays. The I-9 may be completed at the FSSC before beginning employment, but no later than your actual hire date.  To facilitate completion of the form, please bring a copy of this offer letter with you to the Faculty & Staff Service Center.

Should you have any questions or require additional clarification, please feel free to contact me at 703-726-8315. We want to welcome you to the GW family and look forward to you becoming an integral member of the Athletics team.

Sincerely,

Diane Conners
Recruitment Partner
Human Resources

To accept this offer of employment, please sign in the space provided below and return to me, via fax at 703-726-3711 no later than the close of business on September 25, 2012.  Additional time for consideration of this offer can be requested from the Department of Human Resources. By signing below, you acknowledge that the provisions of this offer of employment have been read, understood, and accepted.  A copy of this letter should be kept for your files, as it will become a permanent addition to your personnel record.

**Offer accepted by:**

Print Name: _____  Signature: _____  Date: _____

2121 EYE STREET, NW • SUITE 101 • WASHINGTON, DC 20052 • 202-994-9600 • FAX 202-994-9680

GWU_001332

GW

**DEPARTMENT OF ATHLETICS
AND RECREATION**

MEMORANDUM

To: Brian Hamluk, Associate Athletics Director

From: Michael Aresco, Assistant Director of Events

Date: 8/6/2013

Re: Resignation Letter

Please accept this letter as resignation from the Assistant Director of Events Position;

Effective August 12th, 2013 I will be resigning from the Assistant Director of Events position as I transition into a new role as the Director of Events within the George Washington University Department of Athletics and Recreation.

Thank you!

Michael S. Aresco
Assistant Director of Events
George Washington University Athletics

WASHINGTON, DC 20052 (202) 994-6650

GWU_001333



**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC

University Human Resources

August 6, 2013

Michael Aresco
1401 N Taft Street
Arlington, VA 22201

Dear Olivia:

On behalf of The George Washington University (GW), congratulations on your internal transition! This letter confirms your acceptance of the role of **Director of Events, Athletics** within the Athletics Department. Your new salary will be **$48,000.00** annually and will be paid bi-weekly.  Your effective transfer date, into your new role, will be **August 12, 2013.**

To ensure that all hires are properly screened, all offers of employment are contingent upon the satisfactory outcome of a personal background screening and favorable feedback of professional references. Additionally, some University positions may require current employees to undergo periodic background screenings, as necessary for their position.

This is a **full-time, exempt** position.  In accordance with the Fair Labor Standards Act (FLSA), employees in exempt positions are not eligible to receive overtime pay and are not subject to the provisions of the FLSA based on the duties and responsibilities of the position. Exempt employees are expected to fulfill their responsibilities on an on-going basis and are paid a salary for the duties they perform, not the hours worked.

We look forward to your continued efforts and success to provide excellent services to the University community and to create an environment that supports high quality education, health care, and research.

Sincerely,

*[signature]*

Sr. Recruitment Partner
Human Resources

To accept this offer of employment, please sign in the space provided below and return to me, via fax at **(202) 994-9680,** scanned email, or in person.  Additional time for consideration of this offer can be requested from the Department of Human Resources. By signing below, you acknowledge that the provisions of this offer of employment have been read, understood, and accepted.  A copy of this letter should be kept for your files, as it will become a permanent addition to your personnel record.

Offer accepted by:

Print Name: _Michael Aresco_   Signature: _[signature]_   Date: _8-6-13_

GWU_001334

# Goal Agreement

THE GEORGE WASHINGTON UNIVERSITY
— WASHINGTON DC —

**Name:** Michael Aresco

**GWID:** Redacted

**Title:** Assistant Director of Events

**Performance Review Period:**

**From** 09/04/12 **to** 07/01/13 **(MM/DD/YY)**

To ensure annual reviews objectively and accurately measure performance, develop up to five **SMART** (specific, measurable, attainable, relevant, and time-bound) goals that support the **GW Values and Objectives** school or division goals, and/or department/ team priorities. Goals must be mutually agreed upon and reflect the most important priorities for the performance review period. *For assistance, review the Frequently Asked Questions, complete the Goal Setting online training, and explore the guidance and resources provided.*

| Goal | Due Date | Key Milestones |
|---|---|---|
| Increase ways to monitor memberships and revenue | July 1, 2012 | -Create an up to date sheet with all PC members information, locker number as well as payment plans<br><br>-Increase communication between members and myself. |
| Increase ability + get more comfortable delegating tasks | July 1, 2012 | -Rely on Building Staff & Managers to do things more ofen<br><br>-Rely on Event Staff to get their tasks done |
| Make at least one improvement to the overall operation of Men's Basketball, Women's Basketball, and Volleyball. | July 1, 2012 | -Find methods which are currently being used that are not as efficient as they can be and change them for the better. |

