## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| U.S. Equal Employment Opportunity Commission, | |
| Plaintiff, | Case No. 1:17-cv-01978 (CKK) |
| v. | |
| The George Washington University, | |
| Defendant. | |

## THE GEORGE WASHINGTON UNIVERSITY'S COMBINED REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE EEOC'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

I. The EEOC's Cross-Motion Should Be Denied Because Its Memorandum of Law
Violates Local Civil Rule 7(h) And The Court's Scheduling Order. ............................... 3

II. The Court Should Grant The University's Motion for Summary Judgment Because No
Reasonable Juror Could Conclude The University Violated The Equal Pay Act............. 6

    A.    The Record Contradicts The EEOC's Assertion That Williams Spent The
    "Vast Majority" Of Her Time On Non-Clerical Tasks. ...................................... 7

        1.    Williams Input Information Into Non-Financial Form Contracts,
        While Aresco Drafted And Negotiated Coach Contracts ........................ 10

        2.    Williams Checked On The Status Of Projects At Nero's Request,
        While Aresco Helped Manage The Department's Strategic Plan............ 15

        3.    Williams Scheduled Interviews And Booked Travel, While Aresco
        Made Hiring Decisions and Drafted HR Policies ................................... 16

        4.    Williams's Testimony Regarding Her Budget Management Duties
        Is Contradicted By The Record.............................................................. 20

        5.    Williams Allegedly Supervised Student Interns, While Aresco
        Supervised The Men's Rowing Coach .................................................... 24

        6.    Williams Printed Materials And Placed Them In Folders, While
        Aresco Researched And Prepared Presentations For The Board............. 25

        7.    Williams Managed Special Projects Like Sending The
        Department's Holiday Card, While Aresco Managed Budget Cuts ........ 26

        8.    Only Williams Believes She Was On The Senior Staff........................... 28

    B.    The EEOC Does Not Dispute That Aresco Had Multiple Responsibilities
    That Williams Did Not................................................................................ 30

    C.    The University Has Established That The Pay Difference Between
    Williams And Aresco Was Based On Factors Other Than Sex......................... 32

III. This Court Also Should Grant Summary Judgment To The University On The
EEOC's Title VII Claim. .............................................................................................. 34

    A.    The University Did Not Subject Williams To An Adverse Employment
    Action........................................................................................................ 35

    B.    Even Assuming That Williams Had Suffered An Adverse Employment
    Action, There Are No Facts To Suggest It Was Discriminatory. ..................... 42

    C.    The University Has Shown Legitimate, Nondiscriminatory Reasons For
    Any Adverse Employment Action................................................................ 44

CONCLUSION................................................................................................................ 45

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Agelli v. Burwell,*
    164 F. Supp. 3d 69 (D.D.C. 2016) ........................................................................13

*Barnette v. Chertoff,*
    453 F.3d 513 (D.C. Cir. 2006) ..............................................................................42

*Bartko v. SEC.,*
    845 F.3d 1217 (D.C. Cir. 2017) ..............................................................................6

*Bostock v. Clayton Cty.,*
    140 S. Ct. 1731 (2020) ..........................................................................................35

*Brooks v. City of Utica,*
    275 F. Supp. 3d 370 (N.D.N.Y. 2017) ..................................................................39

*Burlington Indus., Inc. v. Ellerth,*
    524 U.S. 742 (1998) ........................................................................................34, 36

*Chambers v. Sebelius,*
    6 F. Supp. 3d 118 (D.D.C. 2013) ..........................................................................41

*\*United States ex rel. El-Amin v. George Wash. Univ.,*
    533 F. Supp. 2d 12 (D.D.C. 2008) ..........................................................................5

*Gaujacq v. EDF, Inc.,*
    601 F.3d 565 (D.C. Cir. 2010) ..............................................................................34

*Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO,*
    815 F.2d 1519 (D.C. Cir. 1987) ......................................................................19, 23

*Greer v. Paulson,*
    505 F.3d 1306 (D.C. Cir. 2007) ............................................................................37

*Hajjar-Nejad v. George Wash. Univ.,*
    No. 10-cv-626, 2013 WL 12407402 (D.D.C. May 13, 2013) ..................................5

*Headfirst Baseball LLC v. Elwood,*
    168 F. Supp. 3d 236 (D.D.C. 2016) ......................................................................37

*Hein v. Oregon Coll. of Educ.,*
    718 F.2d 910 (9th Cir. 1983) ................................................................................23

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006) ................................................................................10

*\*Jimenez v. Wolf*,
  No. 19-cv-2055, 2020 WL 13546497 (D.D.C. Sept. 29, 2020).........................7, 18

*Johnson v. Dist. of Columbia*,
  947 F. Supp. 2d 123 (D.D.C. 2013) ....................................................................14, 16

*Johnson v. Wash. Metro. Area Transit Auth.*,
  883 F.2d 125 (D.C. Cir. 1989) .............................................................................13, 23

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999)..................................................................................................6

*\*Lash v. Lemke*,
  786 F.3d 1 (D.C. Cir. 2015) ....................................................................................21

*Lucas v. Brennan*,
  No. 17-cv-8964, 2020 WL 127768 (N.D. Ill. Jan. 10, 2020).................................43

*Mickelson v. N.Y. Life Ins. Co.*,
  460 F.3d 1304 (10th Cir. 2006) ..............................................................................32

*Muldrow v. City of St. Louis*,
  30 F.4th 680 (8th Cir. 2022) ...................................................................................18

*Mulhall v. Advance Sec., Inc.*,
  19 F.3d 586 (11th Cir. 1994) ..................................................................................23

*Musgrove v. Gov't of Dist. of Columbia*,
  775 F. Supp. 2d 158 (D.D.C. 2011) ........................................................................24

*Nyman v. FDIC*,
  967 F. Supp. 1562 (D.D.C. 1997) ...........................................................................32

*Polak v. Va. Dep't of Env't Quality*,
  57 F.4th 426 (4th Cir. 2023) ...................................................................................7

*\*Payne v. Dist. of Columbia*,
  741 F. Supp. 2d 196 (D.D.C. 2010), *aff'd*, 722 F.3d 345 (D.C. Cir. 2013)..............5

*Smith v. Lynch*,
  115 F. Supp. 3d 5 (D.D.C. 2015)............................................................................45

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)..........................................................................45

*\*Sykes v. Dudas*,
   573 F. Supp. 2d 191 (D.D.C. 2008) .........................................38, 39

*Walden v. Patient-Centered Outcomes Research Inst.*,
   304 F. Supp. 3d 123 (D.D.C. 2018) .................................................44

*Waters v. Turner, Wood & Smith Ins. Agency*,
   874 F.2d 797 (11th Cir. 1989) .................................................28, 29

*Wilkins v. Dist. of Columbia*,
   No. 17-cv-884, 2019 WL 3767164 (D.D.C. Aug. 9, 2019)....................4

**STATUTES**

29 U.S.C. § 206...............................................................................7, 23, 32

**RULES**

Local. Civ. R. 7(h) ......................................................................1, 3, 4, 5

Fed. R. Civ. P. 56.................................................................................1

**OTHER AUTHORITIES**

Lindemann, Grossman & Weirich, 1 *Employment Discrimination Law*
   (5th ed. 2012)...........................................................................19, 28

## INTRODUCTION

By both seeking summary judgment, the George Washington University and the EEOC (together, the "Parties") have agreed there are no genuine disputes of material fact that warrant a trial in this case.  Although the Parties provide different descriptions of the duties that Charging Party Sara Williams performed as the executive assistant to former University Athletics Director Patrick Nero, only the University has substantiated its account with citations to the record. Remarkably, even though the EEOC's first Motion for Summary Judgment was stricken due to its failure to comply with Local Civil Rule 7(h) and this Court's Order, the EEOC filed a renewed Motion that contains not a *single fact citation* in the entire "Analysis" section of its brief.  *See* Dkt. 134 ("EEOC Br.") at 23-43.  The cites that the EEOC does provide in its "Fact Summary" section likewise fail to support the EEOC's lofty description of Williams's role.  To take just one example, the EEOC maintains that Williams "coordinated the hiring process for two Senior Associate Athletics Directors."  *Id.* at 7.  The EEOC cites 25 paragraphs of its Statement of Undisputed Material Facts ("EEOC SMF") to support this assertion.  EEOC Br. at 7 (citing EEOC SMF ¶¶ 40-54, 198-209).  But those paragraphs show that Williams "coordinated" hiring by "schedul[ing] all of the candidates' phone screens" and "book[ing] the candidates' travel and lodging."  EEOC SMF ¶¶ 45-46.  The EEOC cannot create a "genuine dispute" of "material" fact where none exists by relying on ambiguous, undefined terms like "coordinate" in its brief.  Fed. R. Civ. P. 56(a).

Actual examination of the evidence shows that Williams and Aresco received different pay for substantially different work:  Williams provided clerical support as the *assistant to* the Athletics Director, while Aresco had policymaking authority as an *Assistant Athletics Director*.  *See* Dkt. 112-1 ("Univ. Br.") at 1-2.  Although the EEOC attempts to salvage its Equal Pay Act ("EPA") claim by arguing that Williams, too, had "wide-ranging responsibility" for contracts, human

resources, budgets, and project management, EEOC Br. at 4, the record reveals that to the extent Williams touched these areas, she was only carrying out instructions or relaying messages from her boss, Nero—not exercising independent judgment or authority.  Under these circumstances, no reasonable juror could find that she and Aresco performed substantially equal work.

This Court also should reject the EEOC's Title VII claim because the EEOC has offered no evidence that Williams suffered any adverse employment action—much less one due to gender. The EEOC appears to have abandoned its original argument that the University discriminated against Williams by failing to promote her to the Special Assistant role (likely because such an argument is foreclosed by Williams's admitted failure to apply for the job).  *See* EEOC Br. at 35. Instead, the EEOC now argues that the University violated Title VII by denying Williams an amorphous "opportunity for advancement." *Id.* at 35, 37.  But the only tangible "opportunity for advancement" that the University denied Williams was her request that the University create an entirely new position for her that has never existed.  *See* Dkt. 112-2 ("Univ. SMF") ¶¶ 103-07. The EEOC has cited no caselaw—and the University is aware of none—that would support a Title VII claim based on an employer's failure to create a new role for an employee simply because she asked for it.  And of course, the EEOC does not explain why—if the University had been motivated to discriminate against Williams due to her gender—it would have gone on to hire her for a different position that did exist outside the Athletics Department, where she ultimately earned *more* than the male comparator at the heart of the EEOC's EPA claim in this case.  *See id.* ¶ 337.

At bottom, the EEOC's case rests on nothing more than Williams's uncorroborated, self-serving narrative, which conflicts with the documentary record and does not suffice to create a "genuine" dispute of material fact.  For these reasons, and those set forth in the University's Motion, the University is entitled to summary judgment.

**ARGUMENT**

**I.      The EEOC's Cross-Motion Should Be Denied Because Its Memorandum of Law Violates Local Civil Rule 7(h) And The Court's Scheduling Order.**

This Court struck the EEOC's entire initial summary judgment filing for failure to comply with Local Civil Rule 7(h) and the Court's Scheduling Order.  *See* Dec. 21, 2022 Minute Order. Although the EEOC had more than five weeks to cure the defects in its original filing, the EEOC returned with a new Cross-Motion for Summary Judgment that again flouts the Court's Order and the Local Rule.[1]  This Court directed the parties to "furnish **precise citations** to the portions of the record on which they rely" "when briefing motions for summary judgment."  Dkt. 111 at 2 (emphasis in original).  Despite the Court's bolded language, such "precise citations" are nowhere to be found in the EEOC's brief.  The EEOC's repeated failure to abide by the Court's Order in and of itself justifies denial of the EEOC's summary judgment bid.  At minimum, none of the EEOC's unsupported factual assertions should be credited.