GWU_001335

| | July 1, 2012 | |
|---|---|---|
| Continue to improve and find ways to make the schedule easier to read, follow, update, and transfer to other individuals. | | -Begin the transformation to google calendar rather than Calendar Creator<br><br>-Find ways for calendar to be updated on mobile devices<br><br>-Follow scheduling protocol based on Strategic Plan |

### PERFORMANCE CHECKPOINTS

Use the space below to document discussions at each <u>performance checkpoint</u> during the review period. For each checkpoint, document date, progress, changes to goals (if applicable), and manager and employee initials. Add additional rows as needed.

| Date | Progress on Goals | Changes and/or Comments | Initials |
|---|---|---|---|
| | | | |

| Date | Progress on Goals | Changes and/or Comments | Initials |
|---|---|---|---|
| | | | |

| Date | Progress on Goals | Changes and/or Comments | Initials |
|---|---|---|---|
| | | | |

## Agreement

These goals outline the most important priorities for this performance cycle. We commit to working towards achieving these goals, completing performance checkpoints throughout the year, and implementing the professional development plan.

## Signatures

GWU_001336

Michael Aresco

Jason Wilson

**Employee Name**                                    **Manager Name**

11-12-12                                                  11/14/2

**Employee Signature/Date**                    **Manager Signature/Date**

To:      Michael Aresco

From:   Jason McGhee

Date:    December 16, 2013

Subject: Employee Notification for Category Designation

The purpose of this memorandum is to inform you that your position as, Director of Events, Athletics is deemed an **"essential" position** for the Department of Athletics and Recreation. Employees in an essential position perform functions that have been deemed essential by management to maintaining business or academic operations during an emergent event. Employees may be required to report physically or may be required to be available for work from a remote location. Under certain conditions, you may also be directed to report to an alternate location to perform the functions of the position.

If, at your manager's discretion, you are called onto campus to work or to work from home, essential employees are expected to work and perform their duties during an emergent event. We recognize that weather situations can sometimes lead to environmental and connectivity constraints and that the ability to work may be difficult or near impossible. In the event you cannot make it to campus or you are not able to work from home due to circumstances beyond your control, it is your responsibility to follow up with your manager to inform them of the situation and to ensure there is proper coverage. Your failure to comply with direction provided by your manager may result in being placed in an absent without approved leave (AWOL) status and/or being subject to disciplinary action.

To ensure you are informed of the operating status of the University please refer to the GW Campus Advisories webpage at http://www.gwu.edu/~gwalert/.  Other methods of communication are also available and can be found at http://hr.gwu.edu/communication-during-adverse-weather-conditions-and-other-emergency-conditions.

Acknowledgement:  _____        _____12/17/13_____
                              Employee's signature                                          Date



THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

# Personnel Action Form
### Complete All Sections Required for Action

RECOMMENDED ACTION - VALUES PER ACTIVITY DENOTED REQUIRED SECTIONS TO BE COMPLETED

| | | | PREPARED BY: |
|---|---|---|---|
| ■ PROMOTION 1, 3, 4, 8 | ☐ JOB TITLE CHANGE 1, 4, 8 | ☐ LEAVE OF ABSENCE 1, 5, 8 | Brian Hamluk |
| ☐ DEMOTION 1, 3, 4, 8 | ☐ STATUS CHANGE 1, 3, 8 | ☐ RETURN FROM LEAVE 1, 5, 8 | **DATE PREPARED:** November 10, 2014 |
| ☐ WAGE ADJUSTMENT 1, 3, 4, 8 | ☐ HOURS CHANGE 1, 3, 8 | ☐ WORKERS COMP. 1, 6, 8 | **PHONE:** 202-994-6273 |
| ☐ DEPARTMENT TRANSFER 1, 2, 7, 8 | ☐ TERMINATION 1, 6, 8 | ☐ RETN WORKERS COMP. 1, 6, 8 | **FAX:** |
| ☐ ASSIGN SECONDARY POSN 1, 3, 8 | ☐ SHIFT CODE 1, 3, 8 | ☐ LOCATION CODE 1, 2, 8 | 202-994-6818 |

**1.**

**EFFECTIVE DATE:**
July 1, 2014

**SUPERVISOR'S NAME AND GWID**
Patrick Nero: Redacted

**GWID:** Redacted

**EMPLOYEE STATUS:**
Full-Time

**CURRENT HIRE DATE:**
9/26/2012

**ADJUSTED SERVICE DATE:**

**REMARKS:**
This is for the promotion of Michael Aresco to the position of Assistant Athletic Director and his increased level of responsibility overseeing the facilities and events operations. Salary increase is funded through usage of Merit Pool monies.