The entire "Analysis" section of the EEOC's brief does not contain a ***single*** citation to the record.  *See* EEOC Br. at 23-43.  The agency instead forces the University—and the Court—to forage through the brief's "Fact Summary" section to attempt to ascertain whether the EEOC's arguments do, indeed, have support in the record.  Unfortunately, even the "Fact Summary" section affords little help to the reader.  Rather than furnish the "**precise citations**" required by the Court's Order, the EEOC cites to broad paragraph ranges in its SMF, forcing the reader to undertake an unguided expedition through the record.  *See, e.g.*, EEOC Br. at 7 (citing EEOC SMF ¶¶ 26-39);

---

[1]    The EEOC's Opposition (the "Opposition") to the University's Statement of Undisputed Material Facts likewise violates both Local Civil Rule 7(h) and this Court's Order.  Although the University brought the deficiencies in the Opposition to the EEOC's attention in accordance with Local Civil Rule 7(m), the EEOC declined to cure the deficiencies, which required that the University move to strike the EEOC's Opposition.  *See* Dkt. 141.  As set forth in the University's Motion to Strike, the EEOC's Opposition should be stricken and all facts in the University's Statement of Undisputed Material Facts should be deemed admitted.  *See id.*

*id.* at 8 (citing EEOC SMF ¶¶ 55-70); *id.* at 9 (citing EEOC SMF ¶¶ 82-104); *id.* at 14 (citing EEOC SMF ¶¶ 138-72, 148-67).   To give one egregious example, the EEOC claims that former Athletics Director Patrick Nero "planned to give Aresco . . . work that Williams already was doing."   EEOC Br. at 10.   The EEOC then directs the reader to ***67 paragraphs*** in its SMF that supposedly support this assertion, *see id.* (citing EEOC SMF ¶¶ 105-172), even though none of those paragraphs actually contains evidence that Nero intended to or did transfer Williams's job duties to Aresco.   These citations do not comply with Local Civil Rule 7(h) or this Court's Order. *See, e.g.*, *Wilkins v. Dist. of Columbia*, No. 17-cv-884, 2019 WL 3767164, at *2 (D.D.C. Aug. 9, 2019) (Kollar-Kotelly, J.) (where proper "references to the record are lacking," a court cannot "decide motions for summary judgment efficiently and effectively").

The EEOC's brief is also replete with factual assertions that lack ***any*** evidentiary support, even in the "Fact Summary" section.   For example, the EEOC offers a host of speculative reasons why Aresco's transfer from Assistant Athletics Director for Operations, Events, and Facilities to the Special Assistant role supposedly could not have been a lateral move, but not one of these assertions is accompanied by a citation to the record.   *See* EEOC Br. 12-13.   Similarly, the EEOC claims that Aresco had "no" experience working in athletics administration before he became the Special Assistant and that the Special Assistant position was not one that "required or used" the prior "Athletics experiences" that Aresco did have.   *Id.* at 2, 25.   But the EEOC offers nothing beyond its own say-so to prove that these assertions are true.   And the actual evidence in the record demonstrates that they are false.   *See, e.g.*, Univ. SMF ¶ 208 (Aresco "highlighted his experience as an Assistant Athletics Director at the University" in his application for Special Assistant); *id.* ¶¶ 193, 212-15 (Vogel and Nero viewed Aresco's prior experience "as a sport administrator and serving on the senior staff" as helpful for the Special Assistant position, which listed among its

preferred qualifications "4+ years administrative experience in [a] similar role").

The EEOC's rhetoric—devoid of proper record citations—provides no basis for the Court to grant the EEOC's Cross-Motion. "The Court does not accept factual assertions by counsel that are not supported with citations to the record, nor does it scour the record for evidence that will support a party's claims." *Payne v. Dist. of Columbia*, 741 F. Supp. 2d 196, 216 n.9 (D.D.C. 2010) (Kollar-Kotelly, J.). "Judges are not like pigs, hunting for truffles buried in briefs or the record." *Hajjar-Nejad v. George Wash. Univ.*, No. 10-cv-626, 2013 WL 12407402, at *1 (D.D.C. May 13, 2013) (Kollar-Kotelly, J.). "In these situations, . . . the Court has no choice but to conclude" that the EEOC has failed to support its arguments "with specific evidence and references to the record because [it] cannot—the evidentiary foundation is not there." *United States ex rel. El-Amin v. George Wash. Univ.*, 533 F. Supp. 2d 12, 19 (D.D.C. 2008) (Kollar-Kotelly, J.).

Here, the EEOC's pervasive failure to provide factual support for its arguments in and of itself justifies denying the EEOC summary judgment. This outcome is warranted because the agency's disregard for this Court's Order and Local Civil Rule 7(h) is only the latest example in a long-running pattern of unreasonable litigation conduct. From the outset of this case in 2017, the EEOC has pursued a scorched-earth litigation strategy that is far out of proportion to the amount in controversy in this case, which involves—at most—a $90,000 wage differential. *See* Dkt. 53 at 2-3 & n.2. The EEOC unreasonably terminated the conciliation process, eliminating the prospect of an early resolution that could have saved resources for both sides. *See* Dkt. 10-1 at 21-23. The EEOC then engaged in a series of abusive discovery tactics, documented by Magistrate Judge Harvey in three lengthy, published opinions. *See* Dkts. 53, 69, 107. Now, after more than two years of discovery, the EEOC has not even bothered to support the arguments in its brief with citations to the thousands of documents that it insisted the University produce. Enough is enough.

The EEOC's flagrant disregard for the Rules throughout this litigation justifies denial of summary judgment to the EEOC. At a minimum, the Court should disregard each factual assertion in the EEOC's brief that lacks a "precise citation" to the record. Dkt. 111 at 2 (emphasis omitted).[2]

## II. The Court Should Grant The University's Motion for Summary Judgment Because No Reasonable Juror Could Conclude The University Violated The Equal Pay Act.

The University demonstrated in its Motion why the EEOC's EPA claim is meritless: Williams received lower pay than Aresco because her duties were largely clerical, while he held a senior leadership role within the Athletics Department. *See* Univ. Br. at 12-30. The EEOC counters that Williams, too, had "significant and wide-ranging responsibility," with duties that allegedly overlapped with Aresco's in contracts administration, project management, human resources, budget management, and special projects. *See* EEOC Br. at 4-5. But the agency's exaggerated account of Williams's job rests on its use of vague descriptions, including *13* uses of the word "coordinate" to mask in broad strokes the specific tasks that Williams actually performed.

---

[2] Even if the Court were inclined to grant some portion of the EEOC's Cross-Motion, the Court still should reject the EEOC's Cross-Motion with respect to the University's *Kolstad* and unclean hands defenses. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545 (1999), provides that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." Here, the University strictly prohibits discrimination based on sex, and its Compensation Department follows robust procedures for setting salaries based on merit, including by examining education and years of experience. Dkt. 135-4 at 69-72 (Univ. Resp. to EEOC Interrog. No. 12). The Compensation Department reviewed Aresco's pay as Special Assistant and found that it was justified as a "lateral transfer." Dkt. 135-7 at 57. Nothing about that process shows that the University failed to implement its Title VII policies in good faith. And the EEOC's suggestion that the University cannot rely on the *Kolstad* defense because it "refuse[d] to produce information or documents regarding the ultimate question presented by *Kolstad*" already has been rejected by Magistrate Judge Harvey. Dkt. 107 at 47-49. As to unclean hands, the EEOC is incorrect that this defense is unavailable when the government sues as a plaintiff. EEOC Br. at 41. Although an agency "may not be estopped on the same terms as any other litigant," the unclean hands defense remains available where the government's interest "is outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017). That is the case here. The EEOC's brief does not address, much less defend, the egregious litigation conduct that supports the University's unclean hands defense.

*See, e.g.*, EEOC Br. at 5 (Williams "*coordinated* contract workflow"); *id.* at 6 ("Williams *coordinated* with OGC, head coaches, the finance director, Facilities and Nero for approval and payment"); *id.* at 6 (Williams was responsible for "*coordination* of senior staff meetings"); *id.* at 7 (Williams "*coordinated* the presentation of new and significant Human Resources processes") (emphases added).  Tellingly, the EEOC often fails to describe what this "coordination" entailed. Where the EEOC does rely on exhibits to illustrate this "coordination," the exhibits show Williams "coordinated" tasks by serving as a mere information-gatherer or information-provider on behalf of Nero.  These exhibits make clear that it was, in fact, a combination of Nero and Aresco—not Nero's executive assistant—who had "wide-ranging responsibility" in contracts administration, project management, human resources, budget management, and special projects.  The EEOC cannot survive summary judgment armed only with vague generalizations and Williams's "self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence." *Jimenez v. Wolf*, No. 19-cv-2055, 2020 WL 13546497, at *3 (D.D.C. Sept. 29, 2020); *see also Polak v. Va. Dep't of Env't Quality*, 57 F.4th 426, 430 (4th Cir. 2023) (affirming summary judgment to employer under EPA where the plaintiff relied "mostly on her own declaration" and "on broad generalizations at a high level of abstraction").

### A.   The Record Contradicts The EEOC's Assertion That Williams Spent The "Vast Majority" Of Her Time On Non-Clerical Tasks.

To prove a violation of the EPA, the EEOC must show that Williams earned less money than Aresco for performing work that required "equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).  Here, the University has produced evidence that Aresco functioned as a chief of staff to Nero and had authority over Athletics Department contracts, human resources, and strategic planning. *See, e.g.*, Univ. SMF ¶ 238.  The EEOC attempts to show that Williams "performed the same core tasks" as Aresco, EEOC Br. at 14, but the record either refutes the EEOC's allegations

or shows that Williams merely assisted with the projects over which Aresco had real responsibility.

As a threshold matter, the record does not support the EEOC's assertion that Williams's "primary" duties were "to provide project, financial, . . . and human resources support."  EEOC Br. at 25.  In its opening brief, the University offered a wealth of evidence that proves the functions Williams performed as Nero's executive assistant were principally clerical in nature.  The University's exhibits included inch-thick stacks of emails, showing that Williams spent her workday printing documents, scheduling meetings, and submitting expenses for reimbursement. *See* Dkt. 113-5; Dkt. 113-9; Dkt. 113-13.  The University also pointed to Williams's own contemporaneous descriptions of her job duties, which contradict her newfound claim that she performed only "*some* clerical tasks."  Dkt. 135-10 ¶ 5 (emphasis added).  In the annual self-assessment she completed in 2015, for example, Williams described her role as follows:  "On a daily basis I provide assistance and clerical support for the Athletic Director (AD) and senior administrators, as well as office management/receptionist functions for the athletic office including managing calendars, answering phones, responding to messages and assisting with walk-ins." Univ. SMF ¶ 23 (quoting Dkt. 115-10).  Similarly, Williams's LinkedIn profile listed her principal duties as "[o]versee daily calendar, scheduling of meetings, and management of task list systems," along with "[p]lan and manage Director of Athletics and Recreation travel."  Dkt. 115-5.

The EEOC argues that the University takes an overly narrow view of Williams's job duties based on her official job description while "ignoring" her testimony that she handled more than just "clerical duties."  EEOC Br. at 25.  But the University is not arguing that the Court should look only at Williams's job description, to the exclusion of other evidence.  The job description is merely one piece of evidence cited by the University, all of which confirms Williams's "principal responsibilities" consisted of tasks such as "managing [the] calenda[r]," "scheduling meetings,"

and "preparing travel itineraries." Univ. SMF ¶¶ 23, 27, 37, 39, 41. Williams herself conceded at deposition that she understood these tasks—that is, "managing the calendar" and "scheduling meetings"—to be among her "principal job functions" when she applied to be Nero's executive assistant. Dkt. 115-2 at 21:23-22:18, 30:22-32:8, 38:22-39:7. And Williams described her executive assistant duties on her resume to include "scheduling" and "processing and filing financial receipts and tracking expenses." Univ. SMF ¶ 98. Nowhere on her resume, LinkedIn profile, or annual self-assessment did Williams claim to have performed significant work on "contract administration, managing multiple budgets, project management . . . or human resource support," much less assert that she spent the "vast majority of [her] time and effort" on these tasks. Dkt. 135-10 ¶ 5. Indeed, the reason that Williams applied for several different jobs during her tenure as Nero's executive assistant was that she *wanted* to work on these tasks but did not. As she said at the time, "I don't want to just do the schedule anymore." Univ. SMF ¶ 83.