**EMPLOYEE NAME (LAST, FIRST, MI)**
Aresco, Michael, S.

**2.**

| BANNER HOME DEPARTMENT CODE | DEPARTMENT OR SPONSORED PROJECT AWARD DESCRIPTION |
|---|---|
| | |

**3.**

| EMPLOYEE CLASS/DESCRIPTION | HOURS/PAY | FTE | PAY ID | SHIFT | FLSA CODE | EEPT | CONTRACT TYPE |
|---|---|---|---|---|---|---|---|
| UV Staff - Exempt  (Full Time Exempt BW FT) S1 | | 1.0 | BW | | | Exempt Full Time | |

**4.**

| POSITION NO. | SUFFIX | GRADE | POSITION TITLE | | Job Location |
|---|---|---|---|---|---|
| 501426 | | 17 | Assistant Athletic Director | | Main Campus - DC (DCMC00) |

| BEGIN DATE | END DATE | WORKING TITLE | HOUR RATE / SALARY | JOB CHANGE REASON |
|---|---|---|---|---|
| 12/21/14 | | Assistant Athletic Director | 75,000 | Promotion w/Increase (PROUP) |

**5.**

| LEAVE CODE | LEAVE BEGIN DATE | LAST DAY WORKED | ACTUAL LEAVE RETURN DATE |
|---|---|---|---|
| | | | |

**6.**

| TERM CODE | LAST DAY WORKED | REHIRE ELIGIBILITY |
|---|---|---|
| | | |

**7.**

| BANNER INDEX | ACCOUNT NO. | | PERCENT | |
|---|---|---|---|---|
| | | | | Split Distributions must equal 100%. Changes to job labor distributions not associated to a transfer must be processed by the on-line EPAF. |
| | | | | |
| | | | | |
| **TOTAL** | | | | |

**8.**

| FINANCIAL MANAGER/DEPARTMENT HEAD PRINT NAME | SIGNATURE | DATE |
|---|---|---|
| John Gruppo | | 11/10/2014 |
| **DIRECTOR/DEAN PRINT NAME** Patrick Nero | SIGNATURE | DATE November 10, 2014 |
| **VICE PRESIDENT PRINT NAME** | SIGNATURE | DATE |

**9.**

| HUMAN RESOURCES | INITIALS | DATE | FACULTY PERSONNEL | INITIALS | DATE | BUDGET | INITIALS | DATE |
|---|---|---|---|---|---|---|---|---|
| BENEFITS | INITIALS | DATE | HRIS | INITIALS | DATE | PAYROLL | INITIALS | DATE |

THE GEORGE
WASHINGTON
UNIVERSITY

WASHINGTON, DC

REQUEST FOR BONUS PAYMENT

Employee Name: Michael Aresco

Employee Title: Director of Events

Employee GWID: **Redacted**

Justification for Bonus:

This bonus request is for backpay for the promotion of Michael Aresco to Assistant Athletic Director. Michael has picked up significant additional responsibilities and has been promoted to overseeing the entire facilities and events operations. This payment is for the increased responsibility and workload that he has picked up since the departure of a previous staff member.

This bonus is paid for using Merit pool funds.

Banner Org # and Account to Charge: 564101-51228

Requested Bonus Amount ($): $ 9,000.00

**Requestor Infomation**

Name: Patrick Nero (contact Brian Hamluk)          Phone Number: (202) 994-8273

Email Address:   hamluk@gwu.edu

| | | |
|---|---|---|
| HR Client Partner: Mike Kohn | | Date: 11/10/2014 |
| | Name and Signature | |
| Finance Director: John Gruppo | | Date: 11/10/2014 |
| | Name and Signature | |
| Compensation: | | Date: |
| | Name and Signature | |
| EVP&T/Provost: | | Date: |
| | Name and Signature | |

UNIVERSITY HUMAN RESOURCES

*Updated: 10/2014*

GWU_001340



**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

REQUEST FOR BONUS PAYMENT

Employee Name: Michael Aresco

Employee Title: Director of Events

Employee GWID: **Redacted**

Justification for Bonus:

This bonus request is for backpay for the promotion of Michael Aresco to Assistant Athletic Director.  Michael has picked up significant additional responsibilities and has been promoted to overseeing the entire facilities and events operations.  This payment is for the increased responsibility and workload that he has picked up since the departure of a previous staff member.