Even the EEOC's own SMF makes clear that Williams served in an administrative support role and did not exercise the same degree of authority that Aresco possessed. The agency asserts, for example, that Williams "*assisted* . . . with the . . . performance evaluation process." EEOC SMF ¶ 49 (emphasis added). But Aresco actually conducted performance reviews for the men's rowing coach, whom he supervised. Univ. SMF ¶ 288. Williams supposedly "*coordinated* the presentation of new or significant Human Resources processes at senior staff meetings." EEOC SMF ¶ 53 (emphasis added). But Aresco delivered presentations at senior staff meetings about Athletics Department policies that he had crafted. Univ. SMF ¶¶ 239, 306; Ex. E-16 at GWU_044001 (agenda reflecting Aresco presentations). Williams allegedly also "*coordinated* the hiring process" for two Senior Associate Athletics Directors. EEOC SMF ¶ 43 (emphasis added). But Aresco led the search process and helped decide whom to hire as the head women's basketball

coach, the head sailing coach, an assistant softball coach, an assistant women's gymnastics coach, and an assistant women's lacrosse coach.  Univ. SMF ¶¶ 250-52.  Williams claims to have performed certain "sport administrator functions" for the men's basketball team for at least a brief period of time, EEOC SMF ¶ 101, but Aresco served as the sport administrator for the men's rowing program throughout his tenure as Special Assistant, Univ. SMF ¶ 281.

Although the EEOC focuses on eight areas of alleged overlap between Williams's and Aresco's duties, the evidence shows that in each area, Williams merely provided clerical support (at most) whereas Aresco exercised substantive responsibility.  As the D.C. Circuit has recognized, "[a]ssisting with a task is not the same as having ultimate responsibility" for it under the EPA. *Holcomb v. Powell*, 433 F.3d 889, 898 (D.C. Cir. 2006).

1.  Williams Input Information Into Non-Financial Form Contracts, While Aresco Drafted And Negotiated Coach Contracts

The EEOC first contends that Williams and Aresco performed substantially equal work because they both were involved in contract administration for the Athletics Department.  *See* EEOC Br. at 15.  But Aresco negotiated and drafted major Athletics Department contracts, Univ. SMF ¶¶ 248-50, while Williams's role with respect to contracts was a purely clerical one, *id.* ¶ 36.

According to the EEOC, Williams "administered" contracts by sending them through interoffice mail and collecting signatures from the Office of General Counsel ("OGC"), the Finance Department, and Athletics Department administrators.  *See* EEOC Br. at 5; *see also* EEOC SMF ¶ 16 (asserting that Williams "coordinated workflow" to "obtain all appropriate signatures on game and team contracts").  The EEOC claims that Williams also "ensured that financial obligations" under the contracts "were met," citing to testimony from former University Finance Director Rosemarie Sanchez Chee-Wah.  EEOC Br. at 5 (citing EEOC SMF ¶ 16).  But Chee-Wah testified only that Williams brought the contracts to her (Chee-Wah) so *she* could confirm the

Department had sufficient funding to satisfy its obligations under the contract—and to inform Nero if it did not.  *See* Dkt. 135-8 at 49:13-19 (Finance Director testifying, "If I see that they're negotiating for 95,000 and the budget is only for 80, where are you getting the other 15,000 from? [Williams]'d go back and have those conversations with . . . Patrick [Nero]").

The EEOC contends that the most "importan[t]" aspect of Williams's contract administration duties was filling out game contracts.  EEOC Br. at 5.  Although the EEOC describes these contracts as "voluminous," *id.* at 15, they are one-paragraph form agreements that list the date and time of a game and the names of the teams scheduled to compete.  *See* Nero Suppl. Decl. (Univ. Ex. D) ¶ 14 & Ex. D-1.  Creating these contracts required collecting the schedules from coaches and plugging this information into what the EEOC describes as "a form-fillable template."  EEOC Br. at 5; Dkt. 135-11; Nero Suppl. Decl. ¶ 17; *see also* Univ. SMF ¶ 36 (same). The vast majority of game contracts were "non-financial, meaning there was no guaranteed money that one school would pay the other school."  Nero Suppl. Decl. ¶ 14.  For the approximately 10% of game contracts that involved a financial obligation, Nero required Williams to obtain his specific authorization before sending the game contract to the other school for signature.  *Id.* ¶ 18.

Williams claims, for the first time in her declaration, that she actually created the form-fillable template and obtained approval for it from the University's OGC.  EEOC Br. at 5.  But Nero, Williams's boss, attested that he had no knowledge of Williams ever creating such a template, much less obtaining approval for it from OGC.  Nero Suppl. Decl. ¶ 19.  Rather, Nero testified that he told OGC game contracts were "boilerplate documents" that he did not believe merited attorney review at all.  *Id.* ¶ 20.  Regardless, even assuming that Williams did create the "form-fillable template," that shows only she was adept at using software to make her data-entry process more efficient, not that she had any substantive responsibility for contractual content.

The EEOC also asserts that Williams created a "tracking system" for game contracts, which previously resided in a mere "hard copy" binder.  EEOC Br. at 5.[3]  But the fact that Williams kept track of contracts does not suggest she had a substantive role in drafting or negotiating them.  And while the EEOC suggests Williams created a tracking system for the "contracting process" generally, EEOC Br. at 5, the testimony that the EEOC cites makes clear that Williams simply kept a record of game contracts—no more.  EEOC SMF ¶ 23 (citing Dkt. 135-8 at 48:11-49:19).

Filling in the blanks on boilerplate contracts and keeping track of those contracts are administrative support tasks consistent with the role of an executive assistant, and are not comparable to the contract-related work that Aresco performed.  As the Assistant Athletics Director for Operations, Events, and Facilities, Aresco negotiated a contract to rent space in the University athletics arena to the Washington Kastles.  Univ. SMF ¶¶ 134-35.  Aresco's work on the Kastles agreement helped show Nero that Aresco had the skills to serve as Special Assistant— a role that gave him oversight of (among other things) coaching contracts.  *Id.* ¶¶ 242, 274-77.  Ultimately, Aresco helped negotiate and draft the University's contracts with several Department coaches, including head women's basketball coach Jennifer Rizzotti.  *Id.* ¶¶ 276, 255-56.

The EEOC disputes that Aresco negotiated the University's contract with Nike, arguing that "record evidence shows that the Nike contract was . . . already [in] place" by the time Aresco became Special Assistant and that Aresco "simply forwarded" the renewal agreement to Nero.  EEOC Br. at 15, 28.  But the exhibit on which the EEOC relies addresses a *separate* contract between Nike and Mike Lonergan, the former men's basketball coach, which was signed in 2015— before Aresco became Special Assistant.  *See* EEOC SMF ¶ 176 (citing Dkt. 140-23).  The EEOC

---

[3]  As support for its assertion that Williams created an electronic tracking system, the EEOC cites Chee-Wah's deposition testimony.  But Chee-Wah described Williams's alleged tracking system as "a binder of sorts."  Dkt. 135-8 at 48:11-17.

offers no evidence to rebut the testimony of multiple University witnesses, all of whom swore that Aresco negotiated the University's contract with Nike. *See* Univ. SMF ¶¶ 276-77. Similarly, the EEOC purports to dispute that Aresco drafted portions of the Rizzotti contract, asserting that "OGC drafted the contract." EEOC Br. at 26 (citing nothing). But the EEOC supports this assertion with nothing more than its own say-so. *Id.* The EEOC's bare assertion does not create a genuine dispute of material fact when the University has produced testimony from *two* witnesses, both of whom said that Aresco drafted portions of the Rizzotti contract. *See* Univ. SMF ¶¶ 255-56.

The EEOC also alleges that Williams "negotiated certain contracts herself": namely, a contract with Xerox for the use of copy machines at two University campuses and a contract with Marriott to host the senior honors breakfast. EEOC Br. at 5-6. But the agency fails to substantiate that assertion with anything other than Williams's own self-serving testimony, EEOC SMF ¶¶ 24-25, and, as explained below, the documentary record refutes that Williams negotiated these contracts. Williams's bare assertion that she negotiated these contracts does not suffice to create a genuine dispute of material fact precluding summary judgment. *See, e.g.*, *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) (a plaintiff cannot defeat summary judgment "when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence"); *Agelli v. Burwell*, 164 F. Supp. 3d 69, 76 (D.D.C. 2016) (concluding that plaintiff's "self-serving affidavit cannot, without more, create a genuine dispute of material fact" where the allegations in the affidavit were "flatly contradicted" by other evidence in the record).

The only correspondence between Williams and Xerox in the record are emails in which Williams requests help from Xerox representatives with malfunctioning printers. On one occasion, Williams informed a Xerox representative that the Athletics Department was "out of black toner

again" and needed an "expedited" shipment of four cartridges because "we cannot use our printer until we have our black toner replaced." Ex. E-9. On another occasion, Williams informed Xerox that the "admin password is not working again" and asked for it to be reset. Ex. E-8. The company advised that she "reboot the machine." *Id.* These emails are the full extent of Williams's alleged Xerox "contract administration" duties.

The record also undermines the EEOC's assertion that Williams "negotiated" a $23,000 contract with a local Marriott hotel to host the senior honors breakfast. EEOC Br. at 6; EEOC SMF ¶ 97. The actual Marriott contract, which the EEOC does not attach as an exhibit to its Motion, is a standard form agreement created by the hotel. Marriott's logo appears at the top above the title, "Group Sales Agreement." Ex. E-11. The University had held the senior honors breakfast at the Marriott for years prior to Williams becoming Nero's executive assistant, and Williams's role with respect to the contract was simply to tell the hotel how many guests to expect for the annual reception and what kind of audio-visual equipment the University required. Nero Suppl. Decl. (Ex. D) ¶ 50. Admittedly, Williams once asked if the hotel would lower the standard per-person cost of the breakfast. Marriott declined, but it did offer a consolation: "We are not able to lower the cost of the breakfast but I have included hashbrowns and given the option of turkey bacon for the guests that will require it." Ex. E-10. Securing these breakfast choices as a consolation marks the full extent of Williams's negotiation of this "significant" contract, EEOC Br. at 6—which cost the University $10,295 (as can be seen from the face of the document), rather than the $23,000 the EEOC claims, Ex. E-11.

Based on the undisputed evidence, no reasonable jury could conclude that Williams and Aresco performed "substantially equal" work with respect to contracts. *See, e.g.*, *Johnson v. Dist. of Columbia*, 947 F. Supp. 2d 123, 130 (D.D.C. 2013).