Banner Org # and Account to Charge: 564101-51228

Requested Bonus Amount ($):  $ 4,000.00

**Requestor Infomation**

Name: Patrick Nero (contact Brian Hamluk)     Phone Number: (202) 994-8273

Email Address:   hamluk@gwu.edu

HR Client Partner: Mike Kohn                               Date: 11/10/2014
                        Name and Signature

Finance Director: John Gruppo                             Date: 11/10/2014
                        Name and Signature

Compensation: _____     Date: _____
                        Name and Signature

EVP&T/Provost: _____     Date: _____
                        Name and Signature

UNIVERSITY HUMAN RESOURCES

*Updated: 10/2014*

**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

## PERFORMANCE REVIEW FORM

**Employee Name:** Michael S. Aresco

**Employee Title:** Director of Events

**Department:** Athletics and Recreation

**GWID:** [ Redacted ]

**Review Period:**       From  7/1/2013  to  6/30/2014 (MM/DD/Y

### GOALS AND ACCOMPLISHMENTS

Comment on the extent to which goals agreed upon for this review period were achieved. Highlight significant accomplishments and include any special recognition received throughout the year. Employees may include self-assessment comments on the key performance factors in this section. See guidance online for assistance.

**Self-Assessment:**  Successes that have been achieved are improving game day experience for our varsity teams and student athletes.  For Volleyball we have an improved intro and environment for their games due to the intro videos and the arena going dark. Have built a strong understanding of all Facility and Operations budgets and what it takes to stay within budget among all our difference accounts. Increased revenue through membership and events.  Event revenue increased over projected revenue.  Increased concessions revenue and product through continuous efforts to offer options at ALL events.   Increased scheduling flexibility for club sports as well as varsity (Additional cage time for baseball).  Increased university prestige and awareness through the Washington Kastles WTT 2014 Season.  Currently overseeing the Facility and Operations Department in an interim manner as there have been departures of key staff members.  This includes additional responsibilities beyond events and scheduling, such as facilities, operations, and planning.

**Reviewer Comments on Goals and Accomplishments (Key Performance Factors reviewed below):**  Mike has gone well beyond our expectations.  He has been a very valuable contributor for the department and has done a very good job managing his staff.

### PROFESSIONAL DEVELOPMENT PLAN

Identify professional development opportunities pursued last year (e.g., on-the-job learning such as projects and special assignments, certifications obtained/maintained). Describe what is needed for professional development in the upcoming performance period. See guidance online for assistance.

**Self-Assessment:** Upcoming professional development would be continued experience at industry related conferences. (IAVM, CEFMA, CAOS).  This passed year  opportunities pursued were CEFMA which helped see the big picture of our industry and how we can continue to strive to be the industry leader given our place in college athletics.

**Reviewer Guidance:**   Mike, should expand beyond his current professional development plans and include NACDA for athletic administrators

### KEY PERFORMANCE FACTORS

Use this section to indicate to what extent the key performance factors were demonstrated in accomplishing goals and job responsibilities. **Rating Descriptions:**

- **Strength** – Demonstrates and applies knowledge and skills to excel in a consistent and sustained manner. Applies knowledge by using facts and lessons learned.
- **Proficient** – Demonstrates a sufficient level of knowledge and/or skills to perform effectively.
- **Needs Improvement** – Demonstrates the need to improve to meet job requirements or perform more consistently. Needs to develop by increasing knowledge or building skills.

*Communication – Fosters an environment that supports a continual, candid exchange among appropriate members of the University community. Escalates compliance, ethics, and civility related issues to appropriate levels. Encourages expression of new and creative ideas. Listens without interruption. Regularly communicates useful, well organized, and accurate information orally and in writing. Provides regular, timely, and constructive feedback in a straightforward and sensitive manner.*

| Reviewer Rating | | **Reviewer Comments:** Keeps the department appropriately informed. Has a good sense on what information to share. |
|---|---|---|
| Strength | X | |
| Proficient | | |
| Needs Improvement | | |

*Customer Service* – *Commits to pursuing excellence to achieve the highest standards. Understands our responsibility to exceed the expectations of others who depend on our actions. Solves problems at the first point of contact whenever possible; if unable to do so, escalates to an appropriate resource. Responds to all customer requests in a timely manner. Considers customer feedback and explores creative approaches to enhance service and increase efficiency.*

| Reviewer Rating | | **Reviewer Comments:** Has especially excelled with outside customer |
|---|---|---|
| Strength | X | |
| Proficient | | |
| Needs Improvement | | |

*Job Skills/Technical Skills* – *Demonstrates the knowledge and skills necessary to perform the job effectively. Complies with GW policies, external laws and regulations. Maintains the highest-level of ethics in all actions on behalf of the university. Performs responsibilities in accordance with job procedures and expectations. Remains current on new developments in areas of responsibility. Acts as a resource upon whom others rely on for assistance.*

| Reviewer Rating | | **Reviewer Comments:** His new role will require development of new skills which I am confident he will master quickly |
|---|---|---|
| Strength | | |
| Proficient | X | |
| Needs Improvement | | |