2.     Williams Checked On The Status Of Projects At Nero's Request,
While Aresco Helped Manage The Department's Strategic Plan

The EEOC contends that Williams and Aresco each attended Athletics Department meetings and took charge of "project management of the tasks assigned during the meetings." EEOC Br. at 6, 14-15.  But the EEOC does not dispute that Williams and Aresco played different roles at the meetings themselves.  Nor could it.  Aresco participated in the substantive discussion at these meetings, whereas Williams simply listened and took notes.  Univ. SMF ¶ 306; EEOC SMF ¶ 34; Ex. E-16 at GWU_044001.  The EEOC suggests that Williams somehow influenced the discussion at meetings by drafting an agenda in advance and "plot[ting] agenda items based on the strategic needs of the Department."  EEOC Br. at 6.  But "plotting agenda items" in plain English meant that Williams "collected agenda items from senior staff" and pasted them into a Word document prior to the meeting.  EEOC Br. at 6; Nero Suppl. Decl. (Ex. D) ¶ 39.  Williams would then send her draft to Nero, with a copy to Aresco, so they could "tell her the order" in which the topics should "appear on the agenda."  Nero Suppl. Decl. ¶ 40; Ex. E-16.  In other words, Williams exercised no independent judgment or decision-making authority, even with respect to the order in which the agenda items were discussed; that judgment and authority resided in Nero and Aresco.  *See* Nero Suppl. Decl. ¶ 40; Ex. E-16.

The record also does not support the EEOC's claim that Williams managed projects assigned at senior staff or head coaches' meetings.  *See* EEOC Br. at 6-7.  The EEOC contends that "Williams was responsible for keeping track of deadlines and reminding the staff members when their deadlines were approaching."  *Id.*  But Williams sent these reminders on Nero's behalf.  *See* Dkt. 135-12.  She did not have independent authority to review, revise, or complete Department projects herself.  The lone document the EEOC provides to illustrate Williams's "project management" duties says simply:  "Patrick did not receive the second half of the report.

Please follow up on Monday to get it." *Id.*  In other words, Williams's "project management" was limited to relaying a message from Nero.  *See id.*  Williams's role was even less significant with respect to head coaches' meetings than senior staff meetings.  Nero advised Williams that she did not even need to sit in on head coaches' meetings: "Since we do not take minutes at these meetings it is really not necessary for you [to] attend," he wrote.  Univ. SMF ¶ 37.  The EEOC's brief does not address this email, even though the University quoted it in its opening brief.  Univ. Br. at 26.

The EEOC describes Williams's other alleged project management duties in such vague terms that it is impossible for the University to discern what specific tasks she claims to have performed.  For example, the agency alleges that Williams "coordinated with senior staff to assist in completing tasks and expediting processes," without explaining what the "coordination" entailed or how she "assisted" in completing unspecified "tasks" or in "expediting" unidentified "processes."  EEOC Br. at 7.  Regardless, this language suggests Williams provided support to the senior staff members who, in turn, were the persons with substantive responsibility for Department projects.  That clerical support role does not "equal" or "substantially equal" the management role held by Aresco, *Johnson*, 947 F. Supp. 2d at 130, who functioned as chief of staff for the Athletics Department and had independent responsibility not only for "following up" with members of the senior staff about specific projects, but also for tackling projects himself and ensuring that Nero's long-term strategic goals for the Department were accomplished—whether that meant deciding how to implement a University-mandated 20% budget cut, developing Athletics Department HR policies, or negotiating coaching contracts.  *See, e.g.*, Univ. SMF ¶¶ 238, 242, 297, 307.

### 3. Williams Scheduled Interviews And Booked Travel, While Aresco Made Hiring Decisions and Drafted HR Policies

One of Aresco's principal responsibilities as Special Assistant was "overseeing HR" for the Athletics Department.  Univ. SMF ¶ 240.  In that role, Aresco drafted hiring plans, including

salary proposals, for coaches, trainers, and other Department employees, *id.* ¶¶ 244-45; he screened resumes, interviewed job candidates, and participated in decisions about which coaches to hire, *id.* ¶¶ 248-50; he managed the merit pay increase process for Department employees, *id.* ¶ 260; and he participated in deliberations about whether to fire a coach, *id.* ¶¶ 261-62.  The EEOC asserts in its brief that Williams maintained her own "substantial Human Resources duties," EEOC Br. at 7, but none of these alleged duties bears the faintest resemblance to Aresco's.

First, the EEOC claims that Williams "coordinated the hiring process for two Senior Associate Athletics Directors, Ed Scott and Tanya Vogel."  EEOC Br. at 7.  But as the EEOC goes on to describe—and as its cited exhibits make clear—"coordinating" in this context simply meant that Williams "booked travel" for Vogel and Scott and scheduled times for them to meet with other members of the Athletics Department.  *Id.*  In other words, Williams "scheduled candidates for phone screens" and "handled . . . reimbursements for trip expenses," *id.*—the very types of clerical tasks the University contends were the core elements of her job as Nero's executive assistant.

The agency tries to bolster Williams's role with respect to Vogel and Scott's hiring, arguing that Williams also "assembled interview panels with head coaches."  EEOC Br. at 7.  But the underlying document the EEOC cites shows only that Williams contacted the specific coaches who *Nero* decided should conduct the interviews.  EEOC SMF ¶ 45 (citing Dkt. 140-6).  Her email to these coaches reads:  "*Patrick would like you to be involved* in [the] interview process of the candidates for Senior Associate Athletic Director."  Dkt. 140-6 at 6 (EEOC0001386) (emphasis added).  Similarly, the EEOC contends that Williams "worked closely" with Kaithlyn Kayer in the HR office on Vogel and Scott's hiring.  EEOC Br. at 7.  But the same exhibit shows that Williams simply relayed requests from Nero to Kayer.  Nero emailed Williams, "Can I get the applications to look at this am," and Williams then forwarded that request to Kayer, writing:  "Patrick would

like you to provide the applications this morning, please." Dkt. 140-6 at 3 (EEOC0001289). The EEOC contends that Williams "handled budget allocations" for the expenses that Vogel and Scott incurred for their travel to the University. EEOC Br. at 7. But, once again, she did so only as Nero's agent and had no independent authority to decide where the University would draw these funds. Williams told the interim Finance Director: "I spoke to Patrick and *he has advised* that the expenses for Ed and Tanya's trip . . . be allocated to the Administration budget." Dkt. 140-6 at 2 (EEOC0000988) (emphasis added).

Similarly, the record reflects that Williams's only role with respect to "hiring plans" was to relay information from Nero to the Finance Director regarding the Athletic Department's anticipated hiring needs. EEOC SMF ¶ 47. Chee-Wah, whose testimony the EEOC cites, stated that "Sara would get me answers. She would meet with Patrick, get whatever answers are necessary [to] keep the process flowing." Dkt. 135-8 at 40:8-41:14 (cited at EEOC SMF ¶ 47).

The EEOC also offers *no* evidence, beyond Williams's late-breaking, self-serving declaration, that she "worked with coaches on their hiring needs," nor does it provide any details about what that work allegedly entailed. EEOC Br. at 7; EEOC SMF ¶ 48. Williams's vague, one-sided, and uncorroborated account that she assisted coaches with unspecified hiring needs is not "persuasive" evidence "capable of defeating" the University's Motion. *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022); *see also Jimenez*, 2020 WL 13546497, at *3.

Nor does the EEOC offer any evidence that Williams routinely "created hiring packets." EEOC Br. at 7. To the contrary, Williams claims she created a hiring packet only once—when Aresco allegedly neglected to submit the packet.[4] EEOC SMF ¶ 202. As Williams acknowledged,

---

[4] Of course, the only evidence that Aresco neglected to submit the hiring packet for this employee is Williams's self-interested declaration. EEOC SMF ¶ 202 (citing only Dkt. 135-10 ¶ 80).

creating such packets fell outside of her ordinary job duties:  "Mike Aresco handles all of our HR and hiring information" for the Athletics Department, Williams wrote at the time.  Univ. SMF ¶ 243.  The EEOC makes the same concession in its SMF, stating that Williams appointed herself to "step in" and submit this paperwork even though it was among "*his* [Aresco's] HR duties." EEOC SMF ¶¶ 200-01 (emphasis added).  The fact that Williams assisted with a hiring packet on a single occasion does not render her job substantially equal to that of Aresco.  The job-equality inquiry "focuses on the primary duties of each job," not one-off examples of overlapping work. *Goodrich v. Int'l Bhd. of Elec. Workers*, *AFL-CIO*, 815 F.2d 1519, 1523-24 (D.C. Cir. 1987).

The EEOC also claims that Williams assisted with "onboarding" new employees.  EEOC Br. at 7.  At deposition, however, Williams identified only one such onboarding task:  she claimed to have drafted "offer letters" during the brief period between Brian Hamluk's departure as Assistant Athletics Director in August 2015 and Aresco's assumption of Hamluk's duties that fall. EEOC SMF ¶ 42; Dkt. 135-20 at 215:3-18; Nero Suppl. Decl. (Ex. D) ¶ 64.  Even assuming that Williams temporarily performed this task, there is no evidence that "onboarding" new employees was a permanent or substantial part of her role.  *See, e.g.*, Lindemann, Grossman & Weirich, 1 *Employment Discrimination Law* § 19-30 (5th ed. 2012) ("An employee temporarily filling in for a higher-paid person cannot normally be said to be performing the same job.").

To round out Williams's alleged human resources duties, the EEOC claims that Williams "submitted all performance reviews," EEOC Br. at 7, but this task involved nothing more than asking sport administrators to bring her a signed "hard copy" of completed performance reviews so she could deliver them "for Patrick's signature."  Dkt. 135-18; EEOC SMF ¶ 52.  Aresco, meanwhile, managed the merit pay process and actually completed performance reviews for the

men's rowing coach, who reported to him.[5]  Univ. SMF ¶¶ 260, 288.  The EEOC also asserts that Williams "coordinated the presentation of new and significant Human Resources processes at senior staff meetings."  EEOC Br. at 7.  But the agency does not say what "coordinat[ing]" the presentation of these "processes" involved—it could simply mean that Williams added an item to the senior staff agenda or set up PowerPoint slides in a conference room.  *See* Dkt. 135-13 (email from Williams to HR, requesting copy of new staffing policy she could attach to minutes of senior staff meeting).  Aresco, on the other hand, actually gave presentations at senior staff meetings about new Department policies that *he developed*.  Univ. SMF ¶¶ 263-67.

> 4.  Williams's Testimony Regarding Her Budget Management Duties
> Is Contradicted By The Record

As sport administrator for the men's rowing program, Aresco exercised oversight of the men's rowing budget and reviewed the head coaches' requests for major purchases and team travel—facts the EEOC does not dispute.  *See* Univ. SMF ¶¶ 281, 285.  The EEOC contends that budget management also constituted one of Williams's "most significant responsibilities," EEOC Br. at 7, but the agency once again rests this assertion on Williams's testimony and fails to confront other, undisputed evidence in the record that undermines her exaggerated account.

Both the current and former Athletics Directors disputed that Williams managed any budgets.  When the EEOC's lawyer asked Nero, Williams's boss, whether Williams managed any budgets, his answer was an unambiguous "No."  Univ. SMF ¶ 48.  The current Athletics Director, a woman—who, at the time, was a Senior Associates Athletics Director—testified in lockstep with Nero, stating that Williams "didn't manage any budgets" and that long-term budget forecasting "was not part of Sara's role."  *Id.* ¶ 52.  Williams's own, contemporaneous description of her job

---

[5] The EEOC does not claim that Williams prepared performance reviews for the student interns whom she allegedly supervised, which is further proof that her supervisory duties were not substantially equal to Aresco's.  *See* pp. 24-25, *infra*.

as Nero's executive assistant likewise reflects that her budget duties were limited to submitting expenses for reimbursement and ensuring they were paid from the accounts Nero had designated. *Id.* ¶ 98; Nero Suppl. Decl. (Ex. D) ¶¶ 27-28.  The University's 2016 desk audit reached this same conclusion, finding that Williams performed only "aspects" of the finance associate role—a position the Finance Director likened to a "worker bee" who "just process[es] expense reports." Univ. SMF ¶¶ 330-31.  Nor would it have made sense for Williams to perform finance functions beyond these rote tasks:  She was not a member of the Finance Department, she did not report to Chee-Wah (the Finance Director), and she had no background in finance.[6]

The EEOC fails to address any of this evidence in its brief, instead asserting that Williams managed three budgets worth millions of dollars and, for each of them, was "responsible for five-year forecasting, conducting quarterly budget reviews, and monthly and weekly reconciliation, as well as processing and filing receipts."  EEOC SMF ¶ 57.  The EEOC rests this claim entirely on Williams's uncorroborated declaration and deposition testimony, untethered to a single document in the record.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015).