*Productivity (Quantity/Quality of Output)* – *Gets the job done. Produces the quantity and quality of work required for the position. Demonstrates initiative. Sets priorities and organizes work efficiently and effectively. Completes work assignments in a timely manner. Delivers high quality work products. Uses sustainable practices whenever possible.*

| Reviewer Rating | | **Reviewer Comments:** Excellent work ethic. Organized and a good sense of priorities |
|---|---|---|
| Strength | | |
| Proficient | X | |
| Needs Improvement | | |

*Teamwork* – *Demonstrates the* <u>GW Values</u> *in all interactions. Treats others with courtesy, respect, and dignity. Encourages collaboration to meet common goals and produce a sense of shared responsibility. Encourages the expression of different points of view, resolves disagreements in a collegial manner, and supports decisions once they are made. Contributes to the success of the team by working effectively, helping solve problems, and meeting deadlines. Develops the capacity of others through information sharing, mentoring, and/or coaching.*

| Reviewer Rating | | **Reviewer Comments:** He is highly respected by his co-workers. He has developed into a solid leader with his team. |
|---|---|---|
| Strength | X | |
| Proficient | | |
| Needs Improvement | | |

*Management/Supervisory Skills (if applicable)* – *Models and reinforces the* <u>GW Values</u>. *Documents and communicates compliance, ethics, and civility escalation procedures. Takes ownership and accountability for area of responsibility. Acts as a coach to motivate staff and support their professional development. Sets goals and clarifies expectations of staff. Invests time to manage and facilitate the work of others. Responds to the ideas, concerns and needs of direct reports. Demonstrates skill in hiring, developing, and retaining staff. Engages in regular discussions to address performance issues and/or provide recognition when appropriate. Completes annual performance reviews in a timely manner.*

| Reviewer Rating | | **Reviewer Comments:** He is new at this, but excelled quickly. This will lead to additional opportunities |
|---|---|---|
| Strength | X | |
| Proficient | | |
| Needs Improvement | | |

*Optional: [Enter Optional Factor here]* – *If applicable, record any additional factor that was identified during the previous review period in the space above. Note that an individual cannot be evaluated for an optional factor unless it was documented in the last performance review.*

GWU_001343

| Reviewer Rating | Reviewer Comments: |
|---|---|
| Strength | |
| Proficient | |
| Needs Improvement | |

## REVIEWER SUMMARY ASSESSMENT

Assess the individual's overall performance based on **BOTH** goal achievement and demonstrated competence for all performance factors. Please select one of the following:

| Role Model Performance | Exceptional Performance [X] | Valued Performance | Fair Performance | Unacceptable Performance |
|---|---|---|---|---|
| Consistently far exceeds expectations; outstanding performance achieving all goals. An individual whom others look to as a standard of performance excellence. | Meets and often exceeds expectations; performance that generally exceeds goals and job requirements and who consistently delivers. An individual who often outperforms others in the same job. | Consistently meets expectations; performance that satisfies all job requirements and meets all goals. An individual who is consistently reliable to get the job done. | Sometimes meets expectations; performance that is to the standard required in most aspects of the job with opportunity for development. An individual with the potential to be a valued performer. | Does not meet expectations; performance where significant improvement is required to satisfy job requirements. An individual who is not performing at acceptable levels. |

**Reviewer Comments:**   A very good year for Mike who has quickly stepped up as one of our most valuable employees.

## SIGNATURES

### (1) Supervisor

| Supervisor Name: Patrick Nero | Supervisor Title: Director of Athletics |
|---|---|
| Supervisor Signature: | Date: 11/18/2014 |

### (2) Next Level Approver

| Next Level Approver Name: | Next Level Approver Title: |
|---|---|
| Next Level Approver Signature: | Date: |

### (3) Employee

**Employee Signature:**

*By signing above, you acknowledge that you received this review and it was discussed with you. Signature does not indicate agreement or disagreement with the content of this review. Employees may attach comments.*

| This review was discussed with me on the following date: | 11/4 |
|---|---|

| Ethical Principle Statement and GW Values | INITIAL BELOW |
|---|---|
| I have read and understand the George Washington University Statement of Ethical Principles and the GW Values. | MJA |

Submit completed performance reviews to your Human Resources Client Partner. If you have any questions, please contact University Human Resources at 202-994-8500.