Here, Nero attested that budget forecasting was *his* responsibility, and in that capacity, he asked Williams to help him gather information from other members of the Athletics Department. Nero Suppl. Decl. (Ex. D) ¶ 31.  Williams served as a mere "conduit" between him and members

---

[6]  Indeed, the record suggests that Williams's only foray into finance prior to serving as Nero's executive assistant was the D+ grade she earned in her financial accounting course at West Chester University.  *See* Dkt. 11-2 at 19 n.3 (citing SMF ¶ 12).  This is in stark comparison to Aresco, who, among other things, held a graduate degree in business administration.  Univ. SMF ¶ 215.

of the senior staff; she "did not do the forecasting herself." *Id.*  If anything appeared amiss in a budget, Nero simply "would ask Williams to obtain additional information" so he could "assess . . . whether there had been some kind of error." *Id.*

The documentary evidence also refutes the EEOC's assertion that Williams assumed the financial responsibilities of a sport administrator for the men's basketball team, including "managing the men's basketball budget." EEOC Br. at 15.  Instead, following the departure of Associate Athletics Director Ed Scott in October 2016, Nero began "taking over financial responsibility from Ed" for the men's basketball budget. Ex. D-3; *see also* Dkt. 113-1 ¶ 65.  At the time, Williams told an accounting manager in the Finance Office that "*Patrick has asked me to help*" with that budget and requested to be copied on emails. Ex. D-3 (emphasis added). Williams's own correspondence thus shows not that she managed the men's basketball budget or served as a quasi-sport administrator for that team, but only that Nero did, and that he asked her to "help" by obtaining copies of relevant emails. *See id.*  Her email to the accounting manager also was dated less than two months before she left her job as Nero's executive assistant. *Id.*; EEOC SMF ¶ 314.  Whatever support she provided with respect to the basketball budget during her final two months as Nero's executive assistant does not justify the claim that she was performing "substantially equal" work as Aresco for her entire tenure.

The EEOC also does not offer a shred of evidence that Williams "worked on" unidentified "complicated issues" with the men's basketball budget. EEOC Br. at 8.  Even Williams herself does not claim to have done so.  Williams's own supplemental declaration states only that she "assisted" the directors of basketball operations ("DOBOs") for men's and women's basketball "with their respective budget plans" following Scott's departure, without representing that this assistance involved complex decision-making. Dkt. 135-10 (Williams Decl.) ¶¶ 38-39.  Although

Williams goes on to claim that she trained the DOBOs on forecasting methods and helped them "identif[y] potential revenue streams from games," *id.*, the EEOC fails to substantiate this testimony with citations to any documents, and Nero disputes it. He has sworn that Williams was never "responsible for training any Department employee on how to complete five-year forecasting" because she did not perform "five-year forecasting herself." Nero Suppl. Decl. (Ex. D) ¶ 32. Because Williams's claim that she—a non-member of the Finance Department with no background in finance—"trained" others on budget forecasting is "so undermined as to be incredible," it does not suffice to create a genuine issue of material fact. *Johnson*, 883 F.2d at 128.

Unable to establish that Williams had the substantial budget authority she claims, the EEOC instead resorts to denigrating Aresco's skills at budget management. The agency quotes the Finance Director, who supervised neither Williams nor Aresco, opining that Aresco required "hand holding" on budget matters, while Williams "would knock [it] out of the park." EEOC Br. at 15. Although the University disputes the EEOC's baseless attacks on Aresco's competence, they are ultimately irrelevant. "In Equal Pay Act cases, we compare the jobs, not the individual employees holding those jobs." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994). In other words, "only the skills actually required by those jobs, not the abilities of the persons currently in those positions," are important. *Goodrich*, 815 F.2d at 1524.[7] The Finance Director's personal opinion of Williams's and Aresco's respective performance in two different roles—neither of which was in the Finance Department—plays no part in the EPA analysis.

---

[7] Courts look to the skills required by the two jobs, and not the abilities of the individuals holding those jobs, in deciding whether a plaintiff has stated a prima facie claim under the EPA. *See, e.g.*, *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 914 (9th Cir. 1983). However, a defendant may rely on a male comparator's skills, experience, education, or training to prove an affirmative defense that a pay difference is justified by a factor "other than sex." 29 U.S.C. § 206(d)(1).

5.      Williams Allegedly Supervised Student Interns, While Aresco
Supervised The Men's Rowing Coach

The EEOC next argues that Williams and Aresco exercised comparable supervisory authority—she over two student interns and he over Mark Davis, the head men's rowing coach. The EEOC protests that the University "inaccurately" describes the students as interns; it prefers to use the phrase "student employees."  Dkt. 134-2 ("EEOC Resp. to Univ. SMF") ¶ 61.  But one of the student workers whose timesheet Williams signed listed his own "job title" as "Athletics intern." Dkt. 140-9.  And in at least two cover letters she submitted with job applications, Williams herself referred to "supervising the office interns."  Dkt. 115-20 at 17; Dkt. 115-21 at 17. Irrespective of the terminology, there is no dispute that these students worked on a part-time, per-semester basis and handled clerical tasks such as photocopying and mailing.  EEOC Br. at 16 (noting students were hired "each semester"); Dkt. 140-9 (showing student worked 20 hours per week); Univ. SMF ¶ 63.  No "rational" jury would conclude that Williams's alleged management of part-time, temporary student helpers equaled Aresco's oversight of a head coach of a Division I athletics program.  *Musgrove v. Gov't of Dist. of Columbia*, 775 F. Supp. 2d 158, 167 (D.D.C. 2011), *aff'd*, 458 F. App'x 1 (D.C. Cir. 2012).

The EEOC suggests that Williams's supervisory duties were *superior* to Aresco's because she could "discipline" student workers, whereas Aresco "was not responsible for deciding any disciplinary matters regarding the rowing team."  EEOC Br. at 16.  Neither of these assertions finds support in the record.  First, Nero attested that Williams was not "responsible for disciplining student workers" and that she would have been acting "outside the scope of her authority" if she ever did so without approval from him or one of the Assistant or Associate Athletics Directors (such as Aresco).  Nero Suppl. Decl. ¶ 49.  And the EEOC provides no citation to support its bare assertion that Aresco lacked disciplinary authority over the men's rowing coach.  EEOC Br. at 16.

The EEOC also argues that Aresco's authority over Davis was "minimal" because Aresco did not "direct him how to coach" or have the independent ability to increase his salary. EEOC Br. at 27. But the EEOC has no foundation for its assertion that sport administrators such as Aresco were supposed to micromanage the coaching staff by "directing" them how to do their jobs. And Aresco testified that sport administrators did provide oversight on significant operational questions such as how to comply with NCAA rules or distribute scholarship funds to student-athletes, among other issues. Univ. SMF ¶¶ 284, 287. The EEOC likewise fails to offer evidence that *any* supervisor at the University could unilaterally award raises. To the contrary, the record reflects that salary decisions at the University required several layers of approval, including by members of HR and the University's Compensation Department. *See, e.g.*, Dkt. 115-22. The fact that Aresco fails to satisfy the EEOC's invented standards for what constitutes a supervisory role does not mean he had only "minimal" responsibilities as a sport administrator. EEOC Br. at 27.

6. Williams Printed Materials And Placed Them In Folders, While Aresco Researched And Prepared Presentations For The Board

As Special Assistant, Aresco "contributed extensively" to senior staff deliberations about revising the Athletics Department's strategic plan and prepared Nero for "extensive meetings" with the University's Board of Trustees about the plan. Univ. SMF ¶¶ 298-99. The EEOC claims that Williams likewise "prepared briefings and reports for Nero" and "coordinated" his reports to the Board of Trustees, EEOC Br. at 8-9, but its assertions again lack support in the record.

The alleged "briefings" Williams prepared, which the EEOC declined to attach as exhibits, consisted of printing out documents and placing them in a folder at Nero's direction. Nero Suppl. Decl. (Ex. D) ¶¶ 43-44. In one example, Nero asked Williams: "Can you print out the agenda and supplements section. Put in a folder for me to take with me when I leave on Wednesday." Ex. D-4; Nero Suppl. Decl. ¶ 44. In another, he asked: "Can you print out the attached maps and put

them in my A10 WBB folder," referring to a folder he planned to bring to an Atlantic 10 Conference meeting.  Ex. D-5; Nero Suppl. Decl. ¶ 44.  The EEOC points to no documents suggesting that Williams did anything more than print the documents that Nero requested she print.

Nor did Williams "coordinate" information that Nero presented to the Board of Trustees. Other members of the Athletics Department, including Aresco, created content for those presentations.  Nero Suppl. Decl. (Ex. D) ¶ 45.  That is why Nero emailed Aresco and other Assistant Athletics Directors after the February 2016 Board meeting to thank them for their "assistance with the Board of Trustees video and presentation," which left the Board "very impressed."  Ex. D-7.  Williams did not receive the email because "she had no involvement whatsoever in the Board presentation."  Nero Supp. Decl. ¶ 45.  Williams simply sent a reminder to Aresco and Associate Athletics Director Brian Sereno that the Board required two documents for the February meeting, noting that "*Mike Aresco will take the lead*" on the first submission, while "Brian Sereno has the lead" on the second.  Ex. E-17 (emphasis added).  The EEOC has cited no evidence that Williams ever took the lead on Board presentations.

7.    Williams Managed Special Projects Like Sending The
          Department's Holiday Card, While Aresco Managed Budget Cuts

As Special Assistant, Aresco managed "special projects in support of key priorities" of the Athletics Department, such as revising the Department's strategic plan and identifying targets for a University-mandated 20% budget cut.  Univ. SMF ¶¶ 167, 297.  Nero created the Special Assistant position specifically to ensure that his long-term goals for the Department were being accomplished.  *Id.* ¶¶ 183, 238.  The EEOC contends that Williams also "worked on a host of special projects," EEOC Br. at 9, but the agency conceives of special projects as any one-time tasks outside of Williams's day-to-day workstream.  It fails to show that the miscellaneous projects to which Williams contributed advanced the long-term strategic goals of the Department like

Aresco's did, or that she had any role in these "projects" beyond providing clerical support.

At deposition, Williams identified the special projects on which she worked as sending out the Department's holiday card, helping to organize the seniors honors breakfast, and coordinating with other University departments on a special commencement for graduating athletes.  Univ. SMF ¶ 68.   But each of these alleged "special projects" illustrates that Williams served in an administrative support role.  She informed the Marriott how many people would attend the senior honors breakfast and provided a list of required audio-visual equipment.  Ex. E-10; Nero Suppl. Decl. ¶ 50.   With respect to the special commencement, she forwarded the invitation to the Athletics Department staff and sent a reminder to the student speaker when he failed to respond to an email from University Events requesting a copy of his remarks.  Ex. E-12; Ex. E-13.  None of these emails shows that Williams had any role beyond conveying basic logistical information on behalf of the Athletics Department.

The EEOC asserts that Williams "planned" events and "coordinated" travel to Hawaii for a men's basketball tournament.  EEOC Br. at 16.  But the emails the EEOC attaches "evidencing" her "duties relating to the trip" show more of the same administrative support consistent with her role as Nero's executive assistant.  Dkt. 135-10 ¶¶ 50, 51.  These documents show that Williams compiled RSVPs for a reception, forwarded the basketball team's flight information to the University President's office, and looked up directions on Google Maps to estimate the driving time from the team's hotel to Pearl Harbor.  Dkt. 135-15.  Although the EEOC claims that Williams also "authorized payment to an outside vendor for an event," EEOC SMF ¶ 87, she merely provided Nero's credit card to the vendor after he gave her specific instructions to do so.  Ex. D-9.  These examples confirm, rather than undermine, the University's position that a core function of the executive assistant role was to plan and organize Nero's travel, not to manage special

projects of long-term strategic importance to the Athletics Department.