GW Confidential
The George Washington University, 2013          Version 5.0                                    3

**THE GEORGE
WASHINGTON
UNIVERSITY**
WASHINGTON, DC

University Human Resources

December 16, 2013

Michael Aresco

SMITH ACTIVITIES CENTER

Dear Michael,

The George Washington University is pleased to provide you an increase in compensation based on the recommendation provided by your supervisor.  Effective 12/22/2013, your salary will be $48,960.00. This 2.00% increase will appear in the pay you receive on 1/17/2014.

We thank you for your service over the past year. Please contact your Human Resources Client Partner if you have any questions (http://hr.gwu.edu/department-directory#clientpartners or 202-994-8500).

Sincerely,

University Human Resources

Athletics and Recreation

GWU_001345



**THE GEORGE WASHINGTON UNIVERSITY**

WASHINGTON, DC

University Human Resources

December 16, 2013

Dear Michael Aresco,

The George Washington University is pleased to provide you a bonus of $2000.00. This bonus will appear in the pay you receive on 1/17/2014.

We thank you for your service over the past year.

Sincerely,

University Human Resources

**THE GEORGE
WASHINGTON
UNIVERSITY**

WASHINGTON, DC                                                                                    **University Human Resources**

February 2, 2016

Michael Aresco
2009 14th Street, N Apt. 1008
Arlington, VA 22201

Dear Michael:

On behalf of The George Washington University (GW), congratulations on your internal transition! This letter confirms your acceptance of the role of **Special Assistant** within the **Department of Athletics and Recreation.** Your new salary will be **$77,257.21** annually and will be paid **monthly**. Your effective transfer date, into your new role, will be **February 8, 2016.** Please see http://payroll.gwu.edu/payroll-calendar for a list of designated pay dates. This is a **full-time, exempt** position. Your position is not eligible to receive overtime pay because of the exemption for bona fide Administrative position as defined in the Fair Labor Standards Act. Exempt employees are expected to fulfill their responsibilities on an on-going basis and are paid a salary for the duties of their position which covers all hours worked. You are not eligible for any allowances (e.g., tips, meals, or lodging) as part of your wages for this position. **Your Position is identified as Essential based on the functions of the position**. Employees who are generally expected to work from home during an emergency or during an adjustment to the university's operating status. During special circumstances, a supervisor may require essential employees to physically report to work or remain at work. For additional information, please visit: http://hr.gwu.edu/working-gw#3.13

**Please note**: *If you currently participate in a GW benefit program, your paycheck deduction(s) will now be based on the monthly contribution tables (please visit benefits.gwu.edu for details.) During this transition you may see an additional arrears deduction or a refund based on timing. For questions, please contact benefits@gwu.edu. You will continue to be paid on the regular biweekly payday for the time you have worked prior to the effective date of your change to monthly. You will receive your first monthly paycheck on the last working day of the month in which your change was effective. Please address all questions regarding the change in payroll cycles to your Client Partner.*

To ensure that all hires are properly screened, all offers of employment are contingent upon the satisfactory outcome of a personal background screening and favorable feedback of professional references. Additionally, some University positions may require current employees to undergo periodic background screenings, as necessary for their position.

If at any time during your employment you believe you may need a reasonable accommodation to perform your job duties because of a disability, pregnancy (or childbirth, pregnancy-related medical conditions, or breastfeeding), or religion, you may request one by contacting GW's office of Equal Employment Opportunity at (202) 994-9656.

This letter is intended as an outline of some of the conditions of employment, and should not be construed as a contract of employment. This position is considered at-will, which means that as you retain the right to resign for any reason or no reason at all, GW has the same right with respect to termination. Your employment is for no specific period of time, regardless of any other oral or written statement made by any George Washington University officer or representative.

**District of Columbia Wage-Hour Enforcement**
The DC Office of Wage-Hour (OWH), which is the agency responsible for administering the DC Wage Theft Prevention Act, requires DC employers to provide the following information to its employees:

> If you have concerns about safety, wage and hour, or discrimination relating to your position, we encourage you to contact the HR Client Partner for your unit. You may also contact the DC Department of Employment Services, specifically the Office of Wage-Hour (OWH), as that office is the designated District of Columbia enforcement agency for concerns about safety, wage and hour, or discrimination. The OWH can be contacted at 202-671-1880 or via email at owh.ask@dc.gov. The office is located at 4058 Minnesota Avenue, NE, Suite 4300 Washington, DC 20019. The office is open Monday-Thursday 8:30-4:30 and Friday 9:30-4:30.

2121 Eye Street, N.W., Suite 101  |  Washington, DC 20052

**t** 202-994-8500  |  **f** 202-994-8580  |  www.gwu.edu/hr

GWU_001347

If you have specific concerns about your wages or employment at GW, contact University Human Resources at 202-994-8500.

We look forward to your continued efforts and success to provide excellent services to the University community and to create an environment that supports high quality education, health care, and research.