The EEOC asserts, finally, that Williams "managed" the Athletics Department's account with Nike—a job that supposedly required "handling contracts, quotes, procurement and tracking inventory" and stabilizing "its financial records." EEOC Br. at 9. But Nero attested that Williams was never "responsible for managing the University's account with Nike or ordering Nike equipment." Nero Suppl. Decl. (Ex. D) ¶ 55. And no witness testified that Williams personally handled Nike contracts or procurement. Chee-Wah, the Finance Director, stated only that Williams would give her "the breakdown *from Patrick* on, you know, this coach should get 2,000, and this coach should get 10,000" in Nike merchandise for their teams. Dkt. 135-8 at 46:11-19 (cited at EEOC SMF ¶ 93) (emphasis added). The EEOC also asserts that Williams "*exchanged* hundreds of emails with Nike" to "straighten out the account." EEOC SMF ¶ 90 (emphasis added). But Williams, whose testimony the agency cites, claims only that she "*went through* hundreds of emails" that *others* had exchanged with Nike. Dkt. 135-20 at 175:4-14 (emphasis added). In any event, Williams reported during the University's 2016 desk audit that handling "Nike Inventory" was not part of her "normal job function" and that she "helped" with this task only temporarily "due to staff vacancy." Dkt. 115-19. The temporary support that Williams provided is insufficient to show her role was substantially equal to Aresco's—who was never responsible for Nike inventory in any event. *See* Lindemann, Grossman & Weirich, *supra*, § 19-30; *see also, e.g.*, *Waters v. Turner, Wood & Smith Ins. Agency*, 874 F.2d 797, 799 (11th Cir. 1989).

### 8. Only Williams Believes She Was On The Senior Staff

The EEOC does not dispute that Aresco sat on the Athletics Department's senior staff. EEOC Resp. to Univ. SMF ¶¶ 139-41. And the agency offers no support for its unadorned

assertion that Williams *also* was on the senior staff.  EEOC Br. at 4.[8]  As the University noted in

its opening brief, no witness other than Williams testified that she sat on the senior staff, and her

name does not appear on any organizational chart listing the members of the senior staff.  Univ.

Br. at 15 (citing SMF ¶¶ 139-41).  Williams did not claim on her LinkedIn profile that she served

on the senior staff, *see* Univ. SMF ¶ 70; the Athletics Department desk audit did not identify her

as a member of the senior staff, *id.* ¶ 141; and Williams was not a sport administrator, even though

all members of the senior staff were sport administrators, *id.* ¶¶ 142-43.  Moreover, Williams

described her role with respect to senior staff meetings as "making sure that the meeting was placed

on Mr. Nero's Google calendar"; "sending out a calendar invitation to the senior staff" (not to

herself); compiling the agenda based on feedback from others (not herself); and taking meeting

minutes, which she then sent to Nero and Aresco for approval.  *See id.* ¶¶ 156-64.  Without

confronting any of this evidence, or offering any of its own, the EEOC insists that Williams had a

place on the senior staff.  EEOC Br. at 4.  The agency's bare allegations, unsupported by any

citation, are insufficient to survive the University's properly supported record evidence, all of

which demonstrates that Williams was not, in fact, a member of the Department's senior staff.

\*        \*        \*

"The standard for determining whether jobs are equal in terms of skill, effort, and

responsibility is high."  *Waters*, 874 F.2d at 799.  Although employees do not have to prove jobs

are identical to sustain an EPA claim, they have to prove "substantial identity of job functions."

*Id.*  The EEOC has failed to carry that high burden here.

---

[8]  At times, the EEOC appears confused as to whether it is even arguing that Williams was a member of the senior staff or not.  *See* EEOC Br. at 7 (asserting that Williams "coordinated with senior staff," not that Williams coordinated with *other members of* the senior staff); EEOC SMF ¶ 35 (alleging that Williams "coordinated separately with members of the senior staff *to assist them*"); *id.* ¶ 81 (alleging that Williams "worked with senior staff").

**B.**     **The EEOC Does Not Dispute That Aresco Had Multiple Responsibilities That Williams Did Not.**

Even if the Court were to accept the EEOC's unsupported account of Williams's job duties, which it should not, the Court still should grant summary judgment to the University because Aresco held multiple responsibilities that Williams did not share, including serving as a sport administrator, developing Athletics Department policies, contributing to the Department's strategic plan, and creating championship bid packages.  The EEOC attempts to downplay the importance of each of these duties, but its arguments once again lack support in the record.

***Serving as a Sport Administrator***.  The EEOC does not dispute that Aresco served as sport administrator for the men's rowing program and that Williams never served as sport administrator for any University team.  EEOC Br. at 15-16.  Instead, the EEOC argues that Aresco's sport administrator duties were only "marginal" based on a misrepresentation of his testimony.  *Id.*  The University's job posting for the Special Assistant position included a catchall category under the "Job Duties" heading for "other duties as assigned," which the posting, in turn, stated were "marginal" rather than "essential" aspects of the job.  Dkt. 115-28 at GWU_061094.  When the EEOC's lawyer asked Aresco at deposition what "other duties as assigned" included, Aresco responded that one job duty "*not mentioned*" in the posting was his "sport administration" functions.  Dkt. 135-5 at 273:10-15 (cited at Dkt. 134-2 ¶ 295) (emphasis added).  Aresco never suggested that his oversight of the men's rowing program constituted a "marginal" aspect of his job.  To the contrary, he testified that sport administration consumed approximately 15% of his time and that it included functions such as reviewing and approving major purchase and travel requests; meeting weekly with the coach to discuss recruiting and scholarships; mentoring student-athletes; participating in disciplinary decisions; traveling with the team; and planning the rowing team's annual regatta on the Potomac River.  Univ. SMF ¶¶ 281-95.  Williams indisputably

performed none of these functions.

***Drafting Athletics Department Policies***.  As Special Assistant, Aresco had responsibility for devising Athletics Department policies, presenting them to other members of the senior staff, and memorializing them in writing.  Univ. SMF ¶¶ 264-67 (citing Dkt. 114-33).  The EEOC misrepresents the record when it argues that "Aresco assisted with 'drafting' policies only insofar as he told the leadership team . . . about policy recommendations Kayer had made."  EEOC SMF ¶ 188.  Nero testified that Kayer or "others on campus" would sometimes contribute ideas for new HR policies that the Athletics Department should formalize or develop.  Dkt. 115-13 at 64:3-10.  But Aresco also generated policy ideas himself, and researched and drafted new policies for consideration by the senior staff.  *Id.* at 64:11-24.  Aresco testified that he "personally created" a relocation guide, a sport administrator guide, and a team family travel policy, among others.  Dkt. 115-16 at 201:2-12.  This testimony is undisputed.  Williams, by contrast, had no policymaking role within the Athletics Department.  Univ. SMF ¶ 74.

***Revising the Strategic Plan***.  As Special Assistant, Aresco was responsible for "driving the process" for revising the Athletics Department's Strategic Plan.  Univ. SMF ¶ 296.  The EEOC claims there is no "contemporaneous evidence" showing Aresco had this role.  EEOC Br. at 15.  But Nero and Aresco both testified that Aresco participated in long-term strategic planning, including how to implement a University-mandated 20% budget cut, and "contemporaneous evidence" *does* confirm this testimony.  As Tanya Vogel, then a Senior Associate Athletics Director, prepared to join the Department, Nero wrote to her and said:  "Mike [Aresco] . . . will work most closely with you on items such as . . . the process of Strategic Plan."  Dkt. 113-26.  Williams indisputably had no role in revising or contributing to that Plan.  Univ. SMF ¶ 78.

***Preparing Championship Bids***.  The EEOC does not dispute that, as Special Assistant,

Aresco prepared bid packages to host NCAA championship events.  EEOC Br. at 17.  Williams

did not.  Yet the agency argues that this responsibility was insignificant because the only bid

package in the record is 12 pages long.[9]  *Id.*  However, Nero testified that these packages often

totaled 100 pages, Univ. SMF ¶ 272, and the EEOC offers no evidence to rebut that testimony.

Nor is there any merit to the EEOC's argument that Williams's role required "*greater* skill, effort,

and responsibility" because she allegedly managed the championship budget.  EEOC Br. at 17

(emphasis added).  As the Finance Director testified, Williams's role with respect to that budget

involved acting as a "representative of what . . . Patrick wants to see happen" and "following

through on Patrick's intentions."  Dkt. 135-8 at 94:15-19.  In other words, Williams acted at Nero's

direction and had no independent authority to make budgetary decisions herself.  *See id.*

### C.     The University Has Established That The Pay Difference Between Williams And Aresco Was Based On Factors Other Than Sex.

Even if the EEOC somehow had proven that Williams and Aresco performed substantially

equal work—it has not—the Court still should reject the EEOC's EPA claim because the

University has established that the pay differential between Williams and Aresco was based on at

least two "factor[s] other than sex."  29 U.S.C. § 206(d)(1).  Citing out-of-circuit authority, the

EEOC argues that the ***University*** bears a "heavy" burden under the EPA to prove this affirmative

defense.  EEOC Br. at 30.  But courts in this District have rejected that burden of proof and held

that defendants need only satisfy the ordinary preponderance of the evidence standard.  *Nyman v.*

*FDIC*, 967 F. Supp. 1562, 1577 (D.D.C. 1997).  The University readily meets that standard here.

First, Williams's and Aresco's pay difference was justified by Aresco's superior

educational credentials and work experience.  Univ. Br. at 30-32; *see also Mickelson v. N.Y. Life*

---

[9] The EEOC's argument that preparing a 12-page bid package was an insignificant job duty suggests that Williams's job of filling in one-page game contracts was all the more so.

*Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006).  The EEOC counters that the Court should disregard Aresco's prior experience in college athletics because Aresco held only "non-administrative" roles before becoming Special Assistant.  EEOC Br. at 31-32.  But the agency offers no support, other than its say-so, for its characterization of Aresco's previous jobs.  Just before becoming Special Assistant, Aresco served as Assistant Athletics Director for Operations, Events, and Facilities—a role that placed him on Nero's staff and gave him oversight of four employees and a $2.4 million budget, among other responsibilities.  Univ. SMF ¶¶ 128-135.  And Nero and Vogel, who led the search for the Special Assistant, both testified that Aresco's prior experience in athletics administration, along with his master's degree in *business administration*, qualified Aresco for the role and were important reasons for hiring him.  *Id.* ¶ 215.

Second, Aresco's $77,000 salary as Special Assistant was justified because that was the salary he already was earning as an Assistant Athletics Director, and the move he made within the Athletics Department was a "lateral" one.  Univ. Br. at 21-32.  The EEOC disputes that this job change constituted a lateral move and insists that Aresco took a "voluntary demotion" when he became Special Assistant.  EEOC Br. at 36.  But the EEOC does not provide *a single citation to the record* to substantiate this position anywhere in its brief, and the record refutes the agency's assertion.  The University's hiring proposal for Aresco stated:  "[The] Compensation [Department is] approving salary as *lateral transfer*."  Dkt. 135-7 at 57 (GWU_005892) (emphasis added).