To accept this offer of employment, please sign in the space provided below and return to me, via fax at **(703) 726-3711**, scanned email, or in person. Additional time for consideration of this offer can be requested from the Department of Human Resources. By signing below you acknowledge that the provisions of this offer of employment, including information regarding your pay, has been received, understood, and accepted. You also acknowledge that this notice has been given to you in English. If your primary language is not English and you would like to receive any required pay notices in your primary language in the future, please also indicate below. GW will provide future required pay notices in your designated primary language if, pursuant to DC law, the DC OWH offers a pay notice form in that primary language. A copy of this letter should be kept for your files, as it will become a permanent addition to your personnel record.

Sincerely,

Amy Heldreth
Talent Acquisition
Human Resources

**Offer accepted by:**

Print Name: Michael S. Aresco

Check applicable boxes:

1. ___ My primary language is English;
2. ___ My primary language (if not English) is: _____;
3. ___ Although my primary language is not English, GW may send any required pay notices to me in English;
4. ___ I request that GW issue any required pay notices in my primary language if the DC OWH offers a pay notice form in that primary language.

Signature: _____

Date: 2-2-16

| | |
|---|---|
| **From:** | Aresco, Michael <msa05002@email.gwu.edu> |
| **Sent:** | Friday, December 4, 2015 3:41 PM |
| **To:** | Kaithlyn Kayer |
| **Cc:** | Tanya Vogel |
| **Subject:** | Asst AD/Chief of Staff and Interim Director of Facilties |

Hi Kaithlyn,

I wanted to follow up and make sure everyone is on the same page.

1.) I will make sure we get a position description put together by early next week for the Asst AD Chief of Staff Roll and sent your way.

2.) Once that position is posted(internally for 3 days), Tanya will handle the job search

3.) I will also make sure there is a job description for an interim director sent your way as well.  In the mean time, I believe there is already a director of facilities position in the system.  Can you please send that my way as a starting point?

What else will we need to get done in order for these changes to take place and in a timely fashion?

Thanks!
Mike

--
**Michael S. Aresco**
Assistant Athletic Director
The George Washington University
Department of Athletics and Recreation
600 22nd St. NW | Washington, DC 20052
202-994-5480 (o) | 202-437-4441 (c)





GWU_RandomSample_018578

# Special Assistant, Athletics

## Position Description

**Position Description**

| | |
|---|---|
| **Position Title:** | Special Assistant, Athletics |
| **Max Budget Funding** | 77,500 |
| **FTE:** | 1.00 |
| **Total Hours Per Week:** | 40+ |
| **Work Schedule:** | Monday-Friday; nights and weekends |
| **Full-Time/Part-Time** | Full-Time |
| **Is this a grant/research funded position?** | No |
| **Position Designation:** | Essential: Employees who perform functions that have been deemed essential to maintaining business or academic operations. Employees are generally expected to work from home during an event and may be asked to physically report to work. |
| **Telework:** | No |
| **Desired Qualifications:** | 4+ years administrative experience in similar role managing a senior executive and/or organization. |
| | High proficiency with MS Office Suite. |
| | Excellent communication and interpersonal skills and demonstrated experience in dealing with confidential information. |
| | Ability to thrive in a fast-paced environment. |
| **Required Licenses/Certifications/Posting Specific Minimum Qualifications:** | |
| **Positon Reports to:** | 500614 |
| **Subordinates:** | |
| **Job Location Code:** | Charles E. Smith Center - 600 22nd St NW - FB0107 |
| **Job Description Summary** | The George Washington University Department of Athletics and Recreation actively engages our students, our campus community, our alumni and our fans through the spirit of healthy living and competition. Located in the heart of our nation's capital, this world-class university aspires to have a world-class athletics and recreation program. We are committed to building and sustaining a program that mirrors the overall excellence of the university, by providing students an unparalleled opportunity for achievement and engaging the larger community as we grow and cultivate the next generation of leaders. |
| | The Department of Athletics and Recreation seeks a Special Assistant, Athletics to provide high-level administrative support to Director of Athletics. |
| | Responsibilities include: |

**Exhibit 0019**

GWU_001027

Leading the administrative function of the Office of the Director of Athletics and Recreation. Coordinating administrative staff members (including full-time, part-time, temporary and student staff).

Maintaining the external face of the Office of the Director of Athletics and Recreation and acts as liaison to external departments for administrative and operational matters.

Acting as a project manager for special projects in support of key priorities for the Department of Athletics and Recreation

Serving on the Senior Staff of the Department of Athletics.