The EEOC argues that the University cannot rely on its stated policy of allowing employees to retain their salary when they change jobs within the University because it supposedly did not apply this policy uniformly.  EEOC Br. at 32-33.  As evidence of the University's supposed inconsistency, the EEOC argues that the University required Kayer to take a pay cut when she moved from a role in the vice provost's office to a position in the University's HR department.  *Id.*

But unlike Aresco, who switched jobs *within* the Athletics Department, Kayer moved from the vice provost's office to another department—HR—because she was seeking an entirely "new career path." Dkt. 135-21 at 63:4-64:14. The University sometimes requires employees to accept a pay cut when they are "completely changing" careers by switching departments. Dkt. 115-29 at 79:18-82:3. However, the University "does not reduce an employee's salary when he or she makes a lateral move" within the same department. Univ. SMF ¶ 225. The University, in other words, did not apply its policy inconsistently to Aresco and Kayer; it had different policies in place for employees moving within a department as opposed to employees moving between departments.[10]

### III. This Court Also Should Grant Summary Judgment To The University On The EEOC's Title VII Claim.

In denying the University's motion to dismiss the EEOC's Title VII claim, this Court warned the EEOC that "[f]urther evidence likely would be necessary to survive summary judgment" on this claim. Dkt. 23 at 16. Despite more than two years of discovery, the EEOC has failed to adduce any such evidence. Indeed, the EEOC cannot even explain how the University allegedly subjected Williams to an adverse employment action. Although the EEOC devotes several pages of its brief to alleged defects in the University's process for hiring Aresco as the Special Assistant, the agency disclaims that it is pursuing a "failure-to-promote" claim with respect to that position. EEOC Br. at 35. And none of the other allegedly adverse actions taken against Williams—such as refusing to create a nonexistent job she requested—caused her to suffer a "significant change in employment status." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761

---

[10] The EEOC is also wrong when it argues that the University cannot establish its affirmative defense if it "exercises discretion" or applies "subjectiv[e]" factors in deciding whether employees can keep their salary when making a lateral move. EEOC Br. at 32. Employers may base salary decisions on "subjective factors . . . provided that there are demonstrable reasons for the decision, unrelated to sex." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575 (D.C. Cir. 2010) (sustaining employer's affirmative defense). That is the case here.

(1998).  Even assuming that the EEOC had identified an adverse employment action, the University still would be entitled to summary judgment because the EEOC has failed to show that the University intentionally discriminated against Williams because of her sex.  *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020).

### A.    The University Did Not Subject Williams To An Adverse Employment Action.

The EEOC asserts that the "basis of" its Title VII claim is that the University denied Williams "an opportunity for advancement that it gave to male employees."  EEOC Br. at 35 (internal quotation marks omitted).  None of the EEOC's arguments as to how the University supposedly denied Williams an "opportunity for advancement" has merit.

***Hiring Aresco as Special Assistant***.  First, the EEOC contends that the University "flouted" its own policies by hiring Aresco as Special Assistant without interviewing other candidates and by paying him an inflated salary.  EEOC Br. at 36.  But the record does not support the EEOC's assertion, and even if it did, the University's decision to hire Aresco does not amount to an adverse employment action *against Williams*—who did not apply for the job.

Despite the EEOC's assertion to the contrary, the University did not violate its own policy by selecting Aresco to be the Special Assistant without interviewing at least two other people first.  *See* EEOC Br. at 36.  Although the University typically interviews three candidates for open internal positions, if fewer than three candidates apply for a job, then the University will "just intervie[w] the number of candidates that applied."  Dkt. 135-21 at 161:13-20.  That was the case here.  The two women who led the search for the Special Assistant position, Vogel and Kayer, planned to interview three people, but they received only one application—from Aresco.  Univ. SMF ¶¶ 185, 187.  The University did not violate its own policies, much less Title VII, by interviewing and then hiring the only candidate—especially when that candidate's skills and qualifications were already well known to the senior leadership of the Athletics Department.  *Id.*

Nor did the University violate any internal policy when it permitted Aresco as Special Assistant to keep the same salary that he was already earning as Assistant Athletics Director for Operations, Events, and Facilities.  The EEOC's argument that Aresco's salary was "too high" rests on the false premise that his move was a "voluntary demotion."  EEOC Br. at 36.  But there is no evidence that Aresco's transition to Special Assistant was a demotion—and the EEOC cites none.  Instead, the record shows that the University Compensation Department approved Aresco's Special Assistant salary "as a lateral transfer."  Univ. SMF ¶¶ 225-26.  The EEOC also relies on comments by the Compensation Department that Aresco's salary appeared high based on his years of work experience.  *See* EEOC SMF ¶ 151.  But Aresco's pay did not exceed the maximum salary for the position, which was $80,880, and the Department reasonably concluded that Aresco should keep the same salary as he transitioned from one senior leadership role into another.  *Id.* ¶ 146.

Even assuming that the University somehow had violated its policies by hiring Aresco without competition or paying him near the top of the salary range, the EEOC has not shown how either of these actions could constitute an adverse employment action *against Williams*.  It is undisputed that Williams did not apply for the Special Assistant position, EEOC SMF ¶ 129, and the EEOC has stated that it is not asserting that the University wrongfully failed to promote her to the role.  EEOC Br. at 35 ("EEOC does not plead a failure-to-promote claim").[11]  Because the EEOC has not shown that Williams's job title, salary, or benefits changed after Aresco became Special Assistant, the EEOC cannot prove that Aresco's job move caused the "significant change" in *Williams's* "employment status" that Title VII requires.  *Burlington Indus.*, 524 U.S. at 761.

---

[11]  Confusingly, the EEOC states that it "does not plead a failure-to-promote claim, *and even if it did*, the prima facie case would be met" because it would have been futile for Williams to apply for the Special Assistant job.  EEOC Br. at 35 (emphasis added).  At this point, the EEOC should know its own case.  The EEOC's statement that it "does not plead a failure-to-promote claim" therefore should be taken at face value.

The EEOC asserts that Williams was deterred from applying for the Special Assistant position and that Aresco was pre-selected for the role, thereby suggesting that even if Williams had applied, her application would have been futile. EEOC Br. at 12. But again, these allegations are irrelevant absent a failure-to-promote claim—which the EEOC has said it is not pursuing. In any event, the EEOC's assertions also lack evidentiary support.

The EEOC first contends that Mike Kohn, a former HR client partner, told Williams Aresco had been pre-selected for the Special Assistant role. EEOC Br. at 12. In support, the EEOC cites Williams's declaration. *See id.* (EEOC SMF ¶¶ 123-25). That kind of "sheer hearsay"—to the extent offered to show that Aresco *was* pre-selected—"counts for nothing on summary judgment." *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007).

The EEOC's next assertion—that Vogel dissuaded Williams from applying to the Special Assistant role, EEOC Br. at 12—conflicts with Williams's own deposition testimony and thus should be accorded no weight. When asked at deposition how Vogel allegedly discriminated against her, Williams said that Vogel "never once encouraged me to apply or asked if I would be interested" in the Special Assistant role. Ex. E-1 at 137:16-138:8. Williams did ***not*** testify that Vogel dissuaded her from applying or told her that it would be futile to apply. *See id.* Now, after the close of discovery, Williams alleges for the first time that Vogel *discouraged* her from seeking the promotion. Dkt. 135-10 ¶¶ 75-76. She has not explained why her testimony changed on this issue between the time she was deposed and the time she submitted her declaration. Williams's eleventh-hour attempt to revise her testimony should not be credited. *See, e.g.*, *Headfirst Baseball LLC v. Elwood*, 168 F. Supp. 3d 236, 248 n.9 (D.D.C. 2016) (explaining that the sham affidavit rule "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed

correction is more accurate than the prior testimony"). Regardless, Williams does not dispute that Kayer—the HR client partner responsible for the Special Assistant posting—"specifically told" her to apply. Univ. SMF ¶ 196. Given this admission, Williams cannot credibly claim she was deterred from submitting an application.

Yet the EEOC also argues that Aresco dissuaded Williams from applying for the Special Assistant job by telling her the role had been "promised to him." EEOC SMF ¶ 121. However, the EEOC cannot maintain a Title VII claim based on discouraging words from a competing job candidate who had no authority to make the hiring decision, particularly when—even if the candidate did make the statement alleged—there is no evidence that his comment reflected sex-based animus as opposed to self-interest. *See* Univ. Br. at 39. The University made this argument in its opening brief, and the EEOC did not refute it. Thus, the Court now should treat the argument as conceded. *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) (Kollar-Kotelly, J.).

***Transferring Williams's Job Duties to Aresco***. The EEOC next asserts that the University engaged in an adverse employment action against Williams when "Nero began attempting to reassign all of Williams's duties to Aresco" while asking her to perform "diminutive tasks, such [as] running errands." EEOC Br. at 36. But the agency's claim that Nero revoked Williams's duties and handed them to Aresco rests on thin air. The EEOC identifies only one job function that Nero allegedly transferred to Aresco: management of the Athletics Director, administration, and championship budgets. EEOC Br. at 18 (citing EEOC SMF ¶¶ 209-11).[12] However, in the

---

[12] The EEOC asserts, without citation, that Nero also "tried to reassign" unspecified "contracts administration" and "human resources" duties to Aresco. EEOC Br. at 17. The EEOC fails to respond to the University's argument that removing HR duties from Williams does not qualify as an adverse employment action because she performed these duties only temporarily after Assistant Athletics Director Brian Hamluk left the University in August 2015. Univ. Br. at 41, 44. By ignoring this argument, the EEOC again concedes it. *See Sykes*, 573 F. Supp. 2d at 202.

same breath, the agency claims that "the reassignment did not last long" because Aresco allegedly performed his budgetary duties poorly.  EEOC SMF ¶ 210.  Even assuming that managing these budgets was *ever* Williams's responsibility—and Nero and Vogel vigorously disputed it was—the EEOC offers no support for its assertion that this fleeting reassignment from Williams to Aresco and back again amounts to an adverse employment action.

As to the EEOC's claim that Nero asked Williams to run errands, the agency fails to address the University's arguments that Williams volunteered to assist Nero with these tasks and, even if she had not, menial assignments do not amount to adverse employment actions.  *See* Univ. Br. at 41.  The Court should again treat these points as conceded.  *See Sykes*, 573 F. Supp. 2d at 202.

***Eliminating the Executive Assistant Position***.  As yet another basis for its Title VII claim, the EEOC asserts that Nero contemplated eliminating Williams's position shortly after Aresco became Special Assistant.  EEOC Br. at 36.  In early March 2016, Associate Athletics Director Garrett Klassy (not Nero) informed HR that the Athletics Department had identified the executive assistant position as one that could be cut without affecting "our student-athletes."  Dkt. 135-21 at 120.  But those discussions about terminating Williams's position never progressed, and the mere prospect of job loss that does not materialize is not an adverse employment action as a matter of law.  *See Brooks v. City of Utica*, 275 F. Supp. 3d 370, 378 (N.D.N.Y. 2017) (collecting cases).  That is especially true here, where the EEOC does not assert that Williams learned at the time that her role was in jeopardy or detrimentally relied on that information.

***Reclassifying the Special Assistant Position***.  The EEOC next asserts that the University engaged in an adverse employment action against Williams when it "reclassified" the Special Assistant position as an Assistant Athletics Director position in the "[m]anagement stream."  EEOC Br. at 37.  But the agency's brief nowhere contains a citation to prove that the Special

Assistant position was, in fact, reclassified, and the evidence refutes that it was.  University records show that the classification code for Aresco's position *did not change* during his tenure as Special Assistant.  Univ. Resp. to EEOC SMF ¶¶ 338-42.  Even assuming such a change had occurred, it would have had no real-world effect.  From the beginning, the Athletics Department treated the Special Assistant position as equivalent to an Assistant Athletics Director position.  Univ. Br. at 42.  The EEOC asserts that reclassification into the "[m]anagement" stream afforded Aresco long-term "opportunities to advance in salary," EEOC Br. at 37, but Aresco never received a raise after becoming Special Assistant in February 2016.  Univ. SMF ¶ 228.  And he was already an Assistant Athletics Director *before* he became Special Assistant.  *Id.* ¶¶ 127, 220.