**Labor Distribution**
This section is to identify the funding for your position and must add up to 100%. Part time positions should be identified through FTE.

| | |
|---|---|
| **Account Code** | 51211 - SALARY NON-FACULTY REGULAR FULLTIME |
| **Org** | 561101 ATHLETICS ADMINISTRATION |
| **Other Org** | |
| **Percent Distribution** | 100 |

# Job Duties

**Job Duties**

| | |
|---|---|
| **(HISTORICAL) Function:** | Provides high-level advising on administrative matters to the Director of Athletics and Recreation. This includes exercising judgment in scheduling, screening requests for meetings and passing them to the correct office as appropriate, and handling day-to-day operational decisions while escalating as appropriate. Acts as a project manager for special projects in support of key priorities for the Department of Athletics and Recreation |
| **(HISTORICAL) Function Type:** | Essential |
| **(HISTORICAL) Percentage:** | 45 |
| **(HISTORICAL) Function:** | Leads the administrative function of the Office of the Director of Athletics and Recreation. Manages administrative staff members (including full-time, part-time, temporary and student staff). Maintains appropriate organizational structure and division of labor between administrative staff. |
| **(HISTORICAL) Function Type:** | Essential |
| **(HISTORICAL) Percentage:** | 25 |
| **(HISTORICAL) Function:** | Maintains external face of the Office of the Director of Athletics and Recreation and acts as liaison to external departments for administrative and operational matters. |
| **(HISTORICAL) Function Type:** | Essential |
| **(HISTORICAL) Percentage:** | 25 |
| **(HISTORICAL) Function:** | Other duties as assigned. The omission of specific duties does not preclude the supervisor from assigning additional responsibilities that are logically related to the position. |
| **(HISTORICAL) Function Type:** | Marginal |

GWU_001028

| (HISTORICAL) Percentage: | 5 |
|---|---|

# Classification

## Title Information

| Position Class | Assistant Athletics Director |
|---|---|
| Position Class Code | DC321 |
| Default Position Title | Assistant Athletics Director |
| Employee Class Code/Category | SE |
| Job Family | Athletics |
| Job Family Description | Employees are responsible for supporting and managing the operation of intercollegiate sport programs, including administration, coaching, equipment management and training. |
| Sub-Family | Athletics Administration |
| Sub-Family Description | Employees in this subfamily are responsible for the operations that support the intercollegiate athletics program. Duties may include managing internal and external business relationships, administering budgets and managing facilities. |
| Stream | Management |
| Stream Description | This career stream typically includes supervisory and management staff responsible for focusing on tactical or operational activities within a specified area. A manager is define as an administrator responsible for accomplishing department objectives and operations of at least one work unit, which includes managing staff and short- and mid-term planning of department activities. Takes corrective action as necessary to ensure departmental goals are accomplished by established deadlines. The most important factors are (1) clear responsibility for managing performance and goals of a work unit and (2) formal supervision of at least two full-time staff (or its equivalent). Managing performance of staff requires writing and delivering performance evaluations and monitoring production and overall work quality. The entry job title used for this stream is Supervisor. Generally, managers are responsible for the daily operations and work quality for assigned areas, and may have control or input over hiring, firing, promotion, & reward authority for assigned staff or work teams. |
| Level | Level 2 |
| Level Description | • Working manager<br>• Typically reports to a Level 3 or Level 4 Manager<br>• Responsible for managing a single work unit consisting of at least two full-time (or its equivalent) Individual Contributor staff or Level 1 Managers<br>• Serves as subject matter expert within assigned area of responsibility<br>• Typically without direct budget authority |
| Default FLSA Status | Exempt |
| Exempt Type | Administrative |
| Salary Table | SA |
| Salary Grade | 32.1 |
| Minimum Qualifications | Bachelor's degree in an appropriate area of specialization plus 6 years of relevant professional experience. Degree requirements may be substituted with an equivalent |

GWU_001029

combination of education, training and experience.

| | |
|---|---|
| **Minimum Rate/Salary** | 63900 |
| **Mid Rate/Salary** | 92700 |
| **Maximum Rate/Salary** | 121500 |
| **Typical Hiring Range** | $63,900 – $92,700 |
| **EEO Position Group** | 1D |
| **Entry Rate / Salary** | 63900 – 76680 |
| **Emerging Rate / Salary** | 83430 – 101970 |
| **Expert Rate / Salary** | 92700 – 111240 |
| **Last Review Date** | 12/01/2015 |
| **Require Background Check** | Criminal History Screening, Education/Degree/Certifications Verification, Social Security Number Trace, and Sex Offender Registry Search, Credit |

## Supplemental Documents

1. Position Justification Memo (PDF | 374 KB)
2. Organizational Chart (Proposed) (PDF | 164 KB)

## Employee

This position description is vacant.

GWU_001030