Nor does the record support the EEOC's assertion that the University treated Williams differently from Aresco because it "did not promote her or reclassify her to a stream with higher earning potential."  EEOC SMF ¶ 285.  To the contrary, after the University's desk audit identified Williams as performing "aspects" of the finance associate role, *id.* ¶ 307, HR proposed in November 2016 that "Ms. Mutalib . . . be *reclassified*" into that role without the need for a "competitive [job] posting."  Dkt. 140-26 at GWU_033235 (emphasis added).  The only reason Williams (née Mutalib) never received this reclassification is that she voluntarily left the executive assistant job for another role within the University two weeks later, *id.*—a job that paid more than Aresco ever earned during his tenure at the University.  Univ. SMF ¶¶ 221, 228, 336-37.  Had she instead chosen to stay in the Athletics Department, all evidence indicates Williams would have received the reclassification the EEOC claims she was wrongfully denied.  *See* Dkt. 140-26.

***Denying Williams the Promotion She Designed for Herself***.  Finally, the EEOC asserts that Williams suffered an adverse employment action when Nero ignored her request that he create a position for her within the Athletics Department that she termed the Assistant Athletics Director

for Staff and Student-Athlete Development.  EEOC Br. at 37.  According to the EEOC, Nero rewarded Aresco with a raise and noncompetitive promotion to Assistant Athletics Director for Operations, Events, and Facilities after Aresco "asserted himself" and began assuming new responsibilities in 2014.  *Id.* at 36-37.  But when Williams asked Nero to craft a "new role" for her as "an Assistant AD for Staff and Student-Athlete Development," Univ. SMF ¶ 103, Nero "completely ignored" her, EEOC Br. at 37.  The agency's attempt to base a Title VII claim on Nero's failure to create an entirely new position for Williams suffers from at least two fatal defects.

First and foremost, this Court has specifically rejected the argument that an employee can state a Title VII claim based on her employer's failure to create a job that does not already exist.  *Chambers v. Sebelius*, 6 F. Supp. 3d 118, 127 (D.D.C. 2013) (Kollar-Kotelly, J.).  Williams sought promotion into a nonexistent role that she designed by picking and choosing job functions of interest to her:  "I think the job could encompass life skills, diversity and inclusion, SAAC, and leadership academy," she wrote.  Dkt. 113-31.  But "courts in this Circuit have focused on the need for showing an *available position* for which promotion was denied."  *Chambers*, 6 F. Supp. 3d at 127 (emphasis added).  There was no such available position.

Second and relatedly, the EEOC has not made any showing that the new position Williams concocted would satisfy an unmet need in the Athletics Department, as opposed to her personal goals for career advancement.  When the University promoted Aresco to Assistant Athletics Director for Operations, Events, and Facilities in 2015, his workload had naturally increased because the University had "capital projects that were upcoming" and "a larger need for facility maintenance."  Dkt. 140-1 at 64:10-18.  Similarly, when the University hired Aresco as Special Assistant in 2016, Nero expressed that this new chief of staff role was "desperately needed" to drive the Department's long-term strategic plan.  Dkt. 113-26.  But when Williams solicited a

promotion, she focused on the benefits that would accrue to *her*:  "It would give me an opportunity to supervise a full-time employee (Madison) and learn from Tanya's expertise," she wrote.  Dkt. 113-31.[13]  The University did not discriminate against Williams by denying her a promotion into a nonexistent job for which there was no apparent business need—and that has never existed.

**B.      Even Assuming That Williams Had Suffered An Adverse Employment Action, There Are No Facts To Suggest It Was Discriminatory.**

Even if the EEOC had established that Williams "suffered an adverse employment action," which it has not, the agency still would need to show that "the unfavorable action gives rise to an inference of discrimination" to withstand summary judgment.  *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006).  The EEOC argues that such an inference is warranted here because Nero "treated" women other than Williams "less favorably than men."  EEOC Br. at 38.  But the vague, subjective, and unsubstantiated allegations the EEOC levels against Nero are insufficient to raise an inference of discrimination.

The EEOC first asks the Court to infer sex-based discrimination based on the testimony of two witnesses who claim that Nero declined to meet with them.  EEOC Br. at 21, 38.  Chee-Wah, the Finance Director, claimed Nero was reluctant to meet with her and would send Williams to gather information in his place.  But according to Chee-Wah, Nero's reluctance to meet did not have to do with her sex; it had to do with a supposed desire to "avoid accountability."  Dkt. 135-8 at 29:3-9.  Kayer testified that she, too, had difficulty getting an audience with Nero.  While any number of factors could have explained Nero's limited availability, Kayer testified: "My *feeling*

---

[13]  Williams's expressed desire in 2016 to be promoted to a role in which she would "supervise a full-time employee" casts doubt on the assertion she makes in this litigation—that as of 2016, she already *did* supervise "student employees" in a manner akin to Aresco's supervision of the men's rowing coach.  *See* pp. 24-25, *supra*.  Likewise, her expressed desire to "learn from Tanya [Vogel's] expertise" similarly casts doubt on her newfound claim that she was a member of the senior staff.  If Williams already were a member of the senior staff when she sent this email, it is unclear why she would have a desire to learn from the "expertise" of a fellow senior staff member.

around that was because of gender." Dkt. 135-21 at 44:4-5 (emphasis added). But Kayer conceded that "someone can be dismissive for many, many reasons," including the fact that they "don't like HR," and she conceded she could not know for certain why she perceived Nero as dismissive, reiterating, "it's—again, it's a feeling" only, for which she did not "have specifics to give." Ex. E-4 at 57:18-60:19. Of course, a plaintiff must produce "evidence of a discriminatory or retaliatory motive other than her feeling" to sustain a Title VII claim. *Lucas v. Brennan*, No. 17-cv-8964, 2020 WL 127768, at *4 (N.D. Ill. Jan. 10, 2020). Moreover, here, the EEOC seeks to sustain a Title VII claim on behalf of **Williams** based on a feeling by someone else—***Kayer***—that Nero may not have wanted to meet with her due to gender. That is insufficient as a matter of law. *See id.*[14]

The EEOC also suggests Nero treated women less favorably than men because he would allegedly "rip . . . up" the financial reports that Chee-Wah gave him. Dkt. 135-8 at 42:15-19. But Nero attested that he simply tore up copies of outdated budget reports—regardless of who gave them to him—so he would not confuse them with the current versions. Nero Suppl. Decl. (Ex. D) ¶ 37. As further evidence of Nero's alleged discrimination, the EEOC asserts he reduced the number of sports teams overseen by Mary Jo Warner, a former (female) Senior Associate Athletics Director. EEOC SMF ¶ 268. But Warner lost some of those responsibilities only when Nero restructured the Athletics Department to introduce a "sport administrator" system similar to that used by "the vast majority of other schools in the NCAA." Nero Suppl. Decl. ¶ 8. Warner used to manage 20 teams, and Nero "did not think that structure allowed for the care and attention that

---

[14] To the extent that the EEOC seeks to rely on Kayer's testimony to substantiate its EPA or Title VII claims, it bears noting that Kayer perceived Williams's position to be substantially different from Aresco's. As Kayer explained, "my understanding of . . . the special assistant was doing high-level executive support to the Athletics Department, the leadership team, as well as Patrick," whereas the executive assistant needed to perform "administrative" support tasks such as "scheduling, travel reimbursement, things like that." Dkt. 135-21 at 243:8-16.

each team should be given"—an instinct confirmed by student-athlete surveys. *Id.* ¶¶ 6-7. Nero attested that his decision to adopt a new model where responsibility was shared among multiple administrators "had absolutely nothing to do with . . . gender," and Warner's salary and benefits stayed the same after the introduction of the new system. *Id.* ¶ 8. Thus, none of these facts raises a reasonable inference of sex discrimination against anyone—much less against Williams.

Lacking any evidence of sex-based animus on the part of Nero, the EEOC relies heavily on an offensive quote from an anonymous source in an online news article that Nero has "become the talk of the recruiting world for being a sexually aggressive creep." EEOC Br. at 21 (citing EEOC SMF ¶¶ 276-84). This unattributed quote is unreliable hearsay that can form no part of the Court's decision on summary judgment. *Walden v. Patient-Centered Outcomes Research Inst.*, 304 F. Supp. 3d 123, 134 n.4 (D.D.C. 2018). Even worse, Magistrate Judge Harvey already ruled that a video of Nero on which the news article relies is "probative of nothing relevant to this case." Dkt. 53 at 41 n.14. The EEOC violates the spirit, if not the letter, of that ruling by continuing to push this irrelevant and inflammatory hearsay evidence into the summary judgment record.

### C. The University Has Shown Legitimate, Nondiscriminatory Reasons For Any Adverse Employment Action.

Even assuming that the EEOC could show the University took some form of adverse employment action against Williams, the Court still should grant summary judgment to the University because it has produced evidence of a legitimate, nondiscriminatory reason for failing to advance Williams's career within the Athletics Department—namely, Nero had good reason for not trusting her with confidential information. Univ. Br. at 44. The EEOC asserts that this explanation is too "vague" to carry the University's burden. EEOC Br. at 40. But far from making a "vague" claim that Williams did not keep confidentiality, the University described multiple, specific incidents in which Williams either disclosed information that she should have kept private

or reviewed confidential materials not intended for her—including one instance in which Williams made a telephone call without Nero's permission to another university's athletic department concerning a coach who was allegedly unfaithful to his wife. *See* Univ Br. at 44. Nero's belief that Williams could not be trusted with confidential information—which is undisputed, and was a belief shared by several others within the Athletics Department, including Vogel, *see, e.g.*, Univ. SMF ¶ 108; University HR Director Suzanne Alrutz, *id.*; and Aresco, *id.* ¶ 116—"would permit the conclusion that there was a nondiscriminatory reason" for failing to promote her within the Athletics Department. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

The EEOC argues that the University's reasons for failing to advance Williams's career in athletics must be pretextual because Nero supposedly only raised concerns about Williams's inability to maintain confidentiality in order to avoid scrutiny of his own conduct. EEOC Br. at 41. But the only evidence that Nero's confidentiality concerns were insincere is Williams's self-serving declaration. *Id.* at 20-21. Such testimony does not suffice to create a genuine dispute about whether Nero's reasons for any adverse employment actions were pretextual. "[A]n employer is entitled to summary judgment where the plaintiff created only a weak issue of fact as to whether the employer's explanation was untrue and there is abundant and uncontroverted independent evidence that no discrimination has occurred." *Smith v. Lynch*, 115 F. Supp. 3d 5, 14 n.5 (D.D.C. 2015) (brackets omitted). That is the case here.

## CONCLUSION

For all these reasons, this Court should grant the University's Motion for Summary Judgment and deny the EEOC's Cross-Motion.

Dated:  February 17, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: */s/ Jason C. Schwartz*

Jason C. Schwartz, D.C. Bar No. 465837
Molly T. Senger, D.C. Bar No. 995975
Katherine Moran Meeks, D.C. Bar No. 1028302
Matthew P. Sappington, D.C. Bar No. 1616305
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
jschwartz@gibsondunn.com


*Attorneys for Defendant the George Washington University*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2023, I caused a true and correct copy of the George Washington University's Combined Reply in Support of its Motion for Summary Judgment and Opposition to the EEOC's Cross-Motion for Summary Judgment to be electronically filed through the Court's CM/ECF system, which will send a notice of filing to all registered users.

Dated:  February 17, 2023        Respectfully submitted,

       /s/ *Jason C. Schwartz*
       Jason C. Schwartz, D.C. Bar No. 465837
       GIBSON, DUNN & CRUTCHER LLP
       1050 Connecticut Avenue, N.W.
       Washington, D.C.  20036
       jschwartz@gibsondunn.